**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| NASHAILY ORTIZ, ISAURA LOPEZ, RUBEN LEMUS NAJARRO, NASHEMIR ORTIZ, and ADRIANNA GAMBOA, on behalf of themselves and others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> CONSOLIDATED EDISON COMPANY OF NEW YORK, INC., CE SOLUTIONS GROUP, LLC, CE SOLUTIONS INC., CE FLAGGING PLUS CORP., CE RESERVE CORP., FLAGGING SPOTTING FLIPPING SERVICES INC., ARGANI INC., NYC 2WAY INTERNATIONAL LTD. d/b/a CTG CARS LLC, CONCORD LIMOUSINE INC., CONCORD LIMOUSINE 1, LLC, JEANNINE NAPOLEONE-COLBERT, in her individual and professional capacities, HASSAN SABLINI, in his individual and professional capacities, EDWARD SLININ, in his individual and professional capacities, DORA SLININ, in her individual and professional capacities, GARY SAMUEL, in his individual and professional capacities, and ALEXANDER GAVRILOV, in his individual and professional capacities, <br><br> Defendants. | Case No.: 1:22-cv-08957 <br><br> **COLLECTIVE AND CLASS ACTION COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

Plaintiffs Nashaily Ortiz ("Nashaily"), Isaura Lopez ("Lopez"), Ruben Lemus Najarro ("Najarro"), Nashemir Ortiz ("Nashemir"), and Adrianna Gamboa ("Gamboa"), (together, "Plaintiffs"), by and through their undersigned counsel, Faruqi & Faruqi, LLP, and on behalf of themselves and others similarly situated, hereby allege as follows against Defendants Consolidated Edison Company of New York, Inc. ("Con Edison"), CE Solutions Group, LLC ("CESG"), CE Solutions Inc. ("CES"), CE Flagging Plus Corp. ("CEFP"), CE Reserve Corp. ("CER"), Flagging Spotting Flipping Services Inc. ("FSFS"), Argani Inc. ("Argani"), NYC 2Way International Ltd.

1

d/b/a CTG Cars LLC ("2Way"), Concord Limousine Inc., Concord Limousine 1, LLC (together, "Concord") (CESG, CES, CEFP, CER, FSFS, Argani, 2Way, and Concord, are hereinafter referred to collectively as "CE Solutions" or the "Companies"), Jeannine Napoleone-Colbert ("Napoleone-Colbert"), Hassan Sablini ("Sablini"), Edward Slinin ("Edward"), Dora Slinin ("Dora"), Gary Samuel ("Samuel"), and Alexander Gavrilov ("Gavrilov") (together, "Defendants"):

## NATURE OF THE CLAIMS

1.      Defendants jointly own and operate CE Solutions, a traffic control services company in Brooklyn, New York that provides Con Edison with Flaggers and Spotters (defined *infra* ¶¶ 138-39) to ensure safety in jobsites on or near roadways.

2.      Defendants' status as joint employers is evident from the myriad ways in which they coordinate with one another to direct and control all aspects of Plaintiffs' and similarly situated employees' employment.

3.      Defendants engage in a common, willful, and deliberate policy and practice of failing to pay Plaintiffs and other similarly situated employees overtime wages, instead paying them at a straight-time rate for all hours worked.

4.      Defendants also engage in a common, willful, and deliberate policy and practice of failing to pay Plaintiffs and other similarly situated employees for all hours worked.

5.      Defendants also engage in a common, willful, and deliberate policy and practice of failing to pay Spotters minimum wages.

6.      Moreover, Defendants engage in a common, willful, and deliberate policy and practice of failing to pay Employees at the proper prevailing wage rates and supplemental benefits owed for work performed on public streets, roadways, and sidewalks throughout New York City and Westchester County.

7.     Further, Defendants require Plaintiffs to drive their personal vehicles between jobsites and incur expenses associated with gas, mileage, tolls, and vehicle maintenance; however, Defendants fail to reimburse Plaintiffs for the same.

8.     Additionally, Defendants routinely fail to pay Plaintiffs and similarly situated employees on or before their regularly scheduled pay days.

9.     Finally, Defendants have failed to furnish Plaintiffs and similarly situated employees with Notices of Pay Rate or wage statements (let alone accurate ones), as required by law.

10.     To redress these wrongs, Plaintiffs bring claims against Defendants under the Fair Labor Standards Act ("FLSA") as a collective action, pursuant to 29 U.S.C. § 216(b) and applicable regulations thereunder, on behalf of themselves and all other similarly situated persons employed by Defendants at any time during the full statute of limitations period.

11.     Plaintiffs also bring claims under the New York Labor Law ("NYLL") as a class action, pursuant to Federal Rule of Civil Procedure ("FRCP") 23, on behalf of themselves and all other similarly situated persons employed by Defendants at any time during the full statute of limitations period.

12.     Further, Plaintiffs bring claims in the alternative under the Freelance Isn't Free Act, N.Y.C. Admin. Code §§ 20-927, *et seq.* ("FIFA") as a class action, pursuant to FRCP 23, on behalf of themselves and all other similarly situated persons who worked for Defendants at any time during the full statute of limitations period.

## JURISDICTION AND VENUE

13.      Pursuant to 28 U.S.C. §§ 1331 and 1343, the Court has subject matter jurisdiction over this action because it involves federal questions regarding the deprivation of Plaintiffs' rights under the FLSA.

14.      The Court also has supplemental jurisdiction over Plaintiffs' related claims arising under State and local law pursuant to 28 U.S.C. § 1367.

15.      Venue is proper under 28 U.S.C. § 1391 because Defendants' principal place of business is located in this District and a substantial portion of the events or omissions giving rise to this action occurred in this District.

## PARTIES

A.      **Plaintiff Nashaily Ortiz**

16.      Nashaily is a resident of Bronx, New York and was employed by Defendants from in or around June 2020 through the present.

17.      At all relevant times, Nashaily was an "employee" of Defendants within the meaning of all applicable statutes and regulations.

B.      **Plaintiff Isaura Lopez**

18.      Lopez is a resident of Spring Valley, New York and was employed by Defendants from in or around August 2020 through in or around February 2022.

19.      At all relevant times, Lopez was an "employee" of Defendants within the meaning of all applicable statutes and regulations.

C.      **Plaintiff Ruben Lemus Najarro**

20.      Najarro is a resident of Spring Valley, New York and was employed by Defendants from in or around March 2021 through in or around April 2022.

21.     At all relevant times, Najarro was an "employee" of Defendants within the meaning of all applicable statutes and regulations.

**D.**     **Plaintiff Nashemir Ortiz**

22.     Nashemir is a resident of Bronx, New York and was employed by Defendants from in or around June 2019 through in or around April 2022.

23.     At all relevant times, Nashemir was an "employee" of Defendants within the meaning of all applicable statutes and regulations.

**E.**     **Plaintiff Adrianna Gamboa**

24.     Gamboa is a resident of Bronx, New York and was employed by Defendants from in or around July 2020 through in or around April 2022.

25.     At all relevant times, Gamboa was an "employee" of Defendants within the meaning of all applicable statutes and regulations.

**F.**     **Defendant Consolidated Edison Company of New York, Inc.**

26.     Con Edison is a domestic corporation with its principal place of business located at 4 Irving Place, New York, New York 10003.

27.     At all relevant times, Con Edison controlled and directed the terms of employment and compensation of Plaintiffs and all others similarly situated.

28.     At all relevant times, Con Edison established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all others similarly situated, including, *inter alia*, scheduling, work allocation, task supervision, monitoring work product, payroll, and other employment practices applicable to Plaintiffs and all others similarly situated.

29.     At all relevant times, Con Edison maintained and exercised its power to hire, fire, promote, and discipline Plaintiffs and all others similarly situated.

30.     At all relevant times, Con Edison was an "employer" within the meaning of all applicable statutes and regulations.

31.     At all relevant times, Con Edison engaged in interstate commerce, as it works on interstate highways and roadways linked to the same, and uses equipment and material produced outside of New York or moved in interstate commerce.

32.     At all relevant times, Con Edison has had gross annual revenues in excess of $500,000.00.

**G.     Defendant CE Solutions Group, LLC**

33.     CESG is a domestic corporation with its principal place of business located at 259 Columbia Street, Brooklyn, New York 11231.

34.     At all relevant times, CESG controlled and directed the terms of employment and compensation of Plaintiffs and all others similarly situated.

35.     At all relevant times, CESG established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all others similarly situated, including, *inter alia*, scheduling, work allocation, task supervision, monitoring work product, payroll, and other employment practices applicable to Plaintiffs and all others similarly situated.

36.     At all relevant times, CESG maintained and exercised its power to hire, fire, promote, and discipline Plaintiffs and all others similarly situated.

37.     At all relevant times, CESG was an "employer" within the meaning of all applicable statutes and regulations.

38.     At all relevant times, CESG engaged in interstate commerce, as it works on interstate highways and roadways linked to the same, and uses equipment and material produced outside of New York or moved in interstate commerce.

39.     Upon information and belief, at all relevant times, CESG has had gross annual revenues in excess of $500,000.00.

**H.    <u>Defendant CE Solutions, Inc.</u>**

40.     CES is a domestic corporation with its principal place of business located at 259 Columbia Street, Brooklyn, New York 11231.

41.     At all relevant times, CES controlled and directed the terms of employment and compensation of Plaintiffs and all others similarly situated.

42.     At all relevant times, CES established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all others similarly situated, including, *inter alia*, scheduling, work allocation, task supervision, monitoring work product, payroll, and other employment practices applicable to Plaintiffs and all others similarly situated.

43.     At all relevant times, CES maintained and exercised its power to hire, fire, promote, and discipline Plaintiffs and all others similarly situated.

44.     At all relevant times, CES was an "employer" within the meaning of all applicable statutes and regulations.

45.     At all relevant times, CES engaged in interstate commerce, as it works on interstate highways and roadways linked to the same, and uses equipment and material produced outside of New York or moved in interstate commerce.

46.     Upon information and belief, at all relevant times, CES has had gross annual revenues in excess of $500,000.00.

**I.    <u>Defendant CE Flagging Plus Corp.</u>**

47.     CEFP is a domestic corporation with its principal place of business located at 30 Jake Court, Staten Island, New York 10304.

48.     At all relevant times, CEFP controlled and directed the terms of employment and compensation of Plaintiffs and all others similarly situated.

49.     At all relevant times, CEFP established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all others similarly situated, including, *inter alia*, scheduling, work allocation, task supervision, monitoring work product, payroll, and other employment practices applicable to Plaintiffs and all others similarly situated.

50.     At all relevant times, CEFP maintained and exercised its power to hire, fire, promote, and discipline Plaintiffs and all others similarly situated.

51.     At all relevant times, CEFP was an "employer" within the meaning of all applicable statutes and regulations.

52.     At all relevant times, CEFP engaged in interstate commerce, as it works on interstate highways and roadways linked to the same, and uses equipment and material produced outside of New York or moved in interstate commerce.

53.     Upon information and belief, at all relevant times, CEFP has had gross annual revenues in excess of $500,000.00.

**J.     Defendant CE Reserve Corp.**

54.     CER is a domestic corporation with its principal place of business located at 3007 43rd Street, Astoria, New York 11103.

55.     At all relevant times, CER controlled and directed the terms of employment and compensation of Plaintiffs and all others similarly situated.

56.     At all relevant times, CER established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all others similarly situated, including, *inter*

*alia*, scheduling, work allocation, task supervision, monitoring work product, payroll, and other employment practices applicable to Plaintiffs and all others similarly situated.

57.     At all relevant times, CER maintained and exercised its power to hire, fire, promote, and discipline Plaintiffs and all others similarly situated.

58.     At all relevant times, CER was an "employer" within the meaning of all applicable statutes and regulations.

59.     At all relevant times, CER engaged in interstate commerce, as it works on interstate highways and roadways linked to the same, and uses equipment and material produced outside of New York or moved in interstate commerce.

60.     Upon information and belief, at all relevant times, CER has had gross annual revenues in excess of $500,000.00.

**K.     Defendant Flagging Spotting Flipping Services, Inc.**

61.     FSFS is a domestic corporation with its principal place of business located at 179-24 137th Avenue, Jamaica, New York 11343.

62.     At all relevant times, FSFS controlled and directed the terms of employment and compensation of Plaintiffs and all others similarly situated.

63.     At all relevant times, FSFS established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all others similarly situated, including, *inter alia*, scheduling, work allocation, task supervision, monitoring work product, payroll, and other employment practices applicable to Plaintiffs and all others similarly situated.

64.     At all relevant times, FSFS maintained and exercised its power to hire, fire, promote, and discipline Plaintiffs and all others similarly situated.

65.     At all relevant times, FSFS was an "employer" within the meaning of all applicable statutes and regulations.

66.     At all relevant times, FSFS engaged in interstate commerce, as it works on interstate highways and roadways linked to the same, and uses equipment and material produced outside of New York or moved in interstate commerce.

67.     Upon information and belief, at all relevant times, FSFS has had gross annual revenues in excess of $500,000.00.

**L.     Defendant Argani, Inc.**

68.     Argani is a domestic corporation with its principal place of business located at 30 Jake Court, Staten Island, New York 10304.

69.     At all relevant times, Argani controlled and directed the terms of employment and compensation of Plaintiffs and all others similarly situated.

70.     At all relevant times, Argani established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all others similarly situated, including, *inter alia*, scheduling, work allocation, task supervision, monitoring work product, payroll, and other employment practices applicable to Plaintiffs and all others similarly situated.

71.     At all relevant times, Argani maintained and exercised its power to hire, fire, promote, and discipline Plaintiffs and all others similarly situated.

72.     At all relevant times, Argani was an "employer" within the meaning of all applicable statutes and regulations.

73.     At all relevant times, Argani engaged in interstate commerce, as it works on interstate highways and roadways linked to the same, and uses equipment and material produced outside of New York or moved in interstate commerce.

74. Upon information and belief, at all relevant times, Argani has had gross annual revenues in excess of $500,000.00.

**M.** **Defendant NYC 2Way International Ltd. d/b/a CTG Cars LLC**

75. 2Way is a domestic corporation with its principal place of business located at 335 Bond Street, Brooklyn, New York 11231.

76. At all relevant times, 2Way controlled and directed the terms of employment and compensation of Plaintiffs and all others similarly situated.

77. At all relevant times, 2Way established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all others similarly situated, including, *inter alia*, scheduling, work allocation, task supervision, monitoring work product, payroll, and other employment practices applicable to Plaintiffs and all others similarly situated.

78. At all relevant times, 2Way maintained and exercised its power to hire, fire, promote, and discipline Plaintiffs and all others similarly situated.

