**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------x

NASHAILY ORTIZ, individually, and on behalf :
of all others similarly situated, et al.,   :
              :
        Plaintiffs,  :
              :
    - against -     :
              :
CONSOLIDATED EDISON COMPANY OF  :
NEW YORK, INC., et al.,     :
              :
        Defendants. :

------------------------------------------------------------------x

22 Civ. No. 8957 (JLR) (GS)

REPORT &
<u>RECOMMENDATION</u>

**GARY STEIN, United States Magistrate Judge:**

 Plaintiffs Nashaily Ortiz, Isaura Lopez, Ruben Lemus Najarro, Nashemir

Ortiz, Adrianna Gamboa, Steven Allicott, Roberto Rosario, Jr., and Stephanie

Bundrick ("Plaintiffs"), on behalf of themselves and a putative class, bring fourteen

causes of actions against Defendants for violations of the Fair Labor Standards Act

("FLSA") and the New York Labor Law ("NYLL") or, in the alternative, the

Freelance Isn't Free Act ("FIFA"), in addition to common-law claims for failure to

pay prevailing wages.  (Dkt. No. 72, First Amended Complaint ("FAC")).[1]

 Plaintiffs name sixteen different Defendants who allegedly jointly employed

Plaintiffs to work at jobsites operated by Consolidated Edison Company of New

---

[1] Specifically, Plaintiffs assert the following claims on behalf of themselves and the putative class: (1)
FLSA overtime violations, (2) failure to timely pay wages under the FLSA, (3) NYLL overtime
violations, (4) failure to timely pay wages under the NYLL, (5) failure to pay all required wages
under the NYLL, (6) failure to provide pay-rate notices under the NYLL, (7) failure to provide
accurate wage notices under the NYLL, (8) failure to reimburse business-related expenses under the
NYLL, (9) failure to provide spread-of-hours pay under the NYLL, (10) NYLL minimum-wage
violations, (11) failure to pay compensation due under the FIFA, (12) failure to provide timely
compensation under the FIFA, (13) breach of contract to pay prevailing wages, and (14) unjust
enrichment, premised on failure to pay prevailing wages.  (FAC ¶¶ 621-747).  The FAC also asserts,
on behalf of Plaintiff Nashaily Ortiz, a retaliation claim under the FLSA and NYLL.  (*Id.* ¶¶ 748-63).

York, Inc. ("Con Edison"): Con Edison itself, CE Solutions Group LLC ("CESG"), CE Solutions, Inc. ("CES"), CE Flagging Plus Corp. ("CEFP"), CE Reserve Corp. ("CER"), Flagging Spotting Flipping Services Inc. ("FSFS"), Argani Inc. ("Argani"), NYC 2Way International Ltd. ("2Way"), Concord Limousine Inc. and Concord Limousine 1, LLC (together, "Concord"), Marvelous Mark Transportation Co., Inc. ("MMT"), A&M Transport Transpors Inc. ("A&M"), 23 West Group Inc. ("23West"), Jeannine Napoleone-Colbert ("Colbert"), Hassan Sablini ("Sablini"), and Nabih Koubaissy ("Koubaissay").

Pending before the Court are two motions to dismiss. Defendants CESG, CES, 2Way, and Colbert (the "CESG Defendants") move to dismiss the FAC in its entirety (Dkt. No. 104), while Defendant Con Edison moves to dismiss only the prevailing wage claims (Dkt. No. 100).

For the reasons set forth herein, the undersigned respectfully recommends both motions be **GRANTED IN PART** and **DENIED IN PART**. The undersigned further recommends granting Plaintiffs leave to replead.

## BACKGROUND

### A. Factual Background

#### 1. The Parties

Plaintiffs allege they work, or worked, as "flaggers" or "spotters" at jobsites operated by Con Edison in New York City and Westchester County. (FAC ¶¶ 144-45, 276-77). Flaggers cordon off jobsites and redirect traffic away from the

area (*id.* ¶ 149) and spotters reserve parking spaces at the sites for Con Edison

vehicles and ensure those vehicles can access the same (*id.* ¶ 150).

The FAC alleges that all Defendants "jointly operate CE Solutions," which

the FAC describes as "a traffic control services company in Brooklyn, New York that

provides Con Edison with Flaggers and Spotters." (*Id.* ¶ 1 & n.2). Plaintiffs attach

to the FAC a screenshot from a website for "CE Solutions," which shows an address

of 259 Columbia Street, Brooklyn, NY 11231. (*Id.* Exh. K; Dkt. No. 128 ¶ 9).

"CE Solutions," however, is not a named Defendant and is not, in fact, a

separate company. Rather, the FAC defines the term "CE Solutions" to refer to "a

collection of companies compris[ed]" of eleven corporate Defendants: CESG, CES,

CEFP, CER, FSFS, Argani, 2Way, Concord, MMT, A&M, and 23 West.

(FAC ¶ 141).[2] The FAC never explains how these companies "comprise" CE

Solutions, how all Defendants "jointly operate" CE Solutions, or the respective roles

played by each Defendant in the operations of CE Solutions.[3]

Two of the CESG Defendants—CESG and CES—are alleged to be located at

259 Columbia Street in Brooklyn (the address on the CE Solutions website).

(*Id.* ¶¶ 39, 46). The remainder of the Defendants that allegedly comprise CE

---

[2] Several of these eleven Defendants have answered the FAC: CEFP, CER, Argani, and Sablini (Dkt. No. 130; Dkt. No. 144 (amended answer)), Concord (Dkt. No. 96), and MMT (Dkt. No. 149). Defendants A&M and 23 West did not answer the FAC and certificates of default have been entered against them. (Dkt. Nos. 121-22). Defendant FSFS was voluntarily dismissed from the action. (Dkt. No. 91; *see also* Dkt. No. 130 at 1 n.1).

[3] Moreover, despite alleging that all Defendants "jointly operate" CE Solutions. the FAC also alleges that "companies . . . including" MMT, A&M, and 23 West were "operated" by CE Solutions. (*Id.* ¶ 241). Similarly, although the FAC alleges that Con Edison (as one of the Defendants) "jointly operate[s]" CE Solutions (*id.* ¶ 1), it simultaneously alleges that CE Solutions contracted with Con Edison (*id.* ¶ 250).

Solutions (CEFP, CER, FSFS, Argani, 2Way, Concord, MMT, A&M and 23 West) have separate corporate addresses at various locations in Brooklyn, Queens, and Staten Island.  (*Id.* ¶¶ 53, 60, 67, 74, 81, 88, 95, 102, 109, 116).  Of these Defendants, only Defendants CER and 23 West share the same corporate address.  (*See id.* ¶¶ 60, 109).

The FAC alleges that Defendant Colbert "manages and operates" CE Solutions.  (FAC ¶ 124).  Sablini allegedly "owns and operates" CE Solutions.  (*Id.* ¶ 130).  Yet the FAC also alleges that in or around April 2023, CE Solutions "terminated Sablini's employment."  (*Id.* ¶ 240).  After Sablini's termination, "CE Solutions transferred a vast majority of the Employees who worked for the Defendants' companies operated by Sablini to other companies operated by CE Solutions, including" MMT, A&M, and 23West.  (*Id.* ¶ 241).

As explained further below, most of the FAC's substantive allegations are directed against all sixteen "Defendants" or against "CE Solutions" (comprised of eleven separate Defendants), with the latter sometimes alleged to be acting "on behalf of all Defendants."

### 2.  Joint Employer Allegations

Plaintiffs allege that Defendants jointly employ approximately 400 to 500 employees as flaggers and spotters at any given time ("Employees") to ensure safety on Con Edison jobsites on or near roadways.  (FAC ¶¶ 1-2, 157).  Plaintiffs contend that "Defendants' status as joint employers is evident from the myriad of ways in which they coordinate with one another to direct and control all aspects of Plaintiffs'

and similarly situated employees' employment." (*Id.* ¶ 2; *see also id.* ¶ 165). According to the FAC, Defendants' joint employment and control over Plaintiffs' work is manifested in several specific ways. (*See id.* ¶¶ 165-241).

*First*, Plaintiffs allege that Defendants jointly coordinate the assignment of shifts to Employees. (*Id.* ¶¶ 166-82). Plaintiffs aver that "CE Solutions, on behalf of all Defendants, calls Employees in the evening and assigns them shifts at jobsites the following day." (*Id.* ¶ 168). If an Employee does not get assigned a shift, CE Solutions, supposedly on behalf of all Defendants, instructs Employees to call CE Solutions' office directly or to call a hotline maintained and operated by Defendants, so that the Employees can be placed in line for shifts as they become available. (FAC ¶ 169). When Employees call the hotline, CE Solutions, allegedly on behalf of all Defendants, instructs Employees to provide their "CE Solutions-issued identification number," and, when a shift becomes available, CE Solutions notifies Employees of the location and the time at which they are to report. (*Id.* ¶¶ 170-71). Plaintiffs also allege that Employees must get approval from a CE Solutions manager to take time off work. (*Id.* ¶ 176).

Plaintiffs contend that, beginning around February 2021, Defendants developed a smartphone application (the "App") to allow Employees to check for available shifts. (FAC ¶ 177). The App allows Defendants to determine if and when an Employee has arrived on a jobsite and logs, among other things, the location of the jobsite, the length of the shift worked, and the name of the Con Edison supervisor working at the jobsite. (*Id.* ¶ 179). Plaintiffs allege that, beginning in

March 2022, Defendants used the App "exclusively to check for available shifts and track Employees' locations."  (*Id.* ¶ 178).

*Second*, Plaintiffs allege that Defendants maintain direction and control over the Employees' manner of work.  (*Id.* ¶¶ 183-209).  CE Solutions allegedly instructs Employees, upon their arrival at the jobsite, to report to a Con Edison supervisor (who is likewise physically present at the jobsite), who then tasks the Employees with assignments and directs the Employees' work by telling the Employees "where to stand to direct traffic."  (*Id.* ¶ 184).  In addition, CE Solutions assigns its own supervisors to perform "regular rounds" of the jobsites to monitor Employees' work.  (*Id.* ¶ 185).

Moreover, Plaintiffs allege that if they need to take a restroom or lunch break, they "must get permission from Defendants before doing so."  (FAC ¶ 187).  Indeed, Plaintiffs allege, Employees must remain at the jobsite before taking a break until a CE Solutions supervisor approves the break; if one of the CE Solutions supervisors is unable to approve the break, "the Employee is prohibited from leaving the jobsite and will be forced to relieve themselves on the side of a roadway and/or skip their lunch break altogether."  (*Id.* ¶¶ 188-89).

Defendants also allegedly control the way in which Plaintiffs report their time.  CE Solutions issues Employees individually numbered timesheets marked "'CE Solutions Group'" with CESG's address and phone number.  (*Id.* ¶ 191; *see also*

*id.* Exh. G).[4]  The timesheets are titled "'Con Edison Flagging / Parking Location Timesheet'" and instruct Employees to "'take a clear photo of this timesheet and send it to close@nyc2way.com at the completion of your job." (*Id.* ¶ 193 & Exh. H). The email address close@nyc2way.com is alleged (upon information and belief) to be owned and operated by CE Solutions and/or 2Way on behalf of all Defendants. (*Id.* ¶ 194).

Plaintiffs allege that Employees are required to sign the timesheet upon arrival at the jobsite and at the conclusion of their shifts, which occurs only when a Con Edison supervisor notifies the Employee the shift has ended.  (FAC ¶¶ 195-96). Relatedly, Plaintiffs allege that CE Solutions directs Employees to present the timesheet to a Con Edison supervisor for their signature to certify the number of hours the Employee worked that shift. (*Id.* ¶ 197).  Con Edison confirms the number of hours an employee worked by notifying CE Solutions that the Employees' shift has ended.  (*Id.* ¶ 201).

After the Employee obtains Con Edison's approval, Employees take a photograph of the timesheet and send it to close@nyc2way.com (in accordance with the instructions CE Solutions gives Employees on the timesheets).  (*Id.* ¶ 198). Plaintiffs allege that, in the alternative, CE Solutions directs Employees to send photographs of their timesheets to a CE Solutions dispatcher, supposedly on behalf of all Defendants.  (*Id.* ¶ 199).

---

[4] The FAC also alleges that Concord issues Employees "similar timesheets" marked "'Con Ed Reserve Parking Site Location Sign Off Sheet'" with Concord's address and phone number.  (FAC ¶ 192).

Employees may also submit their timesheets through the App.  (*See* FAC ¶ 181).  If an Employee does not timely submit their timesheet through the App after completing a shift, Con Edison can cancel the shift in the App "as if it was never worked by the Employee."  (*Id.*; *see also id.* ¶ 182 & *id.* Exh. F).

At the end of each pay period, but before Employees are actually paid, CE Solutions and Con Edison allegedly verify the number of hours Employees worked by comparing separate time reports maintained by each company.  (*Id.* ¶ 202).  The time reports contain, among other things, the Employees' name, their CE Solutions-issued identification number, and the number of hours the Employee worked that week.  (*Id.* ¶ 203).

*Third*, Defendants allegedly have joint responsibility to discipline Employees. (*Id.* ¶¶ 210-17).  The FAC illustrates this joint responsibility as follows: "if an Employee arrives late to a shift, leaves a jobsite without permission, or is not dressed and/or equipped properly, a Con Edison supervisor will notify CE Solutions of the infraction and direct CE Solutions regarding the appropriate discipline." (*Id.* ¶ 211; *see also id.* Exh. A at 21).  The FAC also alleges that Con Edison supervisors report Employees to CE Solutions if the hours on their timesheets submitted through the App do not match the hours noted by Con Edison supervisors.  (*Id.* ¶ 213).

In the event of policy violations, Defendants may discipline the Employee by (1) removing an Employee from a shift, (2) suspending the Employee, or (3) terminating the Employee.  (FAC ¶ 214).  If an Employee calls out of work after

being assigned a shift, Defendants typically suspend the Employee.  (*Id.* ¶ 215).
The FAC also specifies, however, that Con Edison supervisors can mandate that
specific Employees work or not work a shift based on a supervisor's prior experience
with that Employee.  (*Id.* ¶ 216).

   *Fourth*, Defendants allegedly control Employees' wages.  (*Id.* ¶¶ 218-24).
According to Plaintiffs, Defendants establish hourly rates based on whether an
Employee is a flagger or a spotter: $15.00 to $17.00 per hour for flaggers and $10.00
to $12.00 per hour for spotters.  (*Id.* ¶¶ 219-20).

   Furthermore, Defendants allegedly "direct and control the employment
status of Employees," specifically by misclassifying Employees as independent
contractors for shifts performed at Con Edison jobsites.  (*Id.* ¶¶ 222-23).
Defendants supposedly conceal this misclassification by "improperly pay[ing]
Employees on an IRS 1099, as opposed to an IRS Form W-2."  (*Id.* ¶ 224).

   *Fifth*, the FAC alleges several other "indicia of control and employee status,"
including that Defendants maintain all employment, personnel, and business
records for Employees and that Employees have no managerial responsibilities.
(*Id.* ¶¶ 226-35).  In May 2023, Plaintiffs allege, "Defendants began pressuring
Employees to form their own businesses, which, going forward, would be paid
directly by Defendants for shifts worked by Employees."  (*Id.* ¶ 238).  They further
allege that "Defendants notified Employees that if they refused to create their own
corporations, their employment with Defendants would be terminated, effective
immediately."  (*Id.* ¶ 239).

Premised on Defendants' alleged status as their joint employer, Plaintiffs bring ten causes of action against all Defendants for violations of the FLSA and NYLL (Count Nos. 1-10, *id*. ¶¶ 621-707) and Plaintiff Ortiz, individually, brings a claim for retaliation under these statutes (Count Nos. 15 & 16, *id*. ¶¶ 748-63).  If those claims fail, such that Plaintiffs do not establish the requisite employer-employee relationship under the FLSA and NYLL, Plaintiffs allege, in the alternative, that they worked for Defendants as independent contractors and are therefore entitled to the protections of FIFA.  Plaintiffs assert two causes of action under FIFA (Count Nos. 11 & 12, *id*. ¶¶ 708-28).

### 3.  Prevailing Wage Allegations

Separate from their causes of action brought under the FLSA, the NYLL, and FIFA, Plaintiffs bring a breach of contract claim as third-party beneficiaries of agreements allegedly entitling Plaintiffs to prevailing wages, as well as a related claim under an unjust enrichment theory.  (Count Nos. 13 & 14, FAC ¶¶ 729-47).  Plaintiffs allege that "Defendants engage in a common pattern and practice of deliberately denying Employees compensation for prevailing wage work at applicable prevailing wage rates."  (*Id*. ¶ 249).  According to the FAC, "Defendants are required to pay Employees at the local prevailing wage rates, including supplemental benefits and overtime premiums for hours worked in excess of 40 hours per week, eight hours per day, hours worked on Saturdays and Sundays, and hours worked during the evening."  (*Id*. ¶ 251).

In support of this claim, the FAC cites a variety of different sources that purportedly give rise to an obligation on the part of Defendants to pay Employees prevailing wages.  Plaintiffs first cite a provision of Con Edison's "Standard Terms and Conditions for Construction Contracts," which explicitly requires contractors on Con Edison projects to pay prevailing wages to the workers on the sites.  (*Id.* ¶ 252; *id.* Exh. L).  Plaintiffs allege that "the work Employees perform is predominantly physical in nature, and exposes Employees to attendant risks shared by other construction workers due to the presence of construction, construction equipment, and public traffic and was performed in close proximity to construction sites, thereby entitling them to prevailing wages."  (*Id.* ¶ 253).

The FAC further alleges that each jobsite involving street openings or excavation work in New York City requires Con Edison to obtain a "Street Opening Permit" from the New York City Department of Transportation ("DOT Permit" and "DOT," respectively).  (*Id.* ¶ 256).  The FAC attaches an example of a DOT Permit, issued on September 29, 2022, that "grant[s]" "permission . . . to" Con Edison "to open [a] roadway" on 10th Avenue between West 42nd and West 43rd Streets in Manhattan.  (*Id.* ¶ 256; *id.* Exh. M).  The DOT Permit further provides that the "Permittee," Con Edison, shall comply with several "stipulations," including—as highlighted in the FAC—New York City Administrative Code § 19-142.  (*Id.* ¶ 258; *id.* Exh. M at 3).  The text of Admin. Code § 19-142, which is recited on the face of the DOT Permit, generally provides that the prevailing wages established under

NYLL § 220 must be paid to workers on projects for which certain permits are required.  (*Id*. Exh. M at 3 (quoting Admin. Code § 19-142)).

Plaintiffs aver "the fact that such permits (issued by DOT) were required for the work [they] performed in New York City obligated Defendants, including Con Edison, to ensure that prevailing wages were paid for all work on such projects pursuant to NYLL § 220 (3-e)."  (FAC ¶ 259; *see also id.* (alleging "NYLL § 220 (3-a) plainly contemplates and incorporates NYC Admin. Code § 19-142"); *id.* ¶ 260 (alleging Con Edison routinely obtains street permits "which expressly require payment of prevailing wages under NYC Admin. Code § 19-142")).

The FAC further alleges that a schedule containing the prevailing wage rates was, or should have been, annexed to the contracts that CE Solutions entered into with Con Edison, as either a subcontractor or prime contractor, to provide flagging and spotting services (the "Service Contracts").  (*Id.* ¶¶ 250, 261).  Even if the schedules were not annexed to the Service Contracts, Plaintiffs contend their terms "are considered expressly or impliedly incorporated" therein as a "matter of law and/or public policy."  (*Id.* ¶ 262).  Further, the FAC alleges, "upon information and belief," that "the Permits and/or other agreements between Con Edison and New York State, New York City, and/or Westchester County require payment of prevailing wages, either specifically or through a general requirement to comply with all applicable laws."  (*Id.* ¶ 263).

