## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

<table>
<tr><td>

NASHAILY ORTIZ, ISAURA LOPEZ,
RUBEN LEMUS NAJARRO, NASHEMIR ORTIZ,
ADRIANNA GAMBOA, STEVEN ALLICOTT,
ROBERTO ROSARIO, JR., and STEPHANIE
BUNDRICK, on behalf of themselves and others
similarly situated,

Plaintiffs,

v.

CONSOLIDATED EDISON COMPANY OF NEW
YORK, INC., CE SOLUTIONS GROUP, LLC, CE
SOLUTIONS INC., CE FLAGGING PLUS CORP.,
CE RESERVE CORP., ARGANI INC., NYC 2WAY
INTERNATIONAL LTD. d/b/a CTG CARS LLC,
CONCORD LIMOUSINE INC., CONCORD
LIMOUSINE 1, LLC, MARVELOUS MARK
TRANSPORTATION CO., INC., A & M
TRANSPORT TRANSPORS INC., 23 WEST
GROUP INC., JEANNINE NAPOLEONE-
COLBERT, in her individual and professional
capacities, HASSAN SABLINI, in his individual and
professional capacities, and NABIH KOUBAISSAY
a/k/a NABIL SIMBA, in his individual and
professional capacities,

Defendants.

</td><td>

Case No.: 1:22-CV-08957-JLR-GS

**SECOND AMENDED
COLLECTIVE AND CLASS
ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

</td></tr>
</table>

Plaintiffs Nashaily Ortiz ("Nashaily"), Isaura Lopez ("Lopez"), Ruben Lemus Najarro ("Najarro"), Nashemir Ortiz ("Nashemir"), Adrianna Gamboa ("Gamboa"), Steven Allicott ("Allicott"), Roberto Rosario, Jr. ("Rosario"), and Stephanie Bundrick ("Bundrick") (together, "Plaintiffs"), by and through their undersigned counsel, Faruqi & Faruqi, LLP, and on behalf of themselves and others similarly situated, hereby allege as follows against Defendants Consolidated Edison Company of New York, Inc. ("Con Edison"), CE Solutions Group, LLC ("CESG"), CE Solutions Inc. ("CES"), CE Flagging Plus Corp. ("CEFP"), CE Reserve Corp. ("CER"), Argani

1

Inc. ("Argani"), NYC 2Way International Ltd. d/b/a CTG Cars LLC ("2Way"), Concord Limousine Inc. ("Concord"), Concord Limousine 1, LLC ("Concord 1") (together with Concord Limousine Inc., "Concord Defendants"), Marvelous Mark Transportation Co., Inc. ("MMT"), A & M Transport Transpors Inc. ("A&M"), 23 West Group Inc. ("23 West") Jeannine Napoleone-Colbert ("Napoleone-Colbert") (together with CESG, CES, and 2Way, "CESG Defendants"), Hassan Sablini ("Sablini") (together with CEFP, CER, and Argani, "Argani Defendants"), and Nabih Koubaissay a/k/a Nabil Simba ("Koubaissay") (together with A&M, "A&M Defendants") (collectively, "Defendants"):[1]

## <u>NATURE OF THE CLAIMS</u>

1.      CESG Defendants operate a traffic control services company in Brooklyn, New York that provides Con Edison with Flaggers and Spotters (defined *infra* ¶¶ 147-48) (together, "Employees") to ensure safety at Con Edison jobsites located on or near public roadways and sidewalks.

2.      Indeed, CESG Defendants provide Con Edison with traffic control personnel through various subcontractors, including, Argani Defendants, Concord Defendants, A&M Defendants, and 23 West (together, the "Subcontractors") which are operated in concert by CESG Defendants and various managers and owners of the Subcontractors, installed by CESG Defendants.

3.      Despite the purposefully abstruse nature and organization of CESG Defendants' and the Subcontractors' businesses, CESG Defendants and Con Edison work together with the Subcontractors to maintain significant oversight, direction and control over their Employees,

---

[1] Any reference to "Defendants" collectively refers to all Defendants named herein.

including Employees' working conditions, schedules, payment methods, and hiring and firing practices.

4.      Con Edison's, CESG Defendants', and the Subcontractors' status as joint employers is evident from the myriad ways in which they coordinate with one another to direct and control all aspects of Plaintiffs' and similarly situated employees' employment.

5.      Con Edison, CESG Defendants, and the Subcontractors engage in a common, willful, and deliberate policy and practice of failing to pay Plaintiffs and other similarly situated employees overtime wages, instead paying them at a straight-time rate for all hours worked.

6.      Con Edison, CESG Defendants, and the Subcontractors also engage in a common, willful, and deliberate policy and practice of failing to pay Plaintiffs and other similarly situated employees for all hours worked.

7.      Con Edison, CESG Defendants, Argani Defendants, and Concord Defendants also engage in a common, willful, and deliberate policy and practice of failing to pay Spotters minimum wages.

8.      Moreover, Con Edison, CESG Defendants, and the Subcontractors engage in a common, willful, and deliberate policy and practice of failing to pay Employees at the proper prevailing wage rates and supplemental benefits owed for work performed on public streets, roadways, and sidewalks throughout New York City.

9.      Further, Con Edison, CESG Defendants, and the Subcontractors require Plaintiffs to drive their personal vehicles between jobsites and incur expenses associated with gas, mileage, tolls, and vehicle maintenance; however, they fail to reimburse Plaintiffs for the same.

10.      Additionally, Con Edison, CESG Defendants, and the Subcontractors routinely fail to pay Plaintiffs and similarly situated employees on or before their regularly scheduled pay days.

11.     Finally, Con Edison, CESG Defendants, and the Subcontractors have failed to furnish Plaintiffs and similarly situated employees with Notices of Pay Rate or wage statements (let alone accurate ones), as required by law.

12.     To redress these wrongs, Plaintiffs bring claims against Con Edison, CESG Defendants, and the Subcontractors under the Fair Labor Standards Act ("FLSA") as a collective action, pursuant to 29 U.S.C. § 216(b) and applicable regulations thereunder, on behalf of themselves and all other similarly situated persons employed by Con Edison, CESG Defendants, and the Subcontractors at any time during the full statute of limitations period.

13.     Plaintiffs also bring claims under the New York Labor Law ("NYLL") as a class action, pursuant to Federal Rule of Civil Procedure ("FRCP") 23, on behalf of themselves and all other similarly situated persons employed by any of the Defendants at any time during the full statute of limitations period.

14.     Further, Plaintiffs bring claims in the alternative under the Freelance Isn't Free Act, N.Y.C. Admin. Code §§ 20-927, *et seq.* ("FIFA") as a class action, pursuant to FRCP 23, on behalf of themselves and all other similarly situated persons who worked for any of the Defendants at any time during the full statute of limitations period.

## JURISDICTION AND VENUE

15.     Pursuant to 28 U.S.C. §§ 1331 and 1343, the Court has subject matter jurisdiction over this action because it involves federal questions regarding the deprivation of Plaintiffs' rights under the FLSA.

16.     The Court also has supplemental jurisdiction over Plaintiffs' related claims arising under State and local law pursuant to 28 U.S.C. § 1367.

17.     Venue is proper under 28 U.S.C. § 1391 because Con Edison's, CESG Defendants', and the Subcontractors' principal places of business are located in this District and a substantial portion of the events or omissions giving rise to this action occurred in this District.

## PARTIES

### A.     Plaintiff Nashaily Ortiz

18.     Nashaily is a resident of the Bronx, New York and was employed by Con Edison, CESG Defendants, and Argani Defendants from in or around June 2020 through in or around December 2022.

19.     At all relevant times, Nashaily was an "employee" of Con Edison, CESG Defendants, and Argani Defendants within the meaning of all applicable statutes and regulations.

### B.     Plaintiff Isaura Lopez

20.     Lopez is a resident of Spring Valley, New York and was employed by Con Edison, CESG Defendants, and Argani Defendants from in or around August 2020 through on or around September 30, 2021, and then again from on or around November 25, 2021 through in or around February 2022.

21.     Lopez was also employed by Con Edison, CESG Defendants, and Concord Defendants from on or around November 1, 2021 through on or around November 24, 2021.

22.     At all relevant times described above, Lopez was an "employee" of Con Edison, CESG Defendants, Argani Defendants, and Concord Defendants within the meaning of all applicable statutes and regulations.

### C.     Plaintiff Ruben Lemus Najarro

23.     Najarro is a resident of Spring Valley, New York and was employed by Con Edison, CESG Defendants, and Argani Defendants from in or around March 2021 through on or around

5

September 30, 2021, and then again from on or around November 25, 2021 through in or around February 2022.

24.    Najarro was also employed by Con Edison, CESG Defendants, and Concord Defendants from on or around October 1, 2021 through November 25, 2021, and then again from in or around February 2022 through in or around April 2022.

25.    At all relevant times described above, Najarro was an "employee" of Con Edison, CESG Defendants, Argani Defendants, and Concord Defendants within the meaning of all applicable statutes and regulations.

**D.    Plaintiff Nashemir Ortiz**

26.    Nashemir is a resident of the Bronx, New York and was employed by Con Edison, CESG Defendants, and Argani Defendants from in or around June 2019 through in or around April 2022.

27.    At all relevant times, Nashemir was an "employee" of Con Edison, CESG Defendants, and Argani Defendants within the meaning of all applicable statutes and regulations.

**E.    Plaintiff Adrianna Gamboa**

28.    Gamboa is a resident of the Bronx, New York and was employed by Con Edison, CESG Defendants, and Argani Defendants from in or around July 2020 through in or around April 2022.

29.    At all relevant times, Gamboa was an "employee" of Con Edison, CESG Defendants, and Argani Defendants within the meaning of all applicable statutes and regulations.

**F.**    **Plaintiff Steven Allicott**

30.    Allicott is a resident of the Bronx, New York and was employed by Con Edison, CESG Defendants, and MMT from in or around October 2018 through in or around November 2023.

31.    At all relevant times, Allicott was an "employee" of Con Edison, CESG Defendants, and MMT within the meaning of all applicable statutes and regulations.

**G.**    **Plaintiff Roberto Rosario, Jr.**

32.    Rosario is a resident of White Plains, New York and was employed by Con Edison, CESG Defendants, and Argani Defendants from in or around August 2018 through on or around April 10, 2023.

33.    Rosario was also employed by Con Edison, CESG Defendants, Koubaissay, and A&M from on or around April 10, 2023 through April 28, 2023.

34.    At all relevant times described above, Rosario was an "employee" of Con Edison, CESG Defendants, Argani Defendants, and A&M Defendants within the meaning of all applicable statutes and regulations.

**H.**    **Plaintiff Stephanie Bundrick**

35.    Bundrick is a resident of the Bronx, New York and was employed by Con Edison, CESG Defendants, and Argani Defendants from in or around August 2019 through in or around November 2019, then again from in or around March 2020 through in or around March 2022, and lastly from on or around February 24, 2023 through on or around April 5, 2023.

36.    Bundrick was also employed by Con Edison, CESG Defendants, and 23 West from on or around April 6, 2023 through on or around May 18, 2023.

37.     At all relevant times described above, Bundrick was an "employee" of Con Edison, CESG Defendants, Argani Defendants, and 23 West within the meaning of all applicable statutes and regulations.

I.     **Defendant Consolidated Edison Company of New York, Inc.**

38.     Con Edison is a domestic corporation with its principal place of business located at 4 Irving Place, New York, New York 10003.

39.     At all relevant times, Con Edison controlled and directed the terms of employment and compensation of Plaintiffs and all others similarly situated.

40.     At all relevant times, Con Edison established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all others similarly situated, including, *inter alia*, scheduling, work allocation, task supervision, monitoring work product, payroll, and other employment practices applicable to Plaintiffs and all others similarly situated.

41.     At all relevant times, Con Edison maintained and exercised its power to hire, fire, promote, and discipline Plaintiffs and all others similarly situated.

42.     At all relevant times, Con Edison was an "employer" within the meaning of all applicable statutes and regulations.

43.     At all relevant times, Con Edison engaged in interstate commerce, as it works on interstate highways and roadways linked to the same, and uses equipment and material produced outside of New York or moved in interstate commerce.

44.     At all relevant times, Con Edison has had gross annual revenues in excess of $500,000.00.

**J.**    **Defendant CE Solutions Group, LLC**

45.    CESG is a domestic corporation with its principal place of business located at 259 Columbia Street, Brooklyn, New York 11231.

46.    At all relevant times, CESG controlled and directed the terms of employment and compensation of Plaintiffs and all others similarly situated.

47.    At all relevant times, CESG established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all others similarly situated, including, *inter alia*, scheduling, work allocation, task supervision, monitoring work product, payroll, and other employment practices applicable to Plaintiffs and all others similarly situated.

48.    At all relevant times, CESG maintained and exercised its power to hire, fire, promote, and discipline Plaintiffs and all others similarly situated.

49.    At all relevant times, CESG was an "employer" within the meaning of all applicable statutes and regulations.

50.    At all relevant times, CESG engaged in interstate commerce, as it works on interstate highways and roadways linked to the same, and uses equipment and material produced outside of New York or moved in interstate commerce.

51.    Upon information and belief, at all relevant times, CESG has had gross annual revenues in excess of $500,000.00.

**K.**    **Defendant CE Solutions, Inc.**

52.    CES is a domestic corporation, and along with CESG, maintains its principal place of business located at 259 Columbia Street, Brooklyn, New York 11231.

53.    At all relevant times, CES controlled and directed the terms of employment and compensation of Plaintiffs and all others similarly situated.

54.     At all relevant times, CES established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all others similarly situated, including, *inter alia*, scheduling, work allocation, task supervision, monitoring work product, payroll, and other employment practices applicable to Plaintiffs and all others similarly situated.

55.     At all relevant times, CES maintained and exercised its power to hire, fire, promote, and discipline Plaintiffs and all others similarly situated.

56.     At all relevant times, CES was an "employer" within the meaning of all applicable statutes and regulations.

57.     At all relevant times, CES engaged in interstate commerce, as it works on interstate highways and roadways linked to the same, and uses equipment and material produced outside of New York or moved in interstate commerce.

58.     Upon information and belief, at all relevant times, CES has had gross annual revenues in excess of $500,000.00.

**L.**     **Defendant CE Flagging Plus Corp.**

59.     CEFP is a domestic corporation and along with CER and A&M, maintains its principal place of business located at 3007 43rd Street, Astoria, New York 11103.

60.     At all relevant times, CEFP controlled and directed the terms of employment and compensation of Nashaily, Lopez, Najarro, Nashemir, Gamboa, Rosario, and Bundrick and all others similarly situated.

61.     At all relevant times, CEFP established, implemented, disseminated, and controlled the employment policies applicable to Nashaily, Lopez, Najarro, Nashemir, Gamboa, Rosario, and Bundrick and all others similarly situated, including, *inter alia*, scheduling, work allocation, task supervision, monitoring work product, payroll, and other employment practices applicable to

Nashaily, Lopez, Najarro, Nashemir, Gamboa, Rosario, and Bundrick and all others similarly situated.

62.     At all relevant times, CEFP maintained and exercised its power to hire, fire, promote, and discipline Nashaily, Lopez, Najarro, Nashemir, Gamboa, Rosario, and Bundrick and all others similarly situated.

63.     At all relevant times, CEFP was an "employer" within the meaning of all applicable statutes and regulations.

64.     At all relevant times, CEFP engaged in interstate commerce, as it works on interstate highways and roadways linked to the same, and uses equipment and material produced outside of New York or moved in interstate commerce.

65.     Upon information and belief, at all relevant times, CEFP has had gross annual revenues in excess of $500,000.00.

**M.     Defendant CE Reserve Corp.**

66.     CER is a domestic corporation and along with CEFP and A&M, maintains its principal place of business located at 3007 43rd Street, Astoria, New York 11103.

67.     At all relevant times, CER controlled and directed the terms of employment and compensation of Nashaily, Lopez, Najarro, Nashemir, Gamboa, Rosario, and Bundrick and all others similarly situated.

68.     At all relevant times, CER established, implemented, disseminated, and controlled the employment policies applicable to Nashaily, Lopez, Najarro, Nashemir, Gamboa, Rosario, and Bundrick and all others similarly situated, including, *inter alia*, scheduling, work allocation, task supervision, monitoring work product, payroll, and other employment practices applicable to

Nashaily, Lopez, Najarro, Nashemir, Gamboa, Rosario, and Bundrick and all others similarly situated.

69.     At all relevant times, CER maintained and exercised its power to hire, fire, promote, and discipline Nashaily, Lopez, Najarro, Nashemir, Gamboa, Rosario, and Bundrick and all others similarly situated.

70.     At all relevant times, CER was an "employer" within the meaning of all applicable statutes and regulations.

71.     At all relevant times, CER engaged in interstate commerce, as it works on interstate highways and roadways linked to the same, and uses equipment and material produced outside of New York or moved in interstate commerce.

72.     Upon information and belief, at all relevant times, CER has had gross annual revenues in excess of $500,000.00.

**N.     Defendant Argani, Inc.**

73.     Argani is a domestic corporation with its principal place of business located at 30 Jake Court, Staten Island, New York 10304.

74.     At all relevant times, Argani controlled and directed the terms of employment and compensation of Nashaily, Lopez, Najarro, Nashemir, Gamboa, Rosario, and Bundrick and all others similarly situated.

75.     At all relevant times, Argani established, implemented, disseminated, and controlled the employment policies applicable to Nashaily, Lopez, Najarro, Nashemir, Gamboa, Rosario, and Bundrick and all others similarly situated, including, *inter alia*, scheduling, work allocation, task supervision, monitoring work product, payroll, and other employment practices

applicable to Nashaily, Lopez, Najarro, Nashemir, Gamboa, Rosario, and Bundrick and all others similarly situated.

76.    At all relevant times, Argani maintained and exercised its power to hire, fire, promote, and discipline Nashaily, Lopez, Najarro, Nashemir, Gamboa, Rosario, and Bundrick and all others similarly situated.

77.    At all relevant times, Argani was an "employer" within the meaning of all applicable statutes and regulations.

78.    At all relevant times, Argani engaged in interstate commerce, as it works on interstate highways and roadways linked to the same, and uses equipment and material produced outside of New York or moved in interstate commerce.

79.    Upon information and belief, at all relevant times, Argani has had gross annual revenues in excess of $500,000.00.

O.    **Defendant NYC 2Way International Ltd. d/b/a CTG Cars LLC**

80.    2Way is a domestic corporation with its principal place of business located at 335 Bond Street, Brooklyn, New York 11231, which is the same address as CESG's previous principal place of business.

81.    At all relevant times, 2Way controlled and directed the terms of employment and compensation of Plaintiffs and all others similarly situated.

82.    At all relevant times, 2Way established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all others similarly situated, including, *inter alia*, scheduling, work allocation, task supervision, monitoring work product, payroll, and other employment practices applicable to Plaintiffs and all others similarly situated.

83. At all relevant times, 2Way maintained and exercised its power to hire, fire, promote, and discipline Plaintiffs and all others similarly situated.

84. At all relevant times, 2Way was an "employer" within the meaning of all applicable statutes and regulations.

85. At all relevant times, 2Way engaged in interstate commerce, as it works on interstate highways and roadways linked to the same, and uses equipment and material produced outside of New York or moved in interstate commerce.

86. Upon information and belief, at all relevant times, 2Way has had gross annual revenues in excess of $500,000.00.

**P.    Defendant Concord Limousine Inc.**

87. Concord is a domestic corporation with its principal place of business located at 712 Third Avenue, Brooklyn, New York 11232.

88. At all relevant times, Concord controlled and directed the terms of employment and compensation of Lopez and Najarro and all others similarly situated.

89. At all relevant times, Concord established, implemented, disseminated, and controlled the employment policies applicable to Lopez and Najarro and all others similarly situated, including, *inter alia*, scheduling, work allocation, task supervision, monitoring work product, payroll, and other employment practices applicable to Lopez and Najarro and all others similarly situated.

90. At all relevant times, Concord maintained and exercised its power to hire, fire, promote, and discipline Lopez and Najarro and all others similarly situated.

91. At all relevant times, Concord was an "employer" within the meaning of all applicable statutes and regulations.

14

92.     At all relevant times, Concord engaged in interstate commerce as it works on interstate highways and roadways linked to the same, and uses equipment and material produced outside of New York or moved in interstate commerce.

93.     Upon information and belief, at all relevant times, Concord has had gross annual revenues in excess of $500,000.00.

## Q.    **Defendant Concord Limousine 1, LLC**

94.     Concord 1 is a domestic limited liability company, and along with Concord, maintains its principal place of business located at 712 Third Avenue, Brooklyn, New York 11232.

95.     At all relevant times, Concord 1 controlled and directed the terms of employment and compensation of Lopez and Najarro and all others similarly situated.

96.     At all relevant times, Concord 1 established, implemented, disseminated, and controlled the employment policies applicable to Lopez and Najarro and all others similarly situated, including, *inter alia*, scheduling, work allocation, task supervision, monitoring work product, payroll, and other employment practices applicable to Lopez and Najarro and all others similarly situated.

97.     At all relevant times, Concord 1 maintained and exercised its power to hire, fire, promote, and discipline Lopez and Najarro and all others similarly situated.

98.     At all relevant times, Concord 1 was an "employer" within the meaning of all applicable statutes and regulations.

99.     At all relevant times, Concord 1 engaged in interstate commerce as it works on interstate highways and roadways linked to the same, and uses equipment and material produced outside of New York or moved in interstate commerce.

100.    Upon information and belief, at all relevant times, Concord 1 has had gross annual revenues in excess of $500,000.00.

**R.    Defendant Marvelous Mark Transportation Co., Inc.**

101.    MMT is a domestic limited liability company with its principal place of business located at 125 Beach 124 Street, #4H, Rockaway Park, New York, 11694.

102.    At all relevant times, MMT controlled and directed the terms of employment and compensation of Allicott and all others similarly situated.

103.    At all relevant times, MMT established, implemented, disseminated, and controlled the employment policies applicable to Allicott and all others similarly situated, including, *inter alia*, scheduling, work allocation, task supervision, monitoring work product, payroll, and other employment practices applicable to Allicott and all others similarly situated.

104.    At all relevant times, MMT maintained and exercised its power to hire, fire, promote, and discipline Allicott and all others similarly situated.

105.    At all relevant times, MMT was an "employer" within the meaning of all applicable statutes and regulations.

106.    At all relevant times, MMT engaged in interstate commerce as it works on interstate highways and roadways linked to the same, and uses equipment and material produced outside of New York or moved in interstate commerce.