79. At all relevant times, 2Way was an "employer" within the meaning of all applicable statutes and regulations.

80. At all relevant times, 2Way engaged in interstate commerce, as it works on interstate highways and roadways linked to the same, and uses equipment and material produced outside of New York or moved in interstate commerce.

81. Upon information and belief, at all relevant times, 2Way has had gross annual revenues in excess of $500,000.00.

**N.** **Defendant Concord Limousine Inc.**

82. Concord is a domestic corporation with its principal place of business located at 712 Third Avenue, Brooklyn, New York 11232.

83.     At all relevant times, Concord controlled and directed the terms of employment and compensation of Plaintiffs and all others similarly situated.

84.     At all relevant times, Concord established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all others similarly situated, including, *inter alia*, scheduling, work allocation, task supervision, monitoring work product, payroll, and other employment practices applicable to Plaintiffs and all others similarly situated.

85.     At all relevant times, Concord maintained and exercised its power to hire, fire, promote, and discipline Plaintiffs and all others similarly situated.

86.     At all relevant times, Concord was an "employer" within the meaning of all applicable statutes and regulations.

87.     At all relevant times, Concord engaged in interstate commerce as it works on interstate highways and roadways linked to the same, and uses equipment and material produced outside of New York or moved in interstate commerce.

88.     Upon information and belief, at all relevant times, Concord has had gross annual revenues in excess of $500,000.00.

**O.     Defendant Concord Limousine 1, LLC**

89.     Concord is a domestic limited liability company with its principal place of business located at 712 Third Avenue, Brooklyn, New York 11232.

90.     At all relevant times, Concord controlled and directed the terms of employment and compensation of Plaintiffs and all others similarly situated.

91.     At all relevant times, Concord established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all others similarly situated,

including, *inter alia*, scheduling, work allocation, task supervision, monitoring work product, payroll, and other employment practices applicable to Plaintiffs and all others similarly situated.

92.     At all relevant times, Concord maintained and exercised its power to hire, fire, promote, and discipline Plaintiffs and all others similarly situated.

93.     At all relevant times, Concord was an "employer" within the meaning of all applicable statutes and regulations.

94.     At all relevant times, Concord engaged in interstate commerce as it works on interstate highways and roadways linked to the same, and uses equipment and material produced outside of New York or moved in interstate commerce.

95.     Upon information and belief, at all relevant times, Concord has had gross annual revenues in excess of $500,000.00.

**P.     Defendant Jeannine Napoleone-Colbert**

96.     Napoleone-Colbert is, upon information and belief, a resident of Brooklyn, New York.

97.     Napoleone-Colbert manages and operates CE Solutions.

98.     At all relevant times, Napoleone-Colbert controlled and directed the terms of employment and compensation of Plaintiffs and all others similarly situated.

99.     At all relevant times, Napoleone-Colbert maintained control, oversight, and direction of Plaintiffs and all others similarly situated, including, *inter alia*, scheduling, work allocation, task supervision, monitoring work, payroll, and other employment practices applicable to Plaintiffs and all others similarly situated.

100.     At all relevant times, Napoleone-Colbert maintained and exercised her power to hire, fire, promote, and discipline Plaintiffs and all others similarly situated.

101.    At all relevant times, Napoleone-Colbert was an "employer" of Plaintiffs and all others similarly situated within the meaning of all applicable statutes and regulations.

**Q.    Defendant Hassan Sablini**

102.    Sablini is, upon information and belief, a resident of Queens, New York.

103.    Sablini owns and operates CE Solutions.

104.    At all relevant times, Sablini controlled and directed the terms of employment and compensation of Plaintiffs and all others similarly situated.

105.    At all relevant times, Sablini maintained control, oversight, and direction of Plaintiffs and all others similarly situated, including, *inter alia*, scheduling, work allocation, task supervision, monitoring work, payroll, and other employment practices applicable to Plaintiffs and all others similarly situated.

106.    At all relevant times, Sablini maintained and exercised his power to hire, fire, promote, and discipline Plaintiffs and all others similarly situated.

107.    At all relevant times, Sablini was an "employer" of Plaintiffs and all others similarly situated within the meaning of all applicable statutes and regulations.

**R.    Defendant Edward Slinin**

108.    Edward is, upon information and belief, a resident of the State of New York.

109.    Edward owns and operates CE Solutions.

110.    At all relevant times, Edward controlled and directed the terms of employment and compensation of Plaintiffs and all others similarly situated.

111.    At all relevant times, Edward maintained control, oversight, and direction of Plaintiffs and all others similarly situated, including, *inter alia*, scheduling, work allocation, task

supervision, monitoring work, payroll, and other employment practices applicable to Plaintiffs and all others similarly situated.

112.    At all relevant times, Edward maintained and exercised his power to hire, fire, promote, and discipline Plaintiffs and all others similarly situated.

113.    At all relevant times, Edward was an "employer" of Plaintiffs and all others similarly situated within the meaning of all applicable statutes and regulations.

**S.**    **Defendant Dora Slinin**

114.    Dora is, upon information and belief, a resident of the State of New York.

115.    Dora owns and operates CE Solutions.

116.    At all relevant times, Dora controlled and directed the terms of employment and compensation of Plaintiffs and all others similarly situated.

117.    At all relevant times, Dora maintained control, oversight, and direction of Plaintiffs and all others similarly situated, including, *inter alia*, scheduling, work allocation, task supervision, monitoring work, payroll, and other employment practices applicable to Plaintiffs and all others similarly situated.

118.    At all relevant times, Dora maintained and exercised her power to hire, fire, promote, and discipline Plaintiffs and all others similarly situated.

119.    At all relevant times, Dora was an "employer" of Plaintiffs and all others similarly situated within the meaning of all applicable statutes and regulations.

**T.**    **Defendant Gary Samuel**

120.    Samuel is, upon information and belief, a resident of Bronx, New York.

121.    Samuel owns and operates FSFS.

122.     At all relevant times, Samuel controlled and directed the terms of employment and compensation of Plaintiffs and all others similarly situated.

123.     At all relevant times, Samuel maintained control, oversight, and direction of Plaintiffs and all others similarly situated, including, *inter alia*, scheduling, work allocation, task supervision, monitoring work, payroll, and other employment practices applicable to Plaintiffs and all others similarly situated.

124.     At all relevant times, Samuel maintained and exercised his power to hire, fire, promote, and discipline Plaintiffs and all others similarly situated.

125.     At all relevant times, Samuel was an "employer" of Plaintiffs and all others similarly situated within the meaning of all applicable statutes and regulations.

**U.     Defendant Alexander Gavrilov**

126.     Gavrilov is, upon information and belief, a resident of Queens, New York.

127.     Gavrilov owns and operates Concord.

128.     At all relevant times, Gavrilov controlled and directed the terms of employment and compensation of Plaintiffs and all others similarly situated.

129.     At all relevant times, Gavrilov maintained control, oversight, and direction of Plaintiffs and all others similarly situated, including, *inter alia*, scheduling, work allocation, task supervision, monitoring work, payroll, and other employment practices applicable to Plaintiffs and all others similarly situated.

130.     At all relevant times, Gavrilov maintained and exercised his power to hire, fire, promote, and discipline Plaintiffs and all others similarly situated.

131.     At all relevant times, Gavrilov was an "employer" of Plaintiffs and all others similarly situated within the meaning of all applicable statutes and regulations.

## FACTS

### A.    Background

132.    Defendants own and jointly operate CE Solutions, a collection of companies comprising CESG, CES, CEFP, CER, FSFS, Argani, 2Way, and Concord.

133.    CE Solutions is located in New York City and provides a variety of traffic control services for Con Edison in the New York area.

134.    CE Solutions specializes in providing personnel and traffic equipment at jobsites operated by Con Edison on or near roadways (including interstate roadways) throughout the five boroughs of New York City and Westchester County.

135.    Upon information and belief, Con Edison and CE Solutions have entered into an agreement pursuant to which CE Solutions provides personnel to provide spotting and flagging services at Con Edison jobsites.

136.    Plaintiffs and other employees of Defendants who comprise the FLSA Collective (defined *infra* ¶ 427) hold various titles, including, *inter alia*, Flaggers and Spotters (together, "Employees").

137.    All allegations regarding Plaintiffs' and Employees' work, pay, and the control exerted over them by Defendants, apply equally to both Plaintiffs and the Employees who Plaintiffs seek to represent.

138.    Flaggers' job duties include, *inter alia*, redirecting traffic away from and cordoning off access to jobsites operated by Con Edison.

139.    Spotters' job duties include, *inter alia*, parking at jobsites operated by Con Edison to ensure Con Edison trucks can access the same and reserving parking spaces for vehicles operated by Con Edison.

140.     Defendants require every Employee to take an online flagging course and provide proof that they completed the same prior to the given Employee's hire.

141.     Upon hiring Employees, Defendants direct them, *inter alia*, to purchase steel-toed boots, safety vests, safety helmets, safety flags, and portable stop signs to work at Con Edison jobsites.

142.     Defendants require Employees to stay at jobsites operated by Con Edison for indefinite periods of time and at fixed locations.

143.     The date, time, duration, and location of Employees' shifts are determined exclusively by Defendants.

144.     Indeed, depending on the location and duration of the work to be performed at a particular jobsite, Con Edison notifies CE Solutions of the number of Employees Con Edison requires, where it requires them to work, and the date, time, and duration of the work.

145.     Defendants employ approximately 200 to 300 Employees at any given time.

146.     Defendants typically schedule Employees to work various shifts from Monday through Sunday, ranging anywhere from 4 to 24 hours.

147.     In total, Employees typically work five to seven days per week, for a total of anywhere from 20 to 100 hours each week, with some Employees working as many as 168 hours in a given week.

148.     Indeed, Defendants sometimes task Spotters with reserving parking space for Con Edison trucks for an entire week, resulting in Spotters working approximately seven 24-hour shifts for a total of 168 hours in a given week.

149.     Employees' pay periods span one week, spanning from Monday through Sunday.

150.    Until recently, Defendants established the Thursday following each one-week pay period as Employees' regularly scheduled pay day.

151.    As of the beginning of September 2022, Defendants have now established the Friday following each one-week pay period as Employees' regularly scheduled pay day.

**B.    Joint Employment and Control over Employees' Work**

**i.    Direction and Control over Shift Schedules**

152.    Defendants jointly employ all Employees, and work in concert to control all aspects of Employees' employment.

153.    Defendants maintain direction and control over Employees' shifts.

154.    Defendants assign Employees shifts at jobsites in one of several ways.

155.    First, CE Solutions, on behalf of all Defendants, calls Employees in the evening and assigns them shifts at jobsites the following day.

156.    In the event an Employee does not get assigned a shift, CE Solutions, on behalf of all Defendants, instructs Employees to call a hotline maintained and operated by Defendants to be placed in line for shifts as they become available.

157.    When Employees call the hotline, CE Solutions, on behalf of all Defendants, instructs Employees to provide their CE Solutions-issued identification number.

158.    When a shift becomes available, CE Solutions, on behalf of all Defendants, then notifies Employees of the location and the time at which they are to report.

159.    In the event Employees fail to call the hotline and Defendants fail to contact them, Employees are directed to call CE Solutions later in the day to inquire as to whether any afternoon or evening shifts are available.

160.    If Defendants require multiple days to complete work at a jobsite, Con Edison may request an Employee who previously worked at that jobsite to continue to work there on subsequent days.

161.    Additionally, if Employees need to call out from work or plan to take vacation, Defendants require them to get approval from one of CE Solutions's managers.

162.    Beginning in or around February 2021, Defendants have also utilized a proprietary smartphone application (the "Smartphone App") they developed to allow Employees to check for available shifts.

163.    Since in or around March 2022, Defendants began utilizing the Smartphone App exclusively to check for available shifts and track Employees' locations.

164.    Indeed, the Smartphone App allows Defendants to determine if and when an Employee has arrived at a jobsite and logs, *inter alia*, the location of a jobsite, the length of the shift worked, and the name of the Con Edison supervisor working at the jobsite.

**ii.    Direction and Control over the Manner of Employees' Work**

165.    Defendants also maintain direction, control, and supervision of the work performed by Employees.

166.    For example, upon arrival at a jobsite, CE Solutions instructs Employees to report to a Con Edison supervisor (who is also physically present on the jobsite), who then tasks the Employee with assignments and directs the Employee's work, including, *inter alia*, where to stand to direct traffic.

167.    CE Solutions also assigns its own supervisors to perform regular rounds of jobsites to monitor Employees' work.

168.    Defendants direct Employees to get permission from a Con Edison or CE Solutions supervisor to take breaks during their shifts.

169.    For example, if an Employee needs to use a restroom or take lunch, they must get permission from Defendants before doing so.

170.    However, Defendants direct Employees to remain at the jobsite before taking a break until one of CE Solutions's supervisors approves the break, either verbally or by directing another Employee to take over their work.

171.    In the event one of CE Solutions's supervisors is unable to approve the break, the Employee is prohibited from leaving the jobsite and will be forced to relieve themselves on the side of a roadway and/or skip their lunch break altogether.

172.    The fact that CE Solutions and Con Edison representatives are both on the jobsites, monitoring and directing Employees regarding myriad aspects of their work speaks to the inextricably interconnected manner in which Defendants jointly control Employees.

173.    Additionally, CE Solutions issues Employees individually numbered timesheets marked "CE Solutions Group" with CESG's address and phone number.  *See* Exhibit A.

174.    Concord issues Employees similar timesheets marked "Con Ed Reserve Parking Site Location Sign Off Sheet" with Concord's address and number phone number.  *See* Exhibit B.

175.    The timesheets are titled "Con Edison Flagging / Parking Location Timesheet" and contain instructions to Employees to "take a clear photo of this timesheet and send it to close@nyc2way.com at the completion of your job."  *See id*.

176.    Employees are required to sign the timesheet upon arrival at the jobsite and at the conclusion of their shifts.

177.    An Employee's shift does not conclude until a Con Edison supervisor notifies them that the shift has ended.

178.    CE Solutions also directs Employees to present the timesheet to a Con Edison supervisor for their signature to certify the number of hours the Employee worked that shift.  *Id.*

179.    After obtaining Con Edison's approval, Employees then take a photograph of the timesheet and send it to close@nyc2way.com in accordance with the instructions CE Solutions gives Employees on the timesheets.

180.    In the alternative, Sablini directs Employees to send photographs of their timesheets to him directly.  *See* Exhibit C.

181.    Con Edison will further confirm the number of hours an Employee has worked during a shift by notifying CE Solutions that an Employee's shift has ended.