Plaintiffs also rely on a provision in the Service Contracts, an example of which is attached to the FAC as Exhibit O.  (FAC ¶ 272).[5]  This contract, which is between Con Edison and CESG and dated February 2022, incorporates Con Edison's "Standard Terms and Conditions for Service Contracts."  (*Id*. Exh. O at 7-29).  Under the Service Contracts, CESG is required to "comply with all federal, state, and local laws, executive orders, regulations, ordinances, and safety codes applicable at the time of performance to services rendered[.]"  (*Id*. ¶ 272 (quoting Exh. O at 23)).  Plaintiff alleges that, pursuant to Admin. Code § 19-142 and NYLL § 220 (3-e), this contractual provision requiring compliance with all applicable laws "constitutes a promise to pay prevailing wages."  (*Id*. ¶ 273).

The FAC goes on to allege that "Employees are third-party beneficiaries of the Permits and/or the Contracts entered into by Defendants," because "the promise to pay prevailing wage rates and supplemental benefits in the DOT Permits was made for the benefit of Employees working on New York City and New York State public roadways and sidewalks, which required permits to use or open same." (*Id*. ¶¶ 268-69; *see also id*. ¶ 270 ("Therefore, Employees who provide flagging and spotting services for Con Edison on New York City and New York State public streets, roadways, and sidewalks are intended third-party beneficiaries of the Permits and/or the Contracts.")).

---

[5] The Court notes that Plaintiffs submitted two exhibits accompanied by a coversheet entitled "Exhibit N," and no exhibits with a coversheet entitled "Exhibit O."  The Court will treat Dkt. No. 72-15, which is ECF filed as "Exhibit O," but includes a coversheet titled "Exhibit N," as the Exhibit O referenced in the FAC.

In addition, the FAC alleges that Employees' work on New York City and New York State public roadways constituted "public works," thereby requiring Defendants to pay prevailing wages.  (*Id.* ¶ 254; *see also id.* ¶¶ 265-66).  However, the FAC also alleges that "whether a construction project is considered a public or private work is not dispositive since the prevailing wage requirements of [NYLL] § 220 were applicable pursuant to both NYC Admin. Code § 19-142 and the contractual provision in the [DOT] Permit" which cites Admin. Code § 19-142. (*Id.* ¶ 267).

Finally, Plaintiffs include a series of allegations about work performed on Con Edison jobsites in Westchester.  (*Id.* ¶¶ 276-79; *see also id.* ¶ 263).  Plaintiffs allege that, in addition to their work in New York City, Employees perform work on public roads and sidewalks in Westchester, and that—upon information and belief—CE Solutions entered into "analogous contracts" with Con Edison, as either a subcontractor or prime contractor, to provide flagging and spotting services on public streets, roadways, and sidewalks located in Westchester.  (*Id.* ¶¶ 276-77). Plaintiffs allege, again upon information and belief, that the public streets, roadways, and sidewalks located in Westchester on which Employees work under the alleged contracts, "also require permits that entitle Employees to be paid the proper prevailing wage rates."  (*Id.* ¶ 278).

**B. Procedural History**

Plaintiffs commenced the instant action on October 20, 2022.  (Dkt. No. 1 ("Complaint")).  Con Edison moved to partially dismiss the Complaint on April 14,

2023, (Dkt. Nos. 53-55-11), and the CESG Defendants moved to dismiss on May 5, 2023 (Dkt. Nos. 63-65).  Thereafter, on June 2, 2023, Plaintiffs filed the FAC, mooting Defendants' prior motions.  (Dkt. Nos. 72 & 74).  Con Edison and the CESG Defendants separately filed renewed motions to dismiss the FAC on July 17, 2023. (Dkt. No. 100; Dkt. No. 101 ("Con Ed Br")); Dkt. No. 104; Dkt. No. 105 ("CESG Br.")).

The CESG Defendants seek dismissal of all claims asserted against them, arguing that (1) the FAC violates Fed. R. Civ. P. 8(a) by engaging in impermissible "group pleading"; (2) Plaintiffs fail to adequately plead that they were employed by the CESG Defendants, requiring dismissal of the FLSA and NYLL claims; (3) the prevailing wage claims should be dismissed; (4) Plaintiffs cannot pursue class-wide statutory penalties under CPLR § 901(b); (5) Plaintiffs fail to state a claim under FIFA; and (6) Plaintiff Ortiz fails to state a claim for retaliation.  By contrast, Con Edison's motion to dismiss is limited to Plaintiffs' prevailing wage claims.

Plaintiffs filed an omnibus opposition brief on August 17, 2023 (Dkt. No. 127 ("Pl. Br.")), and Con Edison and the CESG Defendants filed reply briefs on August 28, 2023 and September 18, 2023, respectively (Dkt. No. 132 ("Con Ed Reply"); Dkt. No. 146 ("CESG Reply")).[6]

On January 26, 2024, Con Edison filed a Notice of Supplemental Authority, informing the Court of an Opinion & Order issued the day prior by the Honorable

---

[6] On July 18, 2023, the Honorable Jennifer L. Rochon referred the above-referenced motions to dismiss for a report and recommendation to the then-designated Magistrate Judge.  (Dkt. No. 107). The matter was reassigned to the undersigned on September 19, 2023.  (Dkt. Entry dated Sept. 19, 2023).

Edgardo Ramos, *Ballast v. Workforce7 Inc.*, No. 20 Civ. 3812 (ER), 2024 WL 307966 (S.D.N.Y. Jan. 25, 2024), concerning "identical prevailing wage and benefit claims to those asserted by Plaintiffs here."  (Dkt. No. 184 at 2).  On January 31, 2024, the CESG Defendants submitted a letter stating they "reiterate and incorporate" Con Edison's Notice of Supplemental Authority and the *Ballast* decision itself "to the extent they relate to the CESG Defendants' arguments" made in support of their motion to dismiss.  (Dkt. No. 185).

On February 1, 2024, at Plaintiffs' request, Judge Rochon stayed a decision on the motions to dismiss pending the First Department's anticipated ruling in *Ross v. No Parking Today, Inc.*, Index No. 151700/22, a similar state court case filed on behalf of a putative class of flaggers and spotters asserting a claim to prevailing wages.  (Dkt. Nos. 186 & 187).  The First Department issued its ruling on February 20, 2024, *see Ross v. No Parking Today, Inc.*, 224 A.D.3d 559, 203 N.Y.S.3d 608 (1st Dep't 2024), after which Judge Rochon lifted the stay.  (Dkt. No. 195).  The parties submitted letters addressing the impact of *Ross* and *Ballast* on this case in March 2024.  (Dkt. Nos. 188-90).

## LEGAL STANDARDS

### A.   Motion to Dismiss for Failure to State a Claim

Under Fed. R. Civ. P. 12(b)(6), a complaint may be dismissed for "failure to state a claim upon which relief can be granted."  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting

16

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 554, 570 (2007)).  A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 566 U.S. at 678.  The factual allegations "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555; *see also Iqbal*, 556 U.S. at 678 (complaint must raise "more than a sheer possibility that a defendant has acted unlawfully").

In considering a motion to dismiss under Rule 12(b)(6), the Court must "accept[] all factual allegations in the complaint as true" and "draw[] all reasonable inferences in the plaintiff's favor." *Palin v. New York Times Co.*, 940 F.3d 804, 809 (2d Cir. 2019) (citation omitted).  Courts need not, however, consider "conclusory allegations or legal conclusions couched as factual allegations." *Dixon v. von Blanckensee*, 994 F.3d 95, 101 (2d Cir. 2021) (citation omitted); *see also Iqbal*, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").

Determining whether a plausible claim has been pled is "a context-specific task" that requires the court "to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679; *see also Herrera v. Comme des Garcons, Ltd.*, 84 F.4th 110, 113 (2d Cir. 2023).  However, "Rule 12(b)(6) does not countenance . . . dismissals based on a judge's disbelief of a complaint's factual allegations." *Twombly*, 550 U.S. at 556 (citation omitted).  The court's task "is to assess the legal feasibility of the

complaint; it is not to assess the weight of the evidence that might be offered on either side." *Lynch v. City of N.Y.*, 952 F.3d 67, 75 (2d Cir. 2020).

### B.  Group Pleading

Federal Rule of Civil Procedure 8(a) "requires that a pleading contain 'a short and plain statement of the claim showing that the pleader is entitled to relief.'" *Manchanda v. Navient Student Loans*, No. 19 Civ. 5121 (WHP), 2020 WL 5802238, at *2 (S.D.N.Y. Sept. 29, 2020) (quoting Fed. R. Civ. P. 8(a)(2)).  Rule 8(a) "does not demand that a complaint be a model of clarity" but, "at a minimum," it requires that each defendant be given "fair notice of what the plaintiff's claim is and the ground upon which it rests." *Id.* (quoting *Atuahene v. City of Hartford*, 10 F. App'x 33, 34 (2d Cir. 2001)); *see also Adamou v. Cnty. of Spotsylvania,* No. 12 Civ. 7789 (ALC) (SN), 2016 WL 1064608, at *11 (S.D.N.Y. Mar. 14, 2016) ("Pleadings that fail to differentiate as to which defendant was involved in the alleged unlawful conduct are insufficient to state a claim.").

As such, "it is well-established in this Circuit that plaintiffs cannot simply lump defendants together for pleading purposes and that Rule 8 is violated where a plaintiff, by engaging in group pleading, fails to give each defendant fair notice of the claims against it." *Nesbeth v. New York City Mgmt. LLC*, No. 17 Civ. 8650 (JGK), 2019 WL 110953, at *3 (S.D.N.Y. Jan. 4, 2019) (citation omitted & cleaned up); *accord, e.g., Monterey Bay Mil. Hous., LLC v. Ambac Assurance Corp.*, 531 F. Supp. 3d 673, 728 (S.D.N.Y. 2021) (collecting cases); *Farmer v. Cnty. of Westchester*, No. 18 Civ. 2691 (NSR), 2021 WL 4199944, at *6-7 (S.D.N.Y. Sept. 15, 2021)

(granting motion to dismiss pursuant to Rule 8 where "the vast majority of allegations relating to [defendant] are jointly alleged against most of the other Defendants without providing any factual basis to distinguish their conduct").

"In prohibiting 'group pleading,' courts acknowledge that 'the principal function of pleadings under the federal rules is to give the adverse parties fair notice of the claims asserted [against them] so as to enable them to answer and prepare for trial.'" *Monterey Bay*, 531 F. Supp. 3d at 728 (quoting *Salahuddin v. Cuomo*, 861 F.2d 40, 42 (2d Cir. 1988) (cleaned up)). Thus, in accordance with the lenient standard set by Rule 8, "[d]ismissal under [the rule] 'is usually reserved for those cases in which the complaint is so confused, ambiguous, vague or otherwise unintelligible that its true substance, if any, is well disguised.'" *Bancorp Servs., LLC v. Am. Gen. Life Ins. Co.*, No. 14 Civ. 9687 (VEC), 2016 WL 4916969, at *5 (S.D.N.Y. Feb. 11, 2016) (quoting *Wynder v. McMahon*, 360 F.3d 73, 80 (2d Cir. 2004)).

"In the labor law context, courts have entertained group pleading arguments [] with respect to allegations concerning whether particular defendants constitute 'employers.'" *Fallon v. 18 Greenwich Ave., LLC*, 19 Civ. No. 9579 (MKV), 2021 WL 1105066, at *3 (S.D.N.Y. Mar. 23, 2021). *See, e.g.*, *Stewart v. Hudson Hall LLC*, No. 20 Civ. 885 (PGG) (SLC), 2020 WL 8732875, at *7-8 (S.D.N.Y. Oct. 19, 2020) (plaintiff's failure to comply with Rule 8(a)(2)'s minimal requirements required dismissal of FLSA and NYLL claims against corporate defendants), *R&R adopted*, 2021 WL 735244 (S.D.N.Y. Feb. 24, 2021); *see also Shi Ming Chen v. Hunan Manor*

*Enterprise, Inc.*, No. 17 Civ. 802 (GBD), 2018 WL 1166626, at *9 (S.D.N.Y. Feb. 15, 2018) (rejecting plaintiffs' attempt to "simply lump all seventeen Defendants together" in alleging joint employer status under the FLSA and NYLL).

## C.   Definition of "Employer" Under the Labor Laws

The FLSA defines an "employer" as "includ[ing] any person acting directly or indirectly in the interest of an employer in relation to an employee[.]"  29 U.S.C. § 203(d).  "The Supreme Court has recognized 'that broad coverage under the FLSA is essential to accomplish the statute's goal of outlawing from interstate commerce goods produced under conditions that fall below minimum standards of decency.'" *Irizarry v. Catsimatidis*, 722 F.3d 99, 103 (2d Cir. 2013) (quoting *Tony & Susan Alamo Found. v. Sec'y of Labor*, 471 U.S. 290, 296 (1985)).  Accordingly, the FLSA is construed liberally to "to apply to the furthest reaches consistent with congressional direction." *Irizarry*, 722 F.3d at 103.  Rejecting the narrower common law agency test for employment, the Supreme Court determined that the FLSA "defines the verb 'employ' expansively to mean 'suffer or permit to work.'" *Id.* (quoting *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 326 (1992)).[7]

Accordingly, the Second Circuit "has treated employment for FLSA purposes as a flexible concept to be determined on a case-by-case basis by review of the totality of the circumstances," and "has identified different sets of relevant factors"

---

[7] "The NYLL's definition of employment is nearly identical to the FLSA's."  *Fernandez v. HR Parking Inc.*, 407 F. Supp. 3d 445, 452 (S.D.N.Y. 2019); *see* NYLL § 2(7) (defining the term "employed" as "permitted or suffered to work").  Consequently, courts in this Circuit interpret the definition of "employer" under the NYLL coextensively with the FSLA's definition, including for purposes of determining who is a joint employer.  *Fernandez*, 407 F. Supp. 3d at 452 (collecting cases).

based on the factual challenges posed by particular cases. *Barfield v. New York City Health & Hosps. Corp.*, 537 F.3d 132, 141-42 (2d Cir. 2008). The overarching goal of these various tests is to assess the "economic reality" of the relationship between the parties. *Jean-Louis v. Met. Cable Co., Inc.*, 838 F. Supp. 2d 111, 121 (S.D.N.Y. 2011). "[T]he purpose of the 'economic reality' test—'to expose outsourcing relationships that lack a substantial economic purpose'—points to a lodestar for determining whether an employer has outsourced work in name only: the 'overarching concern is whether the alleged employer possessed the power to control the workers in question.'" *Id.* (quoting *Herman v. RSR Security Servs. Ltd.*, 172 F.3d 132, 139 (2d Cir. 1999)).

"The Second Circuit has developed three tests for determining whether a person or entity is an employer, including a joint employer." *Fernandez v. HR Parking Inc.*, 407 F. Supp. 3d 445, 451 (S.D.N.Y. 2019). The first test, articulated in *Carter v. Dutchess Community College*, 735 F. 2d 8 (2d Cir. 1984), assesses whether an employer exercised "formal control" over a worker and considers:

> whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records.

*Carter*, 735 F. 2d at 12.

The second test, set forth in *Brock v. Superior Care, Inc.*, 840 F.2d 1054 (2d Cir. 1988), is used to distinguish between independent contractors and employees.

*Brock* focuses on whether workers "depend upon someone else's business . . . or are in business for themselves." *Brock*, 840 F.2d at 1059.

The third test, outlined in *Zheng v. Liberty Apparel Co.*, 355 F.3d 61 (2d Cir. 2003), weighs six "nonexclusive and overlapping" factors to determine if an employer had "functional control" over workers. *Zheng*, 355 F.3d at 72. The *Zheng* factors are:

> (1) whether [the alleged employers'] premises and equipment were used for the plaintiffs' work; (2) whether the [subcontractors] had a business that could or did shift as a unit from one putative joint employer to another; (3) the extent to which plaintiffs performed a discrete line job that was integral to [the alleged employers'] process of production; (4) whether responsibility under the contracts could pass from one subcontractor to another without material changes; (5) the degree to which [the alleged employers] or their agents supervised plaintiffs' work; and (6) whether plaintiffs worked exclusively or predominantly for [the alleged employers].

*Id.* These factors "are most relevant in the context of subcontractor relationships." *Granada v. Trujillo*, No. 18 Civ. 3949 (PAE), 2019 WL 367983, at *5 (S.D.N.Y. Jan. 30, 2019).

None of the factors articulated by the Second Circuit "comprise a rigid rule for the identification of an FLSA employer." *Irizarry*, 722 F.3d at 105 (citation omitted). To the contrary, "they provide a nonexclusive and overlapping set of factors to ensure that the economic realities test mandated by the Supreme Court is sufficiently comprehensive and flexible to give proper effect to the broad language of the FLSA." *Id.* (cleaned up).

The law is clear that a worker can have more than one employer for purposes of the FLSA. *Zheng*, 355 F.3d at 66. To determine joint employment under the FLSA or NYLL, the Second Circuit uses the same "economic reality" test as that used to assess employer status generally. Courts apply the same factors discussed above, which are aimed at assessing whether "control" exists over the workers in question. *Jean-Louis*, 838 F. Supp. 2d at 121. "[C]ontrol in this context," however, "is not an all or nothing concept." *Id.* Thus, "even when one entity exerts 'ultimate' control over a worker, that does not preclude a finding that another entity exerts specific control to qualify as a joint employer under the FLSA." *Id.* (quoting *Barfield*, 537 F.3d at 148).

## DISCUSSION

### A. The FAC's Allegations Impermissibly Lump the CESG Defendants Together With Other Defendants in Violation of Rule 8

As a threshold issue, the CESG Defendants move to dismiss the FLSA, NYLL, and FIFA claims brought on behalf of all Plaintiffs (Count Nos. 1-12, FAC ¶¶ 621-728) for falling short of Rule 8's pleading requirements. The CESG Defendants argue, in particular, that the FAC engages in "group pleading" and fails to "put each CESG Defendant on notice of the particular claims asserted against it and the grounds for such claim." (CESG Br. at 6; *see also id.* at 4-5, 24; CESG Reply at 2-5).[8] In support of this argument, the CESG Defendants provide examples of

---

[8] Throughout their brief, the CESG Defendants cite the numbers assigned to the causes of action in Plaintiffs' initial Complaint. (*See* CESG Br. at 1-3, 23-24; Dkt. No. 1 at ¶¶ 474-585). It appears the CESG Defendants did not revise this portion of their brief when renewing their motion to dismiss

allegations in the FAC (which relate to the *Carter* factors) that are made about "Defendants" generally, without specifying which Defendants were responsible for the alleged activity.  (CESG Br. at 5 (citing FAC ¶¶ 155, 214, 218-224, 408)).

The CESG Defendants' characterization of the FAC is well founded.  Despite weighing in at 763 paragraphs and 97 pages (plus over 300 pages of exhibits), the FAC, from start to finish, consistently fails to distinguish between or among the sixteen different corporate and individual Defendants and instead lumps them together as either "Defendants" or "CE Solutions."  There are literally hundreds of such allegations in the FAC.[9]  The use of "CE Solutions" provides no meaningful specificity because "CE Solutions" itself is a shorthand comprising eleven different Defendants, including all of the corporate entity Defendants except for Con Edison. (FAC ¶ 141).  What's more, all of the Defendants including Con Edison are alleged to "jointly operate" "CE Solutions."  *Id.*[10]

Compounding the persistent use of such broad-brush allegations, the FAC never delineates the different roles played by the various Defendants with respect to Plaintiffs' work as flaggers and spotters.  Rather than first alleging which

---

the FAC.  The Court assumes this was done in error and relies on the CESG Defendants' substantive description of the counts it moves to dismiss.