107.    Upon information and belief, at all relevant times, MMT has had gross annual revenues in excess of $500,000.00.

**S.    Defendant A & M Transport Transpors Inc.**

108.    A&M is a domestic corporation and along with CEFP and CER, maintains its principal place of business located at 3007 43rd Street, Astoria, New York 11103.

109. At all relevant times, A&M controlled and directed the terms of employment and compensation of Rosario and all others similarly situated.

110. At all relevant times, A&M established, implemented, disseminated, and controlled the employment policies applicable to Rosario and all others similarly situated, including, *inter alia*, scheduling, work allocation, task supervision, monitoring work product, payroll, and other employment practices applicable to Rosario and all others similarly situated.

111. At all relevant times, A&M maintained and exercised its power to hire, fire, promote, and discipline Rosario and all others similarly situated.

112. At all relevant times, A&M was an "employer" within the meaning of all applicable statutes and regulations.

113. At all relevant times, A&M engaged in interstate commerce as it works on interstate highways and roadways linked to the same, and uses equipment and material produced outside of New York or moved in interstate commerce.

114. Upon information and belief, at all relevant times, A&M has had gross annual revenues in excess of $500,000.00.

**T.    Defendant 23 West Group Inc.**

115. 23 West is a domestic corporation with its principal place of business located at 9707 4th Avenue, #30, Brooklyn, New York 11209.

116. At all relevant times, 23 West controlled and directed the terms of employment and compensation of Bundrick and all others similarly situated.

117. At all relevant times, 23 West established, implemented, disseminated, and controlled the employment policies applicable to Bundrick and all others similarly situated,

including, *inter alia*, scheduling, work allocation, task supervision, monitoring work product, payroll, and other employment practices applicable to Bundrick and all others similarly situated.

118.    At all relevant times, 23 West maintained and exercised its power to hire, fire, promote, and discipline Bundrick and all others similarly situated.

119.    At all relevant times, 23 West was an "employer" within the meaning of all applicable statutes and regulations.

120.    At all relevant times, 23 West engaged in interstate commerce as it works on interstate highways and roadways linked to the same, and uses equipment and material produced outside of New York or moved in interstate commerce.

121.    Upon information and belief, at all relevant times, 23 West has had gross annual revenues in excess of $500,000.00.

**U.    Defendant Jeannine Napoleone-Colbert**

122.    Napoleone-Colbert is, upon information and belief, a resident of Brooklyn, New York.

123.    Napoleone-Colbert manages and operates CESG, CES, and 2Way.

124.    At all relevant times, Napoleone-Colbert controlled and directed the terms of employment and compensation of Plaintiffs and all others similarly situated.

125.    At all relevant times, Napoleone-Colbert maintained control, oversight, and direction of Plaintiffs and all others similarly situated, including, *inter alia*, scheduling, work allocation, task supervision, monitoring work product, payroll, and other employment practices applicable to Plaintiffs and all others similarly situated.

126.    At all relevant times, Napoleone-Colbert maintained and exercised her power to hire, fire, promote, and discipline Plaintiffs and all others similarly situated.

127.    At all relevant times, Napoleone-Colbert was an "employer" of Plaintiffs and all others similarly situated within the meaning of all applicable statutes and regulations.

**V.**    **Defendant Hassan Sablini**

128.    Sablini is, upon information and belief, a resident of Queens, New York.

129.    Sablini, along with the CESG Defendants, owns and operates CEFP, CEF, and Argani.

130.    At all relevant times, Sablini controlled and directed the terms of employment and compensation of Nashaily, Lopez, Najarro, Nashemir, Gamboa, Rosario, and Bundrick and all others similarly situated.

131.    At all relevant times, Sablini maintained control, oversight, and direction of Nashaily, Lopez, Najarro, Nashemir, Gamboa, Rosario, and Bundrick and all others similarly situated, including, *inter alia*, scheduling, work allocation, task supervision, monitoring work product, payroll, and other employment practices applicable to Nashaily, Lopez, Najarro, Nashemir, Gamboa, Rosario, and Bundrick and all others similarly situated.

132.    At all relevant times, Sablini maintained and exercised his power to hire, fire, promote, and discipline Nashaily, Lopez, Najarro, Nashemir, Gamboa, Rosario, and Bundrick and all others similarly situated.

133.    At all relevant times, Sablini was an "employer" of Nashaily, Lopez, Najarro, Nashemir, Gamboa, Rosario, and Bundrick and all others similarly situated within the meaning of all applicable statutes and regulations.

**W.**    **Defendant Nabih Koubaissay a/k/a Nabil Simba**

134.    Koubaissay is, upon information and belief, a resident of Queens, New York.

135.    Koubaissay, along with the CESG Defendants, owns and operates A&M.

136.    At all relevant times, Koubaissay controlled and directed the terms of employment and compensation of Rosario and all others similarly situated.

137.    At all relevant times, Koubaissay maintained control, oversight, and direction of Rosario and all others similarly situated, including, *inter alia*, scheduling, work allocation, task supervision, monitoring work product, payroll, and other employment practices applicable to Rosario and all others similarly situated.

138.    At all relevant times, Koubaissay maintained and exercised his power to hire, fire, promote, and discipline Rosario and all others similarly situated.

139.    At all relevant times, Koubaissay was an "employer" of Rosario and all others similarly situated within the meaning of all applicable statutes and regulations.

## FACTS

**A.    Background**

140.    CESG and CES are located in New York City and provide a variety of traffic control services for Con Edison in the New York area.

141.    Indeed, Con Edison and CESG (on behalf of CESG Defendants) entered into a Blanket Purchase Agreement ("BPA") pursuant to which CESG Defendants provide flagging and spotting services and traffic equipment, through the Subcontractors, to Con Edison, in the immediate vicinity of its jobsites located on public roadways (including interstate roadways) and sidewalks throughout, *inter alia*, the five boroughs of New York City and Westchester County. *See* Exhibit A.

142.    As discussed *infra*, Con Edison, CESG Defendants, and the Subcontractors maintain significant oversight, direction, and control over the day-to-day operations of their

Employees, including Employees' working conditions, schedules, payment methods, and hiring and firing practices.

143.    Plaintiffs and other employees of Defendants who comprise the FLSA Collective (defined *infra* ¶ 645) hold various titles, including, *inter alia*, Flaggers and Spotters.

144.    Upon information and belief, the work Employees perform, at Con Edison's, CESG Defendants', and the Subcontractors' direction and under their control, is pursuant to contracts and/or permits between Con Edison and the City of New York and/or the State of New York.

145.    Upon information and belief, the contracts and/or permits require that Con Edison and any of its direct or indirect subcontractors pay prevailing wages and otherwise comply with all applicable laws.

146.    All allegations regarding Plaintiffs' and Employees' work, pay, and the control exerted over them by Defendants, apply equally to both Plaintiffs and the Employees who Plaintiffs seek to represent.

147.    Flaggers' job duties include, *inter alia*, redirecting traffic away from and cordoning off access to jobsites operated by Con Edison.

148.    Spotters' job duties include, *inter alia*, parking at jobsites operated by Con Edison to ensure Con Edison trucks can access the same and reserving parking spaces for vehicles operated by Con Edison.

149.    Con Edison, CESG Defendants, and the Subcontractors require Employees to stay at jobsites operated by Con Edison for indefinite periods of time and at fixed locations.

150.    However, the date, time, duration, and location of Employees' shifts are determined exclusively by Con Edison.

151.    Indeed, depending on the location and duration of the work to be performed at a particular jobsite, Con Edison notifies CESG Defendants of the number of Employees Con Edison requires, where it requires them to work, and the date, time, and duration of the work.

152.    Con Edison's directives are then passed to the CESG Defendants, who either directly notify Employees or notify one of the Subcontractors, who then notify Employees.

153.    Con Edison, CESG Defendants, and the Subcontractors jointly employ approximately 400 to 500 Employees at any given time.

154.    Con Edison, CESG Defendants, and the Subcontractors typically schedule Employees to work various shifts from Monday through Sunday, ranging anywhere from 4 to 24 hours.

155.    In total, Employees typically work five to seven days per week, for a total of anywhere from 20 to 100 hours each week, with some Employees working as many as 168 hours in a given week.

156.    Incredibly, Con Edison, CESG Defendants, and the Subcontractors sometimes task Spotters with reserving parking space for Con Edison trucks for an entire week, resulting in Spotters working approximately seven 24-hour shifts for a total of 168 hours in a given week.

157.    Employees' pay periods span one week, spanning from Monday through Sunday.

158.    Until recently, Con Edison, CESG Defendants, and the Subcontractors established the Thursday following each one-week pay period as Employees' regularly scheduled pay day.

159.    23 West has established the Wednesday two-weeks after each pay period as Employees' regularly scheduled pay day.

160.    Indeed, 23 West does not pay Employees' wages until up to two weeks after the work is performed.

**B.**    **Joint Employment and Control over Employees' Work**

    **i.**    **Direction and Control over Shift Schedules**

161.    Con Edison and CESG Defendants, and the Argani Defendants jointly employ all Employees who work for the Argani Defendants, and work in concert to control all aspects of those Employees' employment.

162.    Con Edison, CESG Defendants, and the Concord Defendants jointly employ all Employees who work for the Concord Defendants, and work in concert to control all aspects of those Employees' employment.

163.    Con Edison, CESG Defendants, and MMT jointly employ all Employees who work for MMT, and work in concert to control all aspects of those Employees' employment.

164.    Con Edison, CESG Defendants, and the A&M Defendants jointly employ all Employees who work for A&M Defendants, and work in concert to control all aspects of those Employees' employment.

165.    Con Edison, CESG Defendants, and 23 West jointly employ all Employees who work for 23 West, and work in concert to control all aspects of those Employees' employment.

166.    Con Edison, CESG Defendants, and the Subcontractor for whom an Employee works, maintain direction and control over that Employee's shifts.

167.    Con Edison, CESG Defendants, and the Subcontractor(s) for whom an Employee works, controls workflow by jointly assigning that Employee's shifts at jobsites in one of several ways.

168.    First, Con Edison directs CESG Defendants as to the number of Employees Con Edison requires at a given jobsite, the location of the jobsite where Employees are to report, and the date, time, and duration of the work.

169.    Managers and/or employees of CESG Defendants, including, *inter alia*, individuals named "Crystal," "Tamika," "April," and "Gustavo"[2] who work(ed) in CESG Defendants' office located at 259 Columbia Street, Brooklyn, New York 11231 (the "Office"), would then call Employees in the evening and assign them shifts at jobsites the following day.

170.    In the alternative, CESG Defendants would direct their Subcontractors to call Employees and assign them shifts on behalf of Con Edison and CESG Defendants.

171.    In the event an Employee does not get assigned a shift, CESG Defendants and/or the Subcontractors, on behalf of Con Edison, instruct Employees to call the Office directly or a hotline maintained and operated by CESG Defendants, to be placed in line for shifts as they become available.  *See* Exhibit B at 1 (Gustavo instructing Lopez to call the hotline).

172.    When Employees call the hotline, CESG Defendants and/or the Subcontractors, on behalf of Con Edison, instruct Employees to provide an identification number issued by CESG Defendants.

173.    When a shift becomes available, employees of CESG Defendants, such as Crystal or Gustavo, notify Employees of the location of the Con Edison jobsite and the time at which Con Edison directed them to report.

174.    In the event Employees fail to call the hotline and CESG Defendants and/or their Subcontractors fail to contact them, Employees are directed to call the Office later in the day to inquire as to whether any afternoon or evening shifts are available.

175.    Additionally, CESG Defendants and/or the Subcontractors, on behalf of Con Edison, may direct Employees to report to one of Con Edison's facilities to receive "standby shifts"

---

[2] Upon information and belief, Gustavo is also a manager and/or employee of Argani Defendants and Concord Defendants.  *See infra* ¶ 263.

located at: (i) 1560 Bruckner Boulevard, Bronx, New York 10473; (ii) 375 Broadway, Buchanan, New York 10511; and (iii) 315 Old Saw Mill River Road, Tarrytown, New York 10591.

176.    Upon arrival, CESG Defendants and/or the Subcontractors, on behalf of Con Edison, direct Employees to call the Office to notify CESG Defendants that they are available to receive a standby shift.

177.    CESG Defendants will then direct the Employee to wait in their vehicles for a Con Edison employee to assign them to a jobsite or for the Office to call them back and direct them to a Con Edison jobsite that day.

178.    If a Con Edison crew does not arrive to the jobsite within a certain number of hours after an Employee arrives at the jobsite, Employees are directed to call the Office to confirm they may leave the jobsite or go to one of Con Edison's facilities, also known as the "yard," to receive a standby shift. *See* Exhibit B at 2.

179.    If Con Edison requires multiple days to complete work at a jobsite, Con Edison, either directly or through the CESG Defendants and/or the Subcontractors, may notify the Employee working at that jobsite to report back on subsequent days. *See* Exhibit C at 14-16 (text messages between Rosario and Sablini regarding Jada Nesbitt ("Nesbitt"), a Con Edison supervisor who began requesting Rosario work directly with her crew in or around December 2021 through on or around April 6, 2023); Exhibit D (text messages exchanged between Rosario and Nesbitt wherein Nesbitt directs Rosario to various jobsites).

180.    Further, in the event Con Edison completes work at a jobsite early, a Con Edison supervisor either directly notifies Employees of the location of a second jobsite—and occasionally a third jobsite—to work another shift, or the Office will call the Employee to inform them of the location of the second or third jobsite.

181.    CESG Defendants also confirm the location of the jobsite by sending a message to the Employee from "Team CE Solutions" at support@cesolutions.io.  *See* Exhibit E at 6 (Rosario showing Gustavo a notification from "Team CE Solutions" sent from the Office).

182.    Upon information and belief, Team CE Solutions refers to the CESG Defendants and the email address, support@cesolutions.io is owned and operated by CESG Defendants on behalf of Con Edison and the Subcontractors.

183.    In the event Employees are running late for their shifts, CESG Defendants inform Employees to notify the Con Edison supervisor working at the jobsite that day.  *See* Exhibit B at 4.

184.    Con Edison supervisors may also, either directly or through the CESG Defendants and/or the Subcontractors, instruct Employees to return to one of the three Con Edison facilities to wait to be assigned to another Con Edison jobsite.

185.    However, an Employee's shift concludes only after a Con Edison supervisor informs the Employee that their shift is completed.  After a Con Edison supervisor notifies the Employee that their shift is complete, the Con Edison supervisor then calls the Office to notify CESG Defendants that the Employee's shift has ended and CESG Defendants will then clock the Employee out.

186.    In other words, Con Edison and CESG Defendants can redirect an Employee throughout the workday to other jobsites or Con Edison facilities as needed, until the Employee's shift is completed.

187.    Additionally, if Employees need to call out from work or plan to take vacation, Con Edison and CESG Defendants require them to notify and get approval from a Con Edison

supervisor, CESG Defendants, or the Subcontractor to whom CESG Defendants assigned the Employee to work.

188.    Beginning in or around February 2021, Defendants have also utilized a proprietary smartphone application (the "Smartphone App") developed, upon information and belief, by CESG Defendants and Con Edison to allow Employees to check for available shifts.

189.    Since in or around March 2022, CESG Defendants, on behalf of Con Edison, began notifying Employees directly, or through the Subcontractors, to utilize the Smartphone App to check for available shifts.  *See* Exhibit F at 3-4 (Napoleone-Colbert directing Najarro, through Lopez, to use the Smartphone App).

190.    Upon information and belief, Con Edison directly posts, or instructs CESG Defendants to post available shifts to the Smartphone App. To check for available shifts, Employees must then login into the Smartphone App and input their identification number issued to each Employee by CESG Defendants.

191.    Indeed, the Smartphone App allows Defendants to track Employees' locations and determine if and when an Employee has arrived at a jobsite.  The Smartphone App also logs, *inter alia*, the name of the Employee assigned to a jobsite, the location of a jobsite, the start time for a shift, the number of Employees needed for a jobsite, and the name of the Con Edison supervisor who requested the Employees to work at a jobsite.  *See id.* at 13 (Napoleone-Colbert utilizing the Smartphone App to track an Employee's location).

192.    In the event Employees require technical support to use the Smartphone App, CESG Defendants' employees and/or the Subcontractors direct them to contact Napoleone-Colbert or other CESG employees at the Office.  *See* Exhibit C at 1; Exhibit E at 2.

ii.      **Direction and Control over the Manner of Employees' Work**

193.    Defendants also maintain direction, control, and supervision of the work performed by Employees.

194.    For example, upon arrival at a jobsite, Con Edison, CESG Defendants, and/or the Subcontractors instruct Employees to report to a Con Edison supervisor (who is also physically present on the jobsite), who then tasks the Employee with assignments and directs the Employee's work, including, *inter alia*, where to stand to direct traffic, where to erect signage and/or barricades, and which streets or sidewalks to close.

195.    CESG Defendants also assign its own supervisors to perform regular rounds of jobsites to, *inter alia*, monitor Employees' work, ensure Employees were dressed appropriately and using proper traffic safety equipment. *See id.* at 4, 6 (Rosario informing Gustavo that "Rad" or "Raad," a CESG supervisor, went to Rosario's jobsite that day to take pictures of his timesheet to confirm his attendance).

196.    Con Edison and CESG Defendants direct Employees to get permission from a Con Edison or a CESG Defendant supervisor or the Office to take breaks during their shifts.

197.    For example, if an Employee needs to use a restroom or take lunch, they must call the Office or get permission from a Con Edison or a CESG Defendants' supervisor before doing so.

198.    Upon information and belief, CESG Defendants, on behalf of Con Edison, communicate this policy to Employees when they are hired and/or during the onboarding process. *See infra* ¶¶ 225-27.

199.    However, Con Edison and CESG Defendants direct Employees to remain at the jobsite before taking a break until one of Con Edison's or CESG Defendants' supervisors or the

Office approves the break, either verbally or by directing another Employee to take over their work.

200.    In the event one of Con Edison's and/or CESG Defendants' supervisors or an employee at the Office is unable to approve the break, the Employee is prohibited from leaving the jobsite and will be forced to relieve themselves on the side of a roadway and/or skip their lunch break altogether.

201.    The fact that CESG Defendants and Con Edison representatives are both on the jobsites, monitoring and directing Employees regarding myriad aspects of their work speaks to the inextricably interconnected manner in which Defendants jointly control Employees.

202.    Additionally, CESG Defendants and/or the Subcontractors, on behalf of Con Edison, issue Employees individually numbered timesheets marked "CE Solutions Group" with the Office's address and phone number.  *See* Exhibit G.

203.    Concord Defendants issue Employees similar timesheets marked "Con Ed Reserve Parking Site Location Sign Off Sheet" with Concord Defendants' address and phone number.  *See* Exhibit H.

204.    The timesheets are titled "Con Edison Flagging / Parking Location Timesheet" and contain instructions to Employees to "take a clear photo of this timesheet and send it to close@nyc2way.com at the completion of your job."  *See* Exhibit G.

205.    Upon information and belief, the email address, close@nyc2way.com is owned and operated by CESG Defendants on behalf of all Defendants.

206.    Employees are required to sign the timesheet upon arrival at the jobsite and at the conclusion of their shifts.

207.    An Employee's shift does not conclude until a Con Edison supervisor notifies them that their shift has ended.

208.    Con Edison, CESG Defendants, and/or the Subcontractors also direct Employees to present the timesheet to a Con Edison supervisor for their signature to certify the number of hours the Employee worked that shift.  *Id.*

209.    After obtaining Con Edison's approval, Employees then take a photograph of the timesheet and send it to close@nyc2way.com in accordance with the instructions CESG Defendants gives Employees on the timesheets.

210.    In the alternative, CESG Defendants and/or the Subcontractors direct Employees to send photographs of their timesheets to the Office, on behalf of all Defendants.  *See* Exhibit J at 2 (Koubaissay directing Rosario to send his timesheets to "Christine," who upon information and belief, works for CESG Defendants and A&M Defendants).

211.    If an Employee runs out of timesheets and a CESG Defendants' supervisor is not present at a jobsite to provide more, CESG Defendants instruct the Employee to go to the Office to obtain additional copies.  *See* Exhibit B at 5 (Gustavo directing Lopez to go to the Office to get more timesheets).

212.    Sablini has also directed Employees to send photographs of their timesheets to him directly.  *See* Exhibit I (Lopez sending her timesheets to Sablini).

213.    Con Edison will further confirm the number of hours an Employee has worked during a shift by notifying the Office that an Employee's shift has ended.

214.    At the end of each pay period, and before Employees are paid, Con Edison, CESG Defendants, and the Subcontractors then verify the number of hours Employees work by comparing separate time reports maintained by each.

215.    The time reports contain, *inter alia*, the Employee's name, the identification number issued to each Employee by CESG Defendants', and the number of hours the Employee worked that week.

216.    Prior to the implementation of the Smartphone App, Con Edison, CESG Defendants, and the Subcontractors required Employees to call the Office to clock-in and then email their timesheets to close@nyc2way.com at the conclusion of their shifts to clock-out.

217.    Beginning in or around May 2021, Con Edison, CESG Defendants, and the Subcontractors directed Employees to upload photographs of their timesheets directly to the Smartphone App.

218.    If an Employee fails to timely submit his or her timesheet through the Smartphone App after completing a shift, Con Edison and/or CESG Defendants can cancel the shift in the Smartphone App as if it was never worked by the Employee. *See* Exhibit C at 6-7.

219.    For example, upon information and belief, Con Edison's and CESG Defendants' supervisors can log into the Smartphone App and/or https://ces.gtnetwork.com/login (*see* Exhibit K) (last visited August 7, 2024) to review Employees' timesheets, determine when an Employee submits same, and change the hours Employees worked. *See* Exhibit L at 1 (A Con Edison supervisor named "Roy" notifying Rosario that he will change the hours Rosario worked).

220.    In or around April 2023, Con Edison, CESG Defendants, and the Subcontractors, began requiring Employees to: (i) take photographs of, *inter alia*, street signs, the Con Edison truck assigned to a jobsite, and/or Employees' equipment to demonstrate that they were physically present at a given Con Edison jobsite; (ii) call the Office if a shift extended beyond its end time; and (iii) call the Office every hour until a Con Edison crew arrives at the jobsite.

221.    Around the same time, CESG Defendants began issuing a new version of the timesheet, replacing "close@nyc2way.com" with "close@cesolutions.io" as the preferred email address for Employees to submit their timesheets.  *See* Exhibit M.