182.    At the end of each pay period, and before Employees are paid, CE Solutions and Con Edison then verify the number of hours Employees work by comparing separate time reports maintained by each.

183.    The time reports contain, *inter alia*, the Employee's name, the Employee's CE Solutions-issued identification number, and the number of hours the Employee worked that week.

**iii.    Discipline of Employees**

184.    Defendants also have the power to fire and discipline Employees for breaching Defendants' internal policies and standards.

185.    For example, if an Employee arrives late to a shift, leaves a jobsite without permission, or is not dressed properly, a Con Edison supervisor will notify CE Solutions of the infraction and direct CE Solutions regarding the appropriate discipline.

186.     In the event of such a policy violation, Defendants discipline the Employee by, *inter alia*: (i) removing the Employee from the shift; (ii) suspending the Employee for a given period; or (iii) terminating the Employee's employment.

187.     Similarly, if an Employee calls out after having been assigned a shift, Defendants typically suspend the Employee.

188.     Con Edison supervisors can also mandate that specific Employees work or not work a shift based on a Con Edison supervisor's prior dealings with the Employee.

189.     Even if Spotters work a 24-hour shift, they may be disciplined if they leave the jobsite absent permission from Defendants and a replacement by a CE Solutions supervisor or another Employee.

### iv.     Control over Employees' Wages

190.     Defendants also direct and control the manner in which Employees are paid.

191.     Defendants establish hourly rates based on whether an Employee is a Flagger or a Spotter.

192.     For example, Defendants set an hourly rate of $15.00 per hour for Flaggers and an hourly rate of anywhere from $10.00 to $12.00 per hour for Spotters.

193.     Defendants also direct and control the employment status of Employees.

194.     Specifically, Defendants misclassify Employees as independent contractors for shifts performed at Con Edison jobsites.

195.     To conceal this misclassification, Defendants improperly pay Employees on an IRS Form 1099, as opposed to an IRS Form W-2.

### v.      Additional Indicia of Control and Employee Status

196.      Employees' relationships with Defendants are permanent insofar as they typically work exclusively for Defendants over extended periods of time.

197.      Defendants maintain all employment, personnel, and business records for Employees.

198.      Defendants determine Employees' rate and method of payment and hours worked.

199.      Defendants maintain control and oversight over the quality of Employees' work.

200.      Employees do not have the power to, and do not actually, hire or fire anyone.

201.      Employees have no ability to set schedules or compensation for any of Defendants' employees.

202.      Employees have no role in budget planning or monitoring, and similarly have no role in implementing legal compliance measures.

203.      Indeed, all such matters are handled by Defendants.

204.      Employees have no opportunity for profit or loss, as they are paid the same hourly wage irrespective of the income generated by their work or Defendants' overall profits.

205.      Employees perform routine tasks that require little training.

206.      Employees exercise little to no initiative, judgment, or foresight in open market competition with others to ensure their success, as they typically work exclusively for Defendants and for a fixed hourly wage.

207.      For example, Employees do not independently advertise or market their services.

208.      On a similar note, Plaintiffs do not operate their own businesses independently of Defendants.

**C.**     **Failure to Reimburse for Work-Related Expenses**

209.     Defendants require Employees to use their personal vehicles to drive between jobsites.

210.     While driving between jobsites, Employees incur expenses for gas, mileage, tolls, and vehicle maintenance—none of which Defendants reimburse.

211.     Employees' personal vehicles are considered tools of the trade because Defendants require Employees to travel in between jobsites as part of their employment and for the performance of Employees' work.

212.     Further, the expenses associated with gas, mileage, tolls, and vehicle maintenance incurred bring Flaggers' wage rates below the applicable State minimum wage (and certainly well below the applicable prevailing wage rates).

213.     Spotters, who are paid only $10.00 to $12.00 per hour, are already paid below the applicable State minimum wage (and certainly well below the applicable prevailing wage rates), but the expenses they incur bring their wages even further below that threshold.

214.     In lieu of calculating their actual expenses, reimbursement for expenses related to an Employee's use of their personal vehicles in the performance of their work can be calculated using the Internal Revenue Service's ("IRS") standard mileage rate set by the U.S. Internal Revenue Service ("IRS") each year.  *See, e.g.*, https://www.irs.gov/pub/irs-pdf/p463.pdf (2021 milage rates) (last visited October 20, 2022).

215.     Pursuant to the IRS's standard mileage rates in 2019, 2020, 2021, and 2022, Employees who used their personal vehicles to travel between jobsites as required by Defendants, should have been paid $0.58, $.0575, $0.56, and $0.585 per mile, respectively.

**D.**     **Failure to Pay Prevailing Wages and Supplemental Benefits for Work Performed on New York City and New York State Public Streets, Roadways, and Sidewalks**

216.    Defendants engage in a common pattern and practice of deliberately denying Employees compensation for prevailing wage work at applicable prevailing wage rates.

217.    Upon information and belief, CE Solutions has entered into contracts with Con Edison (the "Contracts"), as either a subcontractor or a prime contractor to provide flagging and spotting services on New York City and New York State public streets, roadways, and sidewalks.

218.    Upon information and belief, pursuant to the Contracts, Defendants are required to pay Employees at the local prevailing wage rates, including supplemental benefits and overtime premiums for hours worked in excess of 40 hours per week, eight hours per day, hours worked on Saturdays and Sundays, and hours worked during the evening.

219.    Specifically, the "labor" provision of the Con Edison Standard Terms and Conditions for Construction Contracts provides, in relevant part:

> Where Contractor employs workers on sites where a permit to use or open a street (including excavating the street) is required and New York City Administrative Code Section 19-142, or its successor (or a similar law, regulation, or code pertaining to sites located outside of New York City ("Similar Local Law")) is applicable, Contractor agrees that pursuant to and in furtherance of the requirements of New York City Administrative Code Section 19-142, or its successor, (or the requirements of the Similar Local Law) and the terms and conditions of the permit: none but competent workers, skilled in the work required of them, shall be employed thereon; the prevailing scale of union wages shall be the prevailing wage for similar titles as established by the Comptroller of the City of New York pursuant to Section 220 of the New York State Labor Law (or as established by such other fiscal officer, as specified in Section 220 of the New York State Labor Law, for workers on permitted sites located outside of New York City to which a Similar Local Law applies), paid to those so employed, and Contractor shall pay that prevailing wage to workers so employed.

*See* Exhibit D at 15-16.

220.   Upon information and belief, the labor provision requiring the payment of prevailing wages (as excerpted above) is incorporated into each of the Contracts.

221.   Further, the work Employees perform is predominantly physical in nature, and exposes Employees to attendant risks shared by other construction workers due to the presence of construction, construction equipment, and public traffic and was performed in close proximity to construction sites, thereby entitling them to prevailing wages.

222.   Further upon information and belief, each jobsite that involves street openings and/or excavation work for Con Edison, requires a Street Opening Permit (the "Permit") issued by the New York City Department of Transportation. *See* Exhibit E.

223.    The Permit includes specific stipulations as to the work being performed, including, *inter alia*, wages to be paid to "workers on excavations." *Id.* at 3.

224.   Specifically, the Permit states, in relevant part:

> NYC ADMINISTRATIVE CODE, 19-142, WORKERS ON EXCAVATIONS: A PERSON TO WHOM A PERMIT MAY BE ISSUED, TO USE OR OPEN A STREET, SHALL BE REQUIRED, BEFORE SUCH PERMIT MAY BE ISSUED, TO AGREE THAT NONE BUT COMPETENT WORKERS, SKILLED IN THE WORK REQUIRED OF THEM, SHALL BE EMPLOYED THEREON, AND THAT THE PREVAILING SCALE OF UNION WAGES SHALL BE THE PREVAILING WAGE FOR SIMILAR TITLES AS ESTABLISHED BY THE FISCAL OFFICER PURSUANT TO SEC. TWO HUNDRED TWENTY OF THE LABOR LAW, PAID TO THOSE SO EMPLOYED.

*Id.*

225.   A schedule containing the prevailing wage rates and supplemental benefits Employees are to be paid was or should have been annexed to the Contracts.

226.   Even if not annexed to the Contracts, the aforementioned schedules are considered expressly or impliedly incorporated into the Contracts as a matter of law and/or public policy.

27

227.    The promise to pay prevailing wage rates and supplemental benefits in the Contracts was made for the benefit of the Employees working on New York City and New York State public roadways and sidewalks.

228.    As such, Employees are the beneficiaries of the Contracts entered into by Defendants.

229.    Therefore, Employees who provide flagging and spotting services on New York City and New York State public streets, roadways, and sidewalks are intended third-party beneficiaries of the Contracts.

230.    Upon information and belief, pursuant to the Contracts, CE Solutions is paid to provide flagging and spotting services at jobsites, for which Employees must be paid at the applicable prevailing wage rates.

231.    Throughout the relevant time period, Employees have performed flagging and spotting work on Con Edison jobsites only.

232.    In addition to their work in New York City, Employees perform work on public roadways and sidewalks located in Westchester County.

233.    Upon information and belief, CE Solutions have also entered into analogous contracts with Con Edison, as either a subcontractor or a prime contractor, to provide flagging and spotting services on public streets, roadways, and sidewalks located in Westchester (the "Westchester Contracts").

234.    Upon information and belief, the public streets, roadways, and sidewalks located in Westchester on which Employees work under the Westchester Contracts also require permits that entitle Employees to be paid the proper prevailing wage rates.

235.    For example, Employees routinely work on public streets, roadways, and sidewalks located in New Rochelle, a city located in Westchester County that requires flaggers and spotters be paid prevailing wage rates and supplemental benefits for work done on public projects located in New Rochelle.

**E.    Failure to Tender Minimum, Overtime, and Spread of Hours Wages and Payment for all Hours Worked**

236.    Defendants engage in a common pattern and practice of deliberately denying Employees minimum and overtime wages owed.

237.    As noted above, this is accomplished through Defendants' unlawful misclassification of Employees as independent contractors.

238.    Defendants systematically deny Plaintiffs and all other Employees wages in several ways.

239.    First, Defendants engage in a pattern and practice of denying Spotters minimum wages by setting their hourly rates at anywhere from $11.00 to $12.00 for all hours worked.

240.    In fact, Defendants often fail to pay Employees any wages at all for a portion of the hours they work each week.

241.    This common, unlawful compensation scheme is carried out by Defendants directly.

242.    Further, Defendants maintain an intentional practice of failing to pay all Employees overtime wages for all hours worked in excess of 40 hours in a workweek.

243.    In other words, Defendants completely deny all Employees, some of whom work as many as 168 hours per week, any overtime compensation at all.

244.    Instead, Defendants pay Employees at a straight-time rate for all hours worked (save for the hours for which they receive no compensation at all).

245.     Lastly, Defendants do not provide Employees with spread of hours pay—*i.e.*, an additional hour of pay at the applicable State minimum wage rate on each day where the length of interval between the beginning and end of an employee's workday exceeds 10 hours—when they work more than 10 hours a day (as is often the case).

**F.     Late Payment of Wages**

246.     Defendants also engage in a common pattern and practice of delaying payment of wages to Plaintiffs and all other Employees beyond their regularly scheduled paydays.

247.     Plaintiffs and all other Employees' pay periods cover a 7-day time frame—Monday through Sunday—with their regularly scheduled pay day being every Thursday until September 2022, and every Friday throughout the relevant time period thereafter.

248.     However, Defendants routinely fail to pay Plaintiffs and all other Employees for days or even weeks after their regularly scheduled pay days.

249.     As a result of Defendants' failure to timely pay Employees, Employees have suffered concrete harm.

250.     Specifically, each pay period, Employees were, *inter alia*: (i) deprived of money to which they had a right, thereby costing them the time value of their money; (ii) deprived of opportunity to invest their money; and/or (iii) otherwise unable to use their wages to pay bills and satisfy other financial obligations.

**G.     Failure to Provide Notices of Pay Rate and Accurate Wage Statements**

251.     The NYLL requires that employers, including Defendants, provide employees, "at the time of hiring, a notice containing the following information: the rate or rates of pay and basis thereof, whether paid by the hour, shift, day, week, salary, piece, commission, or other; allowances, if any, claimed as part of the minimum wage, including tip, meal, or lodging allowances . . . ; the

regular pay day designated by the employer [ ]; the name of the employer; any 'doing business as' names used by the employer; the physical address of the employer's main office or principal place of business, and a mailing address if different; the telephone number of the employer; plus such other information as the commissioner deems material and necessary[,]" which is commonly referred to as a Notice of Pay Rate.

252.    Throughout the statutory period, Defendants have never provided Plaintiffs or any other Employees with Notices of Pay Rate.

253.    The NYLL also requires that employers, including Defendants, issue or provide employees with accurate wage statements with each payment of wages.

254.    Defendants have never furnished Plaintiffs or any of the other Employees with accurate wage statements during the statutory period.

255.    In fact, Defendants engage in a consistent pattern and practice of failing to furnish Plaintiffs and all other Employees with any wage statements at all.

256.    As a result of Defendants' failure to provide Employees with Notice of Pay Rates and accurate wage statements with each payment of wages, Employees have suffered concrete harm.

257.    Specifically, Employees have been prevented from, *inter alia*: (i) realizing their true hours worked; (ii) realizing that they were underpaid; and (iii) taking appropriate action to obtain the payments due to them.

**H.    Plaintiff Nashaily Ortiz**

**i.    Background**

258.    Nashaily worked for Defendants as a Flagger from in or around June 2020 through the present.

31

259.     Upon Nashaily's hire in or around June 2020, Defendants set her regular rate of pay at $15.00 per hour, with her overtime rate being $22.50 per hour.

260.     From in or around June 2020 through the present, Nashaily routinely worked five to seven days per week, for approximately 50 to 90 hours each week.

261.     However, in or around May 2021, Defendants suspended Nashaily for approximately two weeks for leaving a jobsite before her shift had ended.

262.     Specifically, Nashaily left a jobsite after she witnessed the Con Edison truck that had been working on that jobsite leave for the day.

263.     While this ordinarily signaled to Nashaily (and to any other Employee) that her shift had ended, Con Edison failed to notify Nashaily that another Con Edison truck was en route to replace the previous truck.

264.     As such, Con Edison apparently expected her to remain at the jobsite, resulting in her suspension.

**ii.      Wage Violations**

265.     Defendants failed to pay Nashaily for her hours worked in several ways.

266.     Despite routinely working 50 to 90 hours each week, at all relevant times, Defendants never paid Nashaily at her overtime rate as a result of Defendants' improper classification of their Employees as independent contractors.

267.     Indeed, Defendants did not pay Nashaily any overtime for the 10 to 50 hours that she typically worked in excess of 40 each week.