[9] *See* FAC ¶¶ 1-9, 141-44, 151-52, 155-58, 160, 162, 165-79, 183-91, 197-99, 201-02, 204-09, 210-11, 213-15, 217-28, 232-33, 235, 238-42, 249-51, 269, 277, 280-90, 292, 298-302, 304-05, 307, 311-13, 316-18, 320, 322, 324-31, 335-37, 339-40, 342, 349-49, 351-54, 356-58, 360, 362-66, 368-70, 373, 376-81, 384-87, 389-90, 392, 394, 396-99, 401-03, 405, 407-11, 413, 416-24, 426-28, 431-32, 434-37, 439-42, 443, 445-54, 456-57, 460-62, 464-66, 468-77, 479-81, 485-87, 490-92, 496-97, 499-505, 507-10, 513, 515-16, 517-19, 522, 525-28, 530-31, 533-39, 541-44, 546-48, 550, 553-56, 559-62, 564, 566-72, 625-28, 633-37, 643-46, 651-55, 661-64, 669-73, 679-83, 688-92, 696-99, 704-07, 713-17, 724-28, 730, 734-37, 739-40, 743-47, 751-54, 759-62.

[10] Further, in several places the FAC asserts that "CE Solutions" acted "on behalf of all Defendants." (FAC ¶¶ 168-71, 194, 199, 513, 543).

Defendant (or Defendants) hired Plaintiffs, paid Plaintiffs, and took adverse employment action against Plaintiffs, and then alleging supporting facts as to the role of each Defendant that makes them responsible for these acts as joint employers, the FAC indiscriminately and illogically alleges that all sixteen Defendants engaged in these acts.  (*See, e.g., id.* ¶¶ 304-05, 307, 311-26, 328 (alleging, in the case of Plaintiff Ortiz, that she "worked for Defendants" that "Defendants set her regular rate of pay," that "Defendants" paid or failed to pay Plaintiff certain wages, that "Defendants" failed to provide Plaintiff with accurate wage statements, and that "Defendants" suspended Plaintiff)).[11]

In their opposition brief, Plaintiffs attempt to offer some clarification by introducing the "Argani Defendants" as a subset of the Defendants.  (Pl. Br. at 2, 4). Plaintiffs define the "Argani Defendants" as CEFP, CER, Argani, and Sablini and refers to a contract between CESG and Argani which was not attached to the FAC. (Pl. Br. at 4 n.3, 12).  But the term "Argani Defendants" appears nowhere in the FAC itself, which instead lumps together all three of the corporate "Argani Defendants" as part of "CE Solutions."  (FAC ¶ 141).  Indeed, as noted above, the FAC describes Sablini as the "own[er]" of CE Solutions, while inconsistently alleging that CE Solutions "terminated" Sablini in April 2023.  (*Id.* ¶¶ 130, 240). Plaintiffs cannot cure the FAC's deficiencies through their opposition brief.  *See, e.g., Capers v. Kirby Forensic Psychiatric Ctr.*, 13 Civ. 6953 (AJN), 2016 WL 817452,

---

[11] This same pattern is repeated in the allegations pertaining to the seven other Plaintiffs.  (FAC ¶¶ 339-573).

at *2 (S.D.N.Y. Feb. 25, 2016) ("it is axiomatic that the Complaint cannot be amended by the briefs in opposition to a motion to dismiss") (cleaned up).

Plaintiffs argue that the FAC contains "763 paragraphs asserting detailed allegation of specific conduct by each of the Defendants, including the CESG Defendants," and that the FAC "is replete with allegations specifically pertaining to CESG Defendants' conduct." (Pl. Br. at 14, 18). But this is simply untrue. Most of the FAC paragraphs cited in support of this argument refer generically to "Defendants" or "CE Solutions" and do not specifically allege any conduct by the CESG Defendants, either collectively or individually. (*See* FAC ¶¶ 2, 151-52, 156, 160, 162, 165-79, 183-91, 197-99, 201-02, 204-09, 210-11, 213-15, 217-28, 232-33, 235, 238-41, 342, 513, 543).

In fact, the FAC makes only a handful of assertions specific to the CESG Defendants. CE Solutions Group, LLC (*i.e.*, "CESG") is referenced nine times in the FAC (aside from the creation of a short-form reference), only one of which is a substantive allegation about CESG. (*See* FAC ¶ 191 ("CE Solutions issues Employees individually numbered timesheets marked 'CE Solutions Group' with CESG's address and phone number")). Of the eight remaining references, seven are made in the "Parties" section of the FAC, providing background information on CESG relevant for jurisdictional purposes or reciting boilerplate allegations of control. (*Id.* ¶¶ 39-45). The last reference is merely to include CESG as one the companies in the "collection" that comprises "CE Solutions." (*Id.* ¶ 141).

The FAC treats the other CESG Defendants in similar fashion.  There are no substantive factual allegations about CES in the FAC at all.  There is one substantive allegation about 2Way.  (*See id.* ¶¶ 193-94 (alleging 2Way owns and operates the email address to which Employees are instructed to submit their timesheets)).  And the only substantive allegations about individual Defendant Colbert are, first, that Employees were directed to contact her for technical support for the App (*id.* ¶ 180) and second, that Colbert suspended one Plaintiff, Lopez, and then, when Lopez asked when she could return to work, told her that Con Edison no longer wanted her at their jobsites (*id.* ¶¶ 345-48).

It is true that, as the CESG Defendants themselves acknowledge, "[n]othing in Rule 8 prohibits collectively referring to multiple defendants where the complaint alerts defendants that identical claims are asserted against each defendant." (CESG Br. at 4 (citing *Manchanda*, 2020 WL 5802238, at *2)).  As one court noted in denying dismissal on "group pleading" grounds in an FLSA case, "asserting claims against a group of defendants is appropriate if those defendants allegedly acted in concert to violate a Plaintiff's rights."  *McArdle-Bracelin v. Congress Hotel, LLC*, No. 20 Civ. 861 (TJM) (TWD), 2022 WL 486805, at *7 (N.D.N.Y. Feb. 17, 2022).  "A complaint that pleads enough facts to make claims of such wrongdoing plausible need not then describe each defendant's particular role in detail in order to avoid dismissal on 'group pleading grounds.'"  *Id.*

It is also true that, when read together with its exhibits, the FAC contains *some* degree of information about CESG's role.  The exhibits show that there was a

website in the name of "CE Solutions" and that the Brooklyn address displayed on the website was the same as CESG's address. (FAC Exh. K; *id.* at ¶ 39). Further, the exhibits include a Service Contract between CESG and Con Edison, in which Con Edison retained CESG "to perform various traffic safety and control services in Con Edison's service territory." (*Id.* Exh. O at 1). Through these materials (as well as the Argani Contract, discussed *infra*, which is *not* referred or attached to the FAC), the outlines of CESG's involvement in arranging for flaggers and spotters for Con Edison jobsites can be dimly glimpsed amid the fog of the FAC's prolix, vague, and group-pled allegations.

But under Rule 8(a), it is the job of the pleader to provide a short and plain statement of the facts giving rise to each defendant's liability. It is not the job of the defendant or the Court to guess at the basis for the plaintiff's claim or to try to stitch together a coherent theory on the plaintiff's behalf. *Bardwil Indus. Inc. v. Kennedy*, No. 19 Civ. 8211 (NRB), 2020 WL 2748248, at *4 (S.D.N.Y. May 27, 2020) (dismissing complaint where the defendant was "left to guess not only which factual contentions are asserted against him, but also which of those contentions are the basis for plaintiff's claim" and noting that "[s]uch guesswork is antithetical to the fair notice that Rule 8 requires") (cleaned up). Here, on balance, the Court finds that the FAC improperly "lumps" together Defendants in such a way as to make it impossible to determine what the CESG Defendants are alleged to have done and thus fails to put the CESG Defendants on notice of the claims against them. *See, e.g.*, *Monterey Bay*, 531 F. Supp. 3d at 728. This is one of the rare cases where, on

the central question of how the CESG Defendants are liable to Plaintiffs as their employer, "the complaint is so confused, ambiguous, vague or otherwise unintelligible that its true substance, if any, is well disguised." *Bancorp*, 2016 WL 4916969, at *5.

Accordingly, the Court recommends granting the CESG Defendants' motion to dismiss Count Nos. 1-12 for failure to comply with Rule 8(a). *See, e.g.*, *Stewart*, 2020 WL 8732875, at *7-8 ("the failure of the FAC to comply with the minimal requirements of Rule 8(A)(2)" constituted basis for dismissal where plaintiff did not allege "which of the defendants or agents of those defendants engaged in the wage-and-hour violations" and court could not discern from group-pled allegations concerning "Defendants' corporate-wide policies and practices" which of the corporate defendants' policies and practices were implicated) (cleaned up); *Shi Ming Chen*, 2018 WL 1166626, at *9 ("Plaintiffs' attempt to simply lump all seventeen Defendants together into one allegation—without any accompanying facts to support the inference that Moving Defendants had the power to control Plaintiff—is insufficient to satisfy the *Twombly/Iqbal* pleading standard"); *see also Hernandez v. BMNY Contracting Corp.*, No. 17 Civ. 9375 (GBD), 2019 WL 418498, at *2 (S.D.N.Y. Jan. 17, 2019) (dismissing complaint, which alleged labor law violations, where it improperly "lump[ed] all [D]efendants together and provid[ed] no factual basis to distinguish [defendants'] conduct").[12]

---

[12] By contrast, in cases sustaining FLSA/NYLL complaints against a "group pleading" challenge, more facts were pled as to the different roles and conduct of the different defendants. In *McArdle-Bracelin*, for example, the plaintiff alleged that the corporate defendants moving for dismissal (Embassy Suites and Hilton) were franchisors of the hotel where she worked as a breakfast server

In the event the Court finds, as it does here, that Plaintiffs failed to articulate in the FAC a sufficient basis for liability specific to some or all of the CESG Defendants, Plaintiffs request leave to file an amended pleading.  (*See* Pl. Br. at 48).  The Court recommends granting Plaintiffs' request, as it "may be possible" for Plaintiffs to revise or supplement their allegations "to remedy the deficiencies" identified above.  *Stewart*, 2020 WL 8732875, at *9 (collecting cases); *see also Am. Sales Co. v. AstraZeneca AB*, No. 10 Civ. 6062 (PKC), 2011 WL 1465786, at *6 (S.D.N.Y. Apr. 14, 2011) (granting leave to replead despite dismissing the complaint under Rule 8 for its "abundant flaws").

## B.   Plaintiffs Do Not Adequately Plead That the CESG Defendants Controlled Their Work, Such That the CESG Defendants Were Their "Employers" or "Joint Employers"

Largely due to the same failure of the FAC to make allegations specific to the CESG Defendants, the Court also agrees that Plaintiffs have failed to adequately plead an employment or joint employment relationship with the CESG Defendants. (*See* CESG Br. at 6-17; CESG Reply at 6-11).  Plaintiffs argue that the CESG Defendants exerted formal control over their work, satisfying the *Carter* test, such

---

and banquet server and, as such, exerted sufficient control over the terms of her employment as to give rise to a plausible claim that they were joint employers.  *See McArdle-Bracelin*, 2022 WL 486805, at *1-2, *6-7.  Likewise, in *Atakhanova v. Home Fam. Care Inc.*, No. 16 Civ. 6707 (KAM) (RML), 2019 WL 2435856 (E.D.N.Y. Feb. 19, 2019), plaintiffs sought to add an individual defendant to their existing complaint against a corporate defendant under a joint employer theory.  The court permitted plaintiffs to do so, reasoning the proposed complaint made "sufficiently clear the basis for the claims" against the individual, as it alleged the individual was "'a 50% shareholder and President'" of the only other defendant.  *Id.* at *5 (quoting the proposed complaint).

that they were either employers or joint employers of Plaintiffs.  (Pl. Br. at 19-31).[13]

But as detailed below, the FAC's allegations of the CESG Defendants' control over

Plaintiffs' conditions of employment are cast almost exclusively in terms of

conclusory allegations applicable to all "Defendants" or "CE Solutions."  This is an

insufficient basis to plead a viable claim of employer status against any of the

CESG Defendants.  *See, e.g.*, *Stewart*, 2020 WL 8732875, at *4 (finding that

complaint failed to satisfy *Carter* factors where conclusory allegations of control "'do

not answer the fundamental question of whether each corporate entity controlled'

[plaintiff] or any other employees") (quoting *Huer Huang v. Shanghai City Corp.*,

No. 18 Civ. 7702 (LJL), 2020 WL 2319166, at *5 (S.D.N.Y. May 11, 2020)).

### 1.  Power to Hire and Fire

The first *Carter* factor analyzes whether the supposed employer "had the

power to hire and fire employees."  *Carter*, 735 F.2d at 12.  There are no non-

conclusory allegations in the FAC that support Plaintiffs' assertion that the CESG

Defendants had control over hiring or firing workers, and Plaintiffs' arguments to

the contrary are unpersuasive.  Plaintiffs contend they have alleged that the CESG

Defendants had the power to hire and fire employees, citing to the FAC at

paragraphs 35, 42, 49, 84, 127.  (Pl. Br. at 22)  Those paragraphs do not, however,

include any non-conclusory allegations that the *CESG Defendants* had the power to

hire and fire Plaintiffs.

---

[13] Plaintiffs do not analyze the *Zheng* factors and cite *Zheng* chiefly for the proposition that an entity may be found to be a joint employer under the *Carter* factors even where it did not actually exercise its authority to control the conditions of employment.  (Pl. Br. at 21-22; *see also id*. at 25).

Paragraphs 42, 49, 84, and 127 contain boilerplate allegations as to CESG, CES, 2Way, and Colbert, asserting that each "maintained and exercised its power to hire, fire, promote, and discipline Plaintiffs and all others similar situated." These allegations, which are repeated verbatim for each of the other Defendants (*see* FAC ¶¶ 35, 56, 63, 77, 91, 98, 105, 112, 119, 133, 139), are insufficient to plead that the CESG Defendants had the power to hire or fire Plaintiffs.[14]  Indeed, "[c]ourts in this District have routinely dismissed complaints that do nothing but recite the *Carter* and *Zheng* factors and claim that an alleged employer satisfies them without offering further detail.*" Orellana v. Real Innovative Constr., LLC*, No. 18 Civ. 8396 (VEC) (RWL), 2020 WL 13469284, at *6 (S.D.N.Y. Feb. 6, 2020) (collecting cases); *see also Shi Ming Chen*, 2018 WL 1166626, at *8 ("mere boilerplate recitation of the *Carter* factors is plainly insufficient to raise plaintiffs' right to relief above a speculative level with respect to that individual's liability as an employer under the FLSA") (citation omitted).

Plaintiffs' citation to paragraphs 210-217 of the FAC (Pl. Br. at 25) is no more helpful, as these paragraphs either make conclusory allegations as to all Defendants or make specific allegations as to Con Edison or CE Solutions, but not the CESG Defendants.  Paragraphs 210-217 follow the subheading "Discipline of Employees," and allege, among other things, that: "*Defendants* [] have the power to fire and discipline" (FAC ¶ 210 (emphasis added)); "if an Employee arrives late to a

---

[14] Paragraph 35 is the version of this boilerplate allegation pertinent to Con Edison; as such, it is unclear why Plaintiffs cite it in support of their opposition to the CESG Defendants' motion.

shift, leaves a jobsite without permission, or is not dressed and/or equipped properly, a *Con Edison* supervisor will . . . *direct* CE Solutions regarding the appropriate discipline" (*id.* ¶ 211 (emphasis added)); "[i]n the event of any such policy violations, *Defendants* discipline the Employee" (*id.* ¶ 214 (emphasis added)); "if an Employee calls out after having been assigned a shift, *Defendants* typically suspend the Employee" (*id.* ¶ 215 (emphasis added)); "*Con Edison* supervisors can also mandate that specific Employees work or not work a shift based on a Con Edison supervisor's prior dealings with the Employee" (*id.* ¶ 216 (emphasis added)).

Thus, the specific allegations in the FAC indicate that *Con Edison* directed disciplinary decisions. While more than one entity can retain the power to suspend or terminate an employee, there are no substantive allegations in the FAC supporting Plaintiffs' contention that the CESG Defendants had such authority. Indeed, Colbert's statements in Exhibit R tend to show that she did *not* have such authority, but that Con Edison did. (FAC Exh. R at 9) ("Con Ed [was] not happy with your service . . . Once Con Ed decides they no longer want a worker on any sites . . . *there is nothing I can do* . . . Again I'm sorry but this has nothing to do with me.") (emphasis added).

Although it is not mentioned in the FAC or attached as an Exhibit to the FAC, Plaintiffs also rely on a written Referral Agreement, dated as of July 2018, between CESG and Argani submitted by the CESG Defendants in support of their motion to dismiss (the "Argani Contract"). (Dkt. No. 106-3).[15]  The Argani Contract

---

[15] Although the Argani Contract was submitted by the CESG Defendants—originally in connection with their first motion to dismiss (*see* Dkt. No. 64, Exh. C)—Plaintiffs have not objected to it and, as

is a subcontracting agreement, pursuant to which "CESG . . . subcontract[ed] a portion of the flagging, parking coordination, and signage posting services it furnishes to ConEd to Contractor [(defined as Argani)]." (*Id*. at 1). Plaintiffs argue that the Argani Contract expressly grants the CESG Defendants the authority to suspend or terminate Employees. (Pl. Br. at 6). They rely on Section 11 of the Argani Contract, which provides that personnel assigned to provide services under the agreement "shall not be removed from such Service Assignments without the prior written consent of CESG" and further provides that "Contractor [(*i.e.*, Argani)] shall remove any personnel from performing services under [the] Agreement as may be requested by CESG." (Dkt. No. 106-3 at § 11).

The CESG Defendants rely on a line of cases for the proposition that a "contracting party's authority to de-authorize its vendor's workers from performing work on its projects does not equate to a power to discipline or fire the individual for purposes of a joint employment analysis." (CESG Br. at 11 (citing *Martin v. Sprint United Mgmt. Co.*, 273 F. Supp. 3d 404 (S.D.N.Y 2017); *Jean-Louis v. Metropolitan Cable Communications, Inc.*, 838 F. Supp. 2d 111 (S.D.N.Y. 2011); and *Godlewska v. Human Development Ass'n, Inc.*, 916 F. Supp. 2d 246 (E.D.N.Y 2013)). In response, Plaintiffs note that these cases were each decided on a motion for summary judgment and contend that, in any event, they are "distinguishable on the facts." (Pl. Br. at 23-24). Specifically, Plaintiffs argue that the CESG Defendants not only

---

discussed in text, affirmatively embrace it for certain of their arguments in opposition to the motions to dismiss. (Pl. Br. at 6, 11-12, 33-34). As such, the Court considers it on these motions.

can remove Employees for working on a particular jobsite, as in the cases cited by the CESG Defendants, "but can suspend or fire Employees entirely." (*Id.* at 25 (citing FAC ¶¶ 210-17)).