222.    Tellingly, both versions of the timesheets list the Office's telephone number (646-606-0442) as CESG Defendants' contact number, which is the same number listed on CESG Defendants' website, and on the message CESG Defendants send Employees to confirm the location of a jobsite.  *Compare* Exhibit G *with* Exhibit M; *see also* Exhibits E at 6, N (a screenshot of CESG Defendants' website).

223.    In any event, Con Edison, CESG Defendants, and the Subcontractors used the timesheets, Smartphone App, and the website located at—https://ces.gtnetwork.com/login—to confirm, *inter alia*, Employees were physically present at jobsites, the number of hours Employees worked in order to process Employees' payroll, and/or to rectify any discrepancies regarding an Employee's hours worked or wages paid.

### iii.    Hiring, Firing, and Discipline of Employees

224.    Con Edison, CESG Defendants, and the Subcontractors also all have the power to hire, fire, and discipline Employees for breaching their' internal policies and standards.

225.    For example, Employees are interviewed and hired by one of the Subcontractors directly or by one of the owners and/or managers of CESG, CES, and/or 2Way, such as Colbert-Napoleone, Crystal, Tamika, April, or Gustavo, who then hire the Employee to work for Con Edison, CESG Defendants, and the Subcontractor to whom CESG Defendants later assign them.

226.    Indeed, as part of the onboarding and hiring process, CESG Defendants and/or the Subcontractors, on behalf of Con Edison, direct the Employee to the Office so Employees can be interviewed by CESG Defendants.

227.    If the Employee is hired, CESG Defendants then, *inter alia*: (i) instruct the Employee to fill out paperwork with his or her personal information, including the Employee's bank account information for payroll purposes; (ii) fill out an IRS Form 1099; (iii) make photocopies of the Employee's drivers' license and social security card; and (iv) direct the Employee to take an online flagging course and purchase proper attire and equipment before they are allowed to work at Con Edison jobsites.

228.    Further, CESG Defendants, including Napoleone-Colbert, were responsible for setting up newly hired Employees with accounts on the Smartphone App and issuing them identification numbers as part of the onboarding process. *See* Exhibit F at 1-3.

229.    Additionally, if an Employee arrives late to a shift, leaves a jobsite without permission, or is not dressed and/or equipped properly, a Con Edison or CESG Defendants' supervisor will notify the Office of the infraction and direct CESG Defendants regarding the appropriate discipline.

230.    However, CESG Defendants and/or the Subcontractors will also suspend or terminate Employees if the Employee, *inter alia*, is not properly equipped or wearing the required safety vest, jeans, and hard hat. *See* Exhibit C at 2 (Sablini notifying all Flaggers assigned to work for Argani Defendants regarding the equipment they must have while working at Con Edison jobsites); Exhibit E at 1 (Gustavo relaying a message from CESG Defendants, on behalf of Con Edison, that as of September 29, 2021, all Flaggers must use "stop and slow signs" instead of flags, or face suspension and possible termination).

231.    Further, Con Edison supervisors report Employees to CESG Defendants to be disciplined if the hours they worked reflected on their timesheets submitted to the Smartphone App do not match the hours Con Edison supervisors note Employees worked during their shifts.

*See* Exhibit L at 1-2 (A Con Edison supervisor, Roy, notifying Rosario that he must notify CESG Defendants when Employees worked less hours than they indicated on their timesheet).

232.    CESG Defendants may also terminate Employees if the hours reflected on their timesheets submitted to the Smartphone App do not match the hours Con Edison supervisors note Employees worked.  *See id.* (Rosario notifying Roy that CESG Defendants "are trying to fire all 10 flaggers" for purportedly misrepresenting hours worked).

233.    Employees who also fail to upload pictures of their equipment to the Smartphone App also face suspension or termination.  *See* Exhibit W at 7 (Crystal informing Allicott that he must upload photographs of his equipment to the Smartphone App or he "will not be able to get anymore work.").

234.    In the event of any such policy violations, CESG Defendants, on behalf of Con Edison, will either directly discipline the Employee or will instruct the Subcontractor to whom the Employee is assigned to discipline the Employee by, *inter alia*: (i) removing the Employee from the shift; (ii) suspending the Employee for a given period; or (iii) terminating the Employee's employment. Similarly, if an Employee calls out after having been assigned a shift, CESG Defendants and/or the Subcontractors may suspend the Employee.

235.    Further, as discussed *supra* ¶ 179, Con Edison supervisors can also mandate that specific Employees work or not work a shift or at a jobsite based on a Con Edison supervisor's prior dealing with the Employee.  *See* Exhibit D (text messages between Rosario and Nesbitt); Exhibit B at 3 (Lopez informing Gustavo that she had been requested by Scott Morris, a Con Edison supervisor, to work at a jobsite the following day).

236.    To ensure an Employee continues working at their jobsite, Con Edison supervisors will either instruct the Employee to report to their jobsite the following day or request CESG

Defendants inform the Employee. *See id.* (Lopez informing Gustavo that Scott Morris requested her to work at a jobsite).

237.    Even if Spotters work a 24-hour shift, they may be disciplined if they leave the jobsite absent permission from Con Edison, CESG Defendants, or the Subcontractor for whom they work and a replacement by a CESG Defendants' supervisor or another Employee.

238.    Lastly, in or around May 2023, employees of CESG Defendants, including Napoleone-Colbert, directly or through the Subcontractors, began pressuring Employees to form their own corporations or businesses, so going forward Con Edison and CESG Defendants could tender Employees' wages through their businesses.

239.    Indeed, CESG Defendants pressured Employees to form their own businesses by informing them that if they refused, they may not be paid for shifts worked, would lose access to the Smartphone App, and/or be terminated.

240.    In other words, CESG Defendants sought to preserve Employees' status as independent contractors, by forcing Employees to create their own corporations, through which Con Edison and the CESG Defendants would pay them.

241.    Further, in or around mid-April 2023, the CESG Defendants terminated its contract with Sablini, but upon information and belief, still maintained control over Argani, CEFP, and CER (which were formerly owned and operated by Sablini).

242.    Following CESG Defendants' termination of the contract with Sablini, CESG Defendants transferred a vast majority of the Employees who had worked for the Argani Defendants to other Subcontractors operated by CESG Defendants, including MMT, A&M Defendants, and 23 West. *See* Exhibit C at 17-19 (Rosario informing Sablini that Napoleone-Colbert had transferred him to A&M Defendants).

iv.        **Control over Employees' Wages**

243.    Con Edison, CESG Defendants, and the Subcontractors, also direct and control the manner in which Employees are paid.

244.    Upon information and belief, Con Edison and the CESG Defendants establish hourly rates based on whether an Employee is a Flagger or a Spotter, rates that are then communicated to and agreed upon with the Subcontractors.

245.    Upon information and belief, Con Edison and the CESG Defendants also establish Employees' pay periods, which are also communicated to and agreed upon with the Subcontractors.  *See* Exhibit C at 11-12 (Rosario asking Sablini whether the Office (CESG Defendants) changed when a shift worked on the last day of the pay period is paid).

246.    For example, upon information and belief, Con Edison, CESG Defendants, and the Subcontractors, set an hourly rate of $15.00 to $17.00 per hour for Flaggers and an hourly rate of anywhere from $10.00 to $12.00 per hour for Spotters.  *See* Exhibit J at 1 (Koubaissay communicating to Rosario that A&M pays Flaggers $17.00 per hour).

247.    If there are discrepancies regarding the number of hours Employees work, the Con Edison location where Employees are to report, or with the amount Employees are paid, Con Edison and the Subcontractors direct Employees to call the Office to rectify the issue(s).  *See e.g.*, Exhibit C at 8-9.

248.    Con Edison, CESG Defendants, and the Subcontractors also use Employees' timesheets, the Smartphone App, and the website located at—https://ces.gtnetwork.com/login— to, *inter alia*, confirm the number of hours Employees worked in order to process Employees' payroll or to rectify a discrepancy regarding an Employee's hours worked or wages paid.  *Id.* at 10

(Rosario stating the Office and/or the Smartphone App had incorrectly noted that he worked 16 hours as a Spotter).

249.    Upon information and belief, Con Edison and/or CESG Defendants would only correct an Employee's pay or hours worked if their review of the Employee's timesheets and/or the Smartphone App revealed the Employee had in fact worked the hours they reported.  However, Con Edison, CESG Defendants, and the Subcontractors will not pay Employees if the Employee fails to submit his or her timesheet through the Smartphone App.

250.    That said, Con Edison and CESG Defendants used the timesheets, Smartphone App, and the website to conclusively determine the number of hours Employees worked for payroll purposes.

251.    Once Employees' true hours worked are accounted for, Con Edison then pays CESG Defendants an hourly rate for these hours, pursuant to the hourly unit prices set in the BPAs. *See* Exhibit A at 4-5 (Con Edison describing, *inter alia*, the straight time and overtime hourly rates to be paid to CESG, on behalf of CESG Defendants, for flagging services), § 5(B).

252.    Con Edison also established different hourly rates for Employees' flagging services depending on whether, *inter alia*, the Employee works more or less than eight hours on a given day.  *Id.* at 4-5.

253.    Upon information and belief, after receiving payment from Con Edison, CESG Defendants and the Subcontractors paid Employees at a straight time rate for each hour that they worked. Employees' wages are then issued through by the Subcontractors to whom CESG Defendants assigned the Employee.

254.    In other words, Con Edison paid Employees, through CESG Defendants and the Subcontractors, for hours that Employees worked on Con Edison job sites, rather than a total contracted for amount.

255.    During the onboarding process, CESG Defendants also gather Employees' banking information so that CESG Defendants and the Subcontractors, on behalf of Con Edison, can pay Employees via direct deposit, the method of payment by which Con Edison and CESG Defendants (through the Subcontractors) paid Employees.  *See* Exhibit F at 2 (Lopez providing Napoleone-Colbert Najarro's banking information for payroll purposes).

256.    Con Edison, CESG Defendants, and the Subcontractors, also direct and control the employment status of Employees.

257.    Specifically, Con Edison, CESG Defendants, and the Subcontractors, misclassify Employees as independent contractors for shifts performed at Con Edison jobsites.

258.    To conceal this misclassification, Con Edison and CESG Defendants, through the Subcontractors, improperly pay Employees on an IRS Form 1099, as opposed to an IRS Form W-2.

**v.    Maintenance of Employee Records**

259.    Con Edison, CESG Defendants, and the Subcontractors maintain all employment, personnel, and business records for Employees.

260.    First, CESG Defendants and/or the Subcontractors, on behalf of Con Edison, maintain onboarding paperwork that Employees are directed to fill out upon their hire with their personal information, including, *inter alia*, their banking information for payroll purposes.

261.    The CESG Defendants and/or the Subcontractors, on behalf of Con Edison, also maintain copies of Employees' drivers' licenses and social security cards.

262.    CESG Defendants and the Subcontractors, on behalf of Con Edison, maintain Employees' IRS Form 1099s.  *See* Exhibit C at 13.

263.    The CESG Defendants, Con Edison, and the Subcontractors also require Employees to take photographs of, *inter alia*, street signs, the Con Edison truck assigned to a jobsite, and/or themselves on location wearing all equipment, to demonstrate that they are physically present at a given Con Edison job site.  *See* Exhibit D at 7-8; Exhibit O (Najarro sending photographs to Gustavo and Sablini while working shifts at Con Edison jobsites for Concord Defendants).

264.    Prior to the implementation of the Smartphone App, CESG Defendants instructed Employees to upload the photographs to sitephotos@nyc2way.com.  *See* Exhibit E at 7.

265.    Upon information and belief, the email address, sitephotos@nyc2way.com is also owned and operated by CESG Defendants on behalf of all Defendants.  Later, CESG Defendants changed the email address for Employees to upload photographs to sitephotos@cesolutions.io, which, upon information and belief, is also owned and operated by CESG Defendants on behalf of all Defendants.  *See* Exhibit W at 7.

266.    Con Edison, CESG Defendants, and the Subcontractors also maintain Employees' timesheets which they use to calculate Employees' hours, process Employees' payroll, rectify any discrepancies regarding an Employee's hours worked or wages paid, and control Employees' day-to-day employment, rather than merely for quality control procedures.  *See* Exhibit F at 12-13 (Colbert-Napoleone requesting Lopez confirm the accuracy of the hours Lopez reported on a timesheet).

267.    The CESG Defendants and the Subcontractors, on behalf of Con Edison, also require Employees to upload the photographs and their timesheets to the Smartphone App;

however, Con Edison supervisors also require Employees to send the photographs to them directly. *See* Exhibit D at 7-8.

268.    Prior to the implementation of the Smartphone App, CESG Defendants and the Subcontractors required Employees send their timesheets to the Office directly. *See* Exhibit E at 3.

269.    Con Edison, CESG Defendants, and the Subcontractors also maintain the Smartphone App to, *inter alia*, track Employees' locations, determine if and when an Employee has arrived at a jobsite, the location of a jobsite, the length of the shift worked, and the name of the Con Edison supervisor working at the jobsite. *See* Exhibit F at 13 (Napoleone-Colbert sending Lopez, upon information and belief, a screenshot of the Smartphone App interface).

270.    Notably, CESG Defendants, on behalf of Con Edison and the Subcontractors issue and maintain Employees' login information for the Smartphone App. *See id.* at 3.

271.    Further, Con Edison, CESG Defendants, and the Subcontractors also maintain spreadsheets and/or time reports to track the number of hours Employees work for payroll calculation purposes. *See* Exhibit C at 4-5, 10-11.

272.    The CESG Defendants, on behalf of Con Edison, also maintain certificates demonstrating proof that Employees have completed the online flagging course prior to a given Employee's hire. *See* Exhibit F at 1-2.

273.    Lastly, in or around December 2021, CESG Defendants and the Subcontractors, on behalf of Con Edison, mandated Employees receive vaccinations for COVID-19 to receive shifts on Con Edison jobsites. *See* Exhibit B at 7-8. CESG Defendants and the Subcontractors maintained copies of Employees' vaccination cards. *Id.* at 9 (Gustavo instructing Lopez to "carry your [vaccination] card with you to all [jobsites]").

### vi.    Additional Indicia of Control and Employee Status

274.    Employees' relationships with Defendants are permanent insofar as they typically work exclusively for Defendants over extended periods of time.

275.    Con Edison and the CESG Defendants require every Employee take an online flagging course and provide proof that they completed the same prior to the given Employee's hire.

276.    Employees who started working for Con Edison and CESG Defendants in or around 2018 were provided with equipment to work at Con Edison jobsites, including, *inter alia*, batons with flashing lights, hard hats, "flagger ahead" signs.

277.    In or around late-2018 to early-2019, Con Edison and the CESG Defendants changed their policy and began directing Employees to purchase their own equipment upon their hire as a prerequisite to working on Con Edison jobsites, including, *inter alia*, steel-toed boots, jeans, safety vests, safety helmets, safety flags, traffic cones, tripods, and portable stop and "flagger ahead" signs.

278.    However, at all relevant times, Con Edison also provided Employees with, and directed them when and where to use, other equipment to ensure traffic safety at Con Edison jobsites, such as traffic cones, barricades, and portable "men at work" signs.

279.    For Employees to receive shifts, Employees must wear proper attire and be fully equipped with all required tools and equipment. *See* Exhibit C at 2 (Sablini sending a message to Rosario (and all other Flaggers) on behalf of Con Edison and CESG Defendants regarding the appropriate attire and equipment Flaggers must use, or be "suspended or possibly terminated.").

280.    CESG Defendants and the Subcontractors, on behalf of Con Edison, determine Employees' rate and method of payment and hours worked.

281.    Defendants maintain control and oversight over the quality of Employees' work.

282.    Employees do not have the power to, and do not actually, hire or fire anyone.

283.    Employees have no ability to set schedules or compensation for any of Defendants' employees.

284.    Employees have no role in budget planning or monitoring, and similarly have no role in implementing legal compliance measures.

285.    Indeed, all such matters are handled by Defendants.

286.    Employees have no opportunity for profit or loss, as they are paid the same hourly wage irrespective of the income generated by their work or Defendants' overall profits.

287.    Employees perform routine tasks that require little training beyond the training course Defendants require Employees take as a prerequisite for working at Con Edison jobsites.

288.    Employees exercise little to no initiative, judgment, or foresight in open market competition with others to ensure their success, as they typically work exclusively for Defendants and for a fixed hourly wage.

289.    For example, Employees do not independently advertise or market their services.

290.    On a similar note, Plaintiffs do not operate their own businesses independently of Defendants.

291.    Upon information and belief, CESG Defendants contracted exclusively with Con Edison to provide Flaggers on Con Edison jobsites.

292.    Because the vast majority of Employees' work was performed for or on behalf of Con Edison, CESG Defendants' business operations would be unsustainable without Con Edison.

293.    Flaggers are required on Con Edison jobsites, before work can begin.  Flaggers' job duties, *i.e.*, ensuring traffic control and work zone safety on Con Edison jobsites, are integral to

Con Edison's business of maintaining and providing gas and electricity to the millions of people who live in New York City and Westchester County.

## C.    Failure to Reimburse for Work-Related Expenses

294.    Defendants require Employees to use their personal vehicles to drive between jobsites.

295.    While driving between jobsites, Employees incur expenses for gas, mileage, tolls, and vehicle maintenance—none of which Defendants reimburse.

296.    Employees' personal vehicles are considered tools of the trade because Con Edison, CESG Defendants, and the Subcontractors require Employees to travel in between jobsites as part of their employment and for the performance of Employees' work.

297.    Further, the expenses associated with gas, mileage, tolls, and vehicle maintenance incurred bring Flaggers' wage rates below the applicable State minimum wage (and certainly well below the applicable prevailing wage rates).

298.    Spotters, who are paid only $10.00 to $12.00 per hour, are already paid below the applicable State minimum wage (and certainly well below the applicable prevailing wage rates), but the expenses they incur bring their wages even further below that threshold.

299.    In lieu of calculating their actual expenses, reimbursement for expenses related to an Employee's use of their personal vehicles in the performance of their work can be calculated using the Internal Revenue Service's ("IRS") standard mileage rate set by the IRS each year.  *See, e.g.*, https://www.irs.gov/tax-professionals/standard-mileage-rates (last visited August 7, 2024).

300.    Pursuant to the IRS's standard mileage rates in 2019, 2020, 2021, 2022, 2023, and 2024, Employees who used their personal vehicles to travel between jobsites as required by Con

Edison, CESG Defendants, and the Subcontractors should have been paid $0.58, $.0575, $0.56, $0.585-$0.62.5, $0.655, and $0.67 per mile, respectively.

**D.** **Failure to Pay Prevailing Wages and Supplemental Benefits for Work Performed on New York City and New York State Public Streets, Roadways, and Sidewalks**

301.    Defendants engage in a common pattern and practice of deliberately denying Employees compensation for prevailing wage work at applicable prevailing wage rates.

302.    CESG, on behalf of the CESG Defendants, has entered into the BPAs with Con Edison (the "Contracts"), as either a subcontractor or a prime contractor to provide flagging and spotting services on New York City and New York State public streets, roadways, and sidewalks.

303.    Defendants are required to pay Employees at the local prevailing wage rates, including supplemental benefits and overtime premiums for hours worked in excess of 40 hours per week, eight hours per day, hours worked on Saturdays and Sundays, and hours worked during the evening.

304.    Further, the work Employees perform is predominantly physical in nature, and exposes Employees to attendant risks shared by other construction workers due to the presence of construction, construction equipment, and public traffic and was performed in close proximity to construction sites, thereby entitling them to prevailing wages.

305.    The work Employees performed on New York City and New York State public streets, roadways, and sidewalks also constituted "public works" thereby requiring Defendants to pay Employees at applicable prevailing wage rates.

306.    A project constitutes a public work if: (i) a public agency is a party to the project; (ii) the project is paid for by public funds; and (iii) the primary function or objection of the project is to serve the general public.

307.    First, upon information and belief, each jobsite that involves street openings and/or excavation work for Con Edison, requires a Street Opening Permit (the "Permit") issued by the New York City Department of Transportation ("DOT"), or a "permit… to use or open a street" as the term is defined under New York City Administrative Code § 19-142.  *See* Exhibit P.

308.    The Permit includes specific stipulations as to the work being performed, including, *inter alia*, wages to be paid to "workers on excavations," including Plaintiffs.  *Id.* at 3.

309.    Specifically, the Permit states, in relevant part:

> NYC ADMINISTRATIVE CODE, 19-142, WORKERS ON EXCAVATIONS: A PERSON TO WHOM A PERMIT MAY BE ISSUED, TO USE OR OPEN A STREET, SHALL BE REQUIRED, BEFORE SUCH PERMIT MAY BE ISSUED, TO AGREE THAT NONE BUT COMPETENT WORKERS, SKILLED IN THE WORK REQUIRED OF THEM, SHALL BE EMPLOYED THEREON, AND THAT THE PREVAILING SCALE OF UNION WAGES SHALL BE THE PREVAILING WAGE FOR SIMILAR TITLES AS ESTABLISHED BY THE FISCAL OFFICER PURSUANT TO SEC. TWO HUNDRED TWENTY OF THE LABOR LAW, PAID TO THOSE SO EMPLOYED.

*Id.*

310.    The fact that such permits (issued by DOT) were required for the work to be performed in New York City obligated Defendants, including Con Edison, to ensure that prevailing wages were paid for all work on such projects pursuant to NYLL § 220 (3-e).  Not only are these provisions consistent with one another, but NYLL § 220 (3-a)(e) plainly contemplates and incorporates NYC Admin. Code § 19-142:

> *Utility companies and their contractors and subcontractors who, under local law or ordinance, are required, as a condition of issuance of a permit to use or open a street*, to agree that none but competent workers, skilled in the work required of them shall be employed thereon and *that prevailing scale of union wages shall be the prevailing wage for the similar titles as established by the fiscal officer pursuant to this section, paid to those so employed*,

shall be required to keep original payrolls or transcripts thereof, subscribed and sworn to or affirmed by him or her as true under the penalties of perjury, setting forth the names and addresses and showing for each workman, laborer, or mechanic the hours and days worked, the occupations worked, the hourly wage rates paid and the supplements paid or provided as, and in the manner required by paragraphs a, b and c of this subdivision.

NYLL § 220 (3-a)(e) (emphasis added).

311.    Indeed, Con Edison routinely obtains street permits which expressly require payment of prevailing wages under NYC Admin. Code § 19-142.