268.     By way of example, from December 6, 2021 through December 12, 2021, Nashaily worked approximately 100 hours.  *See* Exhibit F (sampling of Nashaily's timesheets).

269.    Indeed, she worked six 16-hour shifts and one 4-hour shift for a total of 100 hours during that period.

270.    However, Defendants paid Nashaily only $1,500.00 for the 100 hours worked.

271.    For this week alone, Defendants failed to pay Nashaily an additional $450.00 in overtime wages.[1]

272.    Additionally, given that Nashaily worked 6 shifts of 10 hours or more, Defendants also denied her $90.00 in spread of hours pay.[2]

273.    Throughout the statutory period, Nashaily was paid her wages in pay periods spanning a 7-day timeframe, with her regularly scheduled pay day being every Thursday.

274.    However, Defendants routinely failed to pay Nashaily for her shifts on her regularly scheduled pay day.

275.    For example, from August 29, 2022 through September 4, 2022, Nashaily worked approximately 61 hours.

276.    However, on or around September 8, 2022—Nashaily's next scheduled pay day—Defendants paid Nashaily only $592.00 for approximately 39.46 hours worked.

277.    On September 15, 2022—Nashaily's next scheduled pay day—Defendants paid Nashaily an additional $130.00 for approximately 8.67 hours of the remaining 21.54 hours she worked from August 29, 2022 through September 4, 2022. [3]

278.    In other words, Defendants failed to pay Nashaily for approximately 12.87 additional hours.[4]

---

[1] 100 hours – 40 hours = 60 hours; 60 x $7.50 = $450.00.
[2] 6 x $15.00 (minimum wage) = $90.00.
[3] 61 hours - 39.46 hours = 21.54 hours.
[4] 21.54 hours – 8.67 hours = 12.87 hours.

279.    For this week alone, Defendants failed to pay Nashaily an additional $447.07 in overtime wages.[5]

280.    Indeed, Defendants did not pay Nashaily any compensation at all for the remaining 12.87 hours she worked from August 29, 2022 through September 4, 2022 until approximately September 22, 2022—two weeks after her regularly scheduled pay day.

281.    As a result of Defendants' failure to timely pay her, Nashaily, *inter alia*: (i) was deprived of money to which she had a right; (ii) lost the time value of her money; (iii) lost the opportunity to invest her money.

282.    Additionally, Defendants failed to furnish Nashaily with accurate wage statements.

283.    Defendants also failed to issue a Notice of Pay Rate to Nashaily at any time during her employment.

284.    As a result of Defendants' failure to provide Nashaily with a Notice of Pay Rate and accurate wage statements with each payment of her wages, Nashaily was prevented from, *inter alia*: (i) realizing her true hours worked; (ii) realizing that she was underpaid; and (iii) taking appropriate action to obtain the payments due to her.

285.    Further, Defendants required Nashaily to drive her personal vehicle to and from jobsites, which resulted in Nashaily incurring costs associated with gas, mileage, tolls, and vehicle maintenance—none of which Defendants reimbursed.

286.    Throughout the duration of her employment, Nashaily drove approximately 0.1 to 70 miles to and from jobsites on days in which Defendants required the same.

---

[5] 61 hours – 40 hours = 21 hours; 21 x $7.50 = $157.50.
12.87 hours x $22.50 (Nashaily's overtime rate) = $289.57.
$157.50 + $289.57 = $447.07.

287.    Throughout the relevant time period, Nashaily had conversations with other Employees who confirmed that they were subjected to the same unlawful wage practices outlined above.

## I.    **Plaintiff Isaura Lopez**

### i.    **Background**

288.    Lopez worked for Defendants as a Flagger from in or around August 2020 through on or around September 30, 2021 and then again from on or around November 25, 2021 through in or around February 2022.

289.    In this role, Defendants set Lopez's regular rate of pay at $15.00 per hour, with her overtime rate being $22.50 per hour.

290.    From in or around August 2020 through on or around September 30, 2021, and again from on or around November 25, 2021 through in or around February 2022, Lopez routinely worked five to seven days per week, for approximately 50 to 100 hours each week and has worked as many as 134 hours in a single workweek.

291.    On or around September 30, 2021, CE Solutions suspended Lopez for approximately two months following an incident that occurred during one of her shifts.

292.    Specifically, on or around September 30, 2021, Lopez was redirecting traffic away from a Con Edison jobsite when she observed a vehicle speeding towards her.

293.    Despite Lopez's attempts to redirect the vehicle away from the Con Edison jobsite, the driver of the vehicle failed to yield and crashed into a vehicle parked near the jobsite.

294.    Despite an investigation conducted by the New York City Police Department resulting in a determination that the driver had been at fault, Napoleone-Colbert suspended Lopez

from working for CE Solutions for approximately two months after a Con Edison supervisor recommended the same.

295.    Indeed, shortly after the incident, Lopez texted Napoleone-Colbert and inquired as to when she could return to work.

296.    Napoleone-Colbert responded: "[Con Edison] no longer wants [you] serving the company," "I am sorry at this point this is out of my hands[,]" and later, "[o]nce [Con Edison] decides they no longer want a worker on any sites at that point there is nothing I can do." *See* Exhibit G at 1-4, 8.

297.    Despite Napoleone-Colbert's and Con Edison's initial refusal to give her additional hours, Defendants later staffed Lopez to work for Defendants as a Spotter on a different Con Ed jobsite from on or around November 1, 2021 through on or around November 25, 2021.

298.    In this role, Defendants set her regular rate of pay at $12.00 per hour.

299.    From on or around November 1, 2021 through on or around November 25, 2021, Lopez routinely worked two to three days per week, for approximately 24 to 36 hours each week.

**ii.    Wage Violations**

300.    Defendants failed to pay Lopez for her hours worked in several ways.

301.    Despite routinely working 50 to 100 hours each week, at all relevant times, Defendants never paid Lopez at her overtime rate as a result of Defendants' improper classification of their Employees as independent contractors.

302.    Indeed, Defendants did not pay Lopez any overtime for the 10 to 60 hours that she typically worked in excess of 40 each week.

303. By way of example, from July 26, 2021 through July 31, 2021, Lopez worked approximately 99 hours. *See* Exhibit H (screenshot of an Excel spreadsheet maintained by Defendants reflecting the hours Lopez worked during this period).[6]

304. Indeed, Lopez worked five 16-hour shifts, one 12-hour shift, and one 7-hour shift, for a total of 99 hours during that period.

305. However, Defendants paid Lopez only $1,485.00 for the 99 hours worked.

306. For this week alone, Defendants failed to pay Lopez an additional $442.50 in overtime wages.[7]

307. Additionally, given that Lopez worked 6 shifts of 10 hours or more, Defendants also denied her $90.00 in spread of hours pay.[8]

308. Throughout the statutory period, Lopez was paid her wages in pay periods spanning a 7-day timeframe, with her regularly scheduled pay day being every Thursday.

309. However, Defendants routinely failed to pay Lopez for all of her hours worked on her regularly scheduled pay day.

310. For example, from on or around December 13, 2021 through on or around December 19, 2021, Lopez worked approximately 72 hours.

311. However, on or around December 23, 2021—Lopez's next scheduled pay day—Defendants only paid Lopez $900.00, which only accounted for approximately 60 of the 72 hours she worked that week.[9]

---

[6] Lopez changed her last name to Lopez; however, at all relevant times, Defendants maintained records of Lopez's time and hours worked under her maiden name, Giron.
[7] 99 hours – 40 hours = 59 hours; 59 x $7.50 = $442.50.
[8] 6 x $15.00 (minimum wage) = $90.00.
[9] $900.00 / $15.00 (Lopez's regular rate) = 60 hours.

312.     Indeed, Defendants did not pay Lopez any compensation at all for the remaining 12 hours until on or around December 30, 2022—approximately one week following her regularly scheduled pay day.

313.     As a result of Defendants' failure to timely pay her, Lopez, *inter alia*: (i) was deprived of money to which she had a right; (ii) lost the time value of her money; (iii) lost the opportunity to invest her money.

314.     Further, due to Defendants' late payments of her wages, Lopez was unable to timely pay her rent and her cell phone bill.

315.     Defendants also consistently failed to pay Lopez at all for a portion of the hours she worked.

316.     For example, from on or around May 31, 2021 through on or around June 6, 2021, Lopez worked approximately 96.5 hours.

317.     However, on or around June 10, 2021, Lopez realized that Defendants only paid her for approximately 80.5 hours.

318.     In other words, Defendants failed to pay her for 16 additional hours.[10]

319.     For this week alone, Defendants failed to pay Lopez an additional $663.75 in overtime wages.[11]

320.     Despite complaining to Sablini on multiple occasions, Lopez never received any compensation for these missing 16 hours.  *See* Exhibit I.

---

[10] 96.5 hours – 80.5 hours = 16 hours.
[11] 80.5 hours – 40 hours = 40.5 hours; 40.5 x $7.50 = $303.75.
16 hours x $22.50 (Lopez's overtime rate) = $360.00.
 $303.75 + $360.00 = $663.75.

321.    Further, from on or around November 1, 2021 through on or around November 25, 2021, Lopez routinely worked two to three days per week, for approximately 24 to 36 hours each week.

322.    Despite routinely working 24 to 36 hours each week, at all relevant times, Defendants never paid Lopez at the applicable minimum wage as a result of Defendants' improper classification of their Employees as independent contractors.

323.    By way of example, from November 6, 2021 through November 7, 2021, Lopez worked approximately 24 hours.  *See e.g.* Exhibit B at 1 (sampling of Lopez's timesheets).

324.    Indeed, she worked two 12-hour shifts for a total of 24 hours during that period.

325.    However, Defendants paid Lopez only $288.00 for the 24 hours worked.

326.    When accounting for all of her hours worked, Defendants paid Lopez at an hourly rate of approximately $12.00 per hour for this pay period,[12] which is considerably well below the applicable State minimum wage rate of $15.00 per hour.

327.    For this week alone, Defendants failed to pay Lopez an additional $72.00 in straight time wages.[13]

328.    Additionally, given that Lopez worked two shifts of 12 hours or more, Defendants also denied her $30.00 in spread of hours pay.[14]

329.    Additionally, Defendants failed to furnish Lopez with accurate wage statements.

330.    Indeed, on or around September 3, 2020, Lopez requested a copy of her paystubs from Defendants.  *See* Exhibit J.

---

[12] $288.00 / 24 hours = $12.00.
[13] 24 hours x $15.00 (minimum wage) = $360.00; $360.00 - $288.00 = $72.00.
[14] 2 x $15.00 (minimum wage) = $30.00.

331.    In response, Sablini stated: "You are a w9 we don[']t send paystubs we all [*sic*] direct deposit[.]" *Id.*

332.    Defendants also failed to issue a Notice of Pay Rate to Lopez at any time during her employment.

333.    As a result of Defendants' failure to provide Lopez with a Notice of Pay Rate or accurate wage statements with each payment of her wages, Lopez was prevented from, *inter alia*: (i) realizing her true hours worked; (ii) realizing that she was underpaid; and (iii) taking appropriate action to obtain the payments due to her.

334.    Further, Defendants required Lopez to drive her personal vehicles to and from jobsites which resulted in Lopez incurring costs associated with gas, mileage, tolls, and vehicle maintenance—none of which Defendants reimbursed.

335.    Throughout the duration of her employment, Lopez drove approximately 0.1 to 70 miles to and from jobsites on days in which Defendants required the same.

336.    Throughout the relevant time period, Lopez had conversations with other Employees who confirmed that they were subjected to the same unlawful wage practices outline above.

**J.    Plaintiff Ruben Lemus Najarro**

    **i.    Background**

337.    Najarro worked for Defendants as a Flagger from in or around April 2021 through on or around September 30, 2021 and then again from on or around November 25, 2021 through in or around February 2022.

338.    In this role, Defendants set Najarro's regular rate of pay at $15.00 per hour, with his overtime rate being $22.50 per hour.

339.     From in or around April 2021 through on or around September 30, 2021 and then again from on or around November 25, 2021 through in or around April 2022, Najarro routinely worked five to seven days per week, for approximately 60 to 100 hours each week and has worked as many as 118 hours in a workweek.

340.     For the same reasons as Lopez, Defendants suspended Najarro following the incident involving the speeding vehicle that crashed into a parked vehicle at or near a Con Edison jobsite during one of Najarro's shifts (*see supra* ¶¶ 291-97).

341.     Despite initially suspending Najarro, Defendants later lifted the suspension and staffed him as a Spotter on a different Con Ed jobsite from on or around October 1, 2021 through November 25, 2021 and then again from in or around February 2022 through in or around April 2022.

342.     In this role, Defendants set his regular rate of pay at $12.00 per hour— well below the applicable minimum wage of $15.00 per hour—with his overtime rate being $18.00.

343.     From on or around October 1, 2021 through November 25, 2021 and then again from in or around February 2022 through in or around April 2022, Najarro routinely worked three to six days per week, for approximately 72 to 144 hours each week.

**ii.     Wage Violations**

344.     Defendants failed to pay Najarro for his hours worked in several ways.

345.     Despite routinely working 60 to 144 hours each week, at all relevant times, Defendants never paid Najarro at his overtime rate as a result of Defendants' improper classification of their Employees as independent contractors.

346.     Indeed, Defendants did not pay Najarro any overtime for the 20 to 104 hours that he typically worked in excess of 40 each week.

347.   By way of example, from July 12, 2021 through July 18, 2021, Najarro worked approximately 118 hours.  *See e.g.* Exhibit K (screenshot of an Excel spreadsheet maintained by Defendants reflecting the hours Najarro worked during this period).

348.   Indeed, Najarro worked five 16-hour shifts, two 12-hour shifts, and two 7-hour shifts for a total of 118 hours during that period.

349.   However, Defendants paid Najarro only $1,770.00 for the 118 hours he worked.

350.   For this week alone, Defendants failed to pay Najarro an additional $585.00 in overtime wages.[15]

351.   Additionally, given that Najarro worked seven shifts of 10 hours or more, Defendants also denied him $105.00 in spread of hours pay.[16]

352.   Throughout the statutory period, Najarro was paid his wages in pay periods spanning a 7-day timeframe, with his regularly scheduled pay day being every Thursday.

353.   However, Defendants routinely failed to pay Najarro for all of his hours worked on his regularly scheduled pay day.

354.   For example, as described above, from July 12, 2021 through July 18, 2021, Najarro worked approximately 118 hours.