In arguing that the CESG Defendants "can suspend or fire Employees entirely," Plaintiffs again rely on the same allegations in paragraphs 210-217 of the FAC that, as noted above, aver either that "Defendants" had the power to fire or suspend Employees or that "Con Edison supervisors" directed the imposition of such discipline. For the reasons already discussed, those allegations fail to adequately allege that CESG or the other CESG Defendants have any authority to "suspend or fire Employees entirely." Thus, to the extent that Section 11 of the Argani Contract is properly considered on this motion to dismiss even though it is nowhere referenced in the FAC, Plaintiffs have failed to plausibly allege at this juncture that it bestowed control on the CESG Defendants over the firing of Employees within the meaning of the first *Carter* factor.[16]

Furthermore, the Argani Contract refers to the individuals who will be performing flagging and spotting services as "*Contractor's*"—*i.e.*, Argani's— "personnel and representatives." (Dkt. No. 106-3 at 1). And whatever authority Section 11 may give to CESG over the *firing* of these individuals, the Argani

---

[16] Plaintiffs also argue that the CESG Defendants "unwittingly acknowledge" that they maintain the power to suspend Employees and reduce their hours worked. (Pl. Br. at 23). This argument refers to the CESG Defendants' acknowledgement, when addressing Plaintiff Ortiz's retaliation claim, that Ortiz had been suspended for leaving a jobsite before her shift had ended. (CESG Br. at 25-26). But this acknowledgement merely parroted the allegations made in the FAC. (*See id.* (citing FAC ¶¶ 307-08)). And, in any event, the FAC alleges only that "Defendants" suspended Ortiz, not that the CESG Defendants did so. (FAC ¶ 307). Accordingly, Plaintiffs' argument is without merit.

Contract assigns CESG no role with respect to their *hiring*.  Indeed, it contains a representation by Argani to CESG that such personnel "possess the requisite equipment, skills, licenses, and insurance coverage" to provide the requested services.  (*Id.*).  While the Court disagrees with the CESG Defendants' broad assertion that the Argani Contract "refutes any possible claim that Plaintiffs were employees of the CESG Defendants" (CESG Br. at 8 n.2),[17] the Argani Contract does not remedy the FAC's otherwise deficient allegations that the CESG Defendants had the power to hire and fire Plaintiffs and other Employees.

Accordingly, the Court finds that the FAC does not adequately allege the first *Carter* factor with respect to the CESG Defendants.

### 2. Conditions of Employment

The second factor relevant to formal control is whether the putative employer "supervised and controlled employee work schedules or conditions of employment." *Carter*, 735 F.2d at 12.  The CESG Defendants argue the FAC does not include allegations that they had any control over Plaintiffs at or away from project worksites, or over Plaintiffs' wages or working conditions generally.  (CESG Br. at 12).  The CESG Defendants also argue that Plaintiffs' exhibits undermine their contention that CESG Defendants had control over the conditions of their

---

[17] In support of their argument, the CESG Defendants rely on *Valcarcel v. First Quality Maintenance*, No. 12857/12, 2013 WL 5832545 (N.Y. Sup. Ct. Queens Cnty. Oct. 15, 2013), which held that: "There can be no joint employment relationship where there is an agreement between the purported joint employer and plaintiff's direct employer putting 'the sole responsibility and authority for any and all selection, hiring, management, coaching, evaluation, discipline, promotion and employment termination of its employees' on the direct employer." *Id.* at *5 (quoting *Adler v. 20/20 Companies*, 918 N.Y.S.2d 585, 587 (2d Dep't 2011)).  This reliance is misplaced, however, as the Argani Contract is silent on these subjects and, particularly in light of Section 11, cannot be said to have given Argani "*sole* responsibility and authority" over all employment decisions.

employment, and instead show that Con Edison and the Argani Defendants controlled Plaintiffs' work. (*Id.* at 13-16 (citing FAC Exhs. A-D, F, I, R, S-V, Y)).

Plaintiffs argue that the CESG Defendants controlled the terms and conditions of their employment as "the CESG Defendants utilized various other means to assign Employees shifts and directed Employees to report to jobsites operated by Con Edison for indefinite periods of time and at fixed locations, determined exclusively by Defendants, including the CESG Defendants." (Pl. Br. at 25-26 (citing FAC ¶¶ 154-55)). The only allegations to that effect in the FAC, however, are conclusory statements referring to all Defendants. Indeed, paragraphs 154 and 155, to which Plaintiffs cite to support the foregoing statement, allege that "*Defendants* require Employees to stay at jobsites operated by Con Edison for indefinite periods of time and at fixed locations," and that "[t]he date, time, duration, and location of Employees' shifts are determined exclusively by *Defendants*." (FAC ¶¶ 154-55 (emphasis added)). Highlighting the conclusory nature of those allegations as to the CESG Defendants, Plaintiffs specify immediately thereafter that, "depending on the location and duration of work to be performed at a particular jobsite, *Con Edison* notifies CE Solutions of the number of Employees *Con Edison* requires, where [Con Edison] requires them to work, and the date, time, and duration of the work." (*Id.* ¶ 156 (emphasis added)). Thus, the FAC—on its face—alleges that Con Edison controls the "date, time, and duration" of Plaintiffs' work, and to the extent Plaintiffs were required to remain at jobsites

"operated by Con Edison for indefinite periods of time and at fixed locations," those requirements were set by Con Edison.  (*Id.* ¶¶ 154-56).

Similarly, Plaintiffs misconstrue their own allegations by arguing that they clearly allege the CESG Defendants "(i) *call* an Employee to assign them a shift; (ii) *instruct* Employees to call the CESG Defendants' office directly or a hotline maintained and operated by Defendants . . . or (iii) *direct* an Employee to call the CESG Defendants' office later in the day to inquire" about shifts.  (*See* Pl. Br. at 26 (emphasis in original) (citing FAC ¶¶ 168-72; *id.* Exh. E)).  The FAC alleges: "*CE Solutions*, *on behalf of all Defendants*, *calls* Employees . . . and assigns them shifts; (*id.* ¶ 168 (emphasis added)); "*CE Solutions*, *on behalf of all Defendants*, *instructs* Employees to call CE Solution's office directly or a hotline maintained and operated by Defendants" (*id.* ¶ 169 (emphasis added)); and "[i]n the event Employees fail to call the hotline and Defendants fail to contact them, Employees are *directed* to call *CE Solutions's* office later in the day" (*id.* ¶ 172 (emphasis added)).

As discussed above, the FAC defines CE Solutions as being comprised of CESG, CES, CEFP, CER, FSFS, Argani, 2Way, Concord, MMT, A&M, and 23 West. (FAC ¶ 141).  Plaintiffs' suggestion that allegations about CE Solutions are really about CESG, CES, 2Way and Colbert thus falls flat.  Plaintiffs cannot retroactively attribute the alleged actions of "CE Solutions," which includes Defendants who are not moving to dismiss this action and who are apparently unrelated to the moving defendants, to the CESG Defendants specifically.  Accordingly, Plaintiffs have not

adequately alleged that the CESG Defendants controlled their work schedules or conditions of employment.

### 3. Rate and Methods of Pay

The third *Carter* factor concerns whether CESG Defendants "determined the rate and method of payment." *Carter*, 735 F.2d at 12. Plaintiffs fail to satisfy this factor as well. Plaintiffs cite to the FAC at paragraphs 218-221, as well as several exhibits attached to the FAC and the Argani Contract, none of which adequately pleads that the *CESG Defendants* determined the rate and method of Plaintiffs' pay. (Pl. Br. at 9-10; *see also id.* at 28-29). Paragraphs 218 and 219 of the FAC allege in entirely conclusory fashion that "Defendants [] direct and control the manner in which Employees are paid" and that "Defendants establish hourly rates" for flaggers and spotters. (FAC ¶¶ 218-19). Similarly, Paragraphs 220 and 221, although alleging more specific acts, are equally conclusory in alleging who engaged in those acts: they assert that "Defendants set an hourly rate" of $15.00 to $17.00 for Flaggers and $10.00 to $12.00 for Spotters, and that "Defendants direct Employees to call CE Solutions's main office" to rectify any discrepancies regarding payment. (*Id.* ¶¶ 220-21). None of these allegations are specific to the CESG Defendants.

Plaintiffs also mistakenly claim that Exhibit B to the FAC states that "if an Employees' tardiness becomes an issue, the CESG Defendants may not compensate Employees for that shift." (Pl. Br. at 9). In the text message exchange to which Plaintiffs cite, a "CE Dispatcher" states that "laziness or arriving late to the site"

will result in "no payment for the site."  (FAC Exh. B at 2).  The text message does not say that it is the CESG Defendants who decide whether to withhold compensation to Employees for laziness or tardiness.  Indeed, the FAC does not even allege that the "CE Dispatcher" works for any of the CESG Defendants specifically, as opposed to another Defendant.  At another point in the same text chain, the "CE Dispatcher" states "I don't work for Ces I can't see their emails." (*Id.* at 8).

Moreover, Plaintiffs claim that text messages in Exhibit A to the FAC show "Rosario asking Sablini whether CESG Defendants changed how Employees are paid" and "Rosario notifying Sablini that he contacted the CESG Defendants regarding two checks that were 'short' noting that the CESG Defendants did not 'care.'"  (Pl. Br. at 10).[18]  But in fact, in the first text Rosario asks if "the office" changed how payments are made.  (FAC Exh. A at 43).  In the second text, Rosario complains (at a time when Sablini had been out of the office for an extended period of time due to a medical issue) that "the dispatcher" did not care about his checks being short.  (*Id.* at 67-68).  Neither these texts nor any allegation in the FAC shows that Rosario was referring to any of the CESG Defendants as opposed to the Argani "office" or an Argani "dispatcher."

Plaintiffs also cite to Section 2 of the Argani Contract, claiming that it states "the sums to be paid to Employees" for flagging and spotting services.  (Pl. Br. at

---

[18] In support of this proposition, Plaintiffs cite to Exhibit C to a declaration accompanying their opposition brief (Pl. Br. at 9), which is the same as Exhibit A to their FAC.  (*See* Declaration of Camilo M. Burr (Dkt. No. 128) at ¶ 4).

10).  That is not the case.  Section 2 states: "For each Services Assignment successfully completed by the Contractor Representative(s), CESG shall pay *Contractor*"—*i.e.*, Argani—certain amounts for flagging services and parking services (the amounts themselves have been redacted in the document filed with the Court.  (Dkt. No. 106-3 § 2 (emphasis added)).  Thus, this provision concerns how *Argani* will be paid by CESG under the subcontracting agreement, not how Plaintiffs are paid.

Nor is Plaintiffs' contention that "[t]he CESG Defendants [] direct and control the employment status of Employees by misclassifying Employees as independent contractors" an accurate characterization of the FAC.  (Pl. Br. at 10 (citing FAC ¶¶ 223-24)).  In fact, the FAC alleges that "*Defendants* misclassify Employees as independent contractors for shifts performed at Con Edison jobsites" and that "*Defendants* improperly pay Employees on a Form 1099" to conceal this misclassification.  (FAC ¶¶ 223-24 (emphasis added)).  The same lack of fidelity to their own pleading is true of Plaintiffs' contention that "[t]he CESG Defendants also set Employees' one-week pay periods . . . and have established a regularly scheduled pay day for all Employees."  (Pl. Br. at 10 (citing FAC ¶ 291)).  While Paragraph 291 alleges "Plaintiffs and all other Employees' pay periods cover a 7-day time frame" and specifies a "regularly scheduled pay day," there is no indication at all that the CESG Defendant played a role in setting or establishing such payment practices.

Furthermore, the CESG Defendants are correct that, although Plaintiffs allege that they sent timesheets to "CE Solutions," Plaintiffs fail to allege what use

CE Solutions makes of the timesheets or that CE Solutions issues payment based on the timesheets.  (CESG Br. at 13).  Instead, Plaintiffs allege that "*Defendants* use the timesheets to, *inter alia*, confirm the number of hours Employees worked in order to process Employees' payroll."  (FAC ¶ 209; *see also* Pl. Br. at 26 n.9).  Once again, this allegation is not specific to CESG Defendants.

Accordingly, the Court finds that Plaintiffs have not adequately alleged that the CESG Defendants control the rate and method of Plaintiffs' pay.

### 4.  Maintenance of Records

The final *Carter* factor asks whether the putative employer "maintained employment records."  *Carter*, 735 F.2d at 12.  Plaintiffs argue that the timesheets that they are required to submit contain CESG's address and phone number. (Pl. Br. at 10).  The FAC does in fact allege that "CE Solutions issues Employees individually numbered timesheets marked 'CE Solutions Group' with CESG's address and phone number."  (FAC ¶ 191; *id.* Exh. G).  Likewise, Plaintiffs allege that Employees were instructed to send the timesheets to close@nyc2way.com, which was allegedly "owned and operated by CE Solutions and/or NYC 2Way on behalf of all Defendants."  (*Id.* ¶¶ 193-94).

The CESG Defendants point out that Plaintiffs fail to allege that the CESG Defendants maintained other types of employment records, such as personnel files, pay stubs, and government employment forms.  (CESG Br. at 17).  But the FAC's allegations regarding timesheets are themselves significant, as they indicate the CESG Defendants "maintained employment records on the matter most relevant to"

Plaintiffs' claims: "the hours worked." *Barfield*, 537 F.3d at 144. Thus, the FAC does offer some support that the fourth *Carter* factor is satisfied as to the CESG Defendants. Nonetheless, this circumstance alone, absent any tangible allegation of any use of the timesheets made by the CESG Defendants, is insufficient to plead the degree of control needed to allege joint employment. *See, e.g.*, *Hugee v. SJC Group, Inc.*, No. 13 Civ. 423, 2013 WL 4399226, at *7 (S.D.N.Y. Aug. 14, 2013) (fourth *Carter* factor not satisfied where plaintiff alleged that defendant required him to fill out timesheets, but failed to allege that defendant used the timesheets except for quality control purposes).

Plaintiffs also argue the CESG Defendants maintain a "myriad" of other documents, including the App, tax records (Form 1099s), and photographs of jobsites. (Pl. Br. at 29; *see also id*. at 11-12). Here again, as with the bulk of Plaintiffs' control allegations, what the FAC actually alleges is that "Defendants"— not the CESG Defendants specifically—utilized the App, issued Form 1099s, and required Employees to take photographs of jobsites. (*See* FAC ¶¶ 177-78, 206, 224, 226).

### 5. Other Indicia of Control

Plaintiffs also contend that "[they] were required to create their own businesses, so that the CESG Defendants could pay Employees' businesses as opposed to paying them directly, or be fired." (Pl. Br. at 23 (citing FAC ¶¶ 238-39)). The parties dispute the significance of the FAC's allegation that in 2023, Defendants began "pressuring" Plaintiffs to form their own businesses to receive

payment, on pain of termination.  (Pl. Br at 23; CESG Br. at 9; *see also* FAC

¶¶ 238-39).  The CESG Defendants argue that Plaintiffs "do not explain how they

were allegedly pressured to form their own businesses" or why "Plaintiffs being

given the opportunity to form their own businesses is not a level of freedom on its

own."  (CESG Br. at 9).  While this argument has little, if any, force on a motion to

dismiss, Plaintiffs' allegation suffers from the same flaw as their other allegations

of control.  The allegation states only that "in or around May 2023, *Defendants*

began pressuring Employees to form their own businesses, which, going forward

would be paid directly by *Defendants* for shifts worked by Employees."  (FAC ¶ 238

(emphasis added)).  The FAC includes no supporting factual allegations as to how

all Defendants, acting together or independently, exerted this pressure, let alone

specific allegations with respect to the CESG Defendants.

The FAC does not plead (and Plaintiffs do not argue) that the CESG

Defendants maintained control over Plaintiffs' work in any other way.  Despite

some indications that CESG had the authority to direct the removal of Employees

from jobsites and received timesheets from Employees, the Court concludes that

Plaintiffs fail to sufficiently allege that the CESG Defendants controlled Plaintiffs'

hiring or firing, the terms and conditions of Plaintiffs' employment or their work

schedule, Plaintiffs' rate or method of pay, or Plaintiffs' employment records.

Looking at the totality of the circumstances, and drawing all reasonable inferences

in Plaintiffs' favor, the Court cannot infer that the economic reality of the

relationship between Plaintiffs and the CESG Defendants—as pled in the FAC—

was an employment relationship or that the CESG Defendants were a joint employer. As such, the Court respectfully recommends granting the CESG Defendants' motion to dismiss on this ground as well.

At the same time, for similar reasons stated above, the Court further recommends granting Plaintiffs leave to replead to allow them an opportunity to provide greater specificity as to the role played by the CESG Defendants as to the relevant factors in determining who is an employer or joint employer.

## F. Plaintiffs Sufficiently Plead Claims for Prevailing Wages

Plaintiffs allege Defendants were required to pay them prevailing wages for the work they performed as flaggers and spotters. (FAC ¶¶ 249-79). Plaintiffs assert two causes of action, for breach of contract (Count No. 13, *id.* ¶¶ 729-37) and unjust enrichment (Count No. 14, *id.* ¶¶ 738-47), based on these allegations. Both Con Edison and the CESG Defendants move to dismiss those claims. (Con Ed Br. at 1; CESG Br. at 1). For the reasons set forth below, the undersigned recommends granting in part and denying in part Defendants' motions.

### 1. Legal Background

#### a. Section 220 of the New York Labor Law

New York has a "strong public policy of protecting its workers," rooted in the state's Constitution, and codified by Section 220 of the NYLL. *Ramos v. SimplexGrinnell LP*, 796 F. Supp. 2d 346, 352 (E.D.N.Y. 2011) (citing N.Y. CONST. art. I, § 17), *vacated in part*, 773 F.3d 394 (2d Cir. 2014). Section 220 requires all "laborers, workmen or mechanics" employed on "public works" projects to be paid

the "prevailing rate of wages."  NYLL 220(3)(a).  The statute further provides that

every public works contract "shall contain a provision that each laborer, workman

or mechanic . . . shall be paid the [prevailing] wages."[19]  *Id.*; *see Douglas v. Spartan*

*Demolition Co. LLC*, No. 15 Civ. 5126 (HBP), 2018 WL 4521212, at *5 (S.D.N.Y.

Sept. 21, 2018).

In *De La Cruz v. Caddell Dry Dock & Repair Co.*, 997 N.E.2d 1223, 21 N.Y.3d

530 (2013), the New York Court of Appeals set forth a three-factor test to determine

whether a project qualifies as a "public work" within the meaning of Section 220: (i)

"a public agency must be a party to [the] contract" at issue; (ii) "the contract must

concern a project that primarily involves construction-like labor and is paid for by

public funds"; and (iii) "the primary objective or function of the work product must

be the use or other benefit of the general public."  *De La Cruz*, 21 N.Y.3d at 538;

*Moses v. Consolidated Edison Co. of N.Y., Inc.*, No. 18 Civ. 1200 (ALC), 2023 WL

2734331, at *4 (S.D.N.Y. Mar. 31, 2023).

Laborers on a public works project, as defined by *De La Cruz*, have "two

options" to enforce their rights to prevailing wages under Section 220.  *Dominguez*

*v. WRS Environmental Services Inc.*, No. 157820/2017, 2019 WL 2371886, at *3

---

[19] NYLL Section 220(3)(a) provides in relevant part:

> The wages to be paid for a legal day's work, as hereinbefore defined, to
> laborers, workmen or mechanics upon any material to be used upon or in
> connection therewith, shall be not less than the prevailing rate for a day's
> work in the same trade or occupation in the locality within the state where
> such public work on, about or in connection with which such labor is
> performed in its final or completed form is to be situated, erected or used.
> Such contracts shall contain a provision that each laborer, workman or
> mechanic, employed by such contractor, subcontractor or other person about
> or upon such public work, shall be paid the wages herein provided.