312.    A schedule containing the prevailing wage rates and supplemental benefits Employees are to be paid was or should have been annexed to the Contracts.

313.    Even if not annexed to the Contracts, the aforementioned schedules are considered expressly or impliedly incorporated into the Contracts as a matter of law and/or public policy.

314.    Further, upon information and belief, the Permits and/or other agreements between Con Edison and New York State, New York City, and/or DOT require payment of prevailing wages, either specifically pursuant to NYC Admin. Code § 19-142 or through a general requirement to comply with all applicable laws.

315.    Additionally, upon information and belief, worked performed on Con Edison job sites is paid for by public funding, including, *inter alia*, government subsidies.

316.    Lastly, Con Edison provides electric, gas, and steam services for the millions of people who live in New York City and Westchester County.

317.    To that end, the function of the work that Employees perform on Con Edison job sites is to serve and benefit the general public.

318.    In any event, whether a construction project is considered a public or private work is not dispositive since the prevailing wage requirements of Labor Law § 220 were applicable pursuant to both NYC Admin. Code § 19-142 and the contractual provision in the Permit.

319.    While the New York City Office of the Comptroller is given authority to enforce NYC Admin. Code § 19-142, Plaintiffs also have a private right of action under this provision based on their standing as third-party beneficiaries.

320.    Upon information and belief, pursuant to the Permits and/or the Contracts, CESG Defendants and the Subcontractors are paid to provide flagging and spotting services at jobsites, for which Employees must be paid at the applicable prevailing wage rates.

321.    Throughout the relevant time period, Employees have performed flagging and spotting work on Con Edison jobsites only.

**E.    Failure to Tender Minimum, Overtime, and Spread of Hours Wages and Payment for all Hours Worked**

322.    Defendants engage in a common pattern and practice of deliberately denying Employees minimum and overtime wages owed.

323.    As noted above, this is accomplished through Con Edison's, CESG Defendants', and the Subcontractors' unlawful misclassification of Employees as independent contractors.

324.    Con Edison, CESG Defendants, and the Subcontractors systematically deny Plaintiffs and all other Employees wages in several ways.

325.    First, Con Edison, CESG Defendants, Concord Defendants, and Argani Defendants engage in a pattern and practice of denying Spotters minimum wages by setting their hourly rates at anywhere from $11.00 to $12.00 for all hours worked.

326.    In fact, Con Edison, CESG Defendants, Concord Defendants, Argani Defendants, and the remaining Subcontractors often fail to pay Employees any wages at all for a portion of the hours they work each week.

327.    This common, unlawful compensation scheme is carried out by Con Edison, CESG Defendants, and the Subcontractors, directly.

328.    Further, Con Edison, CESG Defendants, and the Subcontractors maintain an intentional practice of failing to pay all Employees overtime wages for all hours worked in excess of 40 hours in a workweek.

329.    In other words, Con Edison, CESG Defendants, and the Subcontractors completely deny all Employees, some of whom work as many as 168 hours per week, any overtime compensation at all.

330.    Instead, Con Edison, CESG Defendants, and the Subcontractors pay Employees at a straight-time rate for all hours worked (save for the hours for which they receive no compensation at all).

331.    Lastly, Con Edison, CESG Defendants, and the Subcontractors do not provide Employees with spread of hours pay—*i.e.*, an additional hour of pay at the applicable State minimum wage rate on each day where the length of interval between the beginning and end of an employee's workday exceeds 10 hours—when they work more than 10 hours a day (as is often the case).

**F.    Late Payment of Wages**

332.    Con Edison and the CESG Defendants, and the Subcontractors, also engage in a common pattern and practice of delaying payment of wages to Plaintiffs and all other Employees beyond their regularly scheduled paydays.

333.    Upon information and belief, Con Edison, CESG Defendants and the Subcontractors together determined Plaintiffs' and all other Employees' pay periods, which cover a 7-day time frame—Monday through Sunday.  *See* Exhibit C at 11-12 (Rosario asking Sablini whether the "Office" (or CESG Defendants) changed when a shift worked on the last day of the pay period is paid).

334.    Upon information and belief, CESG Defendants and the Subcontractors, on behalf of Con Edison, also established every Thursday as Plaintiffs' and all other Employees' regularly scheduled pay day, until in or around September 2022, when CESG Defendants and the Subcontractors, on behalf of Con Edison, established every Friday as Plaintiffs' and all other Employees' pay day throughout the relevant time period thereafter.

335.    However, CESG Defendants and the Subcontractors, on behalf of Con Edison, routinely fail to pay Plaintiffs and all other Employees for days or even weeks after their regularly scheduled pay days.

336.    23 West does not pay Employees' wages until up to two weeks after the work is performed.

337.    Under the FLSA, employers are required to pay Employees on the next regularly scheduled payday following the work performed.

338.    As a result of Con Edison's, CESG Defendants', and the Subcontractors' failure to timely pay Employees, Employees have suffered concrete harm.

339.    Specifically, each pay period, Employees were, *inter alia*: (i) deprived of money to which they had a right, thereby costing them the time value of their money; (ii) deprived of opportunity to invest their money; and/or (iii) otherwise unable to use their wages to pay bills and satisfy other financial obligations.

**G.    Failure to Provide Notices of Pay Rate and Accurate Wage Statements**

340.    The NYLL requires that employers, including Defendants, provide employees, "at the time of hiring, a notice containing the following information: the rate or rates of pay and basis thereof, whether paid by the hour, shift, day, week, salary, piece, commission, or other; allowances, if any, claimed as part of the minimum wage, including tip, meal, or lodging allowances . . . ; the regular pay day designated by the employer [ ]; the name of the employer; any 'doing business as' names used by the employer; the physical address of the employer's main office or principal place of business, and a mailing address if different; the telephone number of the employer; plus such other information as the commissioner deems material and necessary[,]" which is commonly referred to as a Notice of Pay Rate.

341.    Throughout the statutory period, Con Edison, CESG Defendants, and the Subcontractors have never provided Plaintiffs or any other Employees with Notices of Pay Rate.

342.    The NYLL also requires that employers, including Con Edison, CESG Defendants, and the Subcontractors, issue or provide employees with accurate wage statements with each payment of wages.

343.    Con Edison, CESG Defendants, and the Subcontractors have never furnished Plaintiffs or any of the other Employees with accurate wage statements during the statutory period.

344.    In fact, Con Edison, CESG Defendants, and the Subcontractors engage in a consistent pattern and practice of failing to furnish Plaintiffs and all other Employees with any wage statements at all.

345.    As a result of Con Edison's, CESG Defendants', and the Subcontractors' failure to provide Employees with Notice of Pay Rates and accurate wage statements with each payment of wages, Employees have suffered concrete harm.

346.    Specifically, Employees have been prevented from, *inter alia*: (i) realizing their true hours worked; (ii) realizing that they were underpaid; and (iii) taking appropriate action to obtain the payments due to them.

**H.    Plaintiff Nashaily Ortiz**

    **i.    Background**

347.    Nashaily worked for Con Edison, CESG Defendants, and Argani Defendants as a Flagger from in or around June 2020 through in or around December 2022.

348.    Upon Nashaily's hire in or around June 2020, Con Edison, CESG Defendants, and Argani Defendants set her regular rate of pay at $15.00 per hour, with her overtime rate being $22.50 per hour.

349.    From in or around June 2020 through the present, Nashaily routinely worked five to seven days per week, for approximately 50 to 90 hours each week.

350.    In or around June 2020, Nashaily contacted the Office seeking a position as a Flagger.  An employee of CESG Defendants then instructed Nashaily to send a copy of her social security card and take the online flagging course.

351.    The employee of CESG Defendants then directed Nashaily to report to the Office as part of Con Edison's, CESG Defendants', and the Subcontractors' onboarding process. Upon arrival, an employee of CESG Defendants instructed Nashaily to present her driver's license and a copy of her flagging course training certificate for photocopying, to fill out paperwork with her personal information, including banking information for payroll purposes and an IRS Form 1099. CESG Defendants also directed Nashaily to buy traffic safety equipment before she could be staffed to Con Edison jobsites.  CESG Defendants then hired Nashaily on behalf of Con Edison, themselves, and Argani Defendants.

352.    However, in or around May 2021, Con Edison, CESG Defendants, and Argani Defendants suspended Nashaily for approximately two weeks for leaving a jobsite before her shift had ended.

353.    Specifically, Nashaily left a jobsite after she witnessed the Con Edison truck that had been working on that jobsite leave for the day.

354.    While this ordinarily signaled to Nashaily (and to any other Employee) that her shift had ended, Con Edison failed to notify Nashaily that another Con Edison truck was en route to replace the previous truck.

355.    As such, Con Edison apparently expected her to remain at the jobsite, resulting in her suspension.

### ii.    Wage Violations

356.    Con Edison, CESG Defendants, and Argani Defendants failed to pay Nashaily for her hours worked in several ways.

357.    Despite routinely working 50 to 90 hours each week, at all relevant times, Con Edison, CESG Defendants, and Argani Defendants never paid Nashaily at her overtime rate as a result of Defendants' improper classification of their Employees as independent contractors.

358.    Indeed, Con Edison, CESG Defendants, and Argani Defendants did not pay Nashaily any overtime for the 10 to 50 hours that she typically worked in excess of 40 each week.

359.    By way of example, from December 6, 2021 through December 12, 2021, Nashaily worked approximately 100 hours. *See* Exhibit Q (sampling of Nashaily's timesheets).

360.    Indeed, she worked six 16-hour shifts and one 4-hour shift for a total of 100 hours during that period.

361.    However, Con Edison, CESG Defendants, and Argani Defendants paid Nashaily only $1,500.00 for the 100 hours worked.

362.    For this week alone, Con Edison, CESG Defendants, and Argani Defendants failed to pay Nashaily an additional $450.00 in overtime wages.[3]

363.    Additionally, given that Nashaily worked 6 shifts of more than 10 hours, Con Edison, CESG Defendants, and Argani Defendants also denied her $90.00 in spread of hours pay.[4]

364.    Throughout the statutory period, Nashaily was paid her wages in pay periods spanning a 7-day timeframe, with her regularly scheduled pay day being every Thursday.

365.    However, Con Edison, CESG Defendants, and Argani Defendants routinely failed to pay Nashaily for her shifts on her regularly scheduled pay day.

366.    For example, from August 29, 2022 through September 4, 2022, Nashaily worked approximately 61 hours.

367.    However, on or around September 8, 2022—Nashaily's next scheduled pay day—Con Edison, CESG Defendants, and Argani Defendants paid Nashaily only $592.00 for approximately 39.46 hours worked.

368.    On September 15, 2022—Nashaily's next scheduled pay day—Con Edison, CESG Defendants, and Argani Defendants paid Nashaily an additional $130.00 for approximately 8.67 hours of the remaining 21.54 hours she worked from August 29, 2022 through September 4, 2022.[5]

369.    In other words, Con Edison, CESG Defendants, and Argani Defendants failed to pay Nashaily for approximately 12.87 additional hours.[6]

---

[3] 100 hours – 40 hours = 60 hours; 60 x $7.50 = $450.00.
[4] 6 x $15.00 (minimum wage) = $90.00.
[5] 61 hours - 39.46 hours = 21.54 hours.
[6] 21.54 hours – 8.67 hours = 12.87 hours.

370.    For this week alone, Con Edison, CESG Defendants, and Argani Defendants failed to pay Nashaily an additional $447.07 in overtime wages.[7]

371.    Indeed, Con Edison, CESG Defendants, and Argani Defendants did not pay Nashaily any compensation at all for the remaining 12.87 hours she worked from August 29, 2022 through September 4, 2022 until approximately September 22, 2022—two weeks after her regularly scheduled pay day.

372.    As a result of Con Edison's, CESG Defendants', and Argani Defendants' failure to timely pay her, Nashaily, *inter alia*: (i) was deprived of money to which she had a right; (ii) lost the time value of her money; (iii) lost the opportunity to invest her money.

373.    Additionally, Con Edison, CESG Defendants, and Argani Defendants failed to furnish Nashaily with accurate wage statements.

374.    Con Edison, CESG Defendants, and Argani Defendants also failed to issue a Notice of Pay Rate to Nashaily at any time during her employment.

375.    As a result of Con Edison's, CESG Defendants', and Argani Defendants' failure to provide Nashaily with a Notice of Pay Rate and accurate wage statements with each payment of her wages, Nashaily was prevented from, *inter alia*: (i) realizing her true hours worked; (ii) realizing that she was underpaid; and (iii) taking appropriate action to obtain the payments due to her.

376.    Further, Con Edison, CESG Defendants, and Argani Defendants required Nashaily to drive her personal vehicle to and from jobsites, which resulted in Nashaily incurring costs

---

[7] 61 hours – 40 hours = 21 hours; 21 x $7.50 = $157.50.
12.87 hours x $22.50 (Nashaily's overtime rate) = $289.57.
$157.50 + $289.57 = $447.07.

associated with gas, mileage, tolls, and vehicle maintenance—none of which Con Edison, CESG Defendants, or Argani Defendants reimbursed.

377.    Throughout the duration of her employment, Nashaily drove approximately 0.1 to 70 miles to and from jobsites on days in which Con Edison, CESG Defendants, and Argani Defendants required the same.

378.    Throughout the relevant time period, Nashaily had conversations with other Employees who confirmed that they were subjected to the same unlawful wage practices outlined above.

### iii.    FLSA/NYLL Retaliation

379.    On or around October 20, 2022, Nashaily filed her Complaint, initiating this lawsuit.

380.    Beginning on or around November 11, 2022, Con Edison, CESG Defendants, and Argani Defendants drastically reduced the frequency and length of her shifts.

381.    Whereas Nashaily worked five to seven days per week prior to filing her Complaint, Con Edison, CESG Defendants, and Argani Defendants instructed Nashaily that she could only work a maximum of four shifts per week after initiating her lawsuit.

382.    Moreover, Nashaily worked 50 to 90 hours each week prior to filing her Complaint; however, shortly after initiating her lawsuit, Con Edison, CESG Defendants, and Argani Defendants only allowed Nashaily to work a maximum of 40 hours per week, further instructing Nashaily that she no longer would be permitted to work any hours in excess of 40 hours in a workweek.

383.    As a result, Nashaily went from working approximately 10 to 50 hours of overtime per week to not working any overtime hours at all.

I.     **Plaintiff Isaura Lopez**

    i.     **Background**

384.    Lopez worked for Con Edison, CESG Defendants, and Argani Defendants as a Flagger from in or around August 2020 through on or around September 30, 2021 and then again from on or around November 25, 2021 through in or around February 2022.

385.    In this role, Con Edison, CESG Defendants, and Argani Defendants set Lopez's regular rate of pay at $15.00 per hour, with her overtime rate being $22.50 per hour.

386.    From in or around August 2020 through on or around September 30, 2021, and again from on or around November 25, 2021 through in or around February 2022, Lopez routinely worked five to seven days per week, for approximately 50 to 100 hours each week and has worked as many as 134 hours in a single workweek.

387.    In or around August 2020, CESG Defendants directed Lopez to report to the Office as part of Con Edison's, CESG Defendants', and the Subcontractors' onboarding process, where Gustavo interviewed Lopez, and instructed her to present her driver's license and social security card for photocopying, and fill out paperwork with her personal information, including banking information for payroll purposes and an IRS Form 1099.

388.    After Lopez reported to the Office and filled out the paperwork, Gustavo hired Lopez on behalf of CESG Defendants, Con Edison, and Argani Defendants and instructed her to take an online flagging course and buy traffic safety equipment before she could be staffed to Con Edison jobsites.

389.    On or around September 30, 2021, Con Edison, CESG Defendants, and/or Argani Defendants suspended Lopez for approximately two months following an incident that occurred during one of her shifts.

390.    Specifically, on or around September 30, 2021, Lopez was redirecting traffic away from a Con Edison jobsite when she observed a vehicle speeding towards her.

391.    Despite Lopez's attempts to redirect the vehicle away from the Con Edison jobsite, the driver of the vehicle failed to yield and crashed into a vehicle parked near the jobsite.

392.    Despite an investigation conducted by the New York City Police Department resulting in a determination that the driver had been at fault, Napoleone-Colbert, on behalf of Con Edison and Argani Defendants suspended Lopez from working for approximately two months after a Con Edison supervisor recommended the same.

393.    Indeed, shortly after the incident, Lopez texted Napoleone-Colbert and inquired as to who suspended her and when she could return to work.

394.    At first, Napoleone-Colbert responded that Con Edison suspended her because: "[Con Edison] no longer wants [you] serving the company," "I am sorry at this point this is out of my hands[,]" and later, "[o]nce [Con Edison] decides they no longer want a worker on any sites at that point there is nothing I can do."  *See* Exhibit F at 4-6, 9.

395.    However, in the same conversation, Napoleone-Colbert later claimed Sablini suspended Lopez: "[the decision to suspend] comes from [Sablini] once he is aware of the situation[.]" *Id.* at 8.  That said, at all relevant times, CESG Defendants also had the power to suspend and terminate Plaintiffs and all other Employees.  *See supra* ¶¶ 229-36, 379-83.

396.    Despite Lopez's suspension, Con Edison and CESG Defendants sent Lopez to work for Concord Defendants who hired her as a Spotter on different Con Edison jobsites from on or around November 1, 2021 through on or around November 24, 2021.

397.    In this role, Con Edison, CESG Defendants, and Concord Defendants set her regular rate of pay at $12.00 per hour.

398.    From on or around November 1, 2021 through on or around November 24, 2021, Lopez routinely worked two to three days per week, for approximately 24 to 36 hours each week.

**ii.    Wage Violations**

399.    Con Edison, CESG Defendants, Argani Defendants, and Concord Defendants failed to pay Lopez for her hours worked in several ways.

400.    Despite routinely working 50 to 100 hours each week, at all relevant times, Con Edison, CESG Defendants, and Argani Defendants never paid Lopez at her overtime rate as a result of Defendants' improper classification of their Employees as independent contractors.

401.    Indeed, Con Edison, CESG Defendants, and Argani Defendants did not pay Lopez any overtime for the 10 to 60 hours that she typically worked in excess of 40 each week.

402.    By way of example, from July 26, 2021 through July 31, 2021, Lopez worked approximately 99 hours.  *See* Exhibit R (screenshot of an Excel spreadsheet maintained by Argani Defendants on behalf of Con Edison and CESG Defendants, reflecting the hours Lopez worked during this period).[8]

403.    Indeed, Lopez worked five 16-hour shifts, one 12-hour shift, and one 7-hour shift, for a total of 99 hours during that period.

404.    However, Con Edison, CESG Defendants, and Argani Defendants paid Lopez only $1,485.00 for the 99 hours worked.

405.    For this week alone, Con Edison, CESG Defendants, and Argani Defendants failed to pay Lopez an additional $442.50 in overtime wages.[9]

---

[8] Lopez changed her last name to Lopez; however, at all relevant times, Con Edison, CESG Defendants, Argani Defendants, and Concord Defendants maintained records of Lopez's time and hours worked under her maiden name, Giron.

[9] 99 hours – 40 hours = 59 hours; 59 x $7.50 = $442.50.

406.    Additionally, given that Lopez worked 6 shifts of more than 10 hours, Con Edison, CESG Defendants, and Argani Defendants also denied her $90.00 in spread of hours pay.[10]

407.    Throughout the statutory period, Lopez was paid her wages in pay periods spanning a 7-day timeframe, with her regularly scheduled pay day being every Thursday.

408.    However, Con Edison, CESG Defendants, Argani Defendants, and Concord Defendants routinely failed to pay Lopez for all of her hours worked on her regularly scheduled pay day.

409.    For example, from on or around December 13, 2021 through on or around December 19, 2021, Lopez worked approximately 72 hours.

410.    However, on or around December 23, 2021—Lopez's next scheduled pay day—Con Edison, CESG Defendants, and Argani Defendants only paid Lopez $900.00, which only accounted for approximately 60 of the 72 hours she worked that week.[11]

411.    Indeed, Con Edison, CESG Defendants, Argani Defendants did not pay Lopez any compensation at all for the remaining 12 hours until on or around December 30, 2022—approximately one week following her regularly scheduled pay day.

412.    As a result of Con Edison's, CESG Defendants', Argani Defendants', and Concord Defendants' failure to timely pay her, Lopez, *inter alia*: (i) was deprived of money to which she had a right; (ii) lost the time value of her money; (iii) lost the opportunity to invest her money.

413.    Further, due to Con Edison's, CESG Defendants', Argani Defendants', and Concord Defendants' late payments of her wages, Lopez was unable to timely pay her rent and her cell phone bill.

---

[10] 6 x $15.00 (minimum wage) = $90.00.
[11] $900.00 / $15.00 (Lopez's regular rate) = 60 hours.

414.   Con Edison, CESG Defendants, Argani Defendants, and Concord Defendants also consistently failed to pay Lopez at all for a portion of the hours she worked.

415.   For example, from on or around May 31, 2021 through on or around June 6, 2021, Lopez worked approximately 96.5 hours.

416.   However, on or around June 10, 2021, Lopez realized that Con Edison, CESG Defendants, and Argani Defendants only paid her for approximately 80.5 hours.

417.   In other words, Con Edison, CESG Defendants, Argani Defendants failed to pay her for 16 additional hours.[12]

418.   For this week alone, Con Edison, CESG Defendants, and Argani Defendants failed to pay Lopez an additional $663.75 in overtime wages.[13]

419.   Despite complaining to Sablini on multiple occasions, Lopez never received any compensation for these missing 16 hours.  *See* Exhibit S.

420.   Further, from on or around November 1, 2021 through on or around November 25, 2021, Lopez routinely worked two to three days per week, for approximately 24 to 36 hours each week.

421.   Despite routinely working 24 to 36 hours each week, at all relevant times, Con Edison, CESG Defendants, and Concord Defendants never paid Lopez at the applicable minimum wage as a result of Defendants' improper classification of their Employees as independent contractors.

422.   By way of example, from November 6, 2021 through November 7, 2021, Lopez worked approximately 24 hours.  *See e.g.* Exhibit H at 1 (sampling of Lopez's timesheets).

---

[12] 96.5 hours – 80.5 hours = 16 hours.
[13] 80.5 hours – 40 hours = 40.5 hours; 40.5 x $7.50 = $303.75.
16 hours x $22.50 (Lopez's overtime rate) = $360.00.
 $303.75 + $360.00 = $663.75.