355.   However, on July 29, 2021—Najarro's next scheduled pay day—Defendants only paid Najarro $1,485.00, which only accounted for approximately 99 of the 118 hours he worked that week.[17]

---

[15] 118 hours – 40 hours = 78 hours; 78 x $7.50 = $585.00.
[16] 7 x $15.00 (minimum wage) = $105.00.
[17] $1,485.00 / $15.00 (Najarro's regular rate) = 99 hours.

356. Indeed, Defendants did not pay Najarro any compensation at all for the remaining 19 hours until on or around August 5, 2021—approximately one week following his regularly scheduled pay day.

357. As a result of Defendants' failure to timely pay him, Najarro, *inter alia*: (i) was deprived of money to which he had a right; (ii) lost the time value of his money; (iii) lost the opportunity to invest his money.

358. Further, due to Defendants' late payments of his wages, Najarro was unable to timely pay his rent and his cell phone bill.

359. Defendants also consistently failed to pay Najarro at all for a portion of the hours he worked.

360. Further, from on or around September 30, 2021 through on or around November 25, 2021 and then again from in or around February 2022 through April 2022, Najarro routinely worked six days per week, for approximately 72 to 144 hours each week.

361. Despite routinely working 72 to 144 hours each week, at all relevant times, Defendants never paid Najarro at the applicable minimum wage as a result of Defendants' improper classification of their Employees as independent contractors.

362. By way of example, from April 25, 2022 through April 29, 2022, Najarro worked approximately 92.7 hours. *See e.g.* Exhibit L (Najarro's timesheets reflecting the number of hours he worked during this period).[18]

363. Indeed, he worked three 24-hour shifts, one 12-hour shift, one 5-hour and 45-minute shift, and one 2-hour and 57-minute shift for a total of 92.7 hours during that period.

---

[18] Tellingly, Defendants attempted to conceal the true number of hours Najarro worked during this period by directing him to allot every other 12-hour shift on his timesheet under the name of his partner, Lopez. Despite this, Najarro did in fact work every shift detailed in Exhibit L.

364.    However, Defendants paid Najarro only $1,112.40 for the 92.7 hours he worked.

365.    When accounting for all of his hours worked, Defendants paid Najarro at an hourly rate of approximately $12.00 per hour for this pay period,[19] which is considerably well below the applicable State minimum wage rate of $15.00 per hour.

366.    For this week alone, Defendants failed to pay Najarro an additional $278.10 in straight time wages[20] and an additional $395.25 in overtime wages[21] for a total of $673.35 of unpaid straight and overtime wages.[22]

367.    Additionally, given that Najarro worked five shifts of 10 hours or more, Defendants also denied him $75.00 in spread of hours pay.[23]

368.    Additionally, Defendants failed to furnish Najarro with accurate wage statements.

369.    Defendants also failed to issue a Notice of Pay Rate to Najarro at any time during his employment.

370.    As a result of Defendants' failure to provide Najarro with a Notice of Pay Rate or accurate wage statements with each payment of his wages, Najarro was prevented from, *inter alia*: (i) realizing his true hours worked; (ii) realizing that he was underpaid; and (iii) taking appropriate action to obtain the payments due to him.

371.    Further, Defendants required Najarro to drive his personal vehicles to and from jobsites which resulted in Najarro incurring costs associated with gas, mileage, tolls, and vehicle maintenance—none of which Defendants reimbursed.

---

[19] $1,112.40 / 92.7 hours = $12.00.
[20] 92.7 hours x $15.00 (minimum wage) = $1,390.50; $1,390.50 - $1,112.40 = $278.10.
[21] 92.7 hours – 40 hours = 52.7 hours; 52.7 hours x $7.50 = $395.25.
[22] $278.10 + $395.25 = $673.35.
[23] 5 x $15.00 (minimum wage) = $75.00.

372.    Throughout the duration of his employment, Najarro drove approximately 0.1 to 70 miles to and from jobsites on days in which Defendants required the same.

373.    Throughout the relevant time period, Najarro had conversations with other Employees who confirmed that they were subjected to the same unlawful wage practices outline above.

## K.    Plaintiff Nashemir Ortiz

### i.    Background

374.    Nashemir worked for Defendants as a Spotter and Flagger from in or around June 2019 through in or around April 2022.

375.    Upon Nashemir's hire in or around June 2019, Defendants set his regular rate of pay at $10.00 to $12.00 per hour as a Spotter, well below the applicable minimum wage of $15.00 per hour.

376.    As a Flagger, Defendants set Nashemir's regular rate of pay at $15.00 per hour, with his overtime rate being $22.50 per hour.

377.    From in or around June 2019 through in or around April 2022, Nashemir routinely worked five to six days per week for approximately 50 to 70 hours each week as a Flagger.

378.    In his role as a Spotter, Nashemir routinely worked six to seven days per week for approximately 90 to 120 hours each week, but has worked as many as 168 hours in a workweek.

379.    However, in or around December 2020, Defendants suspended Nashemir for approximately two weeks for leaving a jobsite to take a break before seeking permission from the onsite Con Edison supervisor.

380.    Indeed, Nashemir had followed Defendants' internal policies and had waited to be temporarily replaced by another Flagger before taking a break.

381.    Despite this, upon his return to the jobsite, the Con Edison supervisor sent Nashemir home for the rest of the afternoon for failing to notify him that Nashemir had taken a break.

382.    Shortly thereafter, Defendants suspended Nashemir for two weeks and disallowed him from calling the hotline or working any shifts during that time.

**ii.    Wage Violations**

383.    Defendants failed to pay Nashemir for his hours worked in several ways.

384.    Despite routinely working 50 to 70 hours each week as a Flagger and 90 to 120 hours each week as a Spotter, at all relevant times, Defendants never paid Nashemir at his overtime rate as a result of Defendants' improper classification of their Employees as independent contractors.

385.    Indeed, Defendants did not pay Nashemir any overtime for up to the 10 to 30 hours and up to the 80 hours that he typically worked in excess of 40 each week as a Flagger and as a Spotter, respectively.

386.    By way of example, from May 25, 2020 through May 31, 2020, Nashemir worked seven 24-hour shifts as a Spotter for a total of 168 hours during that period.

387.    Indeed, Defendants required Nashemir to remain on a jobsite around-the-clock for an entire week which resulted in Nashemir eating, drinking, and sleeping in his vehicle during this entire time.

388.    However, Defendants paid Nashemir only $1,848.00 for the 168 hours worked.

389.    When accounting for all of his hours worked, Defendants paid Nashemir at an hourly rate of approximately $11.00 per hour for this pay period,[24] which is considerably well below the applicable State minimum wage rate of $15.00 per hour.

---

[24] $1,848.00 / 168 hours = $11.00.

390.    For this week alone, Defendants failed to pay Nashemir an additional $672.00 in straight time wages[25] and $960.00 in overtime wages,[26] for a total of $1,632.00 of unpaid straight and overtime wages.[27]

391.    Additionally, given that Nashemir worked 7 shifts of 10 hours or more, Defendants also denied him $105.00 in spread of hours pay.[28]

392.    Throughout the statutory period, Nashemir was paid his wages in pay periods spanning a 7-day timeframe, with his regularly scheduled pay day being every Thursday.

393.    However, Defendants routinely failed to pay Nashemir for his shifts on his regularly scheduled pay day.

394.    Indeed, Defendants frequently paid a portion of Nashemir's hours worked one week after his designated payday.

395.    As a result of Defendants' failure to timely pay him, Nashemir, *inter alia*: (i) was deprived of money to which he had a right; (ii) lost the time value of his money; and (iii) lost the opportunity to invest his money.

396.    Further, due to Defendants' late payments of his wages, Nashemir was unable to timely pay his rent in or around October 2021.

397.    Defendants also consistently failed to pay Nashemir at all for a portion of the hours he worked.

398.    Additionally, Defendants failed to furnish Nashemir with accurate wage statements.

---

[25] 168 hours x $15.00 (minimum wage) = $2,520.00; $2,520.00 - $1,848.00 = $672.00.
[26] 168 hours – 40 hours = 128 hours; 128 hours x $7.50 = $960.00.
[27] $672.00 + $960.00 = $1,632.00.
[28] 7 x $15.00 (minimum wage) = $105.00.

399.    Defendants also failed to issue a Notice of Pay Rate to Nashemir at any time during his employment.

400.    As a result of Defendants' failure to provide Nashemir with a Notice of Pay Rate or accurate wage statements with each payment of his wages, Nashemir was prevented from, *inter alia*: (i) realizing his true hours worked; (ii) realizing that he was underpaid; and (iii) taking appropriate action to obtain the payments due to him.

401.    Further, Defendants required Nashemir to drive his personal vehicles to and from jobsites which resulted in Nashemir incurring costs associated with gas, mileage, tolls, and vehicle maintenance—none of which Defendants reimbursed.

402.    Throughout the duration of his employment, Nashemir drove approximately 0.1 to 70 miles to and from jobsites on days in which Defendants required the same.

403.    Throughout the relevant time period, Nashemir had conversations with other Employees who confirmed that they were subjected to the same unlawful wage practices outline above.

## L.      **Plaintiff Adrianna Gamboa**

### i.      **Background**

404.    Gamboa worked for Defendants as a Flagger from in or around July 2020 through in or around April 2022.

405.    In this role, Defendants set Gamboa's regular rate of pay at $15.00 per hour, with her overtime rate being $22.50 per hour.

406.    From in or around July 2020 through in or around September 2021, Gamboa routinely worked five to six days per week for approximately 40 to 100 hours each week and has worked as many as 132 hours in a workweek.

407.    From in or around October 2021 through in or around April 2022, Gamboa routinely worked three to four days per week for approximately 20 to 60 hours each week and has worked as many as 66 hours in a workweek.

**ii.    Wage Violations**

408.    Defendants failed to pay Gamboa for her hours worked in several ways.

409.    Despite routinely working 40 to 100 hours each week from in or around July 2020 through in or around September 2021 and 20 to 60 hours each week from in or around October 2021 through in or around April 2022, at all relevant times, Defendants never paid Gamboa at her overtime rate as a result of Defendants' improper classification of their Employees as independent contractors.

410.    Indeed, Defendants did not pay Gamboa any overtime for the 20 to 60 hours that she typically worked in excess of 40 each week during these periods.

411.    By way of example, from August 3, 2020 through August 9, 2020, Gamboa worked approximately 132 hours.

412.    However, Defendants paid Gamboa only $1,980.00 for the 132 hours worked.

413.    For this week alone, Defendants failed to pay Gamboa an additional $690.00 in overtime wages.[29]

414.    Additionally, given that Gamboa worked seven shifts of 10 hours or more, Defendants also denied her approximately $105.00 in spread of hours pay, if not more.[30]

415.    Throughout the statutory period, Gamboa was paid her wages in pay periods spanning a 7-day timeframe, with her regularly scheduled pay day being every Thursday.

---

[29] 132 hours – 40 hours = 92 hours; 92 x $7.50 = $690.00.
[30] 7 x $15.00 (minimum wage) = $105.00.

416.     However, Defendants routinely failed to pay Gamboa for all of her hours worked on her regularly scheduled pay day.

417.     Indeed, Defendants frequently paid a portion of Gamboa's hours worked one week after her designated payday.

418.     As a result of Defendants' failure to timely pay her, Gamboa, *inter alia*: (i) was deprived of money to which she had a right; (ii) lost the time value of her money; and (iii) lost the opportunity to invest her money.

419.     Further, due to Defendants' late payments of her wages, Gamboa was unable to timely pay her rent in or around October 2021.

420.     Defendants also consistently failed to pay Gamboa at all for a portion of the hours she worked.

421.     Additionally, Defendants failed to furnish Gamboa with accurate wage statements.

422.     Defendants also failed to issue a Notice of Pay Rate to Gamboa at any time during her employment.

423.     As a result of Defendants' failure to provide Gamboa with a Notice of Pay Rate or accurate wage statements with each payment of her wages, Gamboa was prevented from, *inter alia*: (i) realizing her true hours worked; (ii) realizing that she was underpaid; and (iii) taking appropriate action to obtain the payments due to her.

424.     Further, Defendants required Gamboa to drive her personal vehicles to and from jobsites which resulted in Gamboa incurring costs associated with gas, mileage, tolls, and vehicle maintenance—none of which Defendants reimbursed.

425.     Throughout the duration of her employment, Gamboa drove approximately 0.1 to 70 miles to and from jobsites on days in which Defendants required the same.

426. Throughout the relevant time period, Gamboa had conversations with other Employees who confirmed that they were subjected to the same unlawful wage practices outline above.

## FLSA COLLECTIVE ACTION ALLEGATIONS

427. Plaintiffs bring their FLSA claims as a collective action on behalf of themselves and all other similarly situated persons who have been employed by Defendants during the full statute of limitations period (the "FLSA Collective").

428. At all relevant times, Plaintiffs and the FLSA Collective were similarly situated, had substantially similar job requirements, were paid in the same manner and under the same common policies, and were subject to Defendants' practices of: (i) failing to compensate Plaintiffs and the FLSA Collective at one and one-half times their regular rate of pay for all hours worked in excess of 40 hours in a workweek; and (ii) failing to timely pay all wages owed.

429. At all relevant times, Defendants have been fully aware of the duties performed by Plaintiffs and the FLSA Collective, and that those duties were not exempt from the provisions of the FLSA.

430. Defendants' violations of the FLSA have been willful, repeated, knowing, intentional, and without a good faith basis, and have significantly damaged Plaintiffs and the FLSA Collective.

431. As a result of their unlawful conduct, Defendants are liable to Plaintiffs and the FLSA Collective for the full amount of their unpaid wages and late wages, with interest, plus an equal amount as liquidated damages, plus reasonable attorneys' fees and costs incurred by Plaintiffs and the FLSA Collective.

432.    While the exact number of the FLSA Collective is unknown to Plaintiffs at this time, upon information and belief, there are approximately 600 members of the FLSA Collective.

433.    Plaintiffs are currently unaware of the identities of the individual members of the FLSA Collective.

434.    Accordingly, the Court should require Defendants to provide Plaintiffs with a list of all members of the proposed FLSA Collective, along with their last known addresses, telephone numbers, and email addresses, so Plaintiffs may provide the members of the FLSA Collective notice of this action and an opportunity to make an informed decision about whether to participate in it.

## CLASS ACTION ALLEGATIONS

435.    Plaintiffs bring this action, in part, as a class action under the NYLL—and, in the alternative, under FIFA—as well as all applicable regulations thereunder.

### A.    Class Definition

436.    Plaintiffs seek to maintain claims, pursuant to FRCP 23, on behalf of themselves and a class of all other Employees who have been employed by Defendants at any time during the full statute of limitations period (the "Class").