46

(Sup. Ct. N.Y. Cnty. June 3, 2019).  They may either (i) "enforce their employer's statutory obligations to pay prevailing wages" administratively by filing a complaint with the relevant "fiscal officer" (in New York City, the Comptroller) and then, if necessary, filing a lawsuit under Section 220; or (ii) file "a third-party beneficiary breach of contract claim against their employer" in a court of competent jurisdiction. *Id.*; *see also Hapanowicz v. Alexandria Tile Co.*, No. 11 Civ. 0127 (ERK) (JO), 2014 WL 1311441, at *6 (E.D.N.Y. Mar. 31, 2014) ("the § 220 administrative process is not the exclusive means for an employee denied prevailing wages to obtain relief . . . [a] plaintiff may also commence a common law breach of contract claim as the intended third-party beneficiary of a public works contract") (citations omitted).

Workers alleging a failure to pay prevailing wages may bring suit under the first option only after first exhausting the administrative remedy provided by the statute.  *See Douglas*, 2018 WL 4521212, at *5 ("It is well established that exhaustion of administrative remedies is a condition precedent to a prevailing claim pursuant to [Section 220].").  To bring a third-party beneficiary breach of contract claim under the second option, claimants need not first seek administrative relief, but must be able to identify a relevant contract providing for prevailing wages.  *See Douglas*, 2018 WL 4521212, at *5 (because the contracts "clearly state plaintiffs were entitled to the prevailing wage" there is "no administrative exhaustion requirement"); *Johnson v. Carlo Lizza & Sons Paving, Inc.*, 160 F. Supp. 3d 605, 613 (S.D.N.Y. 2016) ("provided that the public works contracts at issue expressly state that a prevailing wage will be paid, plaintiffs' breach-of-contract claim will not

be dismissed on the ground of failure to exhaust administrative remedies")
(citations omitted).

Section 220 "applies only to employees on public works projects." *Concerned
Home Care Providers, Inc. v. Cuomo*, 783 F.3d 77, 86 (2d Cir. 2015).  However,
where a private sector contract calls for the payment of prevailing wages, the
third-party beneficiary doctrine provides workers with a remedy under New York
law, even though Section 220 is otherwise inapplicable.  *See Cox v. NAP Const. Co.*,
891 N.E.2d 271, 275, 10 N.Y.3d 592, 602 (2008) ("It cannot be doubted that
provisions requiring the contractor to pay such wages are also inserted in the
contract, whether voluntarily or under compulsion of the statute, for the benefit of
the laborers") (citation omitted).  In that event, laborers may still maintain "a
common law contract claim" as third-party beneficiaries.  *Id.*  But this common-law
remedy is also subject to the common-law limitations attendant to it.  Thus, where
"'a provision in the contract expressly negates enforcement by third parties, that
provision is controlling,'" and workers will "have no standing to bring [a breach of
contract] action."  *Dominguez*, 2019 WL 2371886, at *2-3 (quoting *Edward B.
Fitzpatrick, Jr. Constr. Corp. v. County of Suffolk*, 138 A.D.2d 446, 525 N.Y.S.2d 863
(2nd Dep't 1988)).

### b.  Section 19-142 of the New York City Administrative Code

Section 19-142 of the Administrative Code pertains to permits issued by the
DOT "to use or open a street."  N.Y. City Admin. Code § 19-142.  The code mandates
that before any such permit is issued, the permittee must "agree . . . the prevailing

wage . . . as established by [Section 220] [is to be] paid to those so employed." *Id*. It further provides, in similar fashion to Section 220, that "[n]o permit shall be issued until such agreement shall have been entered into with the [DOT], and all such permits . . . shall include therein a copy of this provision." *Id*.[20]

Section 19-142 states "the power to enforce this provision shall be vested with the comptroller of the city of New York consistent with" Section 220. *Id*. It does not provide for a private cause of action. Con Edison and the CESG Defendants take the position that Plaintiffs cannot sue directly under Admin. Code § 19-142 (Con Ed Br. at 16-17; CESG Br. at 22; Con Ed Reply at 9-10), a proposition with which Plaintiffs do not disagree (Pl. Br. at 41). *See Ross v. No Parking Today, Inc.*, 80 Misc. 3d 499, 502, 192 N.Y.S.3d 872, 874 (Sup. Ct. N.Y. Cnty. 2023) ("Plaintiffs do not seek to enforce [Admin. Code § 19-142] directly because it vests its enforcement exclusively with the New York City Comptroller."), *aff'd in part & rev'd in part*, 224 A.D.3d 559, 203 N.Y.S.3d 608 (1st Dep't 2024).

However, as with the remedies available in the Section 220 context, courts have recognized workers may pursue a common law breach of contract action as

---

[20] Admin. Code § 19-142 provides in full:

> Workers on excavations. A person to whom a permit may be issued, to use or open a street, shall be required, before such permit may be issued, to agree that none but competent workers, skilled in the work required of them, shall be employed thereon, and that the prevailing scale of union wages shall be the prevailing wage for similar titles as established by the fiscal officer pursuant to section two hundred twenty of the labor law, paid to those so employed. No permit shall be issued until such agreement shall have been entered into with the department, and all such permits hereafter issued shall include therein a copy of this provision. When permits are issued to utility companies or their contractors, the power to enforce this provision shall be vested with the comptroller of the city of New York consistent with the provisions of section two hundred twenty of the labor law.

third-party beneficiaries of an agreement to pay prevailing wages made pursuant to Admin. Code § 19-142.  *See Ross*, 203 N.Y.S.3d at 609 (permitting plaintiffs to maintain a breach of contract action based on alleged contract between Con Edison and the City pursuant to Admin. Code § 19-142); *Lewis v. Hallen Constr. Co.*, 193 A.D.3d 511, 512, 141 N.Y.S.3d 857, 858 (1st Dep't 2021) (affirming lower court decision allowing plaintiffs to proceed on breach of contract theory, "[w]hether or not the construction projects at issue were public works projects," where prevailing wage requirements "were applicable pursuant to both [Admin. Code § 19-142] and a contractual provision").

### c.  The *Ballast* and *Ross* Decisions

As noted in the parties' supplemental submissions, two recent decisions are particularly relevant to this dispute: (i) *Ballast v. Workforce7 Inc.*, No. 20 Civ. 3812 (ER), 2024 WL 307966 (S.D.N.Y. Jan. 25, 2024), which Con Edison and the CESG Defendants rely on in support of dismissal (Dkt. Nos. 184 & 185); and (ii) *Ross v. No Parking Today, Inc.*, 224 A.D.3d 559, 203 N.Y.S.3d 608 (1st Dep't 2024), which Plaintiffs rely on in support of their opposition (Dkt. Nos. 186 & 188).

The plaintiffs in *Ross* and *Ballast* made nearly identical allegations to Plaintiffs' here.  In both cases, the plaintiffs asserted (i) they worked as construction flaggers for Con Edison and/or a vendor Con Edison contracted with for those services, like the CESG Defendants here, *Ballast*, 2024 WL 307966 at *1; *Ross*, 192 N.Y.S.3d at 872-73; (ii) the projects they worked on required Con Edison to obtain street opening permits from the DOT pursuant to Admin. Code § 19-142, *Ballast*,

2024 WL 307966 at *5; *Ross*, 192 N.Y.S.3d at 873; and (iii) in order to obtain those permits, Con Edison agreed to pay prevailing wages as required by Admin. Code § 19-142, *Ballast*, 2024 WL 307966 at *5; *Ross*, 192 N.Y.S.3d at 873.  The plaintiffs in both cases brought a common law breach-of-contract claim against Con Edison and the vendor as third-party beneficiaries of agreements for prevailing wages. *Ballast*, 2024 WL 307966 at *1; *Ross*, 192 N.Y.S.3d at 873.

The *Ross* plaintiffs alleged the vendor's liability arose from the vendors' contracts with Con Edison, whereas Con Edison was liable "[b]y reason of its breach of the DOT Permits and the promises required to be made pursuant to New York City Administrative Code § 19-142." *Ross*, 192 N.Y.S.3d at 873.  Only Con Edison moved to dismiss the claim against it.  *Id*.  Granting Con Edison's motion, the New York County Supreme Court held that "while there may be a contract between Consolidated Edison and its [vendor] to support a third party beneficiary claim, an equivalent contractual provision between Consolidated Edison and DOT is missing, as the DOT permit to Consolidated Edison does not constitute a contract."  *Id*. at 876.

The *Ross* plaintiffs appealed.  On February 20, 2024, the First Department modified the lower court's ruling.  *Ross*, 203 N.Y.S.3d at 609.  The First Department found that the "portion of plaintiffs' breach of contract claim based *solely* on the DOT permit" was properly dismissed because the permit is "not a contract giving rise to third-party beneficiary rights."  *Id*. at 609 (emphasis added).  Significantly, however, the First Department found that "plaintiffs sufficiently alleged a breach of contract

claim based on an agreement between Con Edison and the City" and that the lower

court "erred in dismissing this portion of their claim." *Id.* at 609.  Such agreements,

the *Ross* court reasoned, were "required to be made, pursuant to New York City

Administrative Code § 19-142, prior to obtaining [the DOT] permits," and plaintiffs

adequately alleged such contracts existed even though the complaint did "not

specifically identify the relevant contract." *Id.*

On January 25, 2024, while plaintiffs' appeal in *Ross* was pending, Judge

Ramos, of this Court, issued his decision in *Ballast*.  The *Ballast* plaintiffs alleged

Con Edison and the vendor were liable based on the contracts between the

defendants for flagging services and/or the DOT permits, which included a stipulation

for prevailing wages under Admin. Code § 19-142.  *Ballast*, 2024 WL 307966, at *5-6.

Both the vendor and Con Edison moved to dismiss.  *Id.* at *3.  Granting defendants'

motions, Judge Ramos found the plaintiffs could not premise their claim on the

contracts for flagging work because those contracts expressly disclaimed third-party

beneficiaries like the plaintiffs.  *Id.* at *7.  Furthermore, relying on several state court

decisions including the lower court's decision in *Ross*, Judge Ramos dismissed the

claim premised on the DOT permits alone, finding the permits do "'not constitute a

contract that plaintiffs may enforce using a third party beneficiary theory.'" *Id.* at *7

(quoting *Ross*, 192 N.Y.S.3d at 875).

Although the *Ballast* plaintiffs, like the plaintiffs in *Ross*, also sought to rely

on the agreements required to receive the DOT permits, Judge Ramos declined to

consider that argument because it was raised for the first time in plaintiffs'

52

opposition to dismissal. *Id.* at *6. However, in a subsequent decision on plaintiffs'
motion for reconsideration following the First Department's ruling in *Ross*, Judge
Ramos clarified that his dismissal of this theory of liability had been without
prejudice and gave the plaintiffs leave to replead. *Ballast v. Workforce7 Inc.*, No. 20
Civ. 3812 (ER), 2024 WL 1530654, at *3 n.5, *7 (S.D.N.Y. Apr. 8, 2024). The *Ballast*
plaintiffs have now filed an amended complaint that explicitly alleges that Con
Edison and DOT entered into separate agreements as required by Admin. Code
§ 19-142 and asserts a claim for breach of contract based on those alleged
agreements. *See* Plaintiffs' Third Amended Complaint, *Ballast*, No. 20 Civ. 3812
(Dkt. No. 325) at ¶¶ 68-79, 253-59.

### 2. Plaintiffs' Breach of Contract Claim

Plaintiffs here do not seek to bring their claims for prevailing wages directly
under NYLL Section 220 or Admin. Code § 19-142 and acknowledge they have not
attempted to invoke any administrative remedies. (*See* Pl. Br. at 40-41). Rather,
like in *Ross* and *Ballast*, Plaintiffs bring a common law breach of contract claim
against Con Edison and the CESG Defendants as third-party beneficiaries of
agreements that allegedly entitle them to prevailing wages. (FAC ¶¶ 729-737;
Pl. Br. at 32-40).

Plaintiffs premise their contract claim on (i) the contracts between Con
Edison and CESG for flagging and spotting services (*i.e.*, the Service Contracts)
(FAC Exh. O; *id.* ¶¶ 272-74; Pl. Br. at 32-33), as well as the subcontract for those
services between CESG and Argani (*i.e.*, the Argani Contract) (Dkt. No. 106-3; FAC
¶¶ 730-31; Pl. Br. at 33-34); (ii) Con Edison's Standard Terms and Conditions for

Construction Contracts (FAC Exh. L; *id.* ¶ 252; Pl. Br. at 37-38); (iii) the street opening permits issued by the DOT for the work Plaintiffs performed in New York City (*i.e.*, the DOT Permits) (FAC Exh. M; *id.* ¶¶ 256-63, 268-70; Pl. Br. at 37-39); (iv) the prevailing wage agreements required to be made under Admin. Code § 19-142 to receive the DOT Permits (FAC ¶ 263; Pl. Br. at 38; Dkt. No. 188); and (v) purportedly similar agreements required to be made to receive permits for the work Plaintiffs performed in Westchester County (FAC ¶¶ 277-79; Pl. Br. at 39).

The Court finds that Plaintiffs fail to plead a viable breach of contract claim insofar as it is premised on the Service Contracts and the Argani Contract; Con Edison's Standard Terms and Conditions for Construction Contracts; and the DOT Permits. At the same time, the Court finds that in the wake of *Ross*, Plaintiffs plausibly plead a claim based on the alleged agreements between Con Edison and the City that, according to Admin. Code § 19-142, were required to be entered into before the DOT Permits were issued. That finding, however, does not extend to the purportedly analogous agreements made with respect to Plaintiffs' work in Westchester County.

### a. Plaintiffs Fail to State a Claim Based on the Service Contracts and the Argani Contract

Much of the parties' briefing is devoted to whether a general "Compliance with Laws" provision found in the Service Contracts and Argani Contract is sufficient to create an entitlement to prevailing wages. While the Court addresses this disagreement, it ultimately need not resolve it, as Plaintiffs' claim is foreclosed by express disclaimers of third-party beneficiaries included in each contract.

### i. Compliance with Laws Clause

Plaintiffs contend the Service Contracts and the Argani Contract "contractually obligated [Con Edison and the CESG Defendants] to comply with the broad prevailing wage requirement[s] of NYLL § 220," which were applicable pursuant to Admin. Code § 19-142.  (Pl. Br. at 34).  But neither the Service Contracts (FAC Exh. O) nor the Argani Contract (Dkt. No. 106-3) contain any language expressly requiring payment of prevailing wages.  Rather, Plaintiffs rely on a general "Compliance with Laws" clause found in each of the contracts.  (Pl. Br. at 33).[21]  The clause obligates the "[c]ontractor"—CESG, in the case of the Service Contracts, and Argani, in the case of the Argani Contract—to "comply with all federal, state and local laws" applicable to the work performed under the contract. (Pl. Br. at 33; FAC Exh. O at § 26; Dkt. No. 106-3 at § 24).

Plaintiffs do not argue that Section 220 *itself* is an "applicable law" captured by the Compliance with Laws provision,[22] which would only be the case if the contracts were public works contracts.  *See* NYLL § 220(3)(a) (emphasis added);

---

[21] In their instant briefing, Plaintiffs and Con Edison cite to the Service Contracts that were filed by Con Edison in support of their motion to dismiss Plaintiffs' initial Complaint at Docket Nos. 55-1 through 55-11.  One of those contracts (Dkt. No. 55-11) is the same contract that Plaintiffs attached as an example to their FAC as Exhibit O.  As all parties treat the operative provisions in these contracts interchangeably, and they appear to be identical, the Court refers to Exhibit O to the FAC throughout this opinion for the sake of simplicity.

[22] Because Plaintiffs do not rely directly on Section 220, Con Edison misses the mark by arguing Section 220 only obligates "a contractor or subcontractor" to pay prevailing wages, not a "project owner" like itself.  (Con Ed Reply at 6 (citing NYLL § 220(3)(d)(i))).  Rather, the Court looks to the contractual terms to determine liability.  *See Ballast*, 2024 WL 307966, at *10.  In that respect, Con Edison further asserts Plaintiffs fail to identify a *contractual provision* in the Service Contracts or the Argani Contract that obligates *Con Edison* to pay prevailing wages.  (Con Ed Reply at 7). However, as the Court ultimately finds that the Service Contracts and the Argani Contract disclaim Plaintiffs as third-party beneficiaries altogether, it need not parse which party would, in the alternative, be liable under the provisions therein.

*Concerned Home Care Providers, Inc.*, 783 F.3d at 86.  Rather, Plaintiffs take the

position that Admin. Code § 19-142 is the "applicable law" captured by the

contracts, which, by reference to Section 220, requires that prevailing wages be

paid.  (Pl. Br. at 32-34).  Thus, Plaintiffs reason, their right to assert a third-party

beneficiary claim arises "whether employees work on 'public works' projects or not."

(*Id*. at 32).[23]

Con Edison, on the other hand, argues that a provision broadly requiring

"Compliance with Laws" is insufficient to create a contractual obligation for

prevailing wages, as the contracts at issue must "expressly" call for such wages.

(Con Ed Br. at 13; Con Ed Reply at 8).  Furthermore, Con Edison argues that even

if the "Compliance with Laws" clause were sufficient to create an entitlement to

prevailing wages, each of the contracts contains an identical disclaimer of

third-party beneficiaries.  (Con Ed Br. at 14; FAC Exh. O at § 46).

Absent the disclaimer, the Court would be inclined to agree with Plaintiffs

that the Compliance with Laws provision creates enforceable third-party

beneficiary rights to prevailing wages by encompassing Admin. Code § 19-142.

Plaintiffs rely on *Lewis v. Hallen Constr. Co.*, 193 A.D.3d 511, 141 N.Y.S.3d 857 (1st

Dep't 2021), in which the court permitted laborers to pursue a third-party

beneficiary claim for prevailing wages based on a contractual provision that, much

like the one at issue here, required "compliance with all applicable federal and state

---

[23] While Plaintiffs do contend the flagging and spotting work is, "in any event," public work in their briefing, they do so only in an effort to explain why the third-party beneficiary disclaimers should be considered void for public policy.  (Pl. Br. at 36).  That argument is discussed *infra* at § F(2)(a)(ii).

laws" and thereby impliedly incorporated Admin. Code § 19-142.  *Lewis*, 141

N.Y.S.3d at 858; *Lewis v. Hallen Const. Co., Inc.*, No. 151729/2017, 2019 WL

1974917 at *3 (Sup. Ct. N.Y. Cnty. May 3, 2019).

     More recently, in *Machuca v. Collins Bldg. Servs., Inc.*, 206 N.Y.S.3d 515

(Table), 2024 WL 1164653 (Sup. Ct. N.Y. Cnty. Mar. 13, 2024), a New York County

Supreme Court Justice rejected the defendant's argument that plaintiffs could not

bring a third-party beneficiary claim absent "prevailing wage language in the

subject contract."  *Id.* at *1.  Following *Lewis*, the court held "a contract's implicit or

indirect incorporation of statutory wage requirements" through a compliance with

laws provision[24] "will support an employee's third-party beneficiary claim" to

prevailing wages.  *Id.* at *2.[25]

     Furthermore, in *Ballast*, prior to rejecting the plaintiffs' claim due to a

third-party disclaimer, Judge Ramos found that a nearly identical theory to

---

[24] The provision at issue in *Machuca* provided the defendant "shall, in the conduct of its operations, comply with all applicable laws, orders and regulations of any governmental and/or quasi-governmental authorities having jurisdiction over the Services being provided by Contractor hereunder."  *Machuca*, 2024 WL 1164653, at *1.