423.    Indeed, she worked two 12-hour shifts for a total of 24 hours during that period.

424.    However, Con Edison, CESG Defendants, and Concord Defendants paid Lopez only $288.00 for the 24 hours worked.

425.    When accounting for all her hours worked, Con Edison, CESG Defendants, and Concord Defendants paid Lopez at an hourly rate of approximately $12.00 per hour for this pay period,[14] which is considerably well below the applicable State minimum wage rate of $15.00 per hour.

426.    For this week alone, Con Edison, CESG Defendants, and Concord Defendants failed to pay Lopez an additional $72.00 in straight time wages.[15]

427.    Additionally, given that Lopez worked two shifts of more than 10 hours, Con Edison, CESG Defendants, and Concord Defendants also denied her $30.00 in spread of hours pay.[16]

428.    Additionally, Con Edison, CESG Defendants, Argani Defendants, and Concord Defendants failed to furnish Lopez with accurate wage statements.

429.    Indeed, on or around September 3, 2020, Lopez requested a copy of her paystubs from Argani Defendants.  *See* Exhibit T.

430.    In response, Sablini stated: "You are a w9 we don[']t send paystubs we all [*sic*] direct deposit[.]"  *Id.*

431.    By this, Sablini purportedly meant that Lopez, along with the other Plaintiffs was hired as an independent contractor.

---

[14] $288.00 / 24 hours = $12.00.
[15] 24 hours x $15.00 (minimum wage) = $360.00; $360.00 - $288.00 = $72.00.
[16] 2 x $15.00 (minimum wage) = $30.00.

432.    Con Edison, CESG Defendants, Argani Defendants, and Concord Defendants also failed to issue a Notice of Pay Rate to Lopez at any time during her employment.

433.    As a result of Con Edison's, CESG Defendants', Argani Defendants', and Concord Defendants' failure to provide Lopez with a Notice of Pay Rate or accurate wage statements with each payment of her wages, Lopez was prevented from, *inter alia*: (i) realizing her true hours worked; (ii) realizing that she was underpaid; and (iii) taking appropriate action to obtain the payments due to her.

434.    Further, Con Edison, CESG Defendants, Argani Defendants, and Concord Defendants required Lopez to drive her personal vehicle to and from jobsites which resulted in Lopez incurring costs associated with gas, mileage, tolls, and vehicle maintenance—none of which Con Edison, CESG Defendants, Argani Defendants, or Concord Defendants reimbursed.

435.    Throughout the duration of her employment, Lopez drove approximately 0.1 to 70 miles to and from jobsites on days in which Con Edison, CESG Defendants, Argani Defendants, and Concord Defendants required the same.

436.    Throughout the relevant time period, Lopez had conversations with other Employees who confirmed that they were subjected to the same unlawful wage practices outline above.

**J.    Plaintiff Ruben Lemus Najarro**

   **i.    Background**

437.    Najarro worked for Con Edison, CESG Defendants, and Argani Defendants as a Flagger from in or around March 2021 through on or around September 30, 2021 and then again from on or around November 25, 2021 through in or around February 2022.

438.    In this role, Con Edison, CESG Defendants, and Argani Defendants set Najarro's regular rate of pay at $15.00 per hour, with his overtime rate being $22.50 per hour.

439.    From in or around March 2021 through on or around September 30, 2021 and then again from on or around November 25, 2021 through in or around February 2022, Najarro routinely worked five to seven days per week, for approximately 60 to 100 hours each week and has worked as many as 118 hours in a workweek.

440.    In or around March 2021, CESG Defendants directed Najarro to report to the Office as part of Con Edison's, CESG Defendants', and the Subcontractors' onboarding process, where Gustavo interviewed Najarro, and instructed him to present his driver's license and social security card for photocopying, and fill out paperwork with his personal information, including banking information for payroll purposes and an IRS Form 1099.

441.    After Najarro reported to the Office and filled out the paperwork, Gustavo hired Najarro on behalf of CESG Defendants, Con Edison, and Argani Defendants and instructed him to take an online flagging course and buy traffic safety equipment before he could be staffed to Con Edison jobsites.

442.    For the same reasons as Lopez, Con Edison, CESG Defendants, and Argani Defendants suspended Najarro following the incident involving the speeding vehicle that crashed into a parked vehicle at or near a Con Edison jobsite during one of Najarro's shifts (*see supra* ¶¶ 389-95).

443.    Despite initially suspending Najarro, Con Edison and CESG Defendants later lifted the suspension and sent Najarro to work for Concord Defendants who hired him as a Spotter on different Con Edison jobsites from on or around October 1, 2021 through November 25, 2021 and then again from in or around February 2022 through in or around April 2022.

444.     In this role, Con Edison, CESG Defendants, and Concord Defendants set his regular rate of pay at $12.00 per hour—well below the applicable minimum wage of $15.00 per hour—with his overtime rate being $18.00.

445.     From on or around October 1, 2021 through November 25, 2021 and then again from in or around February 2022 through in or around April 2022, Najarro routinely worked three to six days per week, for approximately 72 to 144 hours each week.

ii.     **Wage Violations**

446.     Con Edison, CESG Defendants, Argani Defendants, and Concord Defendants failed to pay Najarro for his hours worked in several ways.

447.     Despite routinely working 60 to 144 hours each week, at all relevant times, Con Edison, CESG Defendants, Argani Defendants, and Concord Defendants never paid Najarro at his overtime rate as a result of Defendants' improper classification of their Employees as independent contractors.

448.     Indeed, Con Edison, CESG Defendants, Argani Defendants, and Concord Defendants did not pay Najarro any overtime for the 20 to 104 hours that he typically worked in excess of 40 each week.

449.     By way of example, from July 12, 2021 through July 18, 2021, Najarro worked approximately 118 hours.  *See e.g.* Exhibit U (screenshot of an Excel spreadsheet maintained by Argani Defendants on behalf of Con Edison and CESG Defendants, reflecting the hours Najarro worked during this period).

450.     Indeed, Najarro worked five 16-hour shifts, two 12-hour shifts, and two 7-hour shifts for a total of 118 hours during that period.

451.    However, Con Edison, CESG Defendants, and Argani Defendants paid Najarro only $1,770.00 for the 118 hours he worked.

452.    For this week alone, Con Edison, CESG Defendants, and Argani Defendants failed to pay Najarro an additional $585.00 in overtime wages.[17]

453.    Additionally, given that Najarro worked seven shifts of more than 10 hours, Con Edison, CESG Defendants, and Argani Defendants also denied him $105.00 in spread of hours pay.[18]

454.    Throughout the statutory period, Najarro was paid his wages in pay periods spanning a 7-day timeframe, with his regularly scheduled pay day being every Thursday.

455.    However, Con Edison, CESG Defendants, Argani Defendants, and Concord Defendants routinely failed to pay Najarro for all of his hours worked on his regularly scheduled pay day.

456.    For example, as described above, from July 12, 2021 through July 18, 2021, Najarro worked approximately 118 hours.

457.    However, on July 29, 2021—Najarro's next scheduled pay day—Con Edison, CESG Defendants, and Argani Defendants only paid Najarro $1,485.00, which only accounted for approximately 99 of the 118 hours he worked that week.[19]

458.    Indeed, Con Edison, CESG Defendants, and Argani Defendants did not pay Najarro any compensation at all for the remaining 19 hours until on or around August 5, 2021—approximately one week following his regularly scheduled pay day.

---

[17] 118 hours – 40 hours = 78 hours; 78 x $7.50 = $585.00.
[18] 7 x $15.00 (minimum wage) = $105.00.
[19] $1,485.00 / $15.00 (Najarro's regular rate) = 99 hours.

459. As a result of Con Edison's, CESG Defendants', Argani Defendants', and Concord Defendants' failure to timely pay him, Najarro, *inter alia*: (i) was deprived of money to which he had a right; (ii) lost the time value of his money; (iii) lost the opportunity to invest his money.

460. Further, due to Con Edison's, CESG Defendants', Argani Defendants', and Concord Defendants' late payments of his wages, Najarro was unable to timely pay his rent and his cell phone bill.

461. Con Edison, CESG Defendants, Argani Defendants, and Concord Defendants also consistently failed to pay Najarro at all for a portion of the hours he worked.

462. Further, from on or around October 1, 2021 through on or around November 25, 2021 and then again from in or around February 2022 through in or around April 2022, Najarro routinely worked six days per week, for approximately 72 to 144 hours each week.

463. Despite routinely working 72 to 144 hours each week, at all relevant times, Con Edison, CESG Defendants, and Concord Defendants never paid Najarro at the applicable minimum wage as a result of Defendants' improper classification of their Employees as independent contractors.

464. By way of example, from April 25, 2022 through April 29, 2022, Najarro worked approximately 92.7 hours. *See e.g.* Exhibit V (Najarro's timesheets reflecting the number of hours he worked during this period).[20]

465. Indeed, he worked three 24-hour shifts, one 12-hour shift, one 5-hour and 45-minute shift, and one 2-hour and 57-minute shift for a total of 92.7 hours during that period.

---

[20] Notably, Gustavo, on behalf of Concord Defendants and CESG Defendants, directed Najarro to write that Lopez, his partner, worked every other 12-hour shift on his timesheets to conceal the true number of hours he worked during this period. Despite this, Najarro did in fact work every shift detailed in Exhibit V.

466.     However, Con Edison, CESG Defendants, and Concord Defendants paid Najarro only $1,112.40 for the 92.7 hours he worked.

467.     When accounting for all of his hours worked, Con Edison, CESG Defendants, and Concord Defendants paid Najarro at an hourly rate of approximately $12.00 per hour for this pay period,[21] which is considerably well below the applicable State minimum wage rate of $15.00 per hour.

468.     For this week alone, Con Edison, CESG Defendants, and Concord Defendants failed to pay Najarro an additional $278.10 in straight time wages[22] and an additional $395.25 in overtime wages[23] for a total of $673.35 of unpaid straight and overtime wages.[24]

469.     Additionally, given that Najarro worked five shifts of more than 10 hours, Con Edison, CESG Defendants, and Concord Defendants also denied him $75.00 in spread of hours pay.[25]

470.     Additionally, Con Edison, CESG Defendants, Argani Defendants, and Concord Defendants failed to furnish Najarro with accurate wage statements.

471.     Con Edison, CESG Defendants, Argani Defendants, and Concord Defendants also failed to issue a Notice of Pay Rate to Najarro at any time during his employment.

472.     As a result of Con Edison's, CESG Defendants', Argani Defendants', and Concord Defendants' failure to provide Najarro with a Notice of Pay Rate or accurate wage statements with each payment of his wages, Najarro was prevented from, *inter alia*: (i) realizing his true hours

---

[21] $1,112.40 / 92.7 hours = $12.00.
[22] 92.7 hours x $15.00 (minimum wage) = $1,390.50; $1,390.50 - $1,112.40 = $278.10.
[23] 92.7 hours – 40 hours = 52.7 hours; 52.7 hours x $7.50 = $395.25.
[24] $278.10 + $395.25 = $673.35.
[25] 5 x $15.00 (minimum wage) = $75.00.

worked; (ii) realizing that he was underpaid; and (iii) taking appropriate action to obtain the payments due to him.

473.    Further, Con Edison, CESG Defendants, Argani Defendants, and Concord Defendants required Najarro to drive his personal vehicle to and from jobsites which resulted in Najarro incurring costs associated with gas, mileage, tolls, and vehicle maintenance—none of which Con Edison, CESG Defendants, Argani Defendants, or Concord Defendants reimbursed.

474.    Throughout the duration of his employment, Najarro drove approximately 0.1 to 70 miles to and from jobsites on days in which Con Edison, CESG Defendants, Argani Defendants, and Concord Defendants required the same.

475.    Throughout the relevant time period, Najarro had conversations with other Employees who confirmed that they were subjected to the same unlawful wage practices outline above.

### K.    **Plaintiff Nashemir Ortiz**

#### i.    **Background**

476.    Nashemir worked for Con Edison, CESG Defendants, and Argani Defendants as a Spotter and Flagger from in or around June 2019 through in or around April 2022.

477.    Upon Nashemir's hire in or around June 2019, Con Edison, CESG Defendants, and Argani Defendants set his regular rate of pay at $10.00 to $12.00 per hour as a Spotter, well below the applicable minimum wage of $15.00 per hour.

478.    As a Flagger, Con Edison, CESG Defendants, and Argani Defendants set Nashemir's regular rate of pay at $15.00 per hour, with his overtime rate being $22.50 per hour.

479.    From in or around June 2019 through in or around April 2022, Nashemir routinely worked five to six days per week for approximately 50 to 70 hours each week as a Flagger.

480.    In his role as a Spotter, Nashemir routinely worked six to seven days per week for approximately 90 to 120 hours each week, but has worked as many as 168 hours in a workweek.

481.    In or around June 2019, Gustavo directed Nashemir to report to Napoleone-Colbert at the Office as part of Con Edison's, CESG Defendants', and the Subcontractors' onboarding process, where Napoleone-Colbert interviewed Nashemir, and instructed him to present his driver's license and social security card for photocopying, and fill out paperwork with his personal information, including banking information for payroll purposes and an IRS Form 1099.

482.    After Nashemir reported to the Office and filled out the paperwork, Napoleone-Colbert hired Nashemir on behalf of CESG Defendants, Con Edison, and the Argani Defendants and instructed him to take an online flagging course before he could be staffed to Con Edison jobsites.

483.    Further, Napoleone-Colbert provided Nashemir with a hard hat and a traffic flag, but instructed him to purchase the other equipment required to work at Con Edison jobsites.

484.    Additionally, Napoleone-Colbert explained to Nashemir that should he require a lunch or restroom break while working a shift on a Con Edison jobsite, he first had to get permission from a Con Edison or CESG Defendants supervisor before doing so and be replaced by another Flagger.

485.    However, in or around December 2020, Con Edison, CESG Defendants, and Argani Defendants suspended Nashemir for approximately two weeks for leaving a jobsite to take a break before seeking permission from the onsite Con Edison supervisor.

486.    Indeed, Nashemir had followed Con Edison's and CESG Defendants' internal policies and had waited to be temporarily replaced by another Flagger before taking a break.

487.    Despite this, upon his return to the jobsite, the Con Edison supervisor sent Nashemir home for the rest of the afternoon for failing to notify him that Nashemir had taken a break.

488.    Shortly thereafter, Con Edison and CESG Defendants suspended Nashemir for two weeks and disallowed him from calling the hotline or working any shifts during that time.

**ii.    Wage Violations**

489.    Con Edison, CESG Defendants, and Argani Defendants failed to pay Nashemir for his hours worked in several ways.

490.    Despite routinely working 50 to 70 hours each week as a Flagger and 90 to 120 hours each week as a Spotter, at all relevant times, Con Edison, CESG Defendants, and Argani Defendants never paid Nashemir at his overtime rate as a result of Defendants' improper classification of their Employees as independent contractors.

491.    Indeed, Con Edison, CESG Defendants, and Argani Defendants did not pay Nashemir any overtime for up to the 10 to 30 hours and up to the 80 hours that he typically worked in excess of 40 each week as a Flagger and as a Spotter, respectively.

492.    By way of example, from May 25, 2020 through May 31, 2020, Nashemir worked seven 24-hour shifts as a Spotter for a total of 168 hours during that period.

493.    Indeed, Con Edison, CESG Defendants, and Argani Defendants required Nashemir to remain on a jobsite around-the-clock for an entire week which resulted in Nashemir eating, drinking, and sleeping in his vehicle during this entire time.

494.    However, Con Edison, CESG Defendants, and Argani Defendants paid Nashemir only $1,848.00 for the 168 hours worked.

495.    When accounting for all of his hours worked, Con Edison, CESG Defendants, and Argani Defendants paid Nashemir at an hourly rate of approximately $11.00 per hour for this pay

period,[26] which is considerably well below the applicable State minimum wage rate of $15.00 per hour.

496.    For this week alone, Con Edison, CESG Defendants, and Argani Defendants failed to pay Nashemir an additional $672.00 in straight time wages[27] and $960.00 in overtime wages,[28] for a total of $1,632.00 of unpaid straight and overtime wages.[29]

497.    Additionally, given that Nashemir worked 7 shifts of more than 10 hours, Con Edison, CESG Defendants, and Argani Defendants also denied him $105.00 in spread of hours pay.[30]

498.    Throughout the statutory period, Nashemir was paid his wages in pay periods spanning a 7-day timeframe, with his regularly scheduled pay day being every Thursday.

499.    However, Con Edison, CESG Defendants, and Argani Defendants routinely failed to pay Nashemir for his shifts on his regularly scheduled pay day.

500.    Indeed, Con Edison, CESG Defendants, and Argani Defendants frequently paid a portion of Nashemir's hours worked one week after his designated payday.

501.    As a result of Con Edison's, CESG Defendants', and Argani Defendants' failure to timely pay him, Nashemir, *inter alia*: (i) was deprived of money to which he had a right; (ii) lost the time value of his money; and (iii) lost the opportunity to invest his money.

502.    Further, due to Con Edison's, CESG Defendants', and Argani Defendants' late payments of his wages, Nashemir was unable to timely pay his rent in or around October 2021.

---

[26] $1,848.00 / 168 hours = $11.00.
[27] 168 hours x $15.00 (minimum wage) = $2,520.00; $2,520.00 - $1,848.00 = $672.00.
[28] 168 hours – 40 hours = 128 hours; 128 hours x $7.50 = $960.00.
[29] $672.00 + $960.00 = $1,632.00.
[30] 7 x $15.00 (minimum wage) = $105.00.

503.     Con Edison, CESG Defendants, and Argani Defendants also consistently failed to pay Nashemir at all for a portion of the hours he worked.

504.     Additionally, Con Edison, CESG Defendants, and Argani Defendants failed to furnish Nashemir with accurate wage statements.

505.     Con Edison, CESG Defendants, and Argani Defendants also failed to issue a Notice of Pay Rate to Nashemir at any time during his employment.

506.     As a result of Con Edison's, CESG Defendants', and Argani Defendants' failure to provide Nashemir with a Notice of Pay Rate or accurate wage statements with each payment of his wages, Nashemir was prevented from, *inter alia*: (i) realizing his true hours worked; (ii) realizing that he was underpaid; and (iii) taking appropriate action to obtain the payments due to him.

507.     Further, Con Edison, CESG Defendants, and Argani Defendants required Nashemir to drive his personal vehicles to and from jobsites which resulted in Nashemir incurring costs associated with gas, mileage, tolls, and vehicle maintenance—none of which Con Edison, CESG Defendants, or Argani Defendants reimbursed.

508.     Throughout the duration of his employment, Nashemir drove approximately 0.1 to 70 miles to and from jobsites on days in which Con Edison, CESG Defendants, and Argani Defendants required the same.

509.     Throughout the relevant time period, Nashemir had conversations with other Employees who confirmed that they were subjected to the same unlawful wage practices outline above.

72

**L.**    **Plaintiff Adrianna Gamboa**

    **i.**    **Background**

510.    Gamboa worked for Con Edison, CESG Defendants, and Argani Defendants as a Flagger from in or around July 2020 through in or around April 2022.

511.    In this role, Con Edison, CESG Defendants, and Argani Defendants set Gamboa's regular rate of pay at $15.00 per hour, with her overtime rate being $22.50 per hour.

512.    From in or around July 2020 through in or around September 2021, Gamboa routinely worked five to six days per week for approximately 40 to 100 hours each week and has worked as many as 132 hours in a workweek.

513.    From in or around October 2021 through in or around April 2022, Gamboa routinely worked three to four days per week for approximately 20 to 60 hours each week and has worked as many as 66 hours in a workweek.

514.    In or around July 2020, Gamboa contacted Sablini seeking a position as a Flagger. As part of Con Edison's, CESG Defendants', and the Subcontractors' onboarding process, Sablini instructed Gamboa to forward him a copy of her driver's license, social security card, and provide certain personal information, including banking information for payroll purposes and an IRS Form 1099.

515.    Sablini also directed Gamboa to take an online flagging course and buy traffic safety equipment before she could be staffed to Con Edison jobsites.

516.    Once Gamboa did so, Sablini hired her on behalf of Con Edison, CESG Defendants, and the Argani Defendants.

ii.    **Wage Violations**

517.    Con Edison, CESG Defendants, and Argani Defendants failed to pay Gamboa for her hours worked in several ways.

518.    Despite routinely working 40 to 100 hours each week from in or around July 2020 through in or around September 2021 and 20 to 60 hours each week from in or around October 2021 through in or around April 2022, at all relevant times, Con Edison, CESG Defendants, and Argani Defendants never paid Gamboa at her overtime rate as a result of Defendants' improper classification of their Employees as independent contractors.

519.    Indeed, Con Edison, CESG Defendants, and Argani Defendants did not pay Gamboa any overtime for the 20 to 60 hours that she typically worked in excess of 40 each week during these periods.

520.    By way of example, from August 3, 2020 through August 9, 2020, Gamboa worked approximately 132 hours.

521.    However, Con Edison, CESG Defendants, and Argani Defendants paid Gamboa only $1,980.00 for the 132 hours worked.

522.    For this week alone, Con Edison, CESG Defendants, and Argani Defendants failed to pay Gamboa an additional $690.00 in overtime wages.[31]

523.    Additionally, given that Gamboa worked seven shifts of more than 10 hours, Con Edison, CESG Defendants, and Argani Defendants also denied her approximately $105.00 in spread of hours pay, if not more.[32]

524.    Throughout the statutory period, Gamboa was paid her wages in pay periods spanning a 7-day timeframe, with her regularly scheduled pay day being every Thursday.

---

[31] 132 hours – 40 hours = 92 hours; 92 x $7.50 = $690.00.
[32] 7 x $15.00 (minimum wage) = $105.00.

525.    However, Con Edison, CESG Defendants, and Argani Defendants routinely failed to pay Gamboa for all of her hours worked on her regularly scheduled pay day.

526.    Indeed, Con Edison, CESG Defendants, and Argani Defendants frequently paid a portion of Gamboa's hours worked one week after her designated payday.

527.    As a result of Con Edison's, CESG Defendants', and Argani Defendants' failure to timely pay her, Gamboa, *inter alia*: (i) was deprived of money to which she had a right; (ii) lost the time value of her money; and (iii) lost the opportunity to invest her money.

528.    Further, due to Con Edison, CESG Defendants, and Argani Defendants' late payments of her wages, Gamboa was unable to timely pay her rent in or around October 2021.

529.    Con Edison, CESG Defendants, and Argani Defendants also consistently failed to pay Gamboa at all for a portion of the hours she worked.

530.    Additionally, Con Edison, CESG Defendants, and Argani Defendants failed to furnish Gamboa with accurate wage statements.