437.    Additionally, Lopez, Najarro, and Nashemir seek to maintain claims, pursuant to FRCP 23, on behalf of themselves and a subclass of all individuals who have been employed by Defendants as Spotters at any time during the full statute of limitations period (the "Subclass").

438.    Plaintiffs allege, on behalf of themselves and the Class, that Defendants violated the NYLL by, *inter alia*: (i) failing to compensate Plaintiffs and the Class for all hours worked at their established regular rates of pay in accordance with their agreed terms of employment; (ii) failing to compensate Plaintiffs and the Class at one and one-half times their regular rate of pay

for all hours worked in excess of 40 hours in a workweek; (iii) failing to timely pay all wages owed; (iv) failing to provide Plaintiffs and the Class with Notices of Pay Rate; and (v) failing to furnish accurate wage statements to Plaintiffs and the Class.

439.    Lopez, Najarro, and Nashemir allege, on behalf of themselves and the Subclass, that Defendants violated the NYLL by, *inter alia*, failing to compensate them and the Subclass at the State minimum wage for all hours worked.

440.    Plaintiffs also allege, in the alternative and on behalf of themselves and the Class, that Defendants violated FIFA by, *inter alia*: (i) failing to pay all compensation owed; and (ii) failing to timely pay all compensation owed.

441.    Plaintiffs, the Class, and the Subclass have standing to seek such relief because of the adverse effects that Defendants' wage practices have had on them individually and as a group.

442.    The wage practices described herein are part of Defendants' normal course of conduct.

443.    Pursuant to FRCP 23, Plaintiffs' NYLL and FIFA claims may be pursued by all similarly situated persons who do not opt out of the Class or Subclass.

**B.    Numerosity and Impracticability of Joinder**

444.    The members of the Class and Subclass are so numerous that joinder is impracticable.

445.    While the exact number of the members of the Class is unknown to Plaintiffs at this time, upon information and belief, there are approximately 1,000 members of the Class.

446.    While the exact number of the members of the Subclass is unknown to Plaintiffs at this time, upon information and belief, there are approximately 500 members of the Subclass.

447.    Therefore, the numerosity requirement of FRCP 23(a) is satisfied.

**C.**     **Common Questions of Law and Fact**

448.     Common questions of law and fact, the answers to which will meaningfully advance this litigation, exist as to the Class and Subclass and predominate over any questions only affecting the members of the Class or Subclass individually.

449.     Indeed, there are few, if any, purely individual issues in this action.

450.     The questions of law and fact that are common to Plaintiffs, the Class, and the Subclass include, without limitation:

(a)     Whether Defendants failed to pay Plaintiffs and the Subclass at the State minimum wage rate;

(b)     Whether Defendants failed to pay Plaintiffs and the Class for all hours worked at their regular rates of pay and in accordance with their agreed terms of employment;

(c)     Whether Defendants failed to pay Plaintiffs and the Class all overtime wages owed to them;

(d)     Whether Defendants failed to timely pay Plaintiffs and the Class their wages;

(e)     Whether Defendants failed to provide Plaintiffs and the Class with Notices of Pay Rate;

(f)     Whether Defendants failed to furnish accurate wage statements to Plaintiffs and the Class; and

(g)     Whether Plaintiffs, the Class, and the Subclass are entitled to liquidated damages and injunctive relief.

451.     Therefore, the common question requirement of FRCP 23(a) is satisfied.

**D.**     **Typicality of Claims and Relief Sought**

452.     Plaintiffs' claims are typical of the claims of the members of the Class and Subclass they seek to represent.

453.    Plaintiffs, the Class, and the Subclass work or have worked for Defendants, and are or were subject to the same compensation policies and practices.

454.    The wage violations suffered by Plaintiffs, and the damages resulting therefrom, are typical of Defendants' treatment of their Employees, generally, and of the Class and Subclass, specifically.

455.    Therefore, the typicality requirement of FRCP 23(a) is satisfied.

**E.    <u>Adequacy of Representation</u>**

456.    Plaintiffs will fairly and adequately protect the interests of the Class and Subclass because Plaintiffs' interests are coextensive and aligned with those of the members of the Class and Subclass.

457.    Plaintiffs have no interests adverse to the Class and Subclass they seek to represent.

458.    Plaintiffs are willing and able to represent the Class and Subclass fairly and vigorously, in part because they do not assert any individual claims separate and apart from the Class and Subclass they seek to represent.

459.    Plaintiffs have retained competent counsel who are qualified and experienced in employment class action litigation and able to meet the demands necessary to litigate a class action of this size and complexity.

460.    The combined interests, experience, and resources of Plaintiffs and their counsel to competently litigate the individual and Class claims at issue in the instant action satisfy the adequacy of representation requirement of FRCP 23(a).

**F.**    **Requirements of Rule 23(b)(1)**

461.    Without certification of the Class and Subclass, the same evidence and issues would be subject to re-litigation in a multitude of individual lawsuits with an attendant risk of inconsistent adjudications and conflicting obligations.

462.    Accordingly, certification of the Class and Subclass is the most efficient and judicious means of presenting the evidence and arguments necessary to resolve such questions for Plaintiffs, the Class, the Subclass, and Defendants.

463.    By filing this Complaint, Plaintiffs preserve the rights of the members of the Class and Subclass with respect to the statute of limitations on their claims.

464.    Therefore, failing to certify the Class and Subclass would substantially impair and/or impede the ability of the members of the Class and Subclass to protect their interests.

**G.**    **Requirements of Rule 23(b)(2)**

465.    Defendants acted on grounds, as described herein, generally applicable to Plaintiffs, the Class, and the Subclass by denying Plaintiffs and the Subclass minimum wages, and denying Plaintiffs and the Class overtime wages, failing to pay them for all hours worked at their established rates of pay in accordance with their agreed terms of employment, failing to pay wages on time, and failing to provide Notices of Pay Rate and furnish accurate wage statements.

466.    These acts are not sporadic or isolated and support the request for final injunctive and declaratory relief with respect to Plaintiffs, the Class, and the Subclass as a whole.

467.    Declaratory and injunctive relief flow directly and automatically from proof of the common questions of law and fact regarding the entitlement to, and denial of, minimum and overtime wages, wages paid at their regular rates of pay, timely payment of wages, Notices of Pay Rate and accurate wage statements.

468.    Declaratory and injunctive relief are the factual and legal predicates for Plaintiffs' and the Class's and Subclass's entitlement to monetary and non-monetary remedies for such wage violations.

469.    Accordingly, injunctive and declaratory relief are among the predominant forms of relief sought in this case.

**H.      Requirements of Rule 23(b)(3)**

470.    The common issues of fact and law affecting Plaintiffs' claims and those of the Class and Subclass—including, without limitation, the common issues identified in the paragraphs above—predominate over issues affecting only individual claims.

471.    A class action is superior to other available means for the fair and efficient adjudication of Plaintiffs' claims and those of the Class and Subclass.

472.    The cost of proving Defendants' pattern and practice of denying minimum, overtime, and other wages makes it impractical for the members of the Class and Subclass to pursue their claims individually.

473.    This class action will not be difficult to manage for reasons including, without limitation, the discrete organizational nature of all members of the Class and Subclass (they must have worked for Defendants as Employees during the statutory period), as well as the common questions of law and fact described herein.

**FIRST CAUSE OF ACTION**
**VIOLATIONS OF THE FLSA: FAILURE TO PAY OVERTIME**
*(On Behalf of Plaintiffs and the FLSA Collective)*

474.    Plaintiffs, on behalf of themselves and the FLSA Collective, hereby repeat and reallege the foregoing allegations as if set forth fully herein.

475.    During the full statutory period, Plaintiffs and the FLSA Collective were protected by the provisions of the FLSA, 29 U.S.C §§ 201, *et seq.*, and applicable regulations thereunder.

476.     The FLSA requires covered employers, including Defendants, to compensate Employees at a rate not less than one and one-half times their regular rate of pay and at a rate not less than one and one-half times the federal minimum wage for all hours worked in excess of 40 hours in a workweek.

477.     Plaintiffs and the FLSA Collective were not exempt from the requirement that their employer pay them overtime under the FLSA, and they are entitled to be paid overtime by Defendants for all hours worked in excess of 40 hours in a workweek during the full statute of limitations period.

478.     Throughout the full statute of limitations period, Defendants have engaged in a policy and practice of failing to compensate Plaintiffs and the FLSA Collective at a rate not less than one and one-half times their regular rate of pay for time spent performing work in excess of 40 hours in a workweek.

479.     As a result of Defendants' failure to compensate Plaintiffs and the FLSA Collective at a rate not less than one and one-half times their regular rate of pay for all hours worked in excess of 40 hours in a workweek, Defendants have violated the FLSA and/or applicable regulations thereunder.

480.     Defendants have acted willfully and deliberately in maintaining an intentional practice of failing to compensate Plaintiffs and the FLSA Collective in accordance with the FLSA and/or applicable regulations thereunder.

481.     Defendants' violations of the FLSA have significantly damaged Plaintiffs and the FLSA Collective and entitle them to recover damages to the greatest extent permitted by law, including, *inter alia*, the total amount of their unpaid wages, an additional equal amount in liquidated damages, prejudgment interest, and attorneys' fees and costs.

## SECOND CAUSE OF ACTION
## VIOLATIONS OF THE FLSA: LATE PAYMENT OF WAGES
### *(On Behalf of Plaintiff and the FLSA Collective)*

482.    Plaintiffs, on behalf of themselves and the FLSA Collective, hereby repeat and reallege the foregoing allegations as if set forth fully herein.

483.    During the full statutory period, Plaintiffs and the FLSA Collective were protected by the provisions of the FLSA, 29 U.S.C §§ 201, *et seq.*, and all applicable regulations thereunder.

484.    The FLSA requires covered employers, including Defendants, to pay Plaintiffs all compensation earned in a particular workweek on the regularly scheduled pay day for the period in which such workweek ends.

485.    Plaintiffs and the FLSA Collective were not exempt from the requirement that Defendants timely pay them their wages.

486.    During the statute of limitations period, Defendants have engaged in a policy and practice of failing to pay Plaintiffs and the FLSA Collective all compensation earned in a particular workweek on the regularly scheduled pay day for the period in which such workweek ends.

487.    As a result of Defendants' failure to pay Plaintiffs and the FLSA Collective all compensation earned in a particular workweek on the regularly scheduled pay day for the period in which such workweek ends, Defendants have violated the FLSA and/or applicable regulations thereunder.

488.    Defendants have acted willfully and deliberately in maintaining an intentional practice of failing to compensate Plaintiffs and the FLSA Collective in accordance with the FLSA.

489.    Defendants' violations of the FLSA have significantly harmed Plaintiffs and the FLSA Collective and entitle them to recover damages to the greatest extent permitted by law, including, *inter alia*, the total amount of their unpaid wages, an additional equal amount in liquidated damages, prejudgment interest, and attorneys' fees and costs.

## THIRD CAUSE OF ACTION
## VIOLATIONS OF THE NYLL: FAILURE TO PAY OVERTIME
### (On Behalf of Plaintiffs and the Class)

490.    Plaintiffs, on behalf of themselves and the Class, hereby repeat and reallege the foregoing allegations as if set forth fully herein.

491.    During the full statutory period, Plaintiffs and the Class were protected by the provisions of the NYLL, N.Y. Lab. Law §§ 1, *et seq.*, as well as all applicable regulations thereunder.

492.    The NYLL requires covered employers, including Defendants, to compensate Employees at a rate not less than one and one-half times their regular rate of pay for all hours worked in excess of 40 hours in a workweek and at a rate not less than one and one-half times the applicable State minimum wage for all hours worked in excess of 40 hours in a workweek.

493.    Plaintiffs and the Class were not exempt from the requirement that Defendants pay them overtime under the NYLL, and they are entitled to be paid overtime by Defendants for all hours worked in excess of 40 hours in a workweek during the full statute of limitations period.

494.    Throughout the full statute of limitations period, Defendants have engaged in a policy and practice of failing to compensate Plaintiffs and the Class at a rate not less than one and one-half times their regular rate of pay for time spent performing off-the-clock work in excess of 40 hours in a workweek.

495.    As a result of Defendants' failure to compensate Plaintiffs and the Class at a rate not less than one and one-half times their regular rate of pay for all hours worked in excess of 40 hours in a workweek, Defendants have violated the NYLL and/or applicable regulations thereunder.

496.    Defendants have acted willfully and deliberately in maintaining an intentional practice of failing to compensate Plaintiffs and the Class in accordance with the NYLL.

497.     Defendants' violations of the NYLL have significantly damaged Plaintiffs and the Class and entitle them to recover damages to the greatest extent permitted by law, including, *inter alia*, the total amount of their unpaid wages, an additional equal amount in liquidated damages, prejudgment interest, and attorneys' fees and costs.

### FOURTH CAUSE OF ACTION
### VIOLATIONS OF THE NYLL: LATE PAYMENT OF WAGES
### *(On Behalf of Plaintiff and the Class)*

498.     Plaintiffs, on behalf of themselves and the Class, hereby repeat and reallege the foregoing allegations as if set forth fully herein.

499.     During the full statutory period, Plaintiffs and the Class were protected by the provisions of the NYLL, N.Y. Lab. Law §§ 1, *et seq.*, and all applicable regulations thereunder.

500.     The NYLL requires covered employers, including Defendants, to pay Plaintiffs and the Class all compensation earned in a particular workweek on the regularly scheduled pay day for the period in which such workweek ends.

501.     Plaintiffs and the Class were not exempt from the requirement that Defendants timely pay them their wages.

502.     Throughout the statute of limitations period, Defendants have engaged in a policy and practice of failing to pay Plaintiffs and the Class all compensation earned in a particular workweek on the regularly scheduled pay day for the period in which such workweek ends.

503.     As a result of Defendants' failure to pay Plaintiffs and the Class all compensation earned in a particular workweek on the regularly scheduled pay day for the period in which such workweek ends, Defendants have violated the NYLL and/or applicable regulations thereunder.

504.     Defendants have acted willfully and deliberately in maintaining an intentional practice of failing to compensate Plaintiffs and the Class in accordance with the NYLL.

505. Defendants' violations of the NYLL have significantly damaged Plaintiffs and the Class and entitle them to recover damages to the greatest extent permitted by law, including, *inter alia*, the total amount of their unpaid wages, an additional equal amount in liquidated damages, prejudgment interest, and attorneys' fees and costs.

**FIFTH CAUSE OF ACTION**
**VIOLATIONS OF THE NYLL: FAILURE TO PAY ALL WAGES OWED**
(***On Behalf of Plaintiffs and the Class***)

506. Plaintiffs, on behalf of themselves and the Class, hereby repeat and reallege the foregoing allegations as if set forth fully herein.