[25] In so doing, the *Machuca* court rejected the same narrow reading of *Lewis* that Con Edison advances here.  In *Lewis*, the First Department found, in pertinent part: "[w]hether or not the construction projects at issue were public works projects is not dispositive since the prevailing wage requirements of Labor Law § 220 were applicable pursuant to both Administrative Code of City of N.Y. § 19–142 and *a contractual provision*."  *Lewis*, 141 N.Y.S.3d at 858 (emphasis added).  There were, however, two contracts at issue in *Lewis*, one that "expressly require[d] compliance with Labor Law § 220" and the one, referenced above, that required "compliance with all applicable federal and state laws."  *Lewis*, 2019 WL 1974917 at *3.  Con Edison contends the First Department's reference to "a contractual provision" is a reference to the express requirement only.  (Con Ed Reply at 8 n.3, 10 n.4).  But the *Machuca* court reasoned that, by affirming the lower court's decision, the First Department "necessarily held that a plaintiff could rest a third-party beneficiary claim on a contractual provision that *impliedly* incorporated prevailing-wage requirements through mandating *compliance with all applicable laws*."  *Machuca*, 2024 WL 1164653 at *4 (emphasis added).  Otherwise, the First Department "would have had to modify or reverse, rather than affirm, the motion court's denial of summary judgment with respect to plaintiffs' reliance on the construction contract that lacked a provision expressly incorporating prevailing-wage obligations."  *Id.*

Plaintiffs' here was "plausible" under a contract between Con Edison and the

vendor, "Workforce7":

> Plaintiffs argue that the obligation § 26 imposes on Con Ed and
> the Workforce7 Defendants to "comply with all laws," includes
> the obligation imposed by § 19-142 to pay prevailing wages to its
> workers on Con Ed's excavation projects. Doc. 295 at 14.
> Defendants do not respond to Plaintiffs' allegations that § 26 of
> the contracts obligated Con Ed and the Workforce7 Defendants to
> comply with § 19-142 and, accordingly, pay Plaintiffs prevailing
> wages. Doc. 297 at 7–8; Doc. 305 at 3–4. Plaintiffs' interpretation
> of § 26 is plausible. Section 19-142 applies to all projects for
> which DOT Permits are issued, independent of whether the
> project is a "public work" pursuant to NYLL § 220, and Plaintiffs
> allege that some, if not all, of the projects for which they served
> as flaggers required DOT Permits. *See* Doc. 295 at 11–14.

*Ballast*, 2024 WL 307966, at *8.

*Lewis*, *Machuca*, and *Ballast* concern the precise issue in dispute here.  In

contrast, while the decisions cited by Con Edison address whether laborers may

assert third-party beneficiary claims for prevailing wages, none of those decisions

address whether they may do so by relying on a "compliance with laws" clause.

For instance, Con Edison cites to *Seidel v. Hoffman Floor Covering Corp.*, No.

09 Civ. 4027 (JS) (WDW), 2012 WL 3064153 (E.D.N.Y. July 26, 2012), and

*Maldonado v. Olympia Mech. Piping & Heating Corp.*, 8 A.D.3d 348, 777 N.Y.S.2d

730 (2nd Dep't 2004).  (Con Ed Br. at 13 n.8; Con Ed Reply at 8).  Those decisions

contain language that, if quoted out of context, would appear to lend considerable

support to Con Edison's position.  *See Seidel*, 2012 WL 3064153, at *3 ("New York

courts have indicated that a breach of contract claim depends on the actual

insertion of Section 220's prevailing wage language into the contract") (collecting

cases); *Maldonado*, 777 N.Y.S.2d at 731 ("workers protected by Labor Law § 220 . . .

possess a cause of action . . . for breach of contract when the contract between the employer and the municipality expressly provides for the wages to be paid to such workers").

In both cases, however, the plaintiffs failed to identify any actual public works contracts on which to base their claim, but argued that this failure did not matter because Section 220 required the prevailing wage provision to appear in the contracts as a matter of law. *Seidel*, 2012 WL 3064153, at *3 ("Plaintiff chiefly argues that because Section 220 requires the prevailing wage provision to appear in public works contracts, it doesn't matter whether the prevailing wage language actually appeared in the contracts"); *Maldonado*, 777 N.Y.S.2d at 731; Reply Brief of Plaintiff-Appellants, *Maldonado*, 2004 WL 1923256, at *5. It was that argument made by the *Seidel* and *Maldonado* plaintiffs—essentially, that they could enforce their rights to prevailing wages as third-party beneficiaries without identifying the relevant contract—that both courts were considering when each observed the requirement of an actual prevailing wage clause. Hence, the holdings in *Seidel* and *Maldonado* did not concern what language in an identified contract is sufficient to give plaintiffs third-party beneficiary rights for prevailing wages, which is what the parties dispute here.[26]

---

[26] Con Edison also relies on *Maddison v. Comfort Sys. USA (Syracuse), Inc.*, No. 517 Civ. 0359 (LEK) (ATB), 2020 WL 950288 (N.D.N.Y. Feb. 27, 2020), where the plaintiffs *did* identify a contract. (Con Ed Br. at 13 n.8). In *Maddison*, however, the contract expressly "prohibit[ed] the payment of prevailing wages" and there was no "compliance with laws" clause at issue. *Maddison*, 2020 WL 950288, at *6.

Con Edison also relies on the Second Circuit's statement in *Ramos v. SimplexGrinnell LP*, 740 F.3d 852 (2d Cir. 2014), that "'in order for workers to bring a third-party breach of contract claim under NYLL section 220, the contract between the employer and the municipality must *expressly* state that a prevailing wage will be paid.'" (Con Ed Br. at 13 n.8 (quoting *Ramos*, 740 F.3d at 858) (emphasis added by Con Edison)).  Notably, the Second Circuit cited to *Seidel* and *Maldonado* in support of that conclusion and, as in those cases, did not make that observation to find a "compliance with laws" provision inadequate.  *Ramos*, 740 F.3d at 858.  To the contrary, the parties did not dispute the District Court's finding that "all of defendant's public works contracts either explicitly or *implicitly* provide for the payment of prevailing wages" through a "compliance with laws" clause.  *Ramos v. SimplexGrinnell LP*, 796 F. Supp. 2d 346, 363 (E.D.N.Y. 2011) (emphasis added) (citing several contractual provisions, one of which required the defendant to act "in strict conformity with all applicable federal, state, and local laws").

Rather, the parties disputed the District Court's finding that two categories of work—"testing and inspection" of fire alarm systems—were not encompassed by the prevailing wage provisions because, at the time of contracting, Section 220 had not been applied to cover such work.  *Ramos*, 740 F.3d at 854-55.  The issue before the Second Circuit was whether that finding was a correct interpretation of New York law.  Finding the state law to be unclear, the Second Circuit declined to decide

the issue and certified the question to the New York Court of Appeals.  *Ramos*, 740 F.3d at 859-60.[27]

Thus, in *Ramos*, the Second Circuit was providing the context of existing New York law, which ultimately led to its conclusion that it was not clear whether a prevailing wage provision covered the scope of work alleged by plaintiffs.  The Second Circuit never decided whether a "compliance with laws" clause was sufficient to create an entitlement to prevailing wages.  Nevertheless, the language in *Ramos* requiring "the contract between the employer and the municipality [to] expressly state that a prevailing wage will be paid," *Ramos*, 740 F.3d at 858, was viewed by the state court in *Machuca* as inconsistent with the view that a general "compliance with laws" provision suffices to incorporate a prevailing wage requirement.  *See Machuca*, 2024 WL 1164653, at *3 n.3 ("To the extent that the U.S. Court of Appeals for the Second Circuit [in *Ramos*] has interpreted [earlier New York] cases as imposing an express-incorporation requirement, this court respectfully disagrees with the Second Circuit's interpretation.").

Ultimately, however, the Court does not need to decide this issue here, as Plaintiffs' claim based on the Service Contracts and Argani Contract fails for a separate reason.

---

[27] The New York Court of Appeals held, in response, that "[a]n agreement to comply with a statute is an agreement to comply with it as correctly interpreted, whether or not the correct interpretation was known to the parties at the time of contracting."  *Ramos v. SimplexGrinnell LP*, 21 N.E.3d 237, 239, 24 N.Y.3d 143, 148 (2014).  In a subsequent decision, the Second Circuit held "the Court of Appeals has now made clear that the contracts nevertheless required compliance with NYLL section 220 as correctly interpreted, meaning that prevailing wages were required to be paid for the testing and inspection work."  *Ramos v. SimplexGrinnell LP*, 773 F.3d 394, 396 (2d Cir. 2014) (vacating the portion of the District Court's opinion on the testing and inspection work).

## ii. Third-Party Beneficiary Disclaimer

As Defendants point out, the Service Contracts and the Argani Contract contain an express disclaimer of third-party beneficiaries.  (Con Ed Br. at 14; CESG Br. at 18-19).  With respect to the Service Contracts, the relevant provision, Section 46, first identifies Con Edison affiliates and other non-parties as third-party beneficiaries of specific provisions not pertinent here, then goes on to state: "There are no other third party beneficiaries of the Contract."  (FAC Exh. O at § 46).[28] Likewise, in the Argani Contract, the relevant provision first identifies Con Edison as a third-party beneficiary of the agreement, and then states: "There are no other third-party beneficiaries of this Agreement."  (Dkt. No. 106-3 at § 43).[29]

Those disclaimers "expressly negate any intent to permit enforcement of its terms by third parties" such as Plaintiffs here, and therefore Plaintiffs "have no standing to bring an action" based on the Service Contracts and the Argani Contract.  *Dominguez*, 2019 WL 2371886, at *3 (dismissing plaintiffs' third-party beneficiary claim for prevailing wages).  Indeed, the contract between Con Edison

---

[28] Paragraph 46 in the Service Contracts provides in full:

> Third Party Rights. O&R is a third party beneficiary of the Contract and may enforce the Contract. The other Con Edison affiliates and other non-parties referenced in Articles 16, 19, 20, 21, 28, 35, 46 and 49 are third party beneficiaries of the Contract and may enforce those Articles and any other articles in which the affiliates or non-parties are specifically referenced. There are no other third party beneficiaries of the Contract.

(FAC Exh. O at § 46; *see also* Dkt. Nos. 55-1–55-11 at § 46).

[29] The relevant provision in the Argani Contract provides in full:

> Third Party Rights. ConEd is a third party beneficiary of this Agreement and may enforce articles of this Agreement in which ConEd is specifically referenced. There are no other third-party beneficiaries of this Agreement.

(Dkt. No. 106-3 at § 43).

and the vendor in *Ballast*, entitled "Standard Terms and Conditions for Service Contracts," included an identical disclaimer, which Judge Ramos found foreclosed the plaintiffs' claims. *Ballast*, 2024 WL 307966 at *8 ("Plaintiffs may not bring a breach of contract claim on the basis of the Con Ed Contracts with Workforce7" due to the disclaimer's "concluding sentence—that '[t]here are no other third party beneficiaries'") (quoting Standard Terms and Conditions for Service Contracts, *Ballast*, 20 Civ. 3812 at Dkt. Nos. 290-1 & 290-2).

Plaintiffs do not dispute that the disclaimers, on their face, serve to deny third-party beneficiary status to laborers like themselves. Rather, Plaintiffs argue that a "'contract clause prohibiting third-party actions for violation of prevailing wage payments would be void as against public policy.'" (Pl. Br. at 35-36 (quoting *Wroble v. Shaw Envtl. & Infrastructure Eng'g of N.Y., P.C.*, 166 A.D.3d 520, 521, 88 N.Y.S.3d 21, 23 (1st Dep't 2018)). As Plaintiffs acknowledge, however, *Wroble* involved a "public works contract" and thus the disclaimers directly implicated the public policy embodied in Section 220 of the Labor Law. *Wroble*, 88 N.Y.S.3d at 23. To bring themselves within the holding in *Wroble*, Plaintiffs argue they "have, in any event, satisfied the factors for the 'public works' test." (Pl. Br. at 36). The Court disagrees.

The Service Contracts and the Argani Contract are not "public works" contracts within the meaning of Section 220. The first of the three *De La Cruz* factors requires Plaintiffs to show a "public agency [is] a party" to the contracts, *Moses*, 2023 WL 2734331, at *4, which Plaintiffs fail to do here. It is undisputed

that Con Edison, CESG, Concord, and Argani are the parties to the respective contracts, and, as Plaintiffs effectively concede, none of those entities is a public agency. (FAC ¶¶ 32, 39, 74, 95 (referring to these Defendants as "domestic corporation[s]"); Pl. Br. at 36). Indeed, nowhere in the FAC, or their instant briefing, do Plaintiffs allege any of the Defendants are public agencies.

Instead, Plaintiffs point to the DOT Permits and assert those "create a contract between the recipient and the DOT, a public agency." (Pl. Br. at 36). This argument is infirm. First, the DOT Permits are not enforceable contracts, as discussed further below. Second, Plaintiffs fail to show how the permits relate to the contracts in a way that transforms the latter into public works contracts. More to the point, Plaintiffs have never asserted, and could not plausibly assert, that the DOT Permits made the DOT *a party* to the Service Contracts or the Argani Contract. *See Pyramid Co. of Onondaga v. New York State Dep't of Lab.*, 223 A.D.2d 285, 287-88, 645 N.Y.S.2d 633, 634-35 (3d Dep't 1996) (holding the DOT's issuance of a permit was insufficient to satisfy the requirement that a public agency be party to a construction contract, as was necessary to trigger NYLL § 220's prevailing wage requirements in its prior incarnation).[30]

Because Plaintiffs cannot satisfy even the first *De La Cruz* factor, the Service Contracts and the Argani Contract do not qualify as "public works" contracts and are therefore not subject to Section 220's mandate that such contracts include a

---

[30] Likewise, the agreements required to be made to receive the DOT Permits, discussed *infra* § F(2)(d), would not make the DOT a party to the Service Contracts or the Argani Contracts.

prevailing wage provision.  *See, e.g.*, NYLL § 224-a(11) (non-public works projects "shall not be subject to the [prevailing wage and benefits] requirements" of NYLL § 220).  Accordingly, contrary to Plaintiffs' contentions, the public policy that led the First Department to invalidate the third-party beneficiary disclaimer in *Wroble* is inapplicable here.  *Santana v. San Mateo Const. Corp.*, No. 650029/2022, 2023 WL 4106949, at *3 (Sup. Ct. N.Y. Cnty. June 21, 2023) (rejecting plaintiff's contention that a third-party beneficiary disclaimer "violates public policy" where the contract related to private work and dismissing plaintiff's third-party beneficiary claim).

Thus, because the Court finds the disclaimers are not void as a matter of public policy, Plaintiffs have no standing here to bring a third-party beneficiary claim under the Service Contracts and the Argani Contract.  As a result, the Compliance with Laws provisions in the contracts cannot constitute an enforceable promise for prevailing wages upon which Plaintiffs may rely.

### b. Plaintiffs Fail to State a Claim Based on Con Edison's Standard Terms and Conditions for Construction Contracts

Plaintiffs also rely on a template of Con Edison's Standard Terms and Conditions for Construction Contracts (the "Template Construction Contract"), a copy of which they attach to the FAC, as well as their opposition brief.  (FAC Exh. L).  Unlike the Service Contracts and the Argani Contract, the Template Construction Contract includes an express provision for prevailing wages.[31]  It also

---

[31] The provision states, in relevant part:

> Where Contractor employs workers on sites where a permit to use or open a street (including excavating the street) is required and New York City Administrative Code Section 19-142, or its successor, (or a similar law, regulation, or code pertaining to sites located outside of New York City

provides that "Con Edison's affiliates and other non-parties referenced in" the prevailing wage provision, among others, "are third party beneficiaries and may enforce those" provisions.  (FAC Exh. L at § 46).

While those provisions of the Template Construction Contract, if operative, would appear to create a strong case for entitlement to prevailing wages, Plaintiffs offer no plausible allegations that they are operative here.  To the contrary, Plaintiffs implicitly acknowledge they are not.  Plaintiffs do not dispute the validity of the fully executed Service Contracts and the Argani Contract (and indeed, are attempting to enforce them).  Nor do Plaintiffs provide any reason to believe that any contract embodying the terms of the Template Construction Contract was ever entered into, or otherwise applicable to, the projects that Plaintiffs worked on as flaggers and spotters.

It appears Plaintiffs' position is that Defendants *should have* used the standard terms in the Template Construction Contract, rather than the Standard Terms and Conditions for Service Contracts, which formed the basis of the Service Contracts here.  (*See* Pl. Br. at 37-38 (arguing there was "heavy construction" on the

---

("Similar Local Law")) is applicable, Contractor agrees that, pursuant to and in furtherance of the requirements of New York City Administrative Code Section 19-142, or its successor, (or the requirements of the Similar Local Law) and the terms and conditions of the permit: none but competent workers, skilled in the work required of them, shall be employed thereon; the prevailing scale of union wages shall be the prevailing wage for similar titles as established by the Comptroller of the City of New York pursuant to Section 220 of the New York State Labor Law (or as established by such other fiscal officer, as specified in Section 220 of the New York State Labor Law, for workers on permitted sites located outside of New York City to which a Similar Local Law applies), paid to those so employed, and Contractor shall pay that prevailing wage to workers so employed.

(FAC Exh. L at § 14(A)).

66

jobsites)).  But Plaintiffs cannot assert a breach of contract claim premised on a template contract to which no party agreed to be bound.  *See Burns Jackson Miller Summit & Spitzer v. Lindner*, 451 N.E.2d 459, 469, 59 N.Y.2d 314, 336 (1983) (third-party beneficiary may recover "only by establishing," *inter alia*, "the existence of a valid and binding contract between other parties"); *I.C. ex rel. Solovsky v. Delta Galil USA*, 135 F. Supp. 3d 196, 208 (S.D.N.Y. 2015) (to establish an enforceable contract under New York law, there must be "'an offer, acceptance of the offer, consideration, mutual assent, and an intent to be bound'") (quoting *Kowalchuk v. Stroup*, 61 A.D.3d 118, 873 N.Y.S.2d 43, 46 (1st Dep't 2009)).  Thus, Plaintiffs do not plead a cognizable claim based on the Template Construction Contract.

### c.  Plaintiffs Fail to State a Claim Based on the DOT Permits

Plaintiffs allege that for each of the jobsites in New York City where they worked as flaggers and spotters, a "Street Opening Permit . . . issued by the DOT . . . as the term is defined under New York City Administrative Code § 19-142" was required.  (FAC ¶¶ 256-59).  Plaintiffs attach to the FAC an example of a permit issued by DOT for a Con Edison jobsite, dated October 4, 2022.  (*Id*. Exh. M; Dkt. No. 128 at ¶ 12; Dkt. No. 128-11).  The permit, reciting the text of Admin. Code § 19-142, expressly provides that, "before such permit may be issued" the permittee shall "agree that . . . the prevailing wage . . . pursuant to [Section 220]" will be paid to those employed.[32]  (FAC Exh. M at 3).