531.    Con Edison, CESG Defendants, and Argani Defendants also failed to issue a Notice of Pay Rate to Gamboa at any time during her employment.

532.    As a result of Con Edison's, CESG Defendants', and Argani Defendants' failure to provide Gamboa with a Notice of Pay Rate or accurate wage statements with each payment of her wages, Gamboa was prevented from, *inter alia*: (i) realizing her true hours worked; (ii) realizing that she was underpaid; and (iii) taking appropriate action to obtain the payments due to her.

533.    Further, Con Edison, CESG Defendants, and Argani Defendants required Gamboa to drive her personal vehicle to and from jobsites which resulted in Gamboa incurring costs associated with gas, mileage, tolls, and vehicle maintenance—none of which Con Edison, CESG Defendants, or Argani Defendants reimbursed.

534.    Throughout the duration of her employment, Gamboa drove approximately 0.1 to 70 miles to and from jobsites on days in which Con Edison, CESG Defendants, and Argani Defendants required the same.

535.    Throughout the relevant time period, Gamboa had conversations with other Employees who confirmed that they were subjected to the same unlawful wage practices outline above.

**M.    Plaintiff Steven Allicott**

    **i.    Background**

536.    Allicott worked for Con Edison, CESG Defendants, and MMT as a Flagger from in or around October 2018 through in or around November 2023.

537.    Upon Allicott's hire in or around October 2018, Con Edison, CESG Defendants, and MMT set his regular rate of pay at $15.00 per hour, with his overtime rate being $22.50 per hour.

538.    In or around early May 2023, Con Edison, CESG Defendants, and MMT increased Allicott's regular rate of pay to $17.00 per hour, with his overtime rate being $25.50 per hour.

539.    In or around October 2018, CESG Defendants directed Allicott to report to the Office as part of Con Edison's, CESG Defendants', and the Subcontractors' onboarding process, where Crystal interviewed Allicott, and instructed him to present his driver's license and social security card for photocopying, and fill out paperwork with his personal information, including banking information for payroll purposes and an IRS Form 1099.

540.    After Allicott reported to the Office and filled out the paperwork, Crystal hired Allicott on behalf of Con Edison, CESG Defendants, and MMT and instructed him to take an online flagging course before he could be staffed to Con Edison jobsites.

541.    Further, Crystal provided Allicott with, *inter alia*, a baton with flashing lights, a hard hat, and a "flagger ahead" sign so he could work at Con Edison jobsites.

542.    Later, when Allicott lost or damaged the equipment provided by CESG Defendants, CESG Defendants directed him to replace it.

543.    Beginning in or around February 2019, Allicott began directly reporting to a Con Edison supervisor, named "Lucas."

544.    Indeed, during that time Lucas, *inter alia*, directed Allicott to the location of the Con Edison job site each day and notified Allicott when his shifts ended. Specifically, Lucas directed Allicott to report to the jobsites his crew worked on at approximately 4:00 a.m. each morning.

545.    From in or around February 2019 through in or around November 2023, Allicott routinely worked five days per week, anywhere from 20 to 70 hours each week.

546.    Additionally, in or around May 2023, Napoleone-Colbert, on behalf of Con Edison, CESG Defendants, and MMT directed Allicott to form his own business.

547.    After Allicott repeatedly refused, CESG Defendants and/or MMT, on behalf of Con Edison, eventually removed his access to the Smartphone App in or around November 2023, effectively terminating his employment.

**ii.    Wage Violations**

548.    Con Edison, CESG Defendants, and MMT failed to pay Allicott for his hours worked in several ways.

549.    Despite routinely working 50 to 70 hours in a given week, at all relevant times, Con Edison, CESG Defendants, and MMT never paid Allicott at his overtime rate as a result of Defendants' improper classification of their Employees as independent contractors.

550.    Indeed, Con Edison, CESG Defendants, and MMT did not pay Allicott any overtime for the 10 to 30 hours that he often worked in excess of 40 each week.

551.    By way of example, from June 20, 2022 through June 24, 2022, Allicott worked approximately 52.5 hours.  *See* Exhibit W (sampling of Allicott's timesheets).

552.    Indeed, he worked one 12.5-hour shift, one 11-hour shift, one 10.5-hour shift, one 10-hour shift, and one 8.5-hour shift for a total of 52.5 hours during that period.

553.    However, Con Edison, CESG Defendants, and MMT paid Allicott only $600.00 for the 52.5 hours worked.

554.    For this week alone, Con Edison, CESG Defendants, and MMT failed to pay Allicott an additional $187.50 in straight time wages[33] and $93.75 in overtime wages, [34] for a total of $281.25 of unpaid straight and overtime wages.

555.    Additionally, given that Allicott worked 3 shifts of more than 10 hours, Con Edison, CESG Defendants, and MMT also denied him $45.00 in spread of hours pay.[35]

556.    Throughout the statutory period, Allicott was paid his wages in pay periods spanning a 7-day timeframe, with his regularly scheduled pay day being every Thursday.

557.    However, Con Edison, CESG Defendants, and MMT routinely failed to pay Allicott for his shifts on his regularly scheduled pay day.

558.    For example, from March 7, 2022 through March 11, 2022 Allicott worked approximately 41.5 hours.

559.    However, Con Edison, CESG Defendants, and MMT did not pay Allicott until on or around March 18, 2022, one day after Allicott's next scheduled pay day.

---

[33] 52.5 hours x $15.00 (regular rate) = $787.50; $787.50 - $600.00 = $187.50.
[34] 52.5 hours – 40 hours = 12.5 hours; 12.5 x $7.50 = $93.75.
[35] 3 x $15.00 (minimum wage) = $45.00.

560.    For this week alone, Con Edison, CESG Defendants, and MMT failed to pay Allicott an additional $11.25 in overtime wages.[36]

561.    Further, he worked one 12-hour shift, one 11.5-hour shift, one 10-hour shift, and two 4-hour shifts for a total of 41.5 hours during that period.

562.    Given Allicott worked two shifts of more than 10 hours, Con Edison, CESG Defendants, and MMT also denied him $30.00 in spread of hours pay.[37]

563.    As a result of Con Edison's, CESG Defendants', and MMT's failure to timely pay him, Allicott, *inter alia*: (i) was deprived of money to which he had a right; (ii) lost the time value of his money; (iii) lost the opportunity to invest his money.

564.    Additionally, Con Edison, CESG Defendants, and MMT failed to furnish Allicott with accurate wage statements.

565.    Con Edison, CESG Defendants, and MMT also failed to issue a Notice of Pay Rate to Allicott at any time during his employment.

566.    As a result of Con Edison's, CESG Defendants', and MMT's failure to provide Allicott with a Notice of Pay Rate and accurate wage statements with each payment of his wages, Allicott was prevented from, *inter alia*: (i) realizing his true hours worked; (ii) realizing that he was underpaid; and (iii) taking appropriate action to obtain the payments due to him.

567.    Further, Con Edison, CESG Defendants, and MMT required Allicott to drive his personal vehicle to and from jobsites, which resulted in Allicott incurring costs associated with gas, mileage, tolls, and vehicle maintenance—none of which Con Edison, CESG Defendants, or MMT reimbursed.

---

[36] 41.5 hours – 40 hours = 1.5 hours; 1.5 x $7.50 = $11.25.
[37] 2 x $15.00 (minimum wage) = $30.00.

568.    Throughout the duration of his employment, Allicott drove approximately 0.1 to 70 miles to and from jobsites on days in which Con Edison, CESG Defendants, and MMT required the same.

569.    Throughout the relevant time period, Allicott had conversations with other Employees who confirmed that they were subjected to the same unlawful wage practices outlined above.

**N.    <u>Plaintiff Roberto Rosario, Jr.</u>**

**i.    Background**

570.    Rosario worked for Con Edison, CESG Defendants, Argani Defendants as a Flagger from in or around August 2018 through on or around April 10, 2023.

571.    From on or around April 10, 2023 through April 28, 2023, Con Edison and CESG Defendants transferred Rosario to A&M Defendants after CESG Defendants terminated its contract with Argani Defendants.

572.    Upon Rosario's hire in or around August 2018, Con Edison, CESG Defendants, Argani Defendants set his regular rate of pay at $15.00 per hour, with his overtime rate being $22.50 per hour.

573.    In or around April 2022, Con Edison, CESG Defendants, and Argani Defendants increased Rosario's regular rate of pay to $16.00 per hour, with his overtime rate being $24.00 per hour.

574.    In or around April 2023, Con Edison, CESG Defendants, and A&M Defendants increased Rosario's regular rate of pay to $17.00 per hour, with his overtime rate being $25.50 per hour.

575.    In or around August 2018, CESG Defendants directed Rosario to report to the Office as part of Con Edison's, CESG Defendants', and the Subcontractors' onboarding process, where an employee of CESG Defendants instructed him to present his driver's license and social security card for photocopying, and fill out paperwork with his personal information, including banking information for payroll purposes and an IRS Form 1099.

576.    After Rosario reported to the Office and filled out the paperwork, the employee of CESG Defendants hired Rosario on behalf of themselves, Con Edison, and Argani Defendants and instructed him to take an online flagging course before he could be staffed to Con Edison jobsites.

577.    Further, the employee of CESG Defendants provided Rosario with, *inter alia*, a baton with flashing lights, a walkie talkie, a hard hat, and a "flagger ahead" sign so he could work at Con Edison jobsites.

578.    Later, when Rosario lost or damaged the equipment provided by CESG Defendants, CESG Defendants and/or Argani Defendants directed him to replace it.

579.    Beginning in or around December 2021 through on or around April 6, 2023, Rosario directly reported to Nesbitt.  *See* Exhibit D.

580.    Indeed, during that time Nesbitt, *inter alia*, directed Rosario to the location of the Con Edison job site each day and notified Rosario when his shifts ended.

581.    From on or around April 10, 2023 through April 28, 2023, Con Edison and CESG Defendants transferred Rosario to work for A&M Defendants.

582.    From in or around August 2018 through April 28, 2023, Rosario routinely worked four to seven days per week, for approximately 40 to 80 hours each week.

583.    However, in or around late-April 2023, Con Edison, CESG Defendants, and A&M Defendants suspended Rosario and removed his access to the Smartphone App for allegedly inflating the number of hours he worked during a shift on or around April 25, 2023.

584.    Despite demonstrating to Con Edison and CESG Defendants that he did not inflate the number of hours he worked during that shift, Con Edison and CESG Defendants informed Rosario that he would remain suspended until further notice, a suspension that remains in effect today.  *See* Exhibit L.

**ii.    Wage Violations**

585.    Con Edison, CESG Defendants, Argani Defendants, and A&M Defendants failed to pay Rosario for his hours worked in several ways.

586.    Despite routinely working 40 to 80 hours each week, at all relevant times, Con Edison, CESG Defendants, Argani Defendants, and A&M Defendants never paid Rosario at his overtime rate as a result of Defendants' improper classification of their Employees as independent contractors.

587.    Indeed, Con Edison, CESG Defendants, Argani Defendants, and A&M Defendants did not pay Rosario any overtime for up to 40 hours that he typically worked in excess of 40 each week.

588.    From in or around August 2018 through in or around early-April 2023, Rosario was paid his wages in pay periods spanning a 7-day timeframe, with his regularly scheduled pay day being every Thursday.

589.    Following Rosario's transfer to A&M Defendants, Rosario was still paid his wages in pay periods spanning a 7-day timeframe, with his regularly scheduled pay day being every Friday.

590.    However, throughout the statutory period, Con Edison, CESG Defendants, Argani Defendants, and A&M Defendants routinely failed to pay Rosario for his shifts on his regularly scheduled pay day.

591.    By way of example, from March 7, 2022 through March 13, 2022, Rosario worked approximately 80 hours.  *See* Exhibit X (sampling of Rosario's timesheets).

592.    Indeed, he worked two 16-hour shifts and four 12-hour shifts for a total of 80 hours during that period.

593.    However, on or around March 17, 2022—Rosario's next scheduled pay day—Con Edison, CESG Defendants, and Argani Defendants paid Rosario only $1,140.00 for approximately 76 hours worked.

594.    On March 24, 2022—Rosario's next scheduled pay day after March 17, 2022—Con Edison, CESG Defendants, and Argani Defendants paid Rosario an additional $60.00 for the remaining 4 hours he worked from March 7, 2022 through March 13, 2022.

595.    For this week alone, Con Edison, CESG Defendants, and Argani Defendants failed to pay Rosario an additional $300.00 in overtime wages.[38]

596.    Additionally, given that Rosario worked 6 shifts of more than 10 hours, Con Edison, CESG Defendants, and Argani Defendants also denied him $90.00 in spread of hours pay.[39]

597.    In another example, from April 17, 2023 through April 23, 2023, Rosario worked approximately 45 hours.

---

[38] 80 hours – 40 hours = 40 hours; 40 x $7.50 = $300.00.
[39] 6 x $15.00 (minimum wage) = $90.00.

598.    However, on or around April 28, 2023—Rosario's next scheduled pay day—Con Edison, CESG Defendants, and A&M Defendants paid Rosario only $765.00 for the 45 hours worked.

599.    For this week alone, Con Edison, CESG Defendants, and A&M Defendants failed to pay Rosario an additional $42.50 in overtime wages.[40]

600.    In one more example, from April 10, 2023 through April 16, 2023, Rosario worked approximately 39 hours.

601.    However, on or around April 21, 2023—Rosario's next scheduled pay day—Con Edison, CESG Defendants, and A&M Defendants paid Rosario only $629.00 for approximately 37 hours worked.

602.    As a result of Con Edison's, CESG Defendants', Argani Defendants', and A&M Defendants' failure to timely pay him, Rosario, *inter alia*: (i) was deprived of money to which he had a right; (ii) lost the time value of his money; (iii) lost the opportunity to invest his money.

603.    Additionally, Con Edison, CESG Defendants, Argani Defendants, and A&M Defendants failed to furnish Rosario with accurate wage statements.

604.    Con Edison, CESG Defendants, Argani Defendants, and A&M Defendants also failed to issue a Notice of Pay Rate to Rosario at any time during his employment.

605.    As a result of Con Edison's, CESG Defendants', Argani Defendants', and A&M Defendants' failure to provide Rosario with a Notice of Pay Rate and accurate wage statements with each payment of his wages, Rosario was prevented from, *inter alia*: (i) realizing his true hours worked; (ii) realizing that he was underpaid; and (iii) taking appropriate action to obtain the payments due to him.

---

[40] 45 hours – 40 hours = 5 hours; 5 x $8.50 = $42.50.

606.    Further, Con Edison, CESG Defendants, Argani Defendants, and A&M Defendants required Rosario to drive his personal vehicle to and from jobsites, which resulted in Rosario incurring costs associated with gas, mileage, tolls, and vehicle maintenance—none of which Defendants reimbursed.

607.    Throughout the duration of his employment, Rosario drove approximately 0.1 to 70 miles to and from jobsites on days in which Con Edison, CESG Defendants, Argani Defendants, and A&M Defendants required the same.

608.    Throughout the relevant time period, Rosario had conversations with other Employees who confirmed that they were subjected to the same unlawful wage practices outlined above.

**O.    <u>Plaintiff Stephanie Bundrick</u>**

**i.    Background**

609.    Bundrick worked for Con Edison, CESG Defendants, Argani Defendants as a Flagger from in or around August 2019 through in or around November 2019, then again from in or around March 2020 through in or around March 2022, and lastly from on or around February 24, 2023 through on or around April 5, 2023.

610.    Upon Bundrick's hire in or around August 2019, Con Edison, CESG Defendants, and Argani Defendants set her regular rate of pay at $15.00 per hour, with her overtime rate being $22.50 per hour.

611.    From on or around April 6, 2023 through on or around May 18, 2023, Con Edison and CESG Defendants transferred Bundrick to 23 West after CESG Defendants terminated their contract with Argani Defendants.

612.     On or around April 6, 2023, Con Edison, CESG Defendants, and 23 West set her regular rate of pay at $17.00 per hour, with her overtime rate being $25.50.

613.     In or around August 2019, Bundrick contacted Sablini to inquire about working as a Flagger.  Sablini directed Bundrick to contact the Office and informed her that she could work for him if she completed Con Edison's and CESG Defendants' onboarding process.

614.     Shortly thereafter, an employee of CESG Defendants directed Bundrick to report to the Office to be interviewed and to present her driver's license and training certificate (Sablini had already informed Bundrick of Defendants' policy regarding the online training course, which she completed beforehand) for photocopying.  Upon arrival, the employee of CESG Defendants directed Bundrick to fill out paperwork with her personal information, including banking information for payroll purposes and an IRS Form 1099.

615.     After Bundrick reported to the Office and filled out the paperwork, the employee of CESG Defendants hired Bundrick on behalf of CESG Defendants, Con Edison, and Argani Defendants and instructed her to buy traffic safety equipment before she could be staffed to Con Edison jobsites.

616.     From in or around August 2019 through in or around November 2019, then again from in or around March 2020 through in or around March 2022, and lastly from on or around February 24, 2023 through on or around May 18, 2023, Bundrick routinely worked three to five days per week, for approximately 20 to 80 hours each week.

**ii.     Wage Violations**

617.     Con Edison, CESG Defendants, Argani Defendants, and 23 West failed to pay Bundrick for her hours worked in several ways.

618.    Despite routinely working 20 to 80 hours each week, at all relevant times, Con Edison, CESG Defendants, Argani Defendants, and 23 West never paid Bundrick at her overtime rate as a result of Defendants' improper classification of their Employees as independent contractors.

619.    Indeed, Con Edison, CESG Defendants, Argani Defendants, and 23 West did not pay Bundrick any overtime for up to 40 hours that she typically worked in excess of 40 each week.

620.    From in or around August 2019 through in or around November 2019, then again from in or around March 2020 through in or around March 2022, and lastly from on or around February 24, 2023 through on or around April 5, 2023, Bundrick was paid her wages in pay periods spanning a 7-day timeframe, with her regularly scheduled pay day being every Thursday.

621.    However, Con Edison, CESG Defendants, Argani Defendants, and 23 West routinely failed to pay Bundrick for her shifts on her regularly scheduled pay day.

622.    By way of example, from January 10, 2022 through January 16, 2022, Bundrick worked approximately 68 hours.   *See* Exhibit Y (sampling of Bundrick's timesheets).

623.    Indeed, she worked four 16-hour shifts and one 4-hour shift for a total of 68 hours during that period.

624.    However, on or around January 20, 2022—Bundrick's next scheduled pay day— Con Edison, CESG Defendants, Argani Defendants paid Bundrick only $780.00 for approximately 52 hours worked.

625.    On January 27, 2022—Bundrick's next scheduled pay day after January 20, 2022— Con Edison, CESG Defendants, Argani Defendants paid Bundrick an additional $240.00 for the remaining 16 hours she worked from January 10, 2022 through January 16, 2022.

626.    For this week alone, Con Edison, CESG Defendants, Argani Defendants failed to pay Bundrick an additional $210.00 in overtime wages.[41]

627.    Additionally, given that Bundrick worked 4 shifts of more than 10 hours, Con Edison, CESG Defendants, Argani Defendants also denied her $60.00 in spread of hours pay.[42]

628.    In another example, from April 17, 2023 through April 23, 2023, Bundrick worked approximately 64.78 hours.  *See* Exhibit Z (sampling of Bundrick's timesheets)

629.    Indeed, she worked one 14.5-hour shift, two 12-hour shifts, one 11.5-hour shift, one 6.78-hour shift, and two 4-hour shifts for a total of 64.78 hours during that period.

630.    However, Con Edison, CESG Defendants, and 23 West paid Bundrick only $1,084.26 for the 64.78 hours worked.

631.    For this week alone, Con Edison, CESG Defendants, and 23 West failed to pay Bundrick an additional $73.26 in straight time wages[43] and an additional $210.63 in overtime wages[44] for a total of $293.89 of unpaid straight and overtime wages.

632.    Additionally, given that Bundrick worked 4 shifts of more than 10 hours, Con Edison, CESG Defendants, and 23 West also denied her $60.00 in spread of hours pay.[45]

633.    Following Bundrick's transfer to 23 West on or around April 6, 2023, Con Edison, CESG Defendants, and 23 West paid Bundrick her wages in pay periods spanning a 7-day timeframe, with her regularly scheduled pay day being every other Wednesday.

634.    Indeed, Con Edison, CESG Defendants, and 23 West routinely did not pay Bundrick her wages until up to two weeks after the work she performed.

---

[41] 68 hours – 40 hours = 28 hours; 28 x $7.50 = $210.00.
[42] 4 x $15.00 (minimum wage) = $60.00.
[43] 64.78 x $17.00 (Bundrick's regular rate) = $1,101.26; $1,101.26 - $1,028.00 = $73.26.
[44] 64.78 hours – 40 hours = 24.78 hours; 24.78 x $8.50 = $210.63.
[45] 4 x $15.00 (minimum wage) = $60.00.

635.    However, Con Edison, CESG Defendants, and 23 West continued to routinely fail to pay Bundrick for her shifts on her regularly scheduled pay day.

636.    For example, from April 7, 2023 to April 8, 2023, Bundrick worked approximately 20.12 hours.

637.    However, Con Edison, CESG Defendants, and 23 West did not pay Bundrick her wages until April 28, 2023—nine days after April 19, 2023, Bundrick's next scheduled pay day.

638.    As a result of Con Edison's, CESG Defendants', Argani Defendants', and 23 West's failure to timely pay her, Bundrick, *inter alia*: (i) was deprived of money to which she had a right; (ii) lost the time value of her money; (iii) lost the opportunity to invest her money.

639.    Additionally, Con Edison, CESG Defendants, Argani Defendants, and 23 West failed to furnish Bundrick with accurate wage statements.

640.    Con Edison, CESG Defendants, Argani Defendants, and 23 West also failed to issue a Notice of Pay Rate to Bundrick at any time during her employment.

641.    As a result of Con Edison's, CESG Defendants', Argani Defendants', and 23 West's failure to provide Bundrick with a Notice of Pay Rate and accurate wage statements with each payment of her wages, Bundrick was prevented from, *inter alia*: (i) realizing her true hours worked; (ii) realizing that she was underpaid; and (iii) taking appropriate action to obtain the payments due to her.

642.    Further, Con Edison, CESG Defendants, Argani Defendants, and 23 West required Bundrick to drive her personal vehicle to and from jobsites, which resulted in Bundrick incurring costs associated with gas, mileage, tolls, and vehicle maintenance—none of which Con Edison, CESG Defendants, Argani Defendants, or 23 West reimbursed.