507. During the full statutory period, Plaintiffs and the Class were protected by the provisions of the NYLL, N.Y. Lab. Law §§ 1, *et seq.*, as well as all applicable regulations thereunder.

508. The NYLL requires covered employers, including Defendants, to compensate Plaintiffs and the Class at their established regular rates of pay for all hours worked in a workweek.

509. Plaintiffs and the Class were not exempt from the requirement and are entitled to be paid by Defendants at their established regular rates of pay for all hours worked in a workweek, during the full statute of limitations period.

510. Throughout the full statute of limitations period, Defendants have engaged in a common policy and practice of failing to pay Plaintiffs and the Class at their established regular rates of pay for all hours worked.

511. As a result of Defendants' failure to compensate Plaintiffs and the Class at their established regular rates of pay (or one and one-half times their established regular rates) for all hours worked, Defendants have violated the NYLL and/or applicable regulations thereunder.

512.     Defendants have acted willfully and deliberately in maintaining an intentional practice of failing to compensate Plaintiffs and the Class in accordance with the NYLL.

513.     Defendants' violations of the NYLL have significantly damaged Plaintiffs and the Class and entitle them to recover damages to the greatest extent permitted by law, including, *inter alia*, the total amount of their unpaid wages, an additional equal amount in liquidated damages, prejudgment interest, and attorneys' fees and costs.

**SIXTH CAUSE OF ACTION**
**VIOLATIONS OF THE NYLL: NOTICES OF PAY RATE**
(*On Behalf of Plaintiffs and the Class*)

514.     Plaintiffs, on behalf of themselves and the Class, hereby repeat and reallege the foregoing allegations as if set forth fully herein.

515.     During the full statutory period, Plaintiffs and the Class were protected by the provisions of the NYLL, N.Y. Lab. Law §§ 190, *et seq.*, as well as all applicable regulations thereunder.

516.     The NYLL requires covered employers, including Defendants, to provide Employees, "at the time of hiring, a notice containing the following information: the rate or rates of pay and basis thereof, whether paid by the hour, shift, day, week, salary, piece, commission, or other; allowances, if any, claimed as part of the minimum wage, including tip, meal, or lodging allowances . . . ; the regular pay day designated by the employer [ ]; the name of the employer; any 'doing business as' names used by the employer; the physical address of the employer's main office or principal place of business, and a mailing address if different; the telephone number of the employer; plus such other information as the commissioner deems material and necessary," which is commonly referred to as a Notice of Pay Rate.

517.     Plaintiffs and the Class were not exempt from the requirement that Defendants provide them with Notices of Pay Rate.

518.     Throughout the full statute of limitations period, Defendants have engaged in a policy and practice of unlawfully failing to provide Notices of Pay Rate to Plaintiffs and the Class.

519.     As a result of Defendants' failure to provide Notices of Pay Rate to Plaintiffs and the Class, Defendants have violated, *inter alia*, NYLL § 195.

520.     Defendants have acted willfully and deliberately in maintaining an intentional practice of failing to provide proper notices to Plaintiffs and the Class in accordance with the NYLL.

521.     Defendants' violations of the NYLL have significantly damaged Plaintiffs and the Class and entitle them to recover damages to the greatest extent permitted by law, including, *inter alia*, $50 for each workday the violation occurred, not to exceed $5,000, plus attorneys' fees and costs.

**SEVENTH CAUSE OF ACTION**
**VIOLATIONS OF THE NYLL: INACCURATE WAGE STATEMENTS**
***(On Behalf of Plaintiffs and the Class)***

522.      Plaintiffs, on behalf of themselves and the Class, hereby repeat and reallege the foregoing allegations as if set forth fully herein.

523.     During the full statutory period, Plaintiffs and the Class were protected by the provisions of the NYLL, N.Y. Lab. Law §§ 190, *et seq.*, as well as all applicable regulations thereunder.

524.     The NYLL requires covered employers, including Defendants, to "furnish each employee with a statement with every payment of wages, listing the following: the dates of work covered by that payment of wages;  name of employee; name of employer; address and phone number of employer; rate or rates of pay and basis thereof, whether paid by the hour, shift, day, week, salary, piece, commission, or other; gross wages; deductions; allowances, if any, claimed as part of the minimum wage . . . ; and net wages."

525.     Plaintiffs and the Class were not exempt from the requirement that Defendants provide them with accurate wage statements.

526.     Throughout the full statute of limitations period, Defendants have engaged in a policy and practice of unlawfully failing to furnish accurate wage statements to Plaintiffs and the Class.

527.     As a result of Defendants' failure to furnish accurate wage statements to Plaintiffs and the Class, Defendants have violated, *inter alia*, NYLL § 195.

528.     Defendants have acted willfully and deliberately in maintaining an intentional practice of failing to furnish proper wage statements to Plaintiffs and the Class in accordance with the NYLL.

529.     Defendants' violations of the NYLL have significantly damaged Plaintiffs and the Class and entitle them to recover damages to the greatest extent permitted by law, including, *inter alia*, $250 for each workday the violation occurred, not to exceed $5,000, plus attorneys' fees and costs.

## EIGHTH CAUSE OF ACTION
## VIOLATIONS OF THE NYLL: UNREIMBURSED BUSINESS EXPENSES
### (*On Behalf of Plaintiffs and the Class*)

530.     Plaintiffs, on behalf of themselves and the Class, hereby repeat and reallege the foregoing allegations as if set forth fully herein.

531.     During the full statutory period, Plaintiffs and the Class were protected by the provisions of the NYLL and applicable regulations thereunder, including, *inter alia*, 12 N.Y.C.R.R. § 146-2.7(c).

532.     The NYLL and applicable regulations thereunder protect employees from incurring expenses in the ordinary course of their employment that result in the employee's rate of pay falling below the applicable State minimum wage rate.

533.    Throughout the full statute of limitations period, Defendants required Plaintiffs and the Class to drive their personal vehicles in the course of their employment and in the performance of their work.

534.    Plaintiffs and the Class incurred expenses associated with gas, mileage, tolls, and vehicle maintenance in the use of their personal vehicles in the course of their employment, as required by Defendants, which brought Plaintiffs' and the Class's wages below the applicable State minimum wage rate.

535.    Defendants failed to reimburse Plaintiffs and the Class for these expenses.

536.    As a result of Defendants' failure to reimburse Plaintiffs and the Class for all business expenses that Defendants required Plaintiffs and the Class to incur, Defendants have violated, *inter alia*, 12 N.Y.C.R.R. § 146-2.7(c).

537.    Defendants' violations of the NYLL and applicable regulations thereunder have significantly damaged Plaintiffs and the Class and entitle them to recover damages to the greatest extent permitted by law, including, *inter alia*, the total amount of their unreimbursed business expenses, an additional equal amount in liquidated damages, prejudgment interest, and attorneys' fees and costs.

### NINTH CAUSE OF ACTION
### VIOLATIONS OF THE NYLL: FAILURE TO PAY MINIMUM WAGE
**(*On Behalf of Lopez, Najarro, Nashemir, and the Subclass*)**

538.    Lopez, Najarro, and Nashemir, on behalf of themselves and the Subclass, hereby repeat and reallege the foregoing allegations as if set forth fully herein.

539.    During the full statutory period, Lopez, Najarro, Nashemir, and the Subclass were protected by the provisions of the NYLL, N.Y. Lab. Law §§ 1, *et seq.*, as well as all applicable regulations thereunder.

540.    The NYLL requires covered employers, including Defendants, to compensate Lopez, Najarro, Nashemir, and the Subclass at a rate not less than the applicable State minimum wage for all hours worked under 40 hours in a workweek.

541.    Lopez, Najarro, Nashemir, and the Subclass were not exempt from the requirement that Defendants pay them minimum wages under the NYLL, and they are entitled to be paid minimum wages by Defendants for all hours worked under 40 hours in a workweek during the full statute of limitations period.

542.    Throughout the full statute of limitations period, Defendants have engaged in a policy and practice of failing to compensate Lopez, Najarro, Nashemir, and the Subclass at a rate not less than the applicable State minimum wage for all hours worked.

543.    As a result of Defendants' failure to compensate Lopez, Najarro, Nashemir, and the Subclass at a rate not less than the applicable State minimum wage for all hours worked, Defendants have violated the NYLL and/or applicable regulations thereunder.

544.    Defendants have acted willfully and deliberately in maintaining an intentional practice of failing to compensate Lopez, Najarro, Nashemir, and the Subclass in accordance with the NYLL.

545.    Defendants' violations of the NYLL have significantly damaged Lopez, Najarro, Nashemir, and the Subclass and entitle them to recover damages to the greatest extent permitted by law, including, *inter alia*, the total amount of their unpaid wages, an additional equal amount in liquidated damages, prejudgment interest, and attorneys' fees and costs.

**TENTH CAUSE OF ACTION**
**VIOLATIONS OF FIFA: FAILURE TO PAY ALL COMPENSATION**
*(On Behalf of Plaintiffs and the Class)*
***(Brought in the Alternative to Plaintiffs' and the Class's Claims under the FLSA and NYLL)***

546.     Plaintiffs, on behalf of themselves and the Class, hereby repeat and reallege the foregoing allegations as if set forth fully herein.

547.     In the alternative to their claims brought under the FLSA and NYLL, Plaintiffs and the Class allege violations of FIFA, N.Y.C. Admin. Code §§ 20-927, *et seq.*, and all applicable regulations thereunder.

548.     Throughout the full statutory period, Plaintiffs and the Class were protected by the provisions of FIFA and all applicable regulations thereunder.

549.     FIFA requires hiring parties, including Defendants, to pay freelance workers all contracted compensation on or before the date such contracted compensation is due under the terms of a contract or, if the contract does not specify when the contracted compensation is due or the mechanism by which such due date shall be determined, no later than 30 days after completion of the freelance worker's services under the contract.

550.     Plaintiffs and the Class were not exempt from the requirement that Defendants pay them their contracted compensation under FIFA for work performed within the City of New York, and they are entitled to be paid all contracted compensation for all services performed for Defendants within the City of New York.

551.     Throughout the statute of limitations period, Defendants have engaged in a policy and practice of hiring Plaintiffs and the Class to perform services within the City of New York and accepting the benefit of the same without paying them all compensation owed under the terms of their agreement.

552.    As a result, Defendants owe compensation to Plaintiffs and the Class for the work they performed within the City of New York.

553.    Throughout the statute of limitations period, Defendants have engaged in a policy and practice of failing to pay Plaintiffs and the Class all contracted compensation for the performance of services within the City of New York by Plaintiffs and the Class.

554.    As a result of Defendants' failures to pay Plaintiffs and the Class all compensation owed for work performed within the City of New York, Defendants have violated FIFA and/or applicable regulations thereunder.

555.    Defendants have acted willfully and deliberately in maintaining an intentional practice of failing to compensate Plaintiffs and the Class in accordance with FIFA.

556.    Defendants' violations of FIFA have significantly damaged Plaintiffs and the Class and entitle them to recover damages to the greatest extent permitted by law, including, *inter alia*, the total amount of their unpaid compensation, an additional equal amount in liquidated damages, prejudgment interest, and attorneys' fees and costs.

**ELEVENTH CAUSE OF ACTION**
**VIOLATIONS OF FIFA: LATE PAYMENT OF COMPENSATION**
**(*On Behalf of Plaintiffs and the Class*)**
**(*Brought in the Alternative to Plaintiffs' and the Class's Claims under the FLSA and NYLL*)**

557.    Plaintiffs, on behalf of themselves and the Class, hereby repeat and reallege the foregoing allegations as if set forth fully herein.

558.    In the alternative to their claims brought under the FLSA and NYLL, Plaintiffs and the Class allege violations of FIFA, N.Y.C. Admin. Code §§ 20-927, *et seq.*, and all applicable regulations thereunder.

559.    Throughout the full statutory period, Plaintiffs and the Class were protected by the provisions of FIFA and all applicable regulations thereunder.

560.    FIFA requires hiring parties, including Defendants, to pay freelance workers all contracted compensation on or before the date such contracted compensation is due under the terms of a contract or, if the contract does not specify when the contracted compensation is due or the mechanism by which such due date shall be determined, no later than 30 days after completion of the freelance worker's services under the contract.

561.    Plaintiffs and the Class were not exempt from the requirement that Defendants pay them their contracted compensation under FIFA for work performed within the City of New York, and they are entitled to be paid all contracted compensation for all services performed for Defendants within the City of New York on their regularly scheduled pay days or, at minimum, within 30 days of the work performed.

562.    Throughout the statute of limitations period, Defendants have engaged in a policy and practice of hiring Plaintiffs and the Class to perform services within the City of New York and accepting the benefit of the same without paying them on their regularly scheduled pay days or, at minimum, within 30 days of the work performed (and, in some cases, not pay them at all).

563.    Throughout the statute of limitations period, Defendants have engaged in a policy and practice of failing to timely pay Plaintiffs and the Class all contracted compensation for the services performed by Plaintiffs and the Class within the City of New York.

564.    As a result of Defendants' failures to timely pay Plaintiffs and the Class all compensation owed for work performed with the City of New York, Defendants have violated FIFA and/or applicable regulations thereunder.

565.    Defendants have acted willfully and deliberately in maintaining an intentional practice of failing to compensate Plaintiffs and the Class in accordance with FIFA.

566.    Defendants' violations of FIFA have significantly damaged Plaintiffs and the Class and entitle them to recover damages to the greatest extent permitted by law, including, *inter alia*, the total amount of their unpaid compensation, an additional equal amount in liquidated damages, prejudgment interest, and attorneys' fees and costs.

<u>TWELFTH CAUSE OF ACTION</u>
<u>BREACH OF CONTRACT</u>
*(On Behalf of Plaintiffs and the Class)*

567.    Plaintiffs, on behalf of themselves and the Class, hereby repeat and reallege the foregoing allegations as if set forth fully herein.

568.    As detailed above, upon information and belief, CE Solutions entered into the Contracts with Con Edison to provide flagging and spotting services on New York City and New York State public streets, roadways, and sidewalks.

569.    Upon information and belief, pursuant to the Contracts, Defendants were required to pay Plaintiffs and the Class the local prevailing wage rate including supplemental benefits and overtime premiums for hours worked in excess of 40 hours per week, eight hours per day, hours worked on Saturdays and Sundays, and hours worked during the evening.

570.    Upon information and belief, the Contracts contained schedules of the prevailing rates of wages and supplemental benefits to be paid to Plaintiffs and the Class performing such work under the Contracts.