---

[32] The DOT Permits bear the following language:

> NYC ADMINISTRATIVE CODE, 19-142, WORKERS ON
> EXCAVATIONS: A PERSON TO WHOM A PERMIT MAY BE
> ISSUED, TO USE OR OPEN A STREET, SHALL BE REQUIRED,

With respect to the permits, the parties dispute two principal points: (i) whether the permits *alone* are enforceable contracts Con Edison and/or the CESG Defendants "entered into with the DOT for the benefit of Plaintiffs and all other Employees" (Con Ed Br. at 14-16; CESG Br. at 21-22; Pl. Br. at 37); and (ii) whether Plaintiffs may bring a claim based on their allegations that in order to obtain the permits, Con Edison entered into *separate* agreements with the DOT that provide for prevailing wages in compliance with Admin. Code § 19-142 (Pl. Br. at 38-39; Con Ed Reply at 11-12; Dkt. No. 188).

With respect to the first point, *Ross* plainly forecloses Plaintiffs' argument that they may premise a breach of contract claim on the permits alone, as the First Department held that the same permits issued under Admin. Code § 19-142 are not enforceable contracts. *See supra* Discussion at § F(1)(c); *Ross*, 203 N.Y.S.3d at 609-10 (affirming dismissal of the portion of plaintiffs' breach of contract claim based solely on the DOT permit because the permit is "not a contract giving rise to third-party beneficiary rights").

Even before the First Department's ruling, Judge Ramos, relying on the lower court's decision in *Ross* and a subsequent decision by a different New York Supreme

---

BEFORE SUCH PERMIT MAY BE ISSUED, TO AGREE THAT NONE BUT COMPETENT WORKERS, SKILLED IN THE WORK REQUIRED OF THEM, SHALL BE EMPLOYED THEREON, AND THAT THE PREVAILING SCALE OF UNION WAGES SHALL BE THE PREVAILING WAGE FOR SIMILAR TITLES AS ESTABLISHED BY THE FISCAL OFFICER PURSUANT TO SEC. TWO HUNDRED TWENTY OF THE LABOR LAW, PAID TO THOSE SO EMPLOYED.

Court Justice to the same effect, rejected this same argument in *Ballast*, because under New York law "'permits are not contracts and thus there can be no viable breach of contract claims' arising therefrom." *Ballast*, 2024 WL 307966, at *7 (quoting *Santana*, 2023 WL 4106949, at *2, and dismissing breach-of-contract claim based on DOT permits brought by a class of flaggers against Con Edison).  Following the First Department's ruling, Judge Ramos adhered to that determination on reconsideration, holding that "*Ross* is controlling, on point authority, and [the Court] will follow the First Department's decision—which reiterates that Plaintiffs may not state a breach of contract claim against Con Ed predicated on the DOT Permits." *Ballast*, 2024 WL 1530654, at *5.  This Court agrees and likewise finds that, under *Ross*, Plaintiffs have failed to state a breach of contract claim based on the DOT Permits.

### d.  Plaintiffs Adequately Plead a Claim Based on the Alleged Agreements Between Con Edison and DOT

At the same time, *Ross* permitted the plaintiffs to proceed with their claim based on the separate "agreements required to be made" under Admin. Code § 19-142, despite the fact the complaint did "not specifically identify the relevant contract." *Ross*, 203 N.Y.S.3d at 609 (finding plaintiffs sufficiently alleged "a breach of contract claim based on an agreement" between Con Edison and the City of New York).  The Court also finds *Ross* controlling on this point and hence Plaintiffs may proceed on the same basis here.  As in *Ross*, Plaintiffs plausibly allege that, based on Admin. Code § 19-142, Con Edison entered into agreements with the City requiring payment of prevailing wages in order to obtain the DOT Permits.  (FAC

¶ 263 ("upon information and belief, the Permits and/or *other agreements* between Con Edison and . . . New York City . . . require payment of prevailing wages, either specifically or through a general requirement to comply with all applicable laws") (emphasis added); *id.* ¶ 146; Pl. Br. at 33-34, 38; Dkt. No. 188 at 1-2).

Defendants' arguments to the contrary are unavailing.  Attempting to distinguish *Ross*, Con Edison argues that the First Department reached its decision under the "relaxed pleading standards" applicable in New York state courts, whereas the federal pleading standards applicable here are more stringent and foreclose Plaintiffs' claim.  (Dkt. No. 189 at 3 (quoting *Eng v. City of New York*, 715 F. App'x 49, 52 (2d Cir. 2017))).  In support, Con Edison cites to *Ballast*, contending Judge Ramos held that traffic flaggers cannot avoid dismissal of their prevailing wage claims by assuming such agreements must exist.  (*Id.* (citing *Ballast*, 2024 WL 307966, at *6)).

While it is certainly true Plaintiffs must allege a plausible breach of contract claim under the *Iqbal* and *Twombly* federal pleading standards, they have done so here.  *See Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 570.  The FAC alleges, on information and belief, that "agreements" between Con Edison and New York state or city "*specifically* or through a general requirement to comply with all applicable laws" require payment of prevailing wages.  (FAC ¶ 263 (emphasis added); *see id.* ¶ 146).  Contrary to Con Edison's characterization of those agreements as "nebulous" (Dkt. No. 189 at 3), Plaintiffs specify that they were required by Admin.

Code § 19-142 for Con Edison to obtain necessary permits for the work Plaintiffs performed in New York City (FAC ¶¶ 256-60).

Indeed, Admin. Code § 19-142 expressly provides that "*before* such permit may be issued," the permittee "*shall be required . . . to agree*" the prevailing wage will be paid to the laborers employed.  Admin. Code §19-142 (emphasis added).  The sentence immediately thereafter reiterates:  "*No permit shall be issued until such agreement shall have been entered into* with the [DOT]."  *Id.* (emphasis added).  The DOT Permit that Plaintiffs rely on similarly states that a permittee "*shall be required, before* such permit may be issued, *to agree*" that prevailing wages shall be paid—clearly implying the existence of an agreement separate from and antecedent to the permit itself.  (FAC Exh. M at 3).  In short, the law appears to *require* the contracts that Plaintiffs allege exist between Con Edison and the City.  That is more than sufficient to "raise [Plaintiffs'] right to relief above the speculative level" and "nudge[] their claim[] across the line from conceivable to plausible."  *Twombly*, 550 U.S. at 555, 570.

Furthermore, the fact that Plaintiffs are unable to point to such a contract at the pleading stage is not fatal to their claim.  The *Twombly/Iqbal* plausibility standard does not prevent a plaintiff from pleading facts alleged "upon information and belief" where either (1) "the facts are peculiarly within the possession and control of the defendant" or (2) "the belief is based on factual information that makes the inference . . . plausible."  *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010).  Both circumstances are present here.  First, as Plaintiffs note

71

(Pl. Br. at 38), it is unreasonable to expect Plaintiffs to have physical copies of these agreements (if they exist) at this stage, as Con Edison and the DOT would be the parties to the agreements, not Plaintiffs.  Second, for the reasons already noted, the express provisions of Admin. Code § 19-142 and the DOT Permits render the inference that these agreements exist more than "plausible."[33]

In addition, Con Edison's characterization of the holding in *Ballast* is incorrect.  As discussed *supra* in Discussion § F(1)(c), although the plaintiffs in *Ballast* similarly argued they could premise their breach of contract claim on the agreements required by Admin. Code § 19-142, Judge Ramos did not consider the viability of that argument because plaintiffs raised it for the first time in opposition to defendants' motion to dismiss.  *Ballast*, 2024 WL 307966, at *6.[34]  Furthermore, following the First Department's ruling in *Ross*, Judge Ramos has now given the *Ballast* plaintiffs leave to replead, finding it "plausible that, with additional

---

[33] Con Edison also asserts it is "unaware of any prior requirement by the NYC DOT that [] an agreement [pursuant to Admin. Code § 19-142] be entered into at all."  (Dkt. No. 189 at 3).  In support, Con Edison cites to the DOT's "Street Works Manual" and a template permit application, neither of which, Con Edison contends, requires an agreement to be made for prevailing wages.  (*Id.*).  In sum, Con Edison argues that, as a practical matter, the DOT does not enforce Admin. Code § 19-142 by requiring the permittee to enter into a separate agreement for payment of prevailing wages.  This argument depends on a factual assertion that the Court cannot credit on a motion to dismiss.

[34] Citing *Ballast*, Con Edison makes a cursory claim that Plaintiffs raised this issue for the first time in their opposition brief.  (Dkt. No. 189 at 3).  Yet, in the preceding sentences, Con Edison repeatedly takes the position Plaintiffs have "failed to offer any *plausible* allegations that such [] agreement[s] exist" (*id.*) (emphasis added), not that Plaintiffs failed to make the allegations in the first instance.  Even if Con Edison had meaningfully raised this objection, Plaintiffs are not "advocating a different theory of liability in an opposition brief wholly unsupported by factual allegations in the complaint."  *Palm Beach Mar. Museum, Inc. v. Hapoalim Sec. USA, Inc.*, 810 F. App'x 17, 20 (2d Cir. 2020).  Although Plaintiffs could have pled this theory more fulsomely, the FAC specifically alleges the existence of contracts between Con Edison and the City requiring payment of prevailing wages (FAC at ¶¶ 146, 263), cites and describes Admin. Code § 19-142 (*id.* ¶¶ 256, 259-60, 267, 273), and quotes the relevant language from the DOT Permit in full (*id.* ¶ 258).

allegations, Plaintiffs could state a claim as to agreements entered into with the DOT before the issuance of the DOT Permits." *Ballast*, 2024 WL 1530654, at *3 n.5.

Lastly, Con Edison and the CESG Defendants argue that Plaintiffs cannot maintain a private right of action under Admin. Code § 19-142 because that provision vests its enforcement exclusively with the New York City Comptroller. (Con Ed Br. at 16-17; CESG Br. at 22). But the theory of liability endorsed in *Ross* does not purport to create a private right of action under Admin. Code § 19-142. It is a theory of *contract* liability predicated on Plaintiffs' status as third-party beneficiaries of the purported contracts between Con Edison and the City. *See Ross*, 203 N.Y.S.3d at 609; *see also Lewis*, 141 N.Y.S.3d at 858. Just as a worker may assert such a common-law contract claim to require payment of prevailing wages on a public works contract (in addition to whatever remedies may be available under Section 220 itself), *see Dominguez*, 2019 WL 2371886, at *3, so too may Plaintiffs assert a contract claim notwithstanding the Comptroller's ability to directly enforce Admin. Code § 19-142.

Accordingly, the Court finds Plaintiffs have adequately alleged a breach of contract claim against Con Edison and the CESG Defendants[35] as third-party beneficiaries of agreements required to be made under Admin. Code § 19-142 to receive the DOT permits.

---

[35] While Plaintiffs allege Con Edison, not the CESG Defendants, entered into those agreements, the CESG Defendants do not raise this as a basis to dismiss the claim as it applies to them. To the contrary, they simply "join in" Con Edison's arguments, which the Court has rejected. (Dkt. No. 190). Accordingly, the Court finds Plaintiffs' claim is adequately pled with respect to both Con Edison and the CESG Defendants.

### e. Plaintiffs Cannot Rely on a *Ross* Theory of Liability for Work Performed in Westchester County

The ruling above applies only to Plaintiffs' claims relating to work performed on jobsites in New York City, despite Plaintiffs' additional allegations, "upon information and belief," that the CESG Defendants and Con Edison "entered into analogous agreements" for the work they performed in Westchester County and received "permits that entitle [Plaintiffs] to be paid the proper prevailing wage rates." (FAC ¶¶ 277-79). Plaintiffs concede that the permits pertaining to the work they performed do "not explicitly incorporate NYC Admin. Code § 19-142 like the Permits issued by the DOT." (Pl. Br. at 39). Nevertheless, Plaintiffs contend they are "entitled to discovery" regarding agreements entered into between Con Edison and municipalities in Westchester County which "will allow the parties to assess the extent Defendants were required to pay prevailing wages." (*Id*). The only basis for Plaintiffs' supposition is a publication that provides information on the classification of laborers and corresponding prevailing wage rates in Westchester County. (FAC Exh. P; Dkt. No. 128 at ¶ 16; Dkt. No. 128-15).

The Court finds that Plaintiffs have failed to state a claim for the work they performed in Westchester County. Plaintiffs cite to no other authority in support of their argument other than the publication of prevailing wages, which sets forth no requirement that parties enter into separate agreements providing for the payment of those wages. Thus, the Court's reasoning above, based on Admin. Code 19-142's express requirement that the permittee shall "agree that . . . the prevailing wage . . . pursuant to [Section 220]" will be paid, does not apply with respect to the

work Plaintiffs performed in Westchester County.  Without more, Plaintiffs have not plausibly alleged a contract claim for work in Westchester County and cannot use discovery "to assess the extent" of such a theory.

### 3.  Plaintiffs' Unjust Enrichment Claim

Plaintiffs' unjust enrichment claim for prevailing wages largely mirrors the allegations underlying their breach of contract claim.  (Count No. 14, FAC ¶¶ 738-47).  Con Edison and the CESG Defendants both move to dismiss that claim.  Con Edison does not provide a separate basis for doing so apart from their arguments as to why Plaintiffs' breach of contract claim should be dismissed.  (*See* Con Ed Br. at 16 ("Plaintiffs cannot claim to be intended beneficiaries of the DOT Permits' terms, whether under a breach of contract or unjust enrichment theory of liability.")).  The CESG Defendants, for their part, argue that Plaintiffs cannot proceed with their unjust enrichment claim because all pertinent contractual terms are contained in the Service Contracts and the Argani Contract, which are "written, integrated and enforceable contracts."  (CESG Br. at 18).  Plaintiffs provide no response other than their arguments addressed above with respect to their breach of contract claims.

In light of the ruling above on Plaintiffs' breach of contract claim, Defendants' arguments lack foundation.  The Court has found that Plaintiffs have adequately pled a breach of contract claim and that the Service Contracts and Argani Contract may not represent all of the pertinent contracts in this case.  Accordingly, the Court finds Plaintiffs have adequately pled an unjust enrichment claim.

### G.   Plaintiffs Fail to Plead the CESG Defendants Were a "Hiring Party" But Otherwise Adequately Plead the Elements of a FIFA Claim

In the alternative to their claims under the FLSA and NYLL, Plaintiffs bring two claims under the Freelance Isn't Free Act, New York City Admin. Code § 20-927, *et seq*., against all Defendants for failure to pay compensation (Count No. 11, FAC ¶¶ 708-18) and late payment of compensation (Count No. 12, *id*. ¶¶ 719-28).  As discussed above, the undersigned recommends granting the CESG Defendants' motion to dismiss Plaintiffs' FIFA claims for failure to specifically or sufficiently plead that the CESG Defendants hired Plaintiffs (*see supra* Discussion at § A), but otherwise denying the motion.

"FIFA regulates the relationship between freelance workers and those who retain their services, the hiring party, in New York City."  *Ward v. Cohen Media Publications LLC*, No. 22 Civ. 06431 (JLR), 2023 WL 5353342, at *17 (S.D.N.Y. Aug. 21, 2023) (quotations omitted).  "FIFA defines a freelance worker as 'any natural person . . . that is hired or retained as an independent contractor by a hiring party to provide services in exchange for compensation.'"  *Varn v. Orchestrade, Inc.*, No. 19 Civ. 2875 (MKB), 2022 WL 900855 at *6 (E.D.N.Y. Mar. 28, 2022) (quoting N.Y.C. Admin. Code § 20-927)  FIFA requires a written contract "[w]henever a hiring party retains the services of a freelance worker and the contract between them has a value of $800 or more."  N.Y.C. Admin. Code § 20-928.

FIFA further mandates:

> Except as otherwise provided by law, the contracted compensation shall be paid to the freelance worker either:
>
> 1.  On or before the date such compensation is due under the terms of the contract; or
>
> 2.  If the contract does not specify when the hiring party must pay the contracted compensation or the mechanism by which such date will be determined, no later than 30 days after the completion of the freelance worker's services under the contract.

N.Y.C. Admin. Code § 20-929.

As noted, Plaintiffs' FIFA claims are brought in the alternative to their principal claims under the FLSA and NYLL, which affirmatively allege that Plaintiffs were employees and *misclassified* as independent contractors by Defendants.  (*See* FAC ¶¶ 223-24, 281).  Plaintiffs plead these alternative legal theories seeking to recover from Defendants under FIFA in the event they fail to prove they were employees, or their FLSA and NYLL claims otherwise fail. Specifically, with respect to their FIFA claims, Plaintiffs allege Defendants hired them to perform services in New York City and "accept[ed] the benefit of the same without paying them all compensation owed under the terms of their agreement" (Count No. 11, FAC ¶ 713) or "without paying them on their regularly scheduled pay days or, at a minimum, within 30 days of the work performed" (Count No. 12, FAC ¶ 724).

The CESG Defendants argue Plaintiffs' FIFA claims suffer from fundamental defects, in that Plaintiffs do not identify a "hiring party" and Plaintiffs do not meet FIFA's definition of "freelancer," which are prerequisites to afford them the protections of the act.  (CESG Br. at 24; CESG Reply at 15-16).  In addition, they

argue Plaintiffs did not allege the CESG Defendants "failed to fulfill the other FIFA elements, which include the duty to provide a written contract" and "the duty to provide timely compensation."  (CESG Br. at 25).[36]

For similar reasons that lead the Court to conclude the FAC does not adequately allege that the CESG Defendants were Plaintiffs' "employer," *see supra* Discussion at § B, the Court finds Plaintiffs do not sufficiently identify the CESG Defendants as a "hiring party" under FIFA.  *See* Admin. Code § 20-297 (defining a "hiring party" as "any person who retains a freelance worker to provide any service" with certain exceptions not applicable here); *Monzano-Moreno v. Libqual Fence Co.*, No. 18 Civ. 161 (MKB) (AKT), 2021 WL 730663, at *18 (E.D.N.Y. Feb. 5, 2021) (finding defendants were not a "hiring party" under FIFA for "similar reasons" they were not plaintiffs' "employer" under the FLSA and the NYLL), *R&R adopted sub nom.*, *Monzano-Moreno v. Fence*, 2021 WL 688295 (E.D.N.Y. Feb. 23, 2021).

The CESG Defendants' remaining arguments, however, are unavailing. *First*, Plaintiffs adequately allege—in the alternative—that they meet FIFA's definition of "freelancer."  FIFA covers anyone who "is hired or retained as an independent contractor by a hiring party to provide services in exchange for compensation."  Admin. Code § 20-927.  The CESG Defendants contend "[n]owhere do Plaintiffs claim facts showing that they are independent contractors."  (CESG

---

[36] The CESG Defendants also assert in their Reply that FIFA is not applicable to the work that took place in Westchester County.  (CESG Reply at 16).  But this point is not in dispute, as Plaintiffs never take the position that their FIFA claims apply to the work they performed in Westchester County.  To the contrary, Plaintiffs consistently allege in Counts 11 and 12 that their claims pertain to the "work [they] performed within *the City of New York*."  (FAC ¶¶ 712-16, 723-26) (emphasis added).