643.    Throughout the duration of her employment, Bundrick drove approximately 0.1 to 70 miles to and from jobsites on days in which Con Edison, CESG Defendants, Argani Defendants, and 23 West required the same.

644.    Throughout the relevant time period, Bundrick had conversations with other Employees who confirmed that they were subjected to the same unlawful wage practices outlined above.

## FLSA COLLECTIVE ACTION ALLEGATIONS

645.    Plaintiffs bring their FLSA claims as a collective action on behalf of themselves and all other similarly situated persons who have been employed by Defendants during the full statute of limitations period (the "FLSA Collective").

646.    At all relevant times, Plaintiffs and the FLSA Collective were similarly situated, had substantially similar job requirements, were paid in the same manner and under the same common policies, and were subject to Defendants' practices of: (i) failing to compensate Plaintiffs and the FLSA Collective at one and one-half times their regular rate of pay for all hours worked in excess of 40 hours in a workweek; and (ii) failing to timely pay all wages owed.

647.    At all relevant times, Defendants have been fully aware of the duties performed by Plaintiffs and the FLSA Collective, and that those duties were not exempt from the provisions of the FLSA.

648.    Defendants' violations of the FLSA have been willful, repeated, knowing, intentional, and without a good faith basis, and have significantly damaged Plaintiffs and the FLSA Collective.

649.    As a result of their unlawful conduct, Defendants are liable to Plaintiffs and the FLSA Collective for the full amount of their unpaid wages and late wages, with interest, plus an

equal amount as liquidated damages, plus reasonable attorneys' fees and costs incurred by Plaintiffs and the FLSA Collective.

650.    While the exact number of the FLSA Collective is unknown to Plaintiffs at this time, upon information and belief, there are approximately 600 members of the FLSA Collective.

651.    Plaintiffs are currently unaware of the identities of the individual members of the FLSA Collective.

652.    Accordingly, the Court should require Defendants to provide Plaintiffs with a list of all members of the proposed FLSA Collective, along with their last known addresses, telephone numbers, and email addresses, so Plaintiffs may provide the members of the FLSA Collective notice of this action and an opportunity to make an informed decision about whether to participate in it.

## CLASS ACTION ALLEGATIONS

653.    Plaintiffs bring this action, in part, as a class action under the NYLL—and, in the alternative, under FIFA—as well as all applicable regulations thereunder.

### A.    Class Definition

654.    Plaintiffs seek to maintain claims, pursuant to FRCP 23, on behalf of themselves and a class of all other Employees who have been employed by Defendants at any time during the full statute of limitations period (the "Class").

655.    Additionally, Lopez, Najarro, and Nashemir seek to maintain claims, pursuant to FRCP 23, on behalf of themselves and a subclass of all individuals who have been employed by Con Edison, CESG Defendants, Argani Defendants, and Concord Defendants as Spotters at any time during the full statute of limitations period (the "Subclass").

656.    Plaintiffs allege, on behalf of themselves and the Class, that Defendants violated the NYLL by, *inter alia*: (i) failing to compensate Plaintiffs and the Class for all hours worked at their established regular rates of pay in accordance with their agreed terms of employment; (ii) failing to compensate Plaintiffs and the Class at one and one-half times their regular rate of pay for all hours worked in excess of 40 hours in a workweek; (iii) failing to tender spread of hours pay for an additional hour of work at the applicable State minimum wage rate for all shifts of more than 10 consecutive hours; (iv) failing to timely pay all wages owed; (v) failing to provide Plaintiffs and the Class with Notices of Pay Rate; and (vi) failing to furnish accurate wage statements to Plaintiffs and the Class.

657.    Lopez, Najarro, and Nashemir allege, on behalf of themselves and the Subclass, that Con Edison, CESG Defendants, Argani Defendants, and Concord Defendants violated the NYLL by, *inter alia*, failing to compensate them and the Subclass at the State minimum wage for all hours worked.

658.    Plaintiffs also allege, in the alternative and on behalf of themselves and the Class, that Defendants violated FIFA by, *inter alia*: (i) failing to pay all compensation owed; and (ii) failing to timely pay all compensation owed.

659.    Plaintiffs, the Class, and the Subclass have standing to seek such relief because of the adverse effects that Defendants' wage practices have had on them individually and as a group.

660.    The wage practices described herein are part of Defendants' normal course of conduct.

661.    Pursuant to FRCP 23, Plaintiffs' NYLL and FIFA claims may be pursued by all similarly situated persons who do not opt out of the Class or Subclass.

**B.**    **Numerosity and Impracticability of Joinder**

662.    The members of the Class and Subclass are so numerous that joinder is impracticable.

663.    While the exact number of the members of the Class is unknown to Plaintiffs at this time, upon information and belief, there are approximately 1,000 members of the Class.

664.    While the exact number of the members of the Subclass is unknown to Plaintiffs at this time, upon information and belief, there are approximately 500 members of the Subclass.

665.    Therefore, the numerosity requirement of FRCP 23(a) is satisfied.

**C.**    **Common Questions of Law and Fact**

666.    Common questions of law and fact, the answers to which will meaningfully advance this litigation, exist as to the Class and Subclass and predominate over any questions only affecting the members of the Class or Subclass individually.

667.    Indeed, there are few, if any, purely individual issues in this action.

668.    The questions of law and fact that are common to Plaintiffs, the Class, and the Subclass include, without limitation:

(a)    Whether Con Edison, CESG Defendants, Argani Defendants, and Concord Defendants failed to pay Plaintiffs and the Subclass at the State minimum wage rate;

(b)    Whether Defendants failed to pay Plaintiffs and the Class for all hours worked at their regular rates of pay and in accordance with their agreed terms of employment;

(c)    Whether Defendants failed to pay Plaintiffs and the Class all overtime wages owed to them;

(d)    Whether Defendants failed to timely pay Plaintiffs and the Class their wages;

(e)     Whether Defendants failed to provide Plaintiffs and the Class with Notices of Pay Rate;

(f)     Whether Defendants failed to furnish accurate wage statements to Plaintiffs and the Class; and

(g)     Whether Plaintiffs, the Class, and the Subclass are entitled to liquidated damages and injunctive relief.

669.    Therefore, the common question requirement of FRCP 23(a) is satisfied.

**D.    Typicality of Claims and Relief Sought**

670.    Plaintiffs' claims are typical of the claims of the members of the Class and Subclass they seek to represent.

671.    Plaintiffs, the Class, and the Subclass work or have worked for Defendants, and are or were subject to the same compensation policies and practices.

672.    The wage violations suffered by Plaintiffs, and the damages resulting therefrom, are typical of Defendants' treatment of their Employees, generally, and of the Class and Subclass, specifically.

673.    Therefore, the typicality requirement of FRCP 23(a) is satisfied.

**E.    Adequacy of Representation**

674.    Plaintiffs will fairly and adequately protect the interests of the Class and Subclass because Plaintiffs' interests are coextensive and aligned with those of the members of the Class and Subclass.

675.    Plaintiffs have no interests adverse to the Class and Subclass they seek to represent.

676.    Plaintiffs are willing and able to represent the Class and Subclass fairly and vigorously, in part because they do not assert any individual claims separate and apart from the Class and Subclass they seek to represent.

677.    Plaintiffs have retained competent counsel who are qualified and experienced in employment class action litigation and able to meet the demands necessary to litigate a class action of this size and complexity.

678.    The combined interests, experience, and resources of Plaintiffs and their counsel to competently litigate the individual and Class claims at issue in the instant action satisfy the adequacy of representation requirement of FRCP 23(a).

**F.    Requirements of Rule 23(b)(1)**

679.    Without certification of the Class and Subclass, the same evidence and issues would be subject to re-litigation in a multitude of individual lawsuits with an attendant risk of inconsistent adjudications and conflicting obligations.

680.    Accordingly, certification of the Class and Subclass is the most efficient and judicious means of presenting the evidence and arguments necessary to resolve such questions for Plaintiffs, the Class, the Subclass, and Defendants.

681.    By filing this Complaint, Plaintiffs preserve the rights of the members of the Class and Subclass with respect to the statute of limitations on their claims.

682.    Therefore, failing to certify the Class and Subclass would substantially impair and/or impede the ability of the members of the Class and Subclass to protect their interests.

**G.    Requirements of Rule 23(b)(2)**

683.    Defendants acted on grounds, as described herein, generally applicable to Plaintiffs, the Class, and the Subclass by denying Plaintiffs and the Subclass minimum wages, and denying

Plaintiffs and the Class overtime wages, failing to pay them for all hours worked at their established rates of pay in accordance with their agreed terms of employment, failing to pay wages on time, and failing to provide Notices of Pay Rate and furnish accurate wage statements.

684.    These acts are not sporadic or isolated and support the request for final injunctive and declaratory relief with respect to Plaintiffs, the Class, and the Subclass as a whole.

685.    Declaratory and injunctive relief flow directly and automatically from proof of the common questions of law and fact regarding the entitlement to, and denial of, minimum and overtime wages, wages paid at their regular rates of pay, timely payment of wages, Notices of Pay Rate and accurate wage statements.

686.    Declaratory and injunctive relief are the factual and legal predicates for Plaintiffs' and the Class's and Subclass's entitlement to monetary and non-monetary remedies for such wage violations.

687.    Accordingly, injunctive and declaratory relief are among the predominant forms of relief sought in this case.

**H.    Requirements of Rule 23(b)(3)**

688.    The common issues of fact and law affecting Plaintiffs' claims and those of the Class and Subclass—including, without limitation, the common issues identified in the paragraphs above—predominate over issues affecting only individual claims.

689.    A class action is superior to other available means for the fair and efficient adjudication of Plaintiffs' claims and those of the Class and Subclass.

690.    The cost of proving Defendants' pattern and practice of denying minimum, overtime, and other wages makes it impractical for the members of the Class and Subclass to pursue their claims individually.

691.    This class action will not be difficult to manage for reasons including, without limitation, the discrete organizational nature of all members of the Class and Subclass (they must have worked for Defendants as Employees during the statutory period), as well as the common questions of law and fact described herein.

## FIRST CAUSE OF ACTION
## VIOLATIONS OF THE FLSA: FAILURE TO PAY OVERTIME
### *(On Behalf of Plaintiffs and the FLSA Collective)*

692.    Plaintiffs, on behalf of themselves and the FLSA Collective, hereby repeat and reallege the foregoing allegations as if set forth fully herein.

693.    During the full statutory period, Plaintiffs and the FLSA Collective were protected by the provisions of the FLSA, 29 U.S.C §§ 201, *et seq.*, and applicable regulations thereunder.

694.    The FLSA requires covered employers, including Defendants, to compensate Employees at a rate not less than one and one-half times their regular rate of pay and at a rate not less than one and one-half times the federal minimum wage for all hours worked in excess of 40 hours in a workweek.

695.    Plaintiffs and the FLSA Collective were not exempt from the requirement that their employer pay them overtime under the FLSA, and they are entitled to be paid overtime by Defendants for all hours worked in excess of 40 hours in a workweek during the full statute of limitations period.

696.    Throughout the full statute of limitations period, Defendants have engaged in a policy and practice of failing to compensate Plaintiffs and the FLSA Collective at a rate not less than one and one-half times their regular rate of pay for time spent performing work in excess of 40 hours in a workweek.

697.    As a result of Defendants' failure to compensate Plaintiffs and the FLSA Collective at a rate not less than one and one-half times their regular rate of pay for all hours worked in excess

of 40 hours in a workweek, Defendants have violated the FLSA and/or applicable regulations thereunder.

698.    Defendants have acted willfully and deliberately in maintaining an intentional practice of failing to compensate Plaintiffs and the FLSA Collective in accordance with the FLSA and/or applicable regulations thereunder.

699.    Defendants' violations of the FLSA have significantly damaged Plaintiffs and the FLSA Collective and entitle them to recover damages to the greatest extent permitted by law, including, *inter alia*, the total amount of their unpaid wages, an additional equal amount in liquidated damages, prejudgment interest, and attorneys' fees and costs.

**SECOND CAUSE OF ACTION**
**VIOLATIONS OF THE FLSA: LATE PAYMENT OF WAGES**
*(On Behalf of Plaintiff and the FLSA Collective)*

700.    Plaintiffs, on behalf of themselves and the FLSA Collective, hereby repeat and reallege the foregoing allegations as if set forth fully herein.

701.    During the full statutory period, Plaintiffs and the FLSA Collective were protected by the provisions of the FLSA, 29 U.S.C §§ 201, *et seq.*, and all applicable regulations thereunder.

702.    The FLSA requires covered employers, including Defendants, to pay Plaintiffs all compensation earned in a particular workweek on the regularly scheduled pay day for the period in which such workweek ends.

703.    Plaintiffs and the FLSA Collective were not exempt from the requirement that Defendants timely pay them their wages.

704.    During the statute of limitations period, Defendants have engaged in a policy and practice of failing to pay Plaintiffs and the FLSA Collective all compensation earned in a particular workweek on the regularly scheduled pay day for the period in which such workweek ends.

705.    As a result of Defendants' failure to pay Plaintiffs and the FLSA Collective all

compensation earned in a particular workweek on the regularly scheduled pay day for the period in which such workweek ends, Defendants have violated the FLSA and/or applicable regulations thereunder.

706. Defendants have acted willfully and deliberately in maintaining an intentional practice of failing to compensate Plaintiffs and the FLSA Collective in accordance with the FLSA.

707. Defendants' violations of the FLSA have significantly harmed Plaintiffs and the FLSA Collective and entitle them to recover damages to the greatest extent permitted by law, including, *inter alia*, the total amount of their unpaid wages, an additional equal amount in liquidated damages, prejudgment interest, and attorneys' fees and costs.

708. Further, due to Defendants' failure to timely pay Employees, Employees have suffered concrete harm.

709. Specifically, each pay period, Employees were, *inter alia*: (i) deprived of money to which they had a right, thereby costing them the time value of their money; (ii) deprived of opportunity to invest their money; and/or (iii) otherwise unable to use their wages to pay bills and satisfy other financial obligations.

### THIRD CAUSE OF ACTION
### VIOLATIONS OF THE NYLL: FAILURE TO PAY OVERTIME
#### (*On Behalf of Plaintiffs and the Class*)

710. Plaintiffs, on behalf of themselves and the Class, hereby repeat and reallege the foregoing allegations as if set forth fully herein.

711. During the full statutory period, Plaintiffs and the Class were protected by the provisions of the NYLL, N.Y. Lab. Law §§ 1, *et seq.*, as well as all applicable regulations thereunder.

712. The NYLL requires covered employers, including Defendants, to compensate Employees at a rate not less than one and one-half times their regular rate of pay for all hours

worked in excess of 40 hours in a workweek and at a rate not less than one and one-half times the applicable State minimum wage for all hours worked in excess of 40 hours in a workweek.

713.    Plaintiffs and the Class were not exempt from the requirement that Defendants pay them overtime under the NYLL, and they are entitled to be paid overtime by Defendants for all hours worked in excess of 40 hours in a workweek during the full statute of limitations period.

714.    Throughout the full statute of limitations period, Defendants have engaged in a policy and practice of failing to compensate Plaintiffs and the Class at a rate not less than one and one-half times their regular rate of pay for time spent performing off-the-clock work in excess of 40 hours in a workweek.

715.    As a result of Defendants' failure to compensate Plaintiffs and the Class at a rate not less than one and one-half times their regular rate of pay for all hours worked in excess of 40 hours in a workweek, Defendants have violated the NYLL and/or applicable regulations thereunder.

716.    Defendants have acted willfully and deliberately in maintaining an intentional practice of failing to compensate Plaintiffs and the Class in accordance with the NYLL.

717.    Defendants' violations of the NYLL have significantly damaged Plaintiffs and the Class and entitle them to recover damages to the greatest extent permitted by law, including, *inter alia*, the total amount of their unpaid wages, an additional equal amount in liquidated damages, prejudgment interest, and attorneys' fees and costs.

## FOURTH CAUSE OF ACTION
## VIOLATIONS OF THE NYLL: LATE PAYMENT OF WAGES
### *(On Behalf of Plaintiff and the Class)*

718.    Plaintiffs, on behalf of themselves and the Class, hereby repeat and reallege the foregoing allegations as if set forth fully herein.

719.    During the full statutory period, Plaintiffs and the Class were protected by the

provisions of the NYLL, N.Y. Lab. Law §§ 1, *et seq.*, and all applicable regulations thereunder.

720.    The NYLL requires covered employers, including Defendants, to pay Plaintiffs and the Class all compensation earned in a particular workweek on the regularly scheduled pay day for the period in which such workweek ends.

721.    Plaintiffs and the Class were not exempt from the requirement that Defendants timely pay them their wages.

722.    Throughout the statute of limitations period, Defendants have engaged in a policy and practice of failing to pay Plaintiffs and the Class all compensation earned in a particular workweek on the regularly scheduled pay day for the period in which such workweek ends.

723.    As a result of Defendants' failure to pay Plaintiffs and the Class all compensation earned in a particular workweek on the regularly scheduled pay day for the period in which such workweek ends, Defendants have violated the NYLL and/or applicable regulations thereunder.

724.    Defendants have acted willfully and deliberately in maintaining an intentional practice of failing to compensate Plaintiffs and the Class in accordance with the NYLL.

725.    Defendants' violations of the NYLL have significantly damaged Plaintiffs and the Class and entitle them to recover damages to the greatest extent permitted by law, including, *inter alia*, the total amount of their unpaid wages, an additional equal amount in liquidated damages, prejudgment interest, and attorneys' fees and costs.

726.    Further, due to Defendants' failure to timely pay Employees, Employees have suffered concrete harm.

727.    Specifically, each pay period, Employees were, *inter alia*: (i) deprived of money to which they had a right, thereby costing them the time value of their money; (ii) deprived of opportunity to invest their money; and/or (iii) otherwise unable to use their wages to pay bills and satisfy other financial obligations.

**FIFTH CAUSE OF ACTION**
**VIOLATIONS OF THE NYLL: FAILURE TO PAY ALL WAGES OWED**
(***On Behalf of Plaintiffs and the Class***)

728.    Plaintiffs, on behalf of themselves and the Class, hereby repeat and reallege the foregoing allegations as if set forth fully herein.

729.    During the full statutory period, Plaintiffs and the Class were protected by the provisions of the NYLL, N.Y. Lab. Law §§ 1, *et seq.*, as well as all applicable regulations thereunder.

730.    The NYLL requires covered employers, including Defendants, to compensate Plaintiffs and the Class at their established regular rates of pay for all hours worked in a workweek.

731.    Plaintiffs and the Class were not exempt from the requirement and are entitled to be paid by Defendants at their established regular rates of pay for all hours worked in a workweek, during the full statute of limitations period.

732.    Throughout the full statute of limitations period, Defendants have engaged in a common policy and practice of failing to pay Plaintiffs and the Class at their established regular rates of pay for all hours worked.

733.    As a result of Defendants' failure to compensate Plaintiffs and the Class at their established regular rates of pay (or one and one-half times their established regular rates) for all hours worked, Defendants have violated the NYLL and/or applicable regulations thereunder.

734.    Defendants have acted willfully and deliberately in maintaining an intentional practice of failing to compensate Plaintiffs and the Class in accordance with the NYLL.

735.    Defendants' violations of the NYLL have significantly damaged Plaintiffs and the Class and entitle them to recover damages to the greatest extent permitted by law, including, *inter alia*, the total amount of their unpaid wages, an additional equal amount in liquidated damages, prejudgment interest, and attorneys' fees and costs.

**SIXTH CAUSE OF ACTION**
**VIOLATIONS OF THE NYLL: NOTICES OF PAY RATE**
**(*On Behalf of Plaintiffs and the Class*)**

736.    Plaintiffs, on behalf of themselves and the Class, hereby repeat and reallege the foregoing allegations as if set forth fully herein.

737.    During the full statutory period, Plaintiffs and the Class were protected by the provisions of the NYLL, N.Y. Lab. Law §§ 190, *et seq.*, as well as all applicable regulations thereunder.

738.    The NYLL requires covered employers, including Defendants, to provide Employees, "at the time of hiring, a notice containing the following information: the rate or rates of pay and basis thereof, whether paid by the hour, shift, day, week, salary, piece, commission, or other; allowances, if any, claimed as part of the minimum wage, including tip, meal, or lodging allowances . . . ; the regular pay day designated by the employer [ ]; the name of the employer; any 'doing business as' names used by the employer; the physical address of the employer's main office or principal place of business, and a mailing address if different; the telephone number of the employer; plus such other information as the commissioner deems material and necessary," which is commonly referred to as a Notice of Pay Rate.

739.    Plaintiffs and the Class were not exempt from the requirement that Defendants provide them with Notices of Pay Rate.

740.    Throughout the full statute of limitations period, Defendants have engaged in a policy and practice of unlawfully failing to provide Notices of Pay Rate to Plaintiffs and the Class.

741.    As a result of Defendants' failure to provide Notices of Pay Rate to Plaintiffs and the Class, Defendants have violated, *inter alia*, NYLL § 195.

742.    Defendants have acted willfully and deliberately in maintaining an intentional practice of failing to provide proper notices to Plaintiffs and the Class in accordance with the NYLL.

743.    Defendants' violations of the NYLL have significantly damaged Plaintiffs and the Class and entitle them to recover damages to the greatest extent permitted by law, including, *inter alia*, $50 for each workday the violation occurred, not to exceed $5,000, plus attorneys' fees and costs.

744.    Further, due to Defendants' failure to timely pay Employees, Employees have suffered concrete harm.

745.    Specifically, Employees have been prevented from, *inter alia*: (i) realizing their true hours worked; (ii) realizing that they were underpaid; and (iii) taking appropriate action to obtain the payments due to them.

**SEVENTH CAUSE OF ACTION**
**VIOLATIONS OF THE NYLL: INACCURATE WAGE STATEMENTS**
(***On Behalf of Plaintiffs and the Class***)

746.    Plaintiffs, on behalf of themselves and the Class, hereby repeat and reallege the foregoing allegations as if set forth fully herein.

747.    During the full statutory period, Plaintiffs and the Class were protected by the provisions of the NYLL, N.Y. Lab. Law §§ 190, *et seq.*, as well as all applicable regulations thereunder.

748.     The NYLL requires covered employers, including Defendants, to "furnish each employee with a statement with every payment of wages, listing the following: the dates of work covered by that payment of wages;  name of employee; name of employer; address and phone number of employer; rate or rates of pay and basis thereof, whether paid by the hour, shift, day, week, salary, piece, commission, or other; gross wages; deductions; allowances, if any, claimed as part of the minimum wage . . . ; and net wages."