571.    The promise to pay prevailing wage rates and supplemental benefits in the Contracts was made for the benefit of Plaintiffs and the Class who worked on New York City and New York State public streets, roadways, and sidewalks under the Contracts.

572.    Defendants failed to pay Plaintiffs and the Class prevailing wage rates for straight-time and overtime work and failed to pay supplemental benefits.

573.    As detailed above, Defendants have breached the Contracts by, *inter alia*, failing to pay Plaintiffs and the Class prevailing wage rates for straight time, overtime, and supplemental benefits for work performed under the Contracts.

574.    Defendants' unlawful conduct was intentional, done with malice, and/or showed a deliberate, willful, wanton, and reckless indifference to Plaintiffs' and the Class's rights.

575.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and the Class have suffered and continue to suffer harm for which they are entitled to an award of damages to the greatest extent permitted by law.

### THIRTEENTH CAUSE OF ACTION
### UNJUST ENRICHMENT
### *(On Behalf of Plaintiffs and the Class)*

576.    Plaintiffs, on behalf of themselves and the Class, hereby repeat and reallege the foregoing allegations as if set forth fully herein.

577.    As detailed above, upon information and belief, CE Solutions entered into the Contracts with Con Edison to provide flagging and spotting services on New York City and New York State public streets, roadways, and sidewalks.

578.    Upon information and belief, pursuant to the Contracts, Defendants were required to pay Plaintiffs and the Class the local prevailing wage rate including supplemental benefits and overtime premiums for hours worked in excess of 40 hours per week, eight hours per day, hours worked on Saturdays and Sundays, and hours worked during the evening.

579.    Upon information and belief, the Contracts contained schedules of the prevailing rates of wages and supplemental benefits to be paid to Plaintiffs and the Class performing such work under the Contracts.

580.    The promise to pay prevailing wage rates and supplemental benefits in the Contracts was made for the benefit of Plaintiffs and the Class who worked on New York City and New York State public streets, roadways, and sidewalks under the Contracts.

581.    Defendants failed to pay Plaintiffs and the Class prevailing wage rates for straight-time and overtime work and failed to pay supplemental benefits.

582.    As detailed above, Defendants have breached the Contracts by, *inter alia*, failing to pay Plaintiffs and the Class prevailing wage rates for straight time, overtime, and supplemental benefits for work performed under the Contracts.

583.    As a direct and proximate result of Defendants' conduct, Defendants retained the benefit of Plaintiffs' and the Class's work under circumstances which render it inequitable and unjust for Defendants to retain such benefits without paying for their value.

584.    Defendants' unlawful conduct was intentional, done with malice, and/or showed a deliberate, willful, wanton, and reckless indifference to Plaintiffs' and the Class's rights.

585.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and the Class have suffered and continue to suffer harm for which they are entitled to an award of damages to the greatest extent permitted by law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves, the FLSA Collective, the Class, and the Subclass, respectfully request that the Court:

A.    Declare that the practices complained of herein are unlawful under applicable federal and State laws;

B.    Grant an injunction and order permanently restraining Defendants from engaging in such unlawful conduct;

C.      Declare this action to be maintainable as a collective action pursuant to 29 U.S.C. § 216, and direct Defendants to provide Plaintiffs with a list of all members of the FLSA Collective, including all last known addresses, telephone numbers, and email addresses of each such person, so Plaintiffs can give such persons notice of this action and an opportunity to make an informed decision about whether to participate in it;

D.      Designate Plaintiffs as the representatives of the FLSA Collective, and their counsel of record as class counsel;

E.      Determine the damages sustained by Plaintiffs and the FLSA Collective as a result of Defendants' violations of the FLSA, and award those damages against Defendants and in favor of Plaintiffs and the FLSA Collective, plus such pre-judgment and post-judgment interest as may be allowed by law;

F.      Declare this action to be maintainable as a class action pursuant to FRCP 23, and direct Defendants to provide Plaintiffs with a list of all members of the Class and Subclass, including all last known addresses, telephone numbers, and email addresses of each such person, so Plaintiffs can give such persons notice of this action and an opportunity to make an informed decision about whether to participate in it;

G.      Designate Plaintiffs as the representatives of the Class, and their counsel of record as class counsel;

H.      Designate Lopez, Najarro, and Nashemir as the representatives of the Subclass, and their counsel of record as class counsel;

I.      Determine the damages sustained by Plaintiffs, the Class, and the Subclass as a result of Defendants' violations of the NYLL or FIFA, and award those damages against

Defendants and in favor of Plaintiffs, the Class, and the Subclass, plus such pre-judgment and post-judgment interest as may be allowed by law;

J.       Award Plaintiffs, the FLSA Collective, the Class, and the Subclass an additional equal amount as liquidated damages because Defendants' violations were without a good faith basis;

K.       Award Plaintiffs, the FLSA Collective, the Class, and the Subclass their reasonable attorneys' fees and costs and disbursements in this action including, without limitation, any accountants' or experts' fees; and

L.       Grant Plaintiffs, the FLSA Collective, the Class, and the Subclass such other and further relief that the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs, on behalf of themselves, the FLSA Collective, the Class, and the Subclass, hereby demand a trial by jury on all issues of fact and damages.

Dated: October 20, 2022         **FARUQI & FARUQI, LLP**
      New York, New York

By: _/s/ Alex J. Hartzband_
    Alex J. Hartzband
    Camilo M. Burr
    Annabel R. Stanley

    685 Third Avenue, 26th Floor
    New York, New York 10017
    Tel: 212-983-9330
    Fax: 212-983-9331
    ahartzband@faruqilaw.com
    cburr@faruqilaw.com
    astanley@faruqilaw.com

    *Attorneys for Plaintiffs, the Putative*
    *FLSA Collective, Class, and Subclass*

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| NASHAILY ORTIZ, ISAURA LOPEZ, RUBEN LEMUS NAJARRO, NASHEMIR ORTIZ, and ADRIANNA GAMBOA, on behalf of themselves and others similarly situated, | Case No.: |
| | **CONSENT TO SUE** |
| Plaintiffs, | |
| v. | |
| CONSOLIDATED EDISON COMPANY OF NEW YORK, INC., CE SOLUTIONS GROUP, LLC, CE SOLUTIONS INC., CE FLAGGING PLUS CORP., CE RESERVE CORP., FLAGGING SPOTTING FLIPPING SERVICES INC., ARGANI INC., NYC 2WAY INTERNATIONAL LTD. d/b/a CTG CARS LLC, CONCORD LIMOUSINE INC., CONCORD LIMOUSINE 1, LLC, JEANNINE NAPOLEONE-COLBERT, in her individual and professional capacities, HASSAN SABLINI, in his individual and professional capacities, EDWARD SLININ, in his individual and professional capacities, DORA SLININ, in her individual and professional capacities, GARY SAMUEL, in his individual and professional capacities, and ALEXANDER GAVRILOV, in his individual and professional capacities, | |
| Defendants. | |

I, Nashaily Ortiz, was employed by Defendants in the last three years and am a named Plaintiff in the above-captioned action, *Ortiz, et al. v. Consolidated Edison Company of New York, et al.*, pending in the United States District Court for the Southern District of New York. I hereby consent to sue Defendants and be a party Plaintiff in this lawsuit.

I hereby appoint the law firm of Faruqi & Faruqi, LLP, located at 685 Third Ave., 26th Fl., New York, NY 10017, telephone number (212) 983-9330, as my attorneys.

Name (Print): _Nashaily Ortiz_____

Signature: _____

Date:   October 20, 2022

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NASHAILY ORTIZ, ISAURA LOPEZ, RUBEN LEMUS NAJARRO, NASHEMIR ORTIZ, and ADRIANNA GAMBOA, on behalf of themselves and others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>CONSOLIDATED EDISON COMPANY OF NEW YORK, INC., CE SOLUTIONS GROUP, LLC, CE SOLUTIONS INC., CE FLAGGING PLUS CORP., CE RESERVE CORP., FLAGGING SPOTTING FLIPPING SERVICES INC., ARGANI INC., NYC 2WAY INTERNATIONAL LTD. d/b/a CTG CARS LLC, CONCORD LIMOUSINE INC., CONCORD LIMOUSINE 1, LLC, JEANNINE NAPOLEONE-COLBERT, in her individual and professional capacities, HASSAN SABLINI, in his individual and professional capacities, EDWARD SLININ, in his individual and professional capacities, DORA SLININ, in her individual and professional capacities, GARY SAMUEL, in his individual and professional capacities, and ALEXANDER GAVRILOV, in his individual and professional capacities,<br><br>Defendants. | Case No.:<br><br>**CONSENT TO SUE** |

I, Isaura Lopez, was employed by Defendants in the last three years and am a named Plaintiff in the above-captioned action, *Ortiz, et al. v. Consolidated Edison Company of New York, et al.*, pending in the United States District Court for the Southern District of New York. I hereby consent to sue Defendants and be a party Plaintiff in this lawsuit.

I hereby appoint the law firm of Faruqi & Faruqi, LLP, located at 685 Third Ave., 26th Fl., New York, NY 10017, telephone number (212) 983-9330, as my attorneys.

Name (Print): ___Isaura Lopez_____

Signature: _[DocuSigned by signature]_____     Date:   October 20, 2022

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NASHAILY ORTIZ, ISAURA LOPEZ, RUBEN LEMUS NAJARRO, NASHEMIR ORTIZ, and ADRIANNA GAMBOA, on behalf of themselves and others similarly situated, | Case No.: |
| Plaintiffs, | **CONSENT TO SUE** |
| v. | |
| CONSOLIDATED EDISON COMPANY OF NEW YORK, INC., CE SOLUTIONS GROUP, LLC, CE SOLUTIONS INC., CE FLAGGING PLUS CORP., CE RESERVE CORP., FLAGGING SPOTTING FLIPPING SERVICES INC., ARGANI INC., NYC 2WAY INTERNATIONAL LTD. d/b/a CTG CARS LLC, CONCORD LIMOUSINE INC., CONCORD LIMOUSINE 1, LLC, JEANNINE NAPOLEONE-COLBERT, in her individual and professional capacities, HASSAN SABLINI, in his individual and professional capacities, EDWARD SLININ, in his individual and professional capacities, DORA SLININ, in her individual and professional capacities, GARY SAMUEL, in his individual and professional capacities, and ALEXANDER GAVRILOV, in his individual and professional capacities, | |
| Defendants. | |

I, Ruben Lemus Najarro, was employed by Defendants in the last three years and am a named Plaintiff in the above-captioned action, *Ortiz, et al. v. Consolidated Edison Company of New York, et al.*, pending in the United States District Court for the Southern District of New York. I hereby consent to sue Defendants and be a party Plaintiff in this lawsuit.

I hereby appoint the law firm of Faruqi & Faruqi, LLP, located at 685 Third Ave., 26th Fl., New York, NY 10017, telephone number (212) 983-9330, as my attorneys.

Name (Print):  Ruben Lemus Najarro
_____

Signature: _____   Date:   October 20, 2022

DocuSigned by:

7E019092391C470

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NASHAILY ORTIZ, ISAURA LOPEZ, RUBEN LEMUS NAJARRO, NASHEMIR ORTIZ, and ADRIANNA GAMBOA, on behalf of themselves and others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>CONSOLIDATED EDISON COMPANY OF NEW YORK, INC., CE SOLUTIONS GROUP, LLC, CE SOLUTIONS INC., CE FLAGGING PLUS CORP., CE RESERVE CORP., FLAGGING SPOTTING FLIPPING SERVICES INC., ARGANI INC., NYC 2WAY INTERNATIONAL LTD. d/b/a CTG CARS LLC, CONCORD LIMOUSINE INC., CONCORD LIMOUSINE 1, LLC, JEANNINE NAPOLEONE-COLBERT, in her individual and professional capacities, HASSAN SABLINI, in his individual and professional capacities, EDWARD SLININ, in his individual and professional capacities, DORA SLININ, in her individual and professional capacities, GARY SAMUEL, in his individual and professional capacities, and ALEXANDER GAVRILOV, in his individual and professional capacities,<br><br>Defendants. | Case No.:<br><br>**CONSENT TO SUE** |

I, Nashemir Ortiz, was employed by Defendants in the last three years and am a named Plaintiff in the above-captioned action, *Ortiz, et al. v. Consolidated Edison Company of New York, et al.*, pending in the United States District Court for the Southern District of New York. I hereby consent to sue Defendants and be a party Plaintiff in this lawsuit.

I hereby appoint the law firm of Faruqi & Faruqi, LLP, located at 685 Third Ave., 26th Fl., New York, NY 10017, telephone number (212) 983-9330, as my attorneys.

Name (Print): Nashemir Ortiz

Signature: *Nashemir Ortiz*
DocuSigned by:
0C8A6D2E807C42C

Date: October 20, 2022

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NASHAILY ORTIZ, ISAURA LOPEZ, RUBEN LEMUS NAJARRO, NASHEMIR ORTIZ, and ADRIANNA GAMBOA, on behalf of themselves and others similarly situated, | Case No.: |
| | **CONSENT TO SUE** |
| Plaintiffs, | |
| v. | |
| CONSOLIDATED EDISON COMPANY OF NEW YORK, INC., CE SOLUTIONS GROUP, LLC, CE SOLUTIONS INC., CE FLAGGING PLUS CORP., CE RESERVE CORP., FLAGGING SPOTTING FLIPPING SERVICES INC., ARGANI INC., NYC 2WAY INTERNATIONAL LTD. d/b/a CTG CARS LLC, CONCORD LIMOUSINE INC., CONCORD LIMOUSINE 1, LLC, JEANNINE NAPOLEONE-COLBERT, in her individual and professional capacities, HASSAN SABLINI, in his individual and professional capacities, EDWARD SLININ, in his individual and professional capacities, DORA SLININ, in her individual and professional capacities, GARY SAMUEL, in his individual and professional capacities, and ALEXANDER GAVRILOV, in his individual and professional capacities, | |
| Defendants. | |

I, Adrianna Gamboa, was employed by Defendants in the last three years and am a named Plaintiff in the above-captioned action, *Ortiz, et al. v. Consolidated Edison Company of New York, et al.*, pending in the United States District Court for the Southern District of New York. I hereby consent to sue Defendants and be a party Plaintiff in this lawsuit.

I hereby appoint the law firm of Faruqi & Faruqi, LLP, located at 685 Third Ave., 26th Fl., New York, NY 10017, telephone number (212) 983-9330, as my attorneys.

Name (Print): ___Adrianna Gamboa_____

Signature: _____[DocuSigned by signature: 06A9BF89F7BA430...]_____     Date:   October 20, 2022