Reply at 15-16).  But Plaintiffs specifically allege Defendants classified them as independent contractors and paid them using 1099 Forms pertaining to freelance work.  (FAC ¶¶ 223-24; *see also id.* ¶¶ 381-83 & Exh. U).  While Plaintiffs contend that classification was improper, in support of their primary NYLL and FLSA claims, that does not change the underlying factual allegations, which support their alternative FIFA theory of liability.  *Breton v. City of New York*, 404 F. Supp. 3d 799, 814 (S.D.N.Y. 2019) ("alternative claims need not be consistent"); 5 WRIGHT & MILLER, FED. PRAC. & PROC. § 1283 (4th ed.) (explaining "Rule 8(d)(2) permits a party to seek inconsistent remedies in a claim for relief without being required to elect between them at the pleading stage of the litigation").  Plaintiffs also plead the other elements of the "freelancer" definition: they allege throughout the FAC they were hired by Defendants to "provide services" in the form of flagging and spotting at Con Edison jobsites "in exchange for compensation," and specify these allegations for each named Plaintiff.  (*See, e.g.*, FAC ¶¶ 339-41, 389-91, 426-30, 456-59, 479-81, 541-45).  The Court is not persuaded by the CESG Defendants' summary declaration to the contrary.  (*See* CESG Reply at 15-16).[37]

---

[37] The Court, however, disagrees with Plaintiffs' argument in their brief that if they are not employees, they are "by default" independent contractors.  (Pl. Br. at 44).  None of the authority Plaintiffs cite establishes that proposition.  For instance, Plaintiffs rely on *Leevson v. Aqualife USA Inc*, 770 F. App'x 577 (2d Cir. 2019), where the Second Circuit found that a worker could be an employee "while also providing different, additional labor as an independent contractor." *id*. at 582 n.4.  Plaintiffs' contention that they *must be either* an employee or an independent contractor does not follow from the finding in *Leevson* that the plaintiff there *could be both*.  Two other decisions cited by Plaintiffs, *Century Sur. Co. v. Franchise Contractors, LLC*, No. 14 Civ. 277 (NRB), 2016 WL 1030134 (S.D.N.Y. Mar. 10, 2016), and *Mt. Vernon Fire Ins. Co. v. William Monier Constr. Co.*, No. 95 Civ. 645 (DC), 1996 WL 447747 (S.D.N.Y. Aug. 7, 1996), concerned the interpretation of insurance policies, not labor law, as the Second Circuit pointed out in *Leevson* and distinguished them on that basis.  *Leevson*, 770 F. App'x at 582 n.4.  Plaintiffs fail to show how those decisions are relevant here.

*Second*, a written contract is not required to bring a claim under Admin. Code § 20-929 for failure to pay compensation and late payment of compensation, as Plaintiffs do here.  *See MJ Lilly Assocs., LLC v. Ovis Creative, LLC*, 221 A.D.3d 805, 805, 200 N.Y.S.3d 403, 405 (2nd Dep't 2023) (permitting plaintiff to bring a compensation claim under Admin. Code § 20-929, despite plaintiff also asserting a claim for failure to provide a written contract).  The failure to provide a written contract may constitute a *separate* violation of FIFA under Admin. Code § 20-928, and a complaint asserting such a violation would, of course, have to include an allegation that no written contract was provided.  But Plaintiffs assert no claim under § 20-928, and the failure to provide a written contract is not an "element" of a claim under § 20-929, as the CESG Defendants erroneously contend (*see* CESG Br. at 25).

*Third*, Plaintiffs adequately allege the CESG Defendants routinely failed to pay them "[o]n or before the date such compensation is due" under Admin. Code § 20-929.  The FAC specifies the agreed-upon "regularly scheduled pay day" for each named Plaintiff, alleges Defendants "routinely failed" to pay the Plaintiffs on that day, and provides specific examples of those instances.  (*See* Pl. Br. at 45; FAC ¶¶ 363, 404, 408, 444-46, 467-70, 493-96, 521-33, 549-66).  These allegations suffice to plead a claim for unpaid or late compensation under Admin. Code § 20-929.

## H.   Plaintiff Ortiz's Retaliation Claim Is Sufficiently Pled

Plaintiff Nashaily Ortiz, individually, brings a retaliation claim against all Defendants under the FLSA (Count No. 15, FAC ¶¶ 748-55) and the NYLL (Count

No. 16, *id*. ¶¶ 756-63).  The CESG Defendants move to dismiss both counts.  (CESG Br. at 25-27).  The undersigned recommends that the motion to dismiss Counts 15 and 16 be denied.[38]

Pursuant to Section 215(a)(3) of the FLSA, it is unlawful for any employer "to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter."  29 U.S.C. § 215(a)(3); *see Greathouse v. JHS Sec. Inc.*, 784 F.3d 105, 109 (2d Cir. 2015).  As with the FLSA, the NYLL makes it unlawful for an employer to "discharge, threaten, penalize, or in any other manner discriminate or retaliate against any employee . . . because such employee has made a complaint . . . that the employer has engaged in conduct that the employee, reasonably and in good faith, believes violates [the NYLL]."  NYLL § 215(1)(a).

Given the "significant overlap in the pleading requirements for retaliation claims under the FLSA and NYLL, courts analyze both statutes under the same standards for the purposes of a motion to dismiss."  *Isayeva v. Diamond Braces*, No. 22 CIV. 4575 (KPF), 2024 WL 1053349, at *6 (S.D.N.Y. Mar. 11, 2024) (cleaned up). In particular, courts use "the three-step burden-shifting analysis" established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *Velazquez v. Yoh Servs., LLC*, 803 F. App'x 515, 517 (2d Cir. 2020).  The "plaintiff must first establish a

---

[38] The CESG Defendants do not move to dismiss Ortiz's retaliation claim on the basis that the FAC fails to adequately allege that they were Ortiz's employer.  The Court therefore does not analyze Ortiz's claim on that basis.

*prima facie* case of retaliation by showing: '(1) participation in protected activity known to the defendant, [such as] the filing of a FLSA lawsuit; (2) an employment action disadvantaging the plaintiff; and (3) a causal connection between the protected activity and the adverse employment action.'" *Id.* (quoting *Mullins v. City of New York*, 626 F.3d 47, 53 (2d Cir. 2010)).  "At the pleading stage, however, 'a temporary presumption of discriminatory motivation is created under the first prong of the *McDonnell Douglas* analysis, [and] a plaintiff need only give plausible support to a minimal inference of discriminatory motivation' to defeat a motion to dismiss." *Isayeva*, 2024 WL 1053349, at *6 (quoting *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 84 (2d Cir. 2015)).

Here, Plaintiff Ortiz alleges she worked as a flagger for Defendants from approximately June 2020 through December 2022.  (FAC ¶ 304).  Prior to initiating this lawsuit on October 20, 2022 (*see* Dkt. No. 1), Ortiz states she "routinely worked five to seven days per week, for approximately 50 to 90 hours each week." (*Id.* ¶ 306; *see also id.* ¶¶ 336-37).  However, according to Ortiz, "[s]hortly after filing her Complaint," Defendants retaliated against her by "drastically reduc[ing] the frequency and length of her shifts."  (*Id.* ¶ 335).  Specifically, Ortiz alleges, Defendants limited the number of shifts she could work per week to four and the number of hours she could work per week to 40.  (*Id.* ¶¶ 335-37, 751).  That meant Ortiz went "from working approximately 10 to 50 hours of overtime per week to not working any overtime hours at all."  (*Id.* ¶ 338).

The CESG Defendants do not dispute that by initiating this action against them, Ortiz satisfies the first of the three elements—"participation in protected activity known to the defendant"—required to establish a *prima facie* case under *McDonnell Douglas*. *See Velazquez*, 803 F. App'x at 517; *Cortese v. Skanska Koch, Inc.*, 544 F. Supp. 3d 456, 470 (S.D.N.Y. 2021) (noting "the filing of a FLSA lawsuit" is a protected activity satisfying the first element of a *prima facie* retaliation case). However, the CESG Defendants dispute whether the alleged loss of overtime here is sufficiently "adverse" to satisfy the second element of a *prima facie* case.  (CESG Br. at 27; Pl. Br. at 45-46; CESG Reply at 16).  They also dispute whether Ortiz adequately pleads a "causal connection" between her initiating this action and the subsequent reduction in her shifts and hours under the third element.  (CESG Br. at 25-27; Pl. Br. at 45-48; CESG Reply at 16-17).  The Court finds the CESG Defendants' arguments to be unpersuasive.

*First*, Ortiz alleges her overtime hours were reduced from approximately 10 to 50 hours per week to *none* (FAC ¶ 338), which is sufficient to plead an adverse employment action under the second *McDonnell Douglas* element.  *Wilson v. New York & Presbyterian Hosp.*, No. 21-1971-CV, 2022 WL 17587564, at *3 (2d Cir. Dec. 13, 2022) (finding an adverse employment action where an employer had "cutoff [an employee's] overtime opportunities" and "den[ied] him opportunities to work for overtime pay").  Courts have also found an overall reduction in hours to be an adverse action, including by numbers comparable to those alleged by Ortiz here (90 to 50 hours per week to 40 hours per week (FAC ¶¶ 335-38)).  *See, e.g., Radice v.*

*Eastport S. Manor Cent. Sch. Dist.*, 437 F. Supp. 3d 198, 213 (E.D.N.Y. 2020) (finding "the reduction of hours from 180 to 80 hours of work time constitutes an adverse employment action" with respect to plaintiff's retaliation claim brought under 42 U.S.C. § 1983 and Title VII); *Lin v. Great Rose Fashion, Inc.*, No. 08 Civ. 4778 (NGG) (RLM), 2009 WL 1544749, at *17 (E.D.N.Y. June 3, 2009) (reduction in hours is an adverse action under the FLSA and the NYLL).

*Second*, the Court finds Ortiz adequately pleads a "causal connection" under the third *McDonnell Douglas* element by alleging the reduction in hours took place shortly after she initiated this action.  (FAC ¶ 335).  Despite the CESG Defendants' suggestion otherwise (CESG Br. at 26), a plaintiff may, at the pleading stage, establish a "causal connection" based solely on the "temporal proximity" of the protected activity and the adverse action, as Ortiz does here.  *See, e.g.*, *Nunez v. Metro. Learning Inst., Inc.*, No. 18 Civ. 1757 (FB) (VMS), 2019 WL 5457731, at *2 (E.D.N.Y. Oct. 24, 2019) ("[a] causal connection may be established by temporal proximity"); *Mazyck v. Metro. Transp. Auth.*, 893 F. Supp. 2d 574, 592 (S.D.N.Y. 2012) (finding "a close temporal connection between the protected activity and the adverse action [was] adequate to establish causation").[39]

---

[39] Ortiz alleges the reduction in her hours occurred "shortly" after she initiated this action, but does not allege with specificity the amount of time that elapsed.  (FAC ¶ 335).  While there is no "bright line to define the outer limits beyond which a temporal relationship is too attenuated," *Summa v. Hofstra Univ.*, 708 F.3d 115, 128 (2d Cir. 2013), courts have generally found that "more than a few months is [] too long without some other evidence of retaliation," *Thurmond v. Thomas-Walsh*, No. 18 Civ. 409 (PMH), 2022 WL 18027617, at *6 (S.D.N.Y. Dec. 30, 2022) (citation omitted).  As the CESG Defendants do not make any argument concerning the *length* of time that elapsed between Ortiz's filing of the Complaint and the alleged retaliatory conduct, the Court will not consider it as a basis for dismissal.

The CESG Defendants do not cite to any contrary authority, but instead compare Ortiz's allegations to those of other plaintiffs where courts have found causal connections, suggesting those plaintiffs made more of a showing than Ortiz does here.  (CESG Br. at 26).[40]  For instance, the CESG Defendants rely on *Mullins v. City of New York*, 626 F.3d 47 (2d Cir. 2010), contending the court there found a causal connection after defendants took "multiple 'unusual'" steps to discipline or investigate plaintiffs shortly after the protected activity occurred.  (CESG Br. at 26 (quoting *Mullins*, 626 F.3d at 54)).  The CESG Defendants' reliance on *Mullins* is misplaced, in the first instance, because the Second Circuit there was not deciding whether the plaintiff adequately *pled* a retaliation claim.

Rather, because the plaintiff was moving for a preliminary injunction, the Second Circuit analyzed the retaliation claim for its "likelihood of success on the merits," the applicable standard.  *Mullins*, 626 F.3d at 48, 53.  Regardless, while the Second Circuit may have accorded weight to the multiple, "unusual" steps defendants allegedly took after the protected activity, nothing requires Plaintiffs to make similar allegations here.  The same is true with respect to the other decisions cited by the CESG Defendants.  (CESG Br. at 26-27 (citing *Black v. Cakor Rest., Inc.*, No. 22 Civ. 1447 (VEC), 2022 WL 17689840 (S.D.N.Y. Dec. 15, 2022); *United Gorman-Bakos v. Cornell Co-op Extension of Schenectady Cnty.*, 252 F.3d 545 (2d Cir. 2001)).  That is to say, while courts may have found different allegations to be

---

[40] The Court disagrees with the CESG Defendants' characterization of Ortiz's allegations as "one isolated incident without any additional context."  (CESG Br. at 26).  Ortiz alleges the hours she worked both before and after initiating this action, which corresponds with the significant reduction in her schedule and effective denial of overtime.  (FAC ¶¶ 306, 335-37).

*sufficient* to establish a causal connection, that does not mean such allegations are *necessary* to do so.

The CESG Defendants further misconstrue the pleading standard by proposing other reasons, apart from retaliatory animus, that may have led to Defendants' decision to reduce Ortiz's hours, such as her failure to complete a shift in May 2021 or a general downturn in work needed.  (CESG Br. at 25-26 (citing FAC ¶ 307); CESG Reply at 16-17).  But these arguments raise issues of fact that cannot be resolved at the pleading stage.  The only question here is whether Ortiz has pled the requisite causal connection, and as stated above, she has done so based on allegations of temporal proximity alone.

## I.   Plaintiffs' Claims for Class-Wide Statutory Damages Are Not Barred by CPLR 901(b)

Plaintiffs, on behalf of themselves and the putative class, bring claims against all Defendants for failure to provide pay rate notices at the time of hiring in violation of NYLL § 195(1)(a) (Count No. 6, FAC ¶¶ 665-74) and furnishing inaccurate wage statement information in violation of NYLL § 195(3) (Count No. 7, *id*. ¶¶ 675-84).  Plaintiffs seek statutory damages under the NYLL, which makes an employer "liable for damages for each instance that the violations [of NYLL §§ 195(1)(a) & 195(3)] occurred or continued to occur."  *Torres v. Golden Home Furniture Inc.*, No. 20 Civ. 4789 (MKV) (SDA), 2023 WL 3793850, at *2 (S.D.N.Y. May 10, 2023) (citing NYLL § 198(1-b) (damages for violations of NYLL § 195(1) accumulate at rate of $50 per day, but not to exceed $5,000) and NYLL § 198(1-d)

(damages for violations of NYLL § 195(3) accumulate at rate of $250 per day, but not to exceed $5,000)), *R&R adopted*, 2023 WL 3791807 (S.D.N.Y. June 2, 2023).

The CESG Defendants move to dismiss both of these claims.  They argue the claims should be dismissed because the statutory damages constitute a "penalty" under N.Y. CPLR § 901(b), which prohibits an action "to recover a penalty" from being "maintained as a class action."  (CESG Br. at 23) (quoting *Vargas v. Citi Parking, Inc.*, 2021 WL 1391287, at *3 (Sup. Ct. N.Y. Cnty. Apr. 12, 2021) ("a cause of action asserted in a class action that seeks liquidated damages must be dismissed")).  The CESG Defendants are mistaken.

As Plaintiffs correctly point out, in *Shady Grove Orthopedic Associates, P.A. v. Allstate Ins. Co.*, 559 U.S. 393 (2010), "[t]he Supreme Court ruled that N.Y. CPLR § 901(b) is preempted by Federal Rule of Civil Procedure 23 in all federal proceedings."  *Fernandez v. Sharp Mgmt. Corp.*, No. 16 Civ. 0551 (JGK) (SN), 2016 WL 5940918, at *5 (S.D.N.Y. Oct. 13, 2016) (allowing plaintiffs to pursue claim to liquidated damages under the NYLL on class basis in federal court).  The Supreme Court held that "Rule 23 unambiguously authorizes *any* plaintiff, in *any* federal civil proceeding, to maintain a class action if the Rule's prerequisites are met.  We cannot contort its text, even to avert a collision with state law that might render it invalid."  *Shady Grove*, 559 U.S. at 406 (emphasis in original).

Relying on Judge Weinstein's decision in *Belfiore v. Procter & Gamble Co.*, 311 F.R.D. 29 (E.D.N.Y. 2015), the CESG Defendants argue in their Reply that statutory damages "'could be excessive and in violation of state policy,' . . . [b]ecause

these statutory penalties would be awarded to an unknown number of Plaintiffs and for alleged technical offenses that caused no actual monetary harm." (CESG Reply at 15) (quoting *Belfiore*, 311 F.R.D. 73)). *Belfiore*, however, expressly *disagreed* with the majority's reasoning in *Shady Grove* and approved of Justice Ginsburg's dissent in that case. *See* 311 F.R.D. at 54-59. Nonetheless, Judge Weinstein recognized that *Shady Grove* "is binding on federal courts" and found only that CPLR § 901(b) could "have an impact on whether there should be a Rule 23 certification." *Id.* at 59. This case is not at the class certification stage yet. And in any event, Judge Weinstein, "[o]n further reflection," subsequently renounced reliance on this aspect of *Belfiore*, finding it "would flout the Supreme Court's *Shady Grove* decision." *Kurtz v. Kimberly-Clark Corp.*, 321 F.R.D. 482, 502 (E.D.N.Y. 2017). Accordingly, *Belfiore* offers no support for the CESG Defendants' argument.

As the CESG Defendants' basis for dismissal is plainly foreclosed by the Supreme Court's decision in *Shady Grove*, the undersigned recommends Plaintiffs be permitted to proceed with their class-wide claims for statutory damages.

## CONCLUSION

For the reasons stated above, the undersigned respectfully recommends the motions to dismiss be **GRANTED IN PART** and **DENIED IN PART**.

Specifically, the undersigned recommends granting the CESG Defendants' motion to dismiss Count Nos. 1-12 because (i) Plaintiffs engage in impermissible group pleading in violation of Rule 8's requirements; and (ii) Plaintiffs fail to adequately allege the CESG Defendants were their employers or joint employers

under the FLSA and NYLL or (alternatively) a hiring party under FIFA.  The undersigned further recommends granting Plaintiffs the opportunity to replead and cure those deficiencies.

In addition, the undersigned recommends (i) denying Con Edison's and the CESG Defendants' motions to dismiss Plaintiffs' prevailing wage claims, Count Nos. 13 & 14, to the extent those claims are based on the agreements required to be made by Admin. Code § 19-142, but (ii) otherwise granting the motions as to all other bases identified by Plaintiffs and addressed above.

Lastly, the undersigned recommends (i) finding Plaintiffs have otherwise adequately pled their FIFA claims; (ii) denying the CESG Defendants' motion to dismiss Plaintiff Ortiz's retaliation claims, Count Nos. 15 & 16; and (iii) denying the CESG Defendants' motion to dismiss Count Nos. 6 & 7 on the basis that CPLR 901(b) bars class-wide statutory damages.

Dated:     June 7, 2024
           New York, New York

_____
GARY STEIN
United States Magistrate Judge

## NOTICE OF PROCEDURE FOR FILING OBJECTIONS TO THIS
## REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b), the parties shall have fourteen calendar days, inclusive of weekends and holidays, from the date of this Report and Recommendation to file written objections thereto.  *See also* Fed. R. Civ. P. 6(a), (b), and (d).  Any such objections shall be filed with the Clerk of Court. Any request for an extension of time to file objections must be directed to Judge Rochon.  A failure to file timely objections will preclude appellate review. *See Thomas v. Arn*, 474 U.S. 140 (1985); *Wagner v. Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C.*, 596 F.3d 84, 92 (2d Cir. 2010).