749.     Plaintiffs and the Class were not exempt from the requirement that Defendants provide them with accurate wage statements.

750.     Throughout the full statute of limitations period, Defendants have engaged in a policy and practice of unlawfully failing to furnish accurate wage statements to Plaintiffs and the Class.

751.     As a result of Defendants' failure to furnish accurate wage statements to Plaintiffs and the Class, Defendants have violated, *inter alia*, NYLL § 195.

752.     Defendants have acted willfully and deliberately in maintaining an intentional practice of failing to furnish proper wage statements to Plaintiffs and the Class in accordance with the NYLL.

753.     Defendants' violations of the NYLL have significantly damaged Plaintiffs and the Class and entitle them to recover damages to the greatest extent permitted by law, including, *inter alia*, $250 for each workday the violation occurred, not to exceed $5,000, plus attorneys' fees and costs.

754.     Further, due to Defendants' failure to timely pay Employees, Employees have suffered concrete harm.

755.    Specifically, Employees have been prevented from, *inter alia*: (i) realizing their true hours worked; (ii) realizing that they were underpaid; and (iii) taking appropriate action to obtain the payments due to them.

**EIGHTH CAUSE OF ACTION**
**VIOLATIONS OF THE NYLL: UNREIMBURSED BUSINESS EXPENSES**
**(*On Behalf of Plaintiffs and the Class*)**

756.    Plaintiffs, on behalf of themselves and the Class, hereby repeat and reallege the foregoing allegations as if set forth fully herein.

757.    During the full statutory period, Plaintiffs and the Class were protected by the provisions of the NYLL and applicable regulations thereunder, including, *inter alia*, 12 N.Y.C.R.R. § 146-2.7(c).

758.    The NYLL and applicable regulations thereunder protect employees from incurring expenses in the ordinary course of their employment that result in the employee's rate of pay falling below the applicable State minimum wage rate.

759.    Throughout the full statute of limitations period, Defendants required Plaintiffs and the Class to drive their personal vehicles in the course of their employment and in the performance of their work.

760.    Plaintiffs and the Class incurred expenses associated with gas, mileage, tolls, and vehicle maintenance in the use of their personal vehicles in the course of their employment, as required by Defendants, which brought Plaintiffs' and the Class's wages below the applicable State minimum wage rate.

761.    Defendants failed to reimburse Plaintiffs and the Class for these expenses.

762.    As a result of Defendants' failure to reimburse Plaintiffs and the Class for all business expenses that Defendants required Plaintiffs and the Class to incur, Defendants have violated, *inter alia*, 12 N.Y.C.R.R. § 146-2.7(c).

763.    Defendants' violations of the NYLL and applicable regulations thereunder have significantly damaged Plaintiffs and the Class and entitle them to recover damages to the greatest extent permitted by law, including, *inter alia*, the total amount of their unreimbursed business expenses, an additional equal amount in liquidated damages, prejudgment interest, and attorneys' fees and costs.

### NINTH CAUSE OF ACTION
### VIOLATIONS OF THE NYLL: SPREAD OF HOURS PAY
**(*On Behalf of Plaintiffs and the Class*)**

764.    Plaintiffs, on behalf of themselves and the Class, hereby repeat and reallege the foregoing allegations as if set forth fully herein.

765.    During the full statutory period, Plaintiffs and the Class were protected by the provisions of the NYLL, N.Y. Lab. Law §§ 1, *et seq.*, as well as all applicable regulations thereunder, including, without limitation, 12 N.Y.C.R.R. § 142-2, *et seq.*

766.    The NYLL and/or applicable regulations thereunder require employers, including Defendants, to furnish each of their employees one additional hour of pay at the basic minimum wage rate on each day during which the length of the interval between the beginning and end of the employee's workday, or "spread of hours," exceeds 10 hours.

767.    Plaintiffs and the Class were not exempt from the requirement that Defendants provide them with spread of hours pay.

768.    Throughout the full statute of limitations period, Defendants have engaged in a policy and practice of unlawfully failing to provide spread of hours pay to Plaintiffs and the Class.

769.    As a result of Defendants' failure to furnish spread of hours pay to Plaintiffs and the Class, Defendants have violated, *inter alia*, the NYLL and/or applicable regulations thereunder.

770.    Defendants' violations of the NYLL have significantly damaged Plaintiffs and the Class and entitle them to recover the total amount of their unpaid wages, an additional equal amount in liquidated damages, prejudgment interest, and attorneys' fees and costs.

**TENTH CAUSE OF ACTION**
**VIOLATIONS OF THE NYLL: FAILURE TO PAY MINIMUM WAGE**
(*On Behalf of Lopez, Najarro, Nashemir, and the Subclass Against Con Edison, CESG Defendants, Argani Defendants, and Concord Defendants*)

771.    Lopez, Najarro, and Nashemir, on behalf of themselves and the Subclass, hereby repeat and reallege the foregoing allegations as if set forth fully herein.

772.    During the full statutory period, Lopez, Najarro, Nashemir, and the Subclass were protected by the provisions of the NYLL, N.Y. Lab. Law §§ 1, *et seq.*, as well as all applicable regulations thereunder.

773.    The NYLL requires covered employers, including Con Edison, CESG Defendants, Argani Defendants, and Concord Defendants, to compensate Lopez, Najarro, Nashemir, and the Subclass at a rate not less than the applicable State minimum wage for all hours worked under 40 hours in a workweek.

774.    Lopez, Najarro, Nashemir, and the Subclass were not exempt from the requirement that Con Edison, CESG Defendants, Argani Defendants, and Concord Defendants pay them minimum wages under the NYLL, and they are entitled to be paid minimum wages by Defendants for all hours worked under 40 hours in a workweek during the full statute of limitations period.

775.    Throughout the full statute of limitations period, Con Edison, CESG Defendants, Argani Defendants, and Concord Defendants have engaged in a policy and practice of failing to compensate Lopez, Najarro, Nashemir, and the Subclass at a rate not less than the applicable State minimum wage for all hours worked.

776.    As a result of Con Edison's, CESG Defendants', Argani Defendants', and Concord Defendants' failure to compensate Lopez, Najarro, Nashemir, and the Subclass at a rate not less than the applicable State minimum wage for all hours worked, Con Edison, CESG Defendants, Argani Defendants, and Concord Defendants have violated the NYLL and/or applicable regulations thereunder.

777.    Con Edison, CESG Defendants, Argani Defendants, and Concord Defendants have acted willfully and deliberately in maintaining an intentional practice of failing to compensate Lopez, Najarro, Nashemir, and the Subclass in accordance with the NYLL.

778.    Con Edison's, CESG Defendants', Argani Defendants', and Concord Defendants' violations of the NYLL have significantly damaged Lopez, Najarro, Nashemir, and the Subclass and entitle them to recover damages to the greatest extent permitted by law, including, *inter alia*, the total amount of their unpaid wages, an additional equal amount in liquidated damages, prejudgment interest, and attorneys' fees and costs.

### ELEVENTH CAUSE OF ACTION
### VIOLATIONS OF FIFA: FAILURE TO PAY ALL COMPENSATION
#### (*On Behalf of Plaintiffs and the Class*)
#### (*Brought in the Alternative to Plaintiffs' and the Class's Claims under the FLSA and NYLL*)

779.    Plaintiffs, on behalf of themselves and the Class, hereby repeat and reallege the foregoing allegations as if set forth fully herein.

780.    In the alternative to their claims brought under the FLSA and NYLL, Plaintiffs and the Class allege violations of FIFA, N.Y.C. Admin. Code §§ 20-927, *et seq.*, and all applicable regulations thereunder.

781.    Throughout the full statutory period, Plaintiffs and the Class were protected by the provisions of FIFA and all applicable regulations thereunder.

782.    FIFA requires hiring parties, including Con Edison, CESG Defendants, and the Subcontractors, to pay freelance workers, including Plaintiffs, plead in the alternative to their status as employees of Defendants under the FLSA and NYLL, all contracted compensation on or before the date such contracted compensation is due under the terms of a contract or, if the contract does not specify when the contracted compensation is due or the mechanism by which such due date shall be determined, no later than 30 days after completion of the freelance worker's services under the contract.

783.    Plaintiffs and the Class were not exempt from the requirement that Con Edison, CESG Defendants, and the Subcontractors pay them their contracted compensation under FIFA for work performed within the City of New York, and they are entitled to be paid all contracted compensation for all services performed for Defendants within the City of New York.

784.    Throughout the statute of limitations period, Con Edison, CESG Defendants, and the Subcontractors have engaged in a policy and practice of hiring Plaintiffs and the Class to perform services within the City of New York and accepting the benefit of the same without paying them all compensation owed under the terms of their agreement.

785.    As a result, Con Edison, CESG Defendants, and the Subcontractors owe compensation to Plaintiffs and the Class for the work they performed within the City of New York.

786.    Throughout the statute of limitations period, Con Edison, CESG Defendants, and the Subcontractors have engaged in a policy and practice of failing to pay Plaintiffs and the Class all contracted compensation for the performance of services within the City of New York by Plaintiffs and the Class.

787.    As a result of Con Edison's, CESG Defendants', and the Subcontractors' failures to pay Plaintiffs and the Class all compensation owed for work performed within the City of New York, Defendants have violated FIFA and/or applicable regulations thereunder.

788.    Con Edison, CESG Defendants, and the Subcontractors have acted willfully and deliberately in maintaining an intentional practice of failing to compensate Plaintiffs and the Class in accordance with FIFA.

789.    Con Edison's, CESG Defendants', and the Subcontractors' violations of FIFA have significantly damaged Plaintiffs and the Class and entitle them to recover damages to the greatest extent permitted by law, including, *inter alia*, the total amount of their unpaid compensation, an additional equal amount in liquidated damages, prejudgment interest, and attorneys' fees and costs.

## TWELFTH CAUSE OF ACTION
## VIOLATIONS OF FIFA: LATE PAYMENT OF COMPENSATION
### (*On Behalf of Plaintiffs and the Class*)
### (*Brought in the Alternative to Plaintiffs' and the Class's Claims under the FLSA and NYLL*)

790.    Plaintiffs, on behalf of themselves and the Class, hereby repeat and reallege the foregoing allegations as if set forth fully herein.

791.    In the alternative to their claims brought under the FLSA and NYLL, Plaintiffs and the Class allege violations of FIFA, N.Y.C. Admin. Code §§ 20-927, *et seq.*, and all applicable regulations thereunder.

792.    Throughout the full statutory period, Plaintiffs and the Class were protected by the provisions of FIFA and all applicable regulations thereunder.

793.    FIFA requires hiring parties, including Con Edison, CESG Defendants, and the Subcontractors, to pay freelance workers, including Plaintiffs, plead in the alternative to their status as employees of Defendants under the FLSA and NYLL, all contracted compensation on or before the date such contracted compensation is due under the terms of a contract or, if the contract

does not specify when the contracted compensation is due or the mechanism by which such due date shall be determined, no later than 30 days after completion of the freelance worker's services under the contract.

794.    Plaintiffs and the Class were not exempt from the requirement that Con Edison, CESG Defendants, and the Subcontractors pay them their contracted compensation under FIFA for work performed within the City of New York, and they are entitled to be paid all contracted compensation for all services performed for Con Edison, CESG Defendants, and Subcontractors within the City of New York on their regularly scheduled pay days or, at minimum, within 30 days of the work performed.

795.    Throughout the statute of limitations period, Con Edison, CESG Defendants, and the Subcontractors have engaged in a policy and practice of hiring Plaintiffs and the Class to perform services within the City of New York and accepting the benefit of the same without paying them on their regularly scheduled pay days or, at minimum, within 30 days of the work performed (and, in some cases, not pay them at all).

796.    Throughout the statute of limitations period, Con Edison, CESG Defendants, and the Subcontractors have engaged in a policy and practice of failing to timely pay Plaintiffs and the Class all contracted compensation for the services performed by Plaintiffs and the Class within the City of New York.

797.    As a result of Con Edison's, CESG Defendants', and the Subcontractors' failures to timely pay Plaintiffs and the Class all compensation owed for work performed with the City of New York, Defendants have violated FIFA and/or applicable regulations thereunder.

798.     Con Edison, CESG Defendants, and the Subcontractors have acted willfully and deliberately in maintaining an intentional practice of failing to compensate Plaintiffs and the Class in accordance with FIFA.

799.     Con Edison's, CESG Defendants', and the Subcontractors' violations of FIFA have significantly damaged Plaintiffs and the Class and entitle them to recover damages to the greatest extent permitted by law, including, *inter alia*, the total amount of their unpaid compensation, an additional equal amount in liquidated damages, prejudgment interest, and attorneys' fees and costs.

### THIRTEENTH CAUSE OF ACTION
### BREACH OF CONTRACT
#### *(On Behalf of Plaintiffs and the Class)*

800.     Plaintiffs, on behalf of themselves and the Class, hereby repeat and reallege the foregoing allegations as if set forth fully herein.

801.     As detailed above, upon information and belief, CESG Defendants and/or New York State and/or New York City entered into the Contracts with Con Edison to provide flagging and spotting services on New York City and New York State public streets, roadways, and sidewalks.

802.     Upon information and belief, pursuant to the Contracts, Defendants were required to pay Plaintiffs and the Class the local prevailing wage rate, including supplemental benefits and overtime premiums for hours worked in excess of 40 hours per week, eight hours per day, hours worked on Saturdays and Sundays, and hours worked during the evening.

803.     Upon information and belief, the Contracts contained schedules of the prevailing rates of wages and supplemental benefits to be paid to Plaintiffs and the Class performing such work under the Contracts.

804.    The promise to pay prevailing wage rates and supplemental benefits in the Contracts was made for the benefit of Plaintiffs and the Class who worked on New York City and New York State public streets, roadways, and sidewalks under the Contracts.

805.    Defendants failed to pay Plaintiffs and the Class prevailing wage rates for straight-time and overtime work and failed to pay supplemental benefits.

806.    As detailed above, Defendants have breached the Contracts by, *inter alia*, failing to pay Plaintiffs and the Class prevailing wage rates for straight time, overtime, and supplemental benefits for work performed under the Contracts.

807.    Defendants' unlawful conduct was intentional, done with malice, and/or showed a deliberate, willful, wanton, and reckless indifference to Plaintiffs' and the Class's rights.

808.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and the Class have suffered and continue to suffer harm for which they are entitled to an award of damages to the greatest extent permitted by law.

### FOURTEENTH CAUSE OF ACTION
### UNJUST ENRICHMENT
*(On Behalf of Plaintiffs and the Class)*

809.    Plaintiffs, on behalf of themselves and the Class, hereby repeat and reallege the foregoing allegations as if set forth fully herein.

810.    As detailed above, upon information and belief, CESG Defendants and/or New York State and/or New York City entered into the Contracts with Con Edison to provide flagging and spotting services on New York City and New York State public streets, roadways, and sidewalks.

811.    Upon information and belief, pursuant to the Contracts, Defendants were required to pay Plaintiffs and the Class the local prevailing wage rate including supplemental benefits and

overtime premiums for hours worked in excess of 40 hours per week, eight hours per day, hours worked on Saturdays and Sundays, and hours worked during the evening.

812.    Upon information and belief, the Contracts contained schedules of the prevailing rates of wages and supplemental benefits to be paid to Plaintiffs and the Class performing such work under the Contracts.

813.    The promise to pay prevailing wage rates and supplemental benefits in the Contracts was made for the benefit of Plaintiffs and the Class who worked on New York City and New York State public streets, roadways, and sidewalks under the Contracts.

814.    Defendants failed to pay Plaintiffs and the Class prevailing wage rates for straight-time and overtime work and failed to pay supplemental benefits.

815.    As detailed above, Defendants have breached the Contracts by, *inter alia*, failing to pay Plaintiffs and the Class prevailing wage rates for straight time, overtime, and supplemental benefits for work performed under the Contracts.

816.    As a direct and proximate result of Defendants' conduct, Defendants retained the benefit of Plaintiffs' and the Class's work under circumstances which render it inequitable and unjust for Defendants to retain such benefits without paying for their value.

817.    Defendants' unlawful conduct was intentional, done with malice, and/or showed a deliberate, willful, wanton, and reckless indifference to Plaintiffs' and the Class's rights.

818.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and the Class have suffered and continue to suffer harm for which they are entitled to an award of damages to the greatest extent permitted by law.

## FIFTEENTH CAUSE OF ACTION
## VIOLATIONS OF THE FLSA: RETALIATION
***(On Behalf of Nashaily Individually Against Con Edison, CESG Defendants, and Argani Defendants)***

819.     Nashaily hereby repeats and realleges the foregoing allegations as if set forth fully herein.

820.     During the full statutory period, Nashaily was protected by the provisions of the FLSA, 29 U.S.C. §§ 201, *et seq*., as well as all applicable regulations thereunder.

821.     As set forth above, Nashaily filed her Complaint on October 20, 2022 regarding Defendants' violations of the FLSA.

822.     Con Edison, CESG Defendants, and Argani Defendants retaliated against Nashaily for her protected activity by, *inter alia*, reducing the frequency and length of her shifts and forbidding her from working any hours in excess of 40 hours in a workweek.

823.     As a direct and proximate result of Con Edison, CESG Defendants, and Argani Defendants' unlawful retaliatory conduct in violation of the FLSA, Nashaily has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of damages.

824.     As a direct and proximate result of Con Edison's, CESG Defendants', and Argani Defendants' unlawful retaliatory conduct in violation of the FLSA, Nashaily has suffered, and continues to suffer, emotional distress for which she is entitled to an award of compensatory damages.

825.     Con Edison's, CESG Defendants', and Argani Defendants' unlawful and retaliatory actions were intentional, done with malice, and/or showed a deliberate, willful, wanton, and reckless indifference to Nashaily's rights under the FLSA, for which Nashaily is entitled to an award of punitive damages.

826.    Nashaily is further entitled to an award of liquidated damages, prejudgment interest, and attorneys' fees and costs.

**SIXTEENTH CAUSE OF ACTION**
**VIOLATIONS OF THE NYLL: RETALIATION**
***(On Behalf of Nashaily Individually Against Con Edison, CESG Defendants, and Argani Defendants)***

827.    Nashaily hereby repeats and realleges the foregoing allegations as if set forth fully herein.

828.    During the full statutory period, Nashaily was protected by the provisions of the NYLL, N.Y. Lab. Law §§ 1, *et seq*., as well as all applicable regulations thereunder.

829.    As set forth above, Nashaily filed her Complaint on October 20, 2022 regarding Defendants' violations of the NYLL.

830.    Con Edison, CESG Defendants, and Argani Defendants retaliated against Nashaily for her protected activity by, *inter alia*, reducing the frequency and length of her shifts and forbidding her from working any hours in excess of 40 hours in a workweek.

831.    As a direct and proximate result of Con Edison's, CESG Defendants', and Argani Defendants' unlawful retaliatory conduct in violation of the NYLL, Nashaily has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of damages.

832.    As a direct and proximate result of Con Edison's, CESG Defendants', and Argani Defendants' unlawful retaliatory conduct in violation of the NYLL, Nashaily has suffered, and continues to suffer, emotional distress for which she is entitled to an award of compensatory damages.

833.    Con Edison's, CESG Defendants', and Argani Defendants' unlawful and retaliatory actions were intentional, done with malice, and/or showed a deliberate, willful, wanton,

and reckless indifference to Nashaily's rights under the NYLL, for which Nashaily is entitled to an award of punitive damages.

834.    Nashaily is further entitled to an award of liquidated damages, prejudgment interest, and attorneys' fees and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves, the FLSA Collective, the Class, and the Subclass, respectfully request that the Court:

A.    Declare that the practices complained of herein are unlawful under applicable federal and State laws;

B.    Grant an injunction and order permanently restraining Defendants from engaging in such unlawful conduct;

C.    Declare this action to be maintainable as a collective action pursuant to 29 U.S.C. § 216, and direct Defendants to provide Plaintiffs with a list of all members of the FLSA Collective, including all last known addresses, telephone numbers, and email addresses of each such person, so Plaintiffs can give such persons notice of this action and an opportunity to make an informed decision about whether to participate in it;

D.    Designate Plaintiffs as the representatives of the FLSA Collective, and their counsel of record as class counsel;

E.    Determine the damages sustained by Plaintiffs and the FLSA Collective as a result of Defendants' violations of the FLSA, and award those damages against Defendants and in favor of Plaintiffs and the FLSA Collective, plus such pre-judgment and post-judgment interest as may be allowed by law;

F.      Declare this action to be maintainable as a class action pursuant to FRCP 23, and direct Defendants to provide Plaintiffs with a list of all members of the Class and Subclass, including all last known addresses, telephone numbers, and email addresses of each such person, so Plaintiffs can give such persons notice of this action and an opportunity to make an informed decision about whether to participate in it;

G.      Designate Plaintiffs as the representatives of the Class, and their counsel of record as class counsel;

H.      Designate Lopez, Najarro, and Nashemir as the representatives of the Subclass, and their counsel of record as class counsel;

I.      Determine the damages sustained by Plaintiffs, the Class, and the Subclass as a result of Defendants' violations of the NYLL or FIFA, and award those damages against Defendants and in favor of Plaintiffs, the Class, and the Subclass, plus such pre-judgment and post-judgment interest as may be allowed by law;

J.      Award Plaintiffs, the FLSA Collective, the Class, and the Subclass an additional equal amount as liquidated damages because Defendants' violations were without a good faith basis;

K.      Award Plaintiffs, the FLSA Collective, the Class, and the Subclass their reasonable attorneys' fees and costs and disbursements in this action including, without limitation, any accountants' or experts' fees; and

L.      Grant Plaintiffs, the FLSA Collective, the Class, and the Subclass such other and further relief that the Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiffs, on behalf of themselves, the FLSA Collective, the Class, and the Subclass,

hereby demand a trial by jury on all issues of fact and damages.

Dated: August 7, 2024          **FARUQI & FARUQI, LLP**
      New York, New York

                     By:  */s/ Camilo M. Burr*
                        Camilo M. Burr
                        Finn W. Dusenbery

                     685 Third Avenue, 26th Floor
                     New York, New York 10017
                     Tel: 212-983-9330
                     Fax: 212-983-9331
                     cburr@faruqilaw.com
                     fdusenbery@faruqilaw.com

                     *Attorneys for Plaintiffs, the Putative*
                     *FLSA Collective, Class, and Subclass*