**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------x

NASHAILY ORTIZ, individually, and on behalf       :
of all others similarly situated, et al.,                    :
                                                                             :
                                     Plaintiffs,          :
                                                                             :
                    - against -                                    :
                                                                             :
CONSOLIDATED EDISON COMPANY OF         :
NEW YORK, INC., et al.,                                  :
                                                                             :
                                     Defendants.      :

-------------------------------------------------------------------x

22 Civ. 8957 (JLR) (GS)

REPORT &
<u>RECOMMENDATION</u>

**GARY STEIN, United States Magistrate Judge:**

Plaintiffs bring this action on behalf of themselves and a class of similarly

situated workers asserting claims for violations of the Fair Labor Standards Act

("FLSA"), 29 U.S.C. § 201 *et seq.*, New York Labor Law ("NYLL") § 190 *et seq.*, and

the New York City Freelance Isn't Free Act ("FIFA"), N.Y.C. Admin. Code §§ 20-

927, *et seq.*, as well as common-law claims for failure to pay prevailing wages.

Pending before the Court are three motions concerning Plaintiffs' Second Amended

Collective and Class Action Complaint (Dkt. No. 210 ("SAC")).

First, Defendant Consolidated Edison Company of New York, Inc. ("Con

Edison") moves to dismiss Counts One through Fourteen of the SAC. (Dkt. No.

229). Second, Defendants CE Solutions Group, LLC ("CESG"), CE Solutions Inc.

("CES"), NYC 2Way International Ltd. d/b/a CTG Cars LLC ("2Way"), and Jeannine

Napoleone-Colbert ("Napoleone-Colbert") (collectively, the "CESG Defendants")

likewise move to dismiss Counts One through Fourteen. (Dkt. No. 234). Third,

Plaintiffs move for leave to file a Third Amended Complaint ("TAC") containing

additional allegations in support of their common-law claims for prevailing wages. (Dkt. No. 278).

For the reasons set forth herein, the undersigned respectfully recommends that Con Edison's motion to dismiss be **DENIED**; that the CESG Defendants' motion to dismiss be **DENIED** except with respect to Counts Thirteen and Fourteen as pled in the SAC; and that Plaintiffs' motion for leave to file a TAC be **GRANTED**.

## BACKGROUND

This is the second round of motions to dismiss filed by the CESG Defendants and Con Edison in this case. Previously the CESG Defendants moved to dismiss all claims asserted against them in Plaintiffs' First Amended Complaint (Dkt. No. 104 ("FAC")), while Con Edison moved to dismiss the FAC's prevailing wage claims only (Dkt. Nos. 100).

On June 7, 2024, the undersigned issued a Report and Recommendation recommending, *inter alia*, that Counts One through Twelve of the FAC—comprising Plaintiffs' core claims under the FLSA, NYLL, and FIFA—be dismissed as to the CESG Defendants. (Dkt. No. 202 ("R&R") at 88-89, *reported as Ortiz v. Consol. Edison Co. of New York*, No. 22 Civ. 8957 (JLR) (GS), 2024 WL 3086161 (S.D.N.Y. June 7, 2024), *R&R adopted*, 2024 WL 3105686 (S.D.N.Y. June 24, 2024)). This recommendation was due largely to the FAC's impermissible group pleading, which both violated the requirements of Fed. R. Civ. P. 8 and resulted in the FAC's failure to adequately allege the CESG Defendants were Plaintiffs' employers or joint

employers under the FLSA and NYLL or (alternatively) a hiring party under FIFA. (*Id.*).  The R&R recommended denying the motions to dismiss Plaintiffs' prevailing wage claims, Counts Thirteen and Fourteen, to the extent those claims are based on agreements required to be made pursuant to New York City Administrative Code § 19-142.  (*Id.* at 69-73).

On June 24, 2024, the Honorable Jennifer L. Rochon adopted the R&R in its entirety, including its recommendation that Plaintiffs be given leave to file an SAC. (Dkt. No. 205).  Plaintiffs filed their SAC on August 7, 2024.  (Dkt. No. 210). Relevant allegations of the SAC pertinent to the pending motions are summarized below.  Familiarity with Plaintiffs' other allegations and the prior procedural history, as described in the R&R, is presumed.

## A. Plaintiffs' Allegations

### 1. The Parties

Plaintiffs Nashaily Ortiz ("Nashaily"), Isaura Lopez ("Lopez"), Ruben Lemus Najarro ("Najarro"), Nashemir Ortiz ("Nashemir"), Adrianna Gamboa ("Gamboa"), Steven Allicott ("Allicott"), Roberto Rosario, Jr. ("Rosario"), and Stephanie Bundrick ("Bundrick") (collectively, "Plaintiffs") allege they worked as "flaggers" or "spotters" at jobsites operated by Con Edison in New York City and Westchester County. (SAC ¶¶ 141, 144, 292-93, 302).  Flaggers' central duty is to cordon off jobsites and redirect traffic away from Con Edison jobsites (*id.* ¶ 147), whereas spotters reserve parking spaces at the sites for Con Edison vehicles and ensure those vehicles can access the spaces (*id.* ¶ 148).

The SAC names fifteen different Defendants who allegedly jointly employed Plaintiffs to work at jobsites operated by Con Edison (collectively, "Defendants"). In addition to Con Edison and the CESG Defendants, the Defendants include CE Flagging Plus Corp. ("CEFP"), CE Reserve Corp. ("CER"), Argani Inc. ("Argani"), and Hassan Sablini ("Sablini") (collectively, the "Argani Defendants"); Nabih Koubaissay a/k/a Nabil Simba ("Koubaissay") and A & M Transport Transpors Inc. ("A&M") (collectively, the "A&M Defendants"); Concord Limousine Inc. ("Concord") and Concord Limousine 1, LLC ("Concord 1") (collectively, the "Concord Defendants"); 23 West Group Inc. ("23 West"); and Marvelous Mark Transportation Co., Inc. ("MMT"). (*Id.* at 1-2).[1]

The SAC alleges that the CESG Defendants operate "a traffic control services company in Brooklyn, New York that provides Con Edison with Flaggers and Spotters." (*Id.* ¶ 1). The CESG Defendants provide these services to Con Edison through one or more Blanket Purchase Agreements ("BPAs") entered into between CESG and Con Edison. (*Id.* ¶¶ 141, 251, 302). CESG allegedly contracted exclusively with Con Edison to provide flaggers on Con Edison jobsites. (*Id.* ¶ 291).

The CESG Defendants provide flaggers and spotters to Con Edison through various subcontractors, including the Argani Defendants, the Concord Defendants, the A&M Defendants, 23 West, and MMT (collectively, the "Subcontractors"). (*Id.* ¶ 2; *see id.* ¶ 242). The Subcontractors allegedly "are operated in concert by CESG

---

[1] The Argani Defendants, the Concord Defendants, and MMT have answered the SAC. (Dkt. Nos. 228, 232, 248). The A&M Defendants and 23 West have not answered any of Plaintiffs' complaints and Clerk's certificates of default have been entered against them. (Dkt. Nos. 121, 122, 143).

Defendants and various managers and owners of the Subcontractors, installed by CESG Defendants." (*Id.*).

Napoleone-Colbert allegedly "manages and operates" CESG, CES, and 2Way. (*Id.* ¶ 123). Sablini, along with the CESG Defendants, allegedly "owns and operates" CEFP, CEF, and Argani. (*Id.* ¶ 129). Koubaissay, along with the CESG Defendants, allegedly "owns and operates" A&M. (*Id.* ¶ 135).

The eight Plaintiffs allegedly worked for Con Edison, the CESG Defendants, and one or more of the Subcontractors at various times between August 2018 and April 2023. (*Id.* ¶¶ 18, 20, 23, 26, 28, 30, 32, 35). All of the Plaintiffs worked for the Argani Defendants at some point except for Allicott, who worked only for MMT. (*Id.* ¶ 30). Two Plaintiffs, Lopez and Najarro, worked for the Concord Defendants beginning in the Fall of 2021 after working for Argani. (*Id.* ¶¶ 20-21, 23-24). Two other Plaintiffs, Rosario and Burdrick, were transferred from Argani to A&M and 23 West, respectively, in April 2023. (*Id.* ¶¶ 32-33, 35-36, 571, 611).[2]

According to the SAC, Plaintiffs and other class members typically worked exclusively for Defendants. (*Id.* ¶¶ 274, 288). Most of the Plaintiffs routinely worked at least five days a week (and sometimes six or seven days a week), and for at least 40 hours a week (and sometimes up to 70 or 80 or more hours a week), during their period of employment. (*Id.* ¶¶ 349, 386, 439, 479, 512, 545, 582, 616).

---

[2] In or around mid-April 2023, the CESG Defendants terminated their contract with Sablini and "transferred a vast majority of the Employees who had worked for the Argani Defendants to other Subcontractors operated by CESG Defendants, including MMT, A&M Defendants, and 23 West." (*Id.* ¶¶ 241-42).

### 2. Joint Employer Allegations

Plaintiffs allege that Con Edison, CESG Defendants, and the Subcontractors jointly employ approximately 400 to 500 employees as flaggers and spotters at any given time ("Employees"). (*Id.* ¶ 153). Plaintiffs contend that all Defendants "maintain significant oversight, direction, and control over the day-to-day operations of their Employees, including Employees' working conditions, schedules, payment methods, and hiring and firing practices." (*Id.* ¶ 142). As such, Plaintiffs allege that Defendants' "status as joint employers is evident from" their coordination in controlling their Employees' employment status and work. (*Id.* ¶ 4).

The SAC supports these allegations of joint employment with allegations concerning a range of specific manifestations of Defendants' control over Plaintiffs' employment status and work, including, *inter alia*, the following:

*First*, Con Edison and CESG Defendants allegedly "jointly employ all Employees who work for" the Argani Defendants, the Concord Defendants, MMT, the A&M Defendants, and 23 West, and "work in concert to control all aspects of those Employees' employment." (SAC ¶¶ 161-65). For example, Con Edison would allegedly direct the CESG Defendants about the number of Employees needed at a jobsite, the location of the jobsite, and the date, time and duration of the job. (*Id.* ¶ 168). The CESG Defendants' employees and/or managers would then allegedly call Employees directly to assign them shifts at jobsites (*id.* ¶ 169) or would direct their Subcontractors to call Employees to assign them shifts (*id.* ¶ 170).

*Second*, Defendants allegedly "maintain direction, control, and supervision of the work performed by Employees." (*Id.* ¶ 193; *see id.* ¶¶ 193-223). For example, Con Edison, the CESG Defendants, and/or the Subcontractors allegedly instruct "Employees to report to a Con Edison supervisor (who is likewise physically present at the jobsite), who then tasks the Employee[s] with assignments and directs the Employee[s'] work." (*Id.* ¶ 194). Similarly, the CESG Defendants allegedly assign their own supervisors to perform regular rounds on jobsites to "monitor Employees' work." (*Id.* ¶ 195). Employees must get approval from a Con Edison or CESG Defendant supervisor before taking a break. (*Id.* ¶ 196). "An Employee's shift does not conclude until a Con Edison supervisor notifies them that their shift has ended." (*Id.* ¶ 207). The CESG Defendants and/or the Subcontractors, on behalf of Con Edison, allegedly issue Employees individually numbered timesheets, titled "Con Edison Flagging / Parking Location Timesheet" and marked with CESG's address and phone number. (*Id.* ¶¶ 204, 202 & Ex. G). At the end of each pay period each of these Defendants allegedly "verify the number of hours Employees work by comparing separate time reports maintained by each." (*Id.* ¶ 214).

*Third*, Con Edison, the CESG Defendants, and the Subcontractors allegedly jointly "have the power to hire, fire, and discipline Employees for breaching their[] internal policies and standards." (*Id.* ¶ 224; *see id.* ¶¶ 224-42). Employees are allegedly interviewed and hired "by one of the Subcontractors directly or by one of the owners and/or managers of CESG, CES, and/or 2Way . . . to work for Con

7

Edison, CESG Defendants, and the Subcontractor to whom CESG Defendants later assign them." (*Id.* ¶ 225). The CESG Defendants, on behalf of Con Edison, either directly discipline Employees for policy violations, or will instruct the Subcontractor to whom an Employee is assigned to discipline the Employee. (*Id.* ¶ 234).

*Fourth*, Con Edison, the CESG Defendants, and the Subcontractors allegedly "direct and control the manner in which Employees are paid." (*Id.* ¶ 243; *see id.* ¶¶ 243-58). Con Edison, the CESG Defendants, and the Subcontractors set an hourly rate of $15.00 to $17.00 per hour for flaggers and $10.00 to $12.00 per hour for spotters. (*Id.* ¶ 246). Con Edison, the CESG Defendants, and the Subcontractors allegedly misclassify Employees as independent contractors by "improperly pay[ing] Employees on an IRS 1099, as opposed to an IRS Form W-2." (*Id.* ¶¶ 255-58).

*Fifth*, Con Edison, the CESG Defendants, and the Subcontractors allegedly "maintain all employment, personnel, and business records for Employees." (*Id.* ¶ 259; *see id.* ¶ 259-73). The CESG Defendants and/or the Subcontractors, on behalf of Con Edison, maintain copies of Employees' onboarding paperwork, drivers' licenses, social security cards, and IRS Form 1099s. (*Id.* ¶¶ 261-62). Con Edison, the CESG Defendants, and the Subcontractors allegedly maintain Employees' timesheets, and utilize a Smartphone App to track Employees' work on jobsites and supervision thereof. (*Id.* ¶¶ 266, 269).

*Sixth,* the SAC also alleges several other "indicia of control and employee status" (*id.* ¶ 40), including that "CESG Defendants contracted exclusively with Con Edison to provide Flaggers on Con Edison jobsites" (*id.* ¶ 291), that Employees

typically work exclusively for Defendants (*id.* ¶¶ 274, 288), and that Defendants maintain all managerial responsibilities (*id.* ¶¶ 280-85).

Premised on Defendants' alleged status as their joint employer, Plaintiffs bring nine causes of action against all Defendants for violations of the FLSA and NYLL. (Counts 1-9, *id.* ¶¶ 692-770). Specifically, Plaintiffs assert the following claims on behalf of themselves and the putative class: (1) FLSA overtime violations, (2) failure to timely pay wages under the FLSA, (3) NYLL overtime violations, (4) failure to timely pay wages under the NYLL, (5) failure to pay all required wages under the NYLL, (6) failure to provide pay-rate notices under the NYLL, (7) failure to provide accurate wage notices under the NYLL, (8) failure to reimburse business-related expenses under the NYLL, and (9) failure to provide spread-of-hours pay under the NYLL. (*Id.*) Plaintiffs Lopez, Najarro, and Nashemir bring a claim against Con Edison, the CESG Defendants, the Argani Defendants, and the Concord Defendants for failure to pay minimum wages under the NYLL. (Count 10, *id.* ¶¶ 771-78).

### 3. FIFA Allegations

Plaintiffs allege that they were classified as "independent contractors" while working at Con Edison jobsites and contend that this was an unlawful misclassification of their true employment status intended to deprive them of their rightful wages. (*Id.* ¶¶ 257, 322-23). In the alternative, Plaintiffs allege that, if they (and other class members) were properly classified as independent contractors, they are entitled to the protections of FIFA. (*Id.* ¶¶ 14, 653). Claiming that they

were "freelance workers" and that Con Edison, the CESG Defendants, and the Subcontractors were "hiring parties" within the meaning of FIFA, Plaintiffs assert, in the alternative, two FIFA causes of action against Defendants: for failure to pay compensation owed and for failure to pay timely compensation.  (Counts 11 & 12, *id*. ¶¶ 779-99).

### 4.  Prevailing Wage Allegations

Plaintiffs also allege that "Defendants engage in a common pattern and practice of deliberately denying Employees compensation for prevailing wage work at applicable prevailing wage rates." (*Id*. ¶ 301).  According to the SAC, "Defendants are required to pay Employees at the local prevailing wage rates, including supplemental benefits and overtime premiums for hours worked in excess of 40 hours per week, eight hours per day, hours worked on Saturdays and Sundays, and hours worked during the evening." (*Id*. ¶ 303; *see also* ¶ 304 (alleging that the work Employees perform "is predominantly physical in nature" and "exposes Employees to attendant risks shared by other construction workers," thereby entitling Employees to prevailing wages)).

The SAC further alleges that each jobsite involving street openings or excavation work in New York City requires Con Edison to obtain a "Street Opening Permit" from the New York City Department of Transportation ("DOT Permit" and "DOT," respectively).  (*Id*. ¶ 307).  The SAC attaches an example of a DOT Permit, issued on September 29, 2022, that "grant[s]" "permission . . . to" Con Edison "to open [a] roadway" on 10th Avenue between West 42nd and West 43rd Streets in

Manhattan.  (*Id.* ¶ 307; *id.* Ex. P).  The DOT Permit further provides that the

"Permittee," Con Edison, shall comply with several "stipulations," including—as

highlighted in the SAC—New York City Administrative Code § 19-142.  (*Id.* ¶ 308;

*id.* Ex. P at 3).  The text of Admin. Code § 19-142, which is recited on the face of the

DOT Permit, generally provides that the prevailing wages established under NYLL

§ 220 must be paid to workers on projects for which permits are required.  (*Id.* Ex. P

at 3 (quoting Admin. Code § 19-142)).

Plaintiffs aver "[t]he fact that such permits (issued by DOT) were required for

the work [they] performed in New York City obligated Defendants, including Con

Edison, to ensure that prevailing wages were paid for all work on such projects

pursuant to NYLL § 220 (3-e)."  (SAC ¶ 310).  Further, the SAC alleges, "upon

information and belief," that "the Permits and/or other agreements between Con

Edison and New York State, New York City, and/or DOT require payment of

prevailing wages, either specifically pursuant to NYC Admin. Code § 19-142 or

through a general requirement to comply with all applicable laws."  (*Id.* ¶ 314).[3]

The SAC asserts two causes of action for prevailing wages on behalf of

Plaintiffs and the putative class.  First, Plaintiffs bring a breach of contract claim as

third-party beneficiaries of agreements allegedly entitling Plaintiffs to prevailing

wages.  (Count 13, *id.* ¶¶ 800-08).  Second, Plaintiffs bring a claim for unjust

---

[3] In addition, the SAC alleges that Employees' work on New York City and New York State public
streets, roadways, and sidewalks constituted "public works," thereby requiring Defendants to pay
prevailing wages.  (*Id.* ¶ 305; *see also id.* ¶¶ 315-317).  However, the FAC also alleges that "whether
a construction project is considered a public or private work is not dispositive since the prevailing
wage requirements of [NYLL] § 220 were applicable pursuant to both NYC Admin. Code § 19-142
and the contractual provision in the [DOT] Permit" which cites Admin. Code § 19-142.  (*Id.* ¶ 318).

enrichment, alleging that Defendants violated their contractual obligations to pay prevailing wages and that it would be inequitable and unjust for Defendants to retain the benefits of such nonpayment. (Count 14, *id.* ¶¶ 809-18).[4]

## B. Procedural History

On September 27, 2024, Con Edison moved to dismiss Counts One through Fourteen of the SAC, to the extent that they are asserted against Con Edison. (Dkt. No. 229; *see* Dkt. No. 230 ("Con Ed Br.")).[5]  On that same day, the CESG Defendants also moved to dismiss Counts One through Fourteen. (Dkt. No. 234; *see* Dkt. No. 235 ("CESG Br.")).

Both the CESG Defendants and Con Edison argue that the SAC fails to cure the deficiencies in the FAC outlined in the R&R, and continues to engage in impermissible "group pleading." (CESG Br. at 2-5; Con Ed Br. at 4-8).  The CESG Defendants and Con Edison also argue that the SAC fails to adequately plead that Plaintiffs were employed by them or that they were joint employers (CESG Br. at 6-13; Con Ed Br. 8-18), and also fails to adequately plead, in the alternative, that they were "hiring parties" within the meaning of FIFA (CESG Br. at 16-17; Con Ed Br. at 18-20).  The CESG Defendants and Con Edison also advance separate arguments for dismissal of the SAC's prevailing wage claims. (CESG Br. at 15-16; Con Ed Br.

---

[4] The SAC's final two causes of action are claims for retaliation under the FLSA and NYLL asserted solely by Plaintiff Nashaily, individually, against Con Edison, the CESG Defendants, and the Argani Defendants. (Counts 15 & 16, *id.* ¶¶ 819-34).  The CESG Defendants previously moved to dismiss Nashaily's retaliation claims as pled in the FAC.  The Court denied that motion. (R&R at 89).  Those claims are not at issue on the current motions to dismiss.

[5] Con Edison's motion mistakenly states that it is seeking dismissal only of Counts One through Twelve. (Dkt. No. 229).  It is clear from Con Edison's brief that it is also seeking dismissal of the prevailing wage claims, Counts Thirteen and Fourteen. (Con. Ed. Br. at 3).

at 20-22).  Finally, the CESG Defendants (but not Con Edison) argue that Plaintiffs'
claims for failure to provide wage notices and accurate wage statements must be
dismissed for lack of standing to sue under NYLL §§ 195(1) and NYLL §195(3).
(CESG Br. at 13-15).

Plaintiffs filed an omnibus opposition brief on November 1, 2024 (Dkt. No.
249 ("Pl. Br.")), and the CESG Defendants and Con Edison filed reply briefs on
November 15, 2024 and November 22, 2024, respectively (Dkt. No. 261 ("CESG
Rep."); Dkt. No. 276 ("Con Ed Rep.")).

On January 21, 2025, Plaintiffs filed a letter-motion for leave to submit
supplemental briefing regarding their prevailing wage claims in light of the First
Department's decision a few days earlier in *Santana v. San Mateo Constr. Corp.*,
234 A.D.3d 562, 225 N.Y.S.3d 246, 247 (1st Dep't 2025).  (Dkt. No. 278).  The Court
granted that request, over Con Edison's objection (Dkt. No. 279), and directed
supplemental letter briefs from the parties.  (Dkt. No. 280).  The Court's Order also
stated that, if Plaintiffs believed the SAC's allegations were insufficient to support
the prevailing wages theory adopted in *Santana*, they should submit a proposed
TAC along with their brief.  (*Id.* at 2).

On March 4, 2025, Plaintiff filed their supplemental letter brief, along with a
proposed TAC.  (Dkt. No. 281 ("Pl. Supp.")).  Con Edison and the CESG Defendants
filed their respective opposition briefs on March 18, 2025.  (*See* Dkt. No. 282 ("CESG
Supp."); Dkt. No. 283 ("Con Ed Supp.")).

## LEGAL STANDARDS

### A.    Motion to Dismiss for Failure to State a Claim

Under Fed. R. Civ. P. 12(b)(6), a complaint may be dismissed for "failure to state a claim upon which relief can be granted."  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 554, 570 (2007)).  A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 566 U.S. at 678.  The factual allegations "must be enough to raise a right to relief above the speculative level."  *Twombly*, 550 U.S. at 555; *see also Iqbal*, 556 U.S. at 678 (complaint must raise "more than a sheer possibility that a defendant has acted unlawfully").

In considering a motion to dismiss under Rule 12(b)(6), the Court must "accept[] all factual allegations in the complaint as true" and "draw[] all reasonable inferences in the plaintiff's favor."  *Palin v. New York Times Co.*, 940 F.3d 804, 809 (2d Cir. 2019) (citation omitted).  Courts need not, however, consider "conclusory allegations or legal conclusions couched as factual allegations."  *Dixon v. von Blanckensee*, 994 F.3d 95, 101 (2d Cir. 2021) (citation omitted); *see also Iqbal*, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").

Determining whether a plausible claim has been pled is "a context-specific task" that requires the court "to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679; *see also Herrera v. Comme des Garcons, Ltd.*, 84 F.4th 110, 113 (2d Cir. 2023). However, "Rule 12(b)(6) does not countenance . . . dismissals based on a judge's disbelief of a complaint's factual allegations." *Twombly*, 550 U.S. at 556 (citation omitted). The court's task "is to assess the legal feasibility of the complaint; it is not to assess the weight of the evidence that might be offered on either side." *Lynch v. City of N.Y.*, 952 F.3d 67, 75 (2d Cir. 2020).

## B.  Motion to Dismiss for Failure to Plead Standing[6]

"Rule 12(b)(1) requires a claim be dismissed for lack of subject matter jurisdiction 'when the district court lacks the statutory or constitutional power to adjudicate it.'" *Riordan v. NEC, Am. Fed'n of Gov't Emps., AFL-CIO*, No. 23 Civ. 881 (JPO), 2024 WL 1313614, at *1 (S.D.N.Y. Mar. 26, 2024) (quoting *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000)); *see* Fed. R. Civ. P. 12(b)(1). "A 'plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists.'" *S.G. v. Success Acad. Charter Sch., Inc.*, No. 18 Civ. 2484 (KPF), 2019 WL 1284280, at *7 (S.D.N.Y. Mar. 20, 2019) (quoting *Makarova*, 201 F.3d at 113). "Where subject matter jurisdiction is contested, a district court may consider evidence outside the pleadings, such as

---

[6] Although the CESG Defendants bring their motion to dismiss exclusively under Rule 8 and Rule 12(b)(6) (Dkt. No. 234), the prong of their motion directed at Plaintiffs' alleged failure to plead standing for their wage notice and wage statement claims is properly viewed as a motion for lack of subject-matter jurisdiction under Rule 12(b)(1). *See, e.g.*, *Green v. Brown*, No. 23 Civ. 6532 (NJC) (ST), 2025 WL 1310852, at *5 (E.D.N.Y. Mar. 11, 2025).

affidavits and exhibits." *Id.* (citing *Zappia Middle East Constr. Co. v. Emirate of Abu Dhabi*, 215 F.3d 247, 253 (2d Cir. 2000)).

"'Under Article III of the Constitution, the jurisdiction of federal courts is limited to the resolution of 'cases' and 'controversies.'" *Maddy v. Life Time, Inc.*, No. 22 Civ. 5007 (LJL), 2023 WL 4364488, at *3 (S.D.N.Y. July 5, 2023) (citation omitted). "For there to be a case or controversy under Article III, the plaintiff must have a 'personal stake' in the case—in other words, standing." *TransUnion LLC v. Ramirez,* 594 U.S. 413, 423 (2021) (citing *Raines v. Byrd,* 521 U.S. 811, 819 (1997)). Standing is "'the threshold question in every federal case, determining the power of the court to entertain the suit.'" *Life Time, Inc.*, 2023 WL 4364488, at *3 (quoting *Denney v. Deutsche Bank AG*, 443 F.3d 253, 263 (2d Cir. 2006)). In the Second Circuit, standing challenges are properly brought on a Rule 12(b)(1) motion to dismiss. *See All. For Env't Renewal, Inc. v. Pyramid Crossgates Co.*, 436 F.3d 82, 88 n.6 (2d Cir. 2006).

## DISCUSSION

### A.  The SAC Does Not Engage in Impermissible Group Pleading

The CESG Defendants renew their motion to dismiss Counts One through Twelve brought under the FLSA, NYLL, and FIFA for falling short of Rule 8's pleading requirements. (CESG Br. at 3-5). While Con Edison did not move to dismiss any counts in the FAC on this basis in its previous motion to dismiss (*see* Dkt. No. 100), Con Edison now moves for dismissal of the same counts in the SAC on this ground. (Con Ed Br. at 4-8).

1.  **Group Pleading**

Federal Rule of Civil Procedure 8(a) "requires that a pleading contain 'a short and plain statement of the claim showing that the pleader is entitled to relief.'" *Manchanda v. Navient Student Loans*, No. 19 Civ. 5121 (WHP), 2020 WL 5802238, at *2 (S.D.N.Y. Sept. 29, 2020) (quoting Fed. R. Civ. P. 8(a)(2)). Rule 8(a) "does not demand that a complaint be a model of clarity" but, "at a minimum," it requires that each defendant be given "fair notice of what the plaintiff's claim is and the ground upon which it rests." *Id.* (quoting *Atuahene v. City of Hartford*, 10 F. App'x 33, 34 (2d Cir. 2001)); *see also Adamou v. Cnty. of Spotsylvania,* No. 12 Civ. 7789 (ALC) (SN), 2016 WL 1064608, at *11 (S.D.N.Y. Mar. 14, 2016) ("Pleadings that fail to differentiate as to which defendant was involved in the alleged unlawful conduct are insufficient to state a claim.").

As such, "it is well-established in this Circuit that plaintiffs cannot simply lump defendants together for pleading purposes and that Rule 8 is violated where a plaintiff, by engaging in group pleading, fails to give each defendant fair notice of the claims against it." *Nesbeth v. New York City Mgmt. LLC*, No. 17 Civ. 8650 (JGK), 2019 WL 110953, at *3 (S.D.N.Y. Jan. 4, 2019) (cleaned up); *accord, e.g., Monterey Bay Mil. Hous., LLC v. Ambac Assurance Corp.*, 531 F. Supp. 3d 673, 728 (S.D.N.Y. 2021) (collecting cases); *Farmer v. Cnty. of Westchester*, No. 18 Civ. 2691 (NSR), 2021 WL 4199944, at *6-7 (S.D.N.Y. Sept. 15, 2021) (granting motion to dismiss pursuant to Rule 8 where "the vast majority of allegations relating to

Case 1:22-cv-08957-JLR-GS    Document 289    Filed 08/08/25    Page 18 of 91

[defendant] are jointly alleged against most of the other Defendants without providing any factual basis to distinguish their conduct").

"In prohibiting 'group pleading,' courts acknowledge that 'the principal function of pleadings under the federal rules is to give the adverse parties fair notice of the claims asserted [against them] so as to enable them to answer and prepare for trial.'" *Monterey Bay*, 531 F. Supp. 3d at 728-29 (quoting *Salahuddin v. Cuomo*, 861 F.2d 40, 42 (2d Cir. 1988) (cleaned up)). Thus, in accordance with the lenient standard set by Rule 8, "[d]ismissal under [the rule] 'is usually reserved for those cases in which the complaint is so confused, ambiguous, vague or otherwise unintelligible that its true substance, if any, is well disguised.'" *Bancorp Servs., LLC v. Am. Gen. Life Ins. Co.*, No. 14 Civ. 9687 (VEC), 2016 WL 4916969, at *5 (S.D.N.Y. Feb. 11, 2016) (quoting *Wynder v. McMahon*, 360 F.3d 73, 80 (2d Cir. 2004)).

"In the labor law context, courts have entertained group pleading arguments [] with respect to allegations concerning whether particular defendants constitute 'employers,'" *Fallon v. 18 Greenwich Ave., LLC*, No. 19 Civ. 9579 (MKV), 2021 WL 1105066, at *3 (S.D.N.Y. Mar. 23, 2021), and have dismissed FLSA and NYLL claims for failure to comply with Rule 8 in alleging employer or joint employer status. *See, e.g.*, *Stewart v. Hudson Hall LLC*, No. 20 Civ. 885 (PGG) (SLC), 2020 WL 8732875, at *7-8 (S.D.N.Y. Oct. 19, 2020), *R&R adopted*, 2021 WL 735244 (S.D.N.Y. Feb. 24, 2021); *Shi Ming Chen v. Hunan Manor Enterprise, Inc.*, No. 17 Civ. 802 (GBD), 2018 WL 1166626, at *9 (S.D.N.Y. Feb. 15, 2018).

### 2.  Application

The R&R found that the FAC presented one of the "rare cases" warranting dismissal under Rule 8(a) (R&R at 28-29), based on the pleading's "consistent fail[ure] to distinguish between or among the sixteen[7] different corporate and individual Defendants," which were instead lumped together as either "Defendants" or "CE Solutions" throughout the FAC.  (*Id.* at 24).  The repeated use of "CE Solutions," the Court explained, "provide[d] no meaningful specificity" because the term was "a shorthand comprising eleven different Defendants," including all of the entity Defendants other than Con Edison.  (*Id.*).[8]  The FAC thus "never delineate[d] the different roles played by the various Defendants with respect to Plaintiffs' work as flaggers and spotters."  (*Id.*).  And the FAC made "only a handful of assertions specific to the CESG Defendants," almost all of which were nonsubstantive.  (*Id* at 26).  By improperly lumping the CESG Defendants together with the other Defendants, the FAC made it "impossible to determine what the CESG Defendants are alleged to have done and thus fail[ed] to put the CESG Defendants on notice of the claims against them."  (*Id.* at 28).

The Court finds that the SAC has adequately remedied these deficiencies.  First, Plaintiffs have directly addressed the R&R's concern about use of "CE Solutions" by doing away with that term altogether.  Second, the SAC now does

---

[7] There are now fifteen defendants in the SAC.  The SAC drops Flagging Spotting Flipping Services Inc., which had previously been voluntarily dismissed from the action.  (R&R at 3 n.2).

[8] "CE Solutions" was not a separate company and the FAC never explained how the eleven different Defendants "comprise[d]" or "jointly operate[d]" it.  (*Id.* at 3).

delineate the different roles played by the different Defendants with respect to Plaintiffs' work. It explains the nature of the CESG Defendants' contractual relationship with Con Edison pursuant to the BPA attached to the SAC. (SAC ¶ 141 & Ex. A; *compare* FAC ¶ 144 (alleging only upon information and belief that Con Edison and the non-existent "CE Solutions" entered into an agreement)). And it also explains, for the first time, that the Argani Defendants, the A&M Defendants, the Concord Defendants and 23 West operated as Subcontractors for the CESG Defendants in providing the flagging and spotting services to Con Edison. (SAC ¶ 141). Moreover, the SAC now specifies which Plaintiff worked for which Subcontractor and during what time period. (*Id*. ¶¶ 18, 20, 23, 26, 28, 30, 32, 35).

Third, the SAC adds numerous other substantive allegations concerning the CESG Defendants' specific role with respect to Plaintiffs' employment. For example, the SAC alleges that the CESG Defendants onboarded Plaintiffs to work as flaggers or spotters. (*Id*. ¶¶ 225-28, 350-51). Plaintiffs (with the exception of Gamboa) describe how they went to the CESG Defendants' office in Brooklyn (the "Office"), where they were interviewed and hired by Napoleone-Colbert, "Gustavo," "Crystal," or another employee of the CESG Defendants. (*Id*. ¶¶ , 387-88, 440-41, 481-82, 539-40, 575-76, 613-15; *see id*. ¶ 169). Once hired, Plaintiffs and other Employees were instructed to call the Office or a hotline operated by the CESG Defendants every day to receive instructions about what Con Edison jobsite to show up at and at what time. (*Id*. ¶¶ 169-78 & Ex. B). Subsequently, the CESG Defendants instructed Employees to use a smartphone application (the

20

"Smartphone App"), developed and maintained by the CESG Defendants, to check for available shifts. (*Id.* ¶¶ 189, 192 & Ex. F). The CESG Defendants also allegedly own and operate an email address through which they send messages to Employees to confirm the location of jobsites. (*Id.* ¶¶ 181-82). In addition, the CESG Defendants also allegedly assign their own supervisors to perform regular rounds of jobsites to monitor Employees' work. (*Id.* ¶ 195 & Ex. E).

These are just examples of how the SAC, unlike the FAC, ascribes specific conduct to the CESG Defendants; more such allegations are detailed below in the discussion of the joint employer issue. They amply illustrate how Plaintiffs' amended pleading satisfies Rule 8. The FAC made many of the same factual allegations, but because the conduct was ascribed to "CE Solutions," it was impossible to tell if they were allegations against the CESG Defendants or other members of that amorphous construct. The SAC now clarifies which actions are alleged to have been undertaken by the CESG Defendants, sometimes with detail about which CESG employee took the action. (*Compare, e.g.*, FAC ¶ 171 ("When a shift becomes available, CE Solutions, on behalf of all Defendants, then notifies Employees of the location and the time at which they are to report.") *with* SAC ¶ 173 ("When a shift becomes available, employees of CESG Defendants, such as Crystal or Gustavo, notify Employees of the location of the Con Edison jobsite and the time at which Con Edison directed them to report.")).

Rule 8(a) requires that "'[w]here a complaint names multiple defendants, that complaint must provide a plausible factual basis to distinguish the conduct of each

of the defendants.'" *Manchanda*, 2020 WL 5802238, at *2 (quoting *Ochre LLC v. Rockwell Architecture Planning & Design, P.C.*, 2012 WL 6082387, at *6 (S.D.N.Y. Dec. 3, 2012)). It does not require more, and its dictates are satisfied so long as each defendant is given "'fair notice of what the plaintiff's claim is and the ground upon which it rests.'" *Id.* (quoting *Atuahene v. City of Hartford*, 10 F. App'x 33, 34 (2d Cir. 2001)). While the FAC did not satisfy this minimal standard, the SAC easily does so. *Id.* at *3 (finding dismissal unwarranted where "the Complaint attributes some specific conduct to each Defendant" and citing several cases to the same effect); *Vantone Grp. Ltd. Liability Co. v. Yangpu NGT Indus. Co.*, No. 13 Civ. 7639 (LTS) (MHD), 2015 WL 4040882, at *4 (S.D.N.Y. July 2, 2015) ("Although it is far from precise, the SAC does make factual allegations that distinguish between the conduct of the Moving Defendants, listing specific actions taken by each of them.").

The CESG Defendants' counterarguments are unavailing. In claiming that the SAC fails to remedy the deficiencies highlighted by the R&R, the CESG Defendants argue that "the majority of the allegations in the SAC generically refer to 'Con Edison, CESG Defendants and the Subcontractors'"—*i.e.*, all of the Defendants—and point to numerous other allegations "refer[ring[ to 'Con Edison, CESG Defendants and the Argani Defendants,'" which comprise nine Defendants. (CESG Br. at 4). Such allegations continue to impermissibly "lump together" Defendants, according to the CESG Defendants. (*Id.*; *see also* CESG Rep. at 2).

This argument is misguided because, as the R&R explained, "'[n]othing in

Rule 8 prohibits collectively referring to multiple defendants where the complaint alerts defendants that identical claims are asserted against each defendant.'" (R&R at 27 (quoting *Manchanda*, 2020 WL 5802238, at *2)). "'[A]sserting claims against a group of defendants is appropriate if those defendants allegedly acted in concert to violate a Plaintiff's rights.'" (R&R at 27 (quoting *McArdle-Bracelin v. Congress Hotel, LLC*, No. 20 Civ. 861 (TJM) (TWD), 2022 WL 486805, at *7 (N.D.N.Y. Feb. 17, 2022))). That is precisely what the SAC does. In the majority of instances where the SAC uses the all-inclusive "Defendants" or its functional equivalent, "Con Edison, CESG Defendants, and the Subcontractors," or the only slightly less sweeping "Con Edison, CESG Defendants, and the Argani Defendants," it does so in setting forth legal conclusions about how the various Defendants jointly employed Plaintiffs or violated the labor laws, or in alleging facts showing how Defendants jointly exercised control over various aspects of the conditions and status of Plaintiffs' employment. (*See, e.g.*, SAC ¶¶ 4-11, 18-20, 22, 23, 25, 28-29, 32, 34, 35, 37, 142, 153, 161-65, 193, 224, 243, 259, 301, 322-33, 338, 341-45, 347-48, 356-58, 384-85, 399-401, 437-38, 446-48, 476-77, 489-91, 51011, 517-19, 570-71, 585-87, 609-10, 617-19, 696-99, 705-08, 714-17, 722-26, 732-35, 741-44, 750-54, 761-63, 768-70, 775-78, 802, 805-08, 811, 814-18, 821-25, 829-33).

Since it is Plaintiffs' contention that they were jointly employed by all Defendants, it is not surprising that allegations of joint employment and control and violation of the FLSA and NYLL would lump Defendants together. This does not render the SAC defective under Rule 8(a), so long as the SAC otherwise

23

plausibly distinguishes the conduct and role of the various Defendants.  And as described above, the SAC does plausibly distinguish the conduct and role of the CESG Defendants.  "In view of these allegations, dismissing the [SAC] solely because [Plaintiffs] . . . lump[] Defendants together" in other instances "would be a bridge too far."  *Manchanda*, 2020 WL 5802238, at *3 (cleaned up); *see also In re Polaroid ERISA Litig.*, 362 F. Supp. 2d 461, 471 (S.D.N.Y. 2005) ("Rule 8 does not require Plaintiffs to identify each of the eighteen Defendants by name each time the Complaint makes an allegation that applies equally to all").[9]

To be sure, there remain numerous allegations in the SAC that do not make clear which Defendant engaged in specific conduct or allege that all (or different groupings of) Defendants did so.  The CESG Defendants point to one such example: that "CESG Defendants and/or the Subcontractors, on behalf of Con Edison, issue Employees individually numbered timesheets marked 'CE Solutions Group' with the Office's address and phone number."  (SAC ¶ 202; *see* CESG Br. at 5).  It is peculiar that the CESG Defendants focus on this allegation, since the R&R cited the parallel allegation in the FAC as an example (indeed, the only example) of a substantive allegation about CESG made in the FAC.  (R&R at 26; *see* FAC ¶ 191 ).  In any event, to the extent the CESG Defendants fault the SAC for not specifying

---

[9] The CESG Defendants contend that the SAC is particularly suspect because it "repeatedly lumps together the CESG Defendants and the Concord Defendants, who are competitors of one another." (CESG Br. at 4 n.4; *see* CESG Rep. at 3).  But the SAC does not allege that the CESG Defendants and the Concord Defendants are "competitors"; it alleges that the Concord Defendants were one of the Subcontractors utilized by the CESG Defendants.  (SAC ¶ 2).  The CESG Defendants do not explain how the Court could, on a motion to dismiss, credit their factual assertion that they and the Concord Defendants are "competitors."  Of course, the Court cannot do so.  *See, e.g.*, *Northwell Health, Inc. v. Premera Blue Cross*, No. 23 Civ. 389 (JS) (ST), 2025 WL 959651, at *24 (E.D.N.Y. Mar. 15, 2025).

whether they, or the Subcontractors, issued the timesheets, such specificity is not required to satisfy Rule 8.  Given the interrelationship between the CESG Defendants and the Subcontractors as alleged in the SAC, it is entirely plausible that timesheets were issued on some occasions by the CESG Defendants and on other occasions by the relevant Subcontractor, and also that Plaintiffs may not know or recall who issued them the timesheets.

The same holds true of other allegations of concerted activity in the SAC. While discovery may paint a fuller and more nuanced picture of which Defendant did what, the Court finds merit to Plaintiffs' argument that, at the pleading stage, "[o]rganizing the allegations via groupings of Defendants . . . makes sense given the abstruse organizational structure of Con Edison's and CESG Defendants' flagging operation, which is comprised of over 16 Defendants who all worked in concert." (Pl. Br. 6-7; *see* SAC ¶ 3).  *See McArdle-Bracelin*, 2022 WL 486805, at *7 ("A complaint that pleads enough facts to make claims of such [concerted] wrongdoing plausible need not then describe each defendant's particular role in detail in order to avoid dismissal on 'group pleading grounds.'").

Aside from their broad challenge to the SAC, the CESG Defendants also argue that the SAC's substantive allegations against 2Way and Napoleone-Colbert are too "minimal" to give these defendants notice of the claims against them. (CESG Br. at 5).  But as the CESG Defendants themselves acknowledge in distinguishing a case cited by Plaintiffs, Rule 8 has been deemed satisfied where the defendants are "an identically situated group of affiliated companies with a common

principal." (CESG Rep. at 3 (citing *Canon U.S.A., Inc. v. F & E Trading LLC*, No. 15 Civ. 6015 (DRH) (AYS), 2017 WL 4357339, at *8 (E.D.N.Y. Sept. 29, 2017) (finding that "the SAC provides adequate notice to meet the notice pleading requirements of Rule 8(a), even though it contains allegations against Defendants and Corporate Defendants collectively"))). The SAC alleges that 2Way, together with CESG and CES, are managed and operated by Napoleone-Colbert (SAC ¶ 123), that 2Way shares the same address as CESG's previous principal place of business (*id.* ¶ 80), and that a 2Way email address, to which Employees were instructed to upload photographs of themselves at jobsites, is owned and operated by the CESG Defendants (*id.* ¶¶ 264-65).

As for Napoleone-Colbert, the SAC alleges, as noted, that she "manages and operates" CESG, CES, and 2Way. (*Id.* ¶ 123). Under the FLSA, liability may attach to individual managers who exercise the requisite degree of control on behalf of the corporate employer, as the SAC alleges Napoleone-Colbert did here. (*Id.* ¶¶ 124-27). *See, e.g.*, *Alvarado v. GC Dealer Servs. Inc.*, 511 F. Supp. 3d 321, 353-56 (E.D.N.Y. 2021). Moreover, the SAC contains several allegations, supported in some instances by attached exhibits, as to specific actions taken by Napoleone-Colbert with respect to Plaintiffs' employment, such as interviewing and hiring Plaintiffs, directing Plaintiffs' activities, transferring Plaintiffs to other Subcontractors, and disciplining Plaintiffs. (SAC ¶¶ 189, 225, 242, 266, 392, 481-82, 546 & Exs. C, F). This is sufficient to satisfy Rule 8(a).

Con Edison's arguments are no more persuasive.  At the outset, Con Edison offers no explanation for why it is now moving to dismiss the SAC for failure to comply with Rule 8(a) when it did not move against the FAC on this ground.  Con Edison does not claim (nor is there any apparent basis for a claim) that the SAC removed material specific allegations pertaining to Con Edison in favor of group-pled allegations.  Thus, if Con Edison believed that the FAC's allegations gave it fair notice of the claims against it, enabling it to prepare its answer and defense for trial, it is hard to understand why it believes the SAC fails to do so.

Con Edison's chief complaint is the SAC "fail[s] to comply with the Court's Order" and "fails to address the Court's concerns."  (Con Ed Br. at 1, 5).  But the concerns expressed in the R&R related to the sufficiency of the FAC's allegations concerning the *CESG Defendants*, not Con Edison.  Indeed, the FAC's core pleading deficiency—its use of "CE Solutions" in lieu of specific allegations concerning the CESG Defendants' role—had nothing to do with Con Edison, as Con Edison was the one corporate Defendant *not* among the collection of companies referred to as "CE Solutions."  (*See* R&R at 24).  Con Edison has no standing to challenge whether Plaintiffs have sufficiently amended their pleading to give the CESG Defendants adequate notice for Rule 8(a) purposes.

In any event, Con Edison's objections lack merit.  For the most part, Con Edison echoes (and provides more citations to the SAC in support of) the CESG Defendants' arguments concerning the SAC's widespread use of broad-brush terms such as "Defendants" or "Con Edison, CESG Defendants, and the Subcontractors" or

"Con Edison, CESG Defendants, and the Argani Defendants." (Con Ed Br. at 5-6). Those arguments fail for the same reasons explained above. As is the case with the CESG Defendants, the SAC explains Con Edison's role with respect to Plaintiffs' work, distinguishes it from that of the CESG Defendants and the Subcontractors, and contains numerous specific allegations of how Con Edison purportedly controls Employees' work activities. (*See, e.g.*, SAC ¶¶ 1-2, 141, 150-52, 168, 179-80, 184-86, 190, 196-97, 207-08, 229, 231, 236, 244, 247, 250-52, 394, 543-44).

The SAC thus provides "a plausible factual basis to distinguish the conduct of" Con Edison. *See Manchanda*, 2020 WL 5802238, at *2. Indeed, Con Edison's brief details some (though by no means all) of the SAC's "substantive allegations relating to Con Edison's own alleged conduct." (Con Ed Br. at 6-7). It never, however, explains why these allegations are insufficient to satisfy Rule 8(a) or cites any authority in support of that contention. Instead, it argues that the SAC's "few" substantive factual allegations regarding Con Edison specifically "fall far short of plausibly suggesting that Con Edison was Plaintiffs' joint employer." (*Id.* at 8). But that is an argument for dismissal under Rule 12(b)(6), not Rule 8(a). Accordingly, the Court likewise rejects Con Edison's group pleading argument.

"[M]otions to dismiss for improper group pleading fail when, even though the plaintiff refers to 'defendants' generally rather than a particular defendant individually, it is sufficiently clear that in the particular factual context of the case the complaint furnishes adequate notice for initial pleading purposes of plaintiff's claim of wrongdoing." *Arias v. E. Hartford*, No. 3:20-CV-895 (JCH), 2021 WL

3268846, at *4 (D. Conn. July 30, 2021) (citation and internal quotation marks omitted).  That is the case here.  While the exact contours of the roles played by the various Defendants remain somewhat imprecise, the SAC plausibly alleges, with sufficient specificity as to both the CESG Defendants and Con Edison, what these Defendants are alleged to have done and the basis for the claims against them.  Accordingly, the Court recommends denying the CESG Defendants' and Con Edison's respective motions to dismiss Counts One to Twelve for failure to comply with Rule 8(a).

### B.    The SAC Adequately Pleads That the CESG Defendants and Con Edison Were Plaintiffs' Employers or Joint Employers

The CESG Defendants renew their arguments that Counts One through Ten should be dismissed because "Plaintiffs have not adequately pled that any of the CESG Defendants meet the definitions and/or qualifications of 'employer' or 'joint employers' under either statutory scheme."  (CESG Br. at 6; *see* CESG Rep. 3-4).  Con Edison, which did not move to dismiss Counts One through Ten of the FAC on this ground, now argues similarly that the SAC is "replete with internal inconsistencies that render Plaintiffs' joint employer claims against Con Edison implausible."  (Con Edison Br. at 8; *see* Con Edison Rep. 2-3).  Plaintiffs argue, by contrast, that the SAC sufficiently alleges that both the CESG Defendants and Con Edison exerted formal control over their work, such that they were either employers or joint employers of Plaintiffs under the FLSA or NYLL.  (Pl. Br. at 12-13).

### 1.  Definition of "Employer" Under the Labor Laws

The FLSA defines an "employer" as "includ[ing] any person acting directly or indirectly in the interest of an employer in relation to an employee[.]" 29 U.S.C. § 203(d).  "The Supreme Court has recognized 'that broad coverage under the FLSA is essential to accomplish the statute's goal of outlawing from interstate commerce goods produced under conditions that fall below minimum standards of decency.'" *Irizarry v. Catsimatidis*, 722 F.3d 99, 103 (2d Cir. 2013) (quoting *Tony & Susan Alamo Found. v. Sec'y of Labor*, 471 U.S. 290, 296 (1985)).  Accordingly, the FLSA is construed liberally to "to apply to the furthest reaches consistent with congressional direction." *Irizarry*, 722 F.3d at 103.  Rejecting the narrower common law agency test for employment, the Supreme Court determined that the FLSA "defines the verb 'employ' expansively to mean 'suffer or permit to work.'" *Id.* (quoting *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 326 (1992)).

Accordingly, the Second Circuit "has treated employment for FLSA purposes as a flexible concept to be determined on a case-by-case basis by review of the totality of the circumstances," and "has identified different sets of relevant factors" based on the factual challenges posed by particular cases.  *Barfield v. New York City Health & Hosps. Corp.*, 537 F.3d 132, 141-42 (2d Cir. 2008).  The goal of these various tests is to assess the "economic reality" of the relationship between the parties. *Jean-Louis v. Met. Cable Co., Inc.*, 838 F. Supp. 2d 111, 121 (S.D.N.Y. 2011).  "[T]he purpose of the 'economic reality' test—'to expose outsourcing relationships that lack a substantial economic purpose'—points to a lodestar for

determining whether an employer has outsourced work in name only: the 'overarching concern is whether the alleged employer possessed the power to control the workers in question.'" *Id.* (quoting *Herman v. RSR Security Servs. Ltd.*, 172 F.3d 132, 139 (2d Cir. 1999)).

In determining whether a person or entity is an employer, including a joint employer, under the FSLA, courts in this Circuit most frequently employ the test articulated in *Carter v. Dutchess Community College*, 735 F.2d 8 (2d Cir. 1984). *See Bing Qing Zhou v. Slim Grass Beauty Corp.*, No. 18 Civ. 5761 (ILG) (SJB), 2021 WL 54058, at *7 (E.D.N.Y. Jan. 6, 2021). The *Carter* test assesses whether an employer exercises "formal control" over a worker and principally considers the following four factors:

> whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records.

*Carter*, 735 F. 2d at 12. While control is an essential aspect of the *Carter* test, "such status does not require continuous monitoring of employees, looking over their shoulders at all times, or any sort of absolute control of one's employees." *Herman*, 172 F.3d at 139. "Control may be restricted, or exercised only occasionally, without removing the employment relationship from the protections of the FLSA." *Id.*

Another test, outlined in *Zheng v. Liberty Apparel Co.*, 355 F.3d 61 (2d Cir. 2003), weighs six "nonexclusive and overlapping" factors to determine if an employer had "functional control" over workers. *Id.* at 72, 75. The *Zheng* factors are:

> (1) whether [the alleged employers'] premises and equipment were
> used for the plaintiffs' work; (2) whether the [subcontractors] had a
> business that could or did shift as a unit from one putative joint
> employer to another; (3) the extent to which plaintiffs performed a
> discrete line job that was integral to [the alleged employers'] process of
> production; (4) whether responsibility under the contracts could pass
> from one subcontractor to another without material changes; (5) the
> degree to which [the alleged employers] or their agents supervised
> plaintiffs' work; and (6) whether plaintiffs worked exclusively or
> predominantly for [the alleged employers].

*Id.* at 72. These factors "are most relevant in the context of subcontractor

relationships." *Granada v. Trujillo*, No. 18 Civ. 3949 (PAE), 2019 WL 367983, at *5

(S.D.N.Y. Jan. 30, 2019).

None of the factors articulated by the Second Circuit "comprise a rigid rule

for the identification of an FLSA employer." *Irizarry*, 722 F.3d at 105 (citation

omitted). To the contrary, "they provide a nonexclusive and overlapping set of

factors to ensure that the economic realities test mandated by the Supreme Court is

sufficiently comprehensive and flexible to give proper effect to the broad language of

the FLSA." *Id.* (cleaned up).

"The NYLL's definition of employment is nearly identical to the FLSA's."

*Fernandez v. HR Parking Inc.*, 407 F. Supp. 3d 445, 452 (S.D.N.Y. 2019); *compare*

NYLL § 2(7) (defining the term "employed" as "permitted or suffered to work") *with*

29 U.S.C. § 203(g) (defining "employ" as "to suffer or permit to work").

Consequently, "'district courts in this Circuit have consistently interpreted the

definition of 'employer' under the New York Labor Law coextensively with the

definition used by the FLSA.'" *Arce v. Sovereign Indus. Grp. Inc.*, No. 19 Civ. 489

(NGG) (JRC), 2025 WL 102449, at *5 (E.D.N.Y. Jan. 15, 2025) (quoting *Inclan v.*

*N.Y. Hosp. Grp.*, 95 F. Supp. 3d 490, 511 (S.D.N.Y. 2015)).

The law is clear that a worker can have more than one employer for purposes

of the FLSA. *Zheng*, 355 F.3d at 66; *see* 29 C.F.R. § 791.2(a) (recognizing that "all

joint employers are responsible, both individually and jointly, for compliance with

all of the applicable provisions of the act"). The same is true of the NYLL.

*Flannigan v. Vulcan Power Grp., LLC*, 642 F. App'x 46, 52 (2d Cir. 2016) ("[A]n

entity may be a 'joint employer' under the [NYLL]."). To determine joint

employment under the FLSA or NYLL, the Second Circuit uses the same "economic

reality" test as that used to assess employer status generally. Courts apply the

same factors discussed above, which are aimed at assessing whether "control" exists

over the workers in question. *Jean-Louis*, 838 F. Supp. 2d at 121. "[C]ontrol in this

context," however, "is not an all or nothing concept." *Id.* Thus, "even when one

entity exerts 'ultimate' control over a worker, that does not preclude a finding that

another entity exerts specific control to qualify as a joint employer under the

FLSA." *Id.* (quoting *Barfield*, 537 F.3d at 148).

### 2. Discussion

In determining whether the SAC adequately pleads that the CESG

Defendants and Con Edison were Plaintiffs' employer or joint employer, the Court

will apply the "formal control" test and analyze the four *Carter* factors: whether the

alleged employer (1) had the power to hire and fire the employees, (2) supervised

and controlled work schedules or conditions of employment, (3) determined the rate

and method of payment, and (4) maintained employment records.  *See Carter*, 735 F.2d at 12.[10]  The Court analyzes these factors first as to the SAC's allegations against the CESG Defendants, and then as to the allegations against Con Edison.

### a. CESG Defendants

The R&R found that "[l]argely due to the same failure of the FAC to make allegations specific to the CESG Defendants, the Court also agrees that [the FAC has] failed to adequately plead an employment or joint employment relationship with the CESG Defendants."  (R&R at 30).  As explained above, the SAC does not suffer from the same flaws identified by the R&R in the FAC regarding group pleading (*see supra* Discussion at § A), and so the Court must now reassess the *Carter* factors as applied to the CESG Defendants in light of the SAC's revised allegations.  The Court also conducts this assessment cognizant that, after the R&R was issued, CESG—the principal CESG Defendant—litigated and lost a similar motion to dismiss in New York state court.  *See Richardson v. CE Solutions Group, LLC*, No. 653369/2021, 2024 WL 4467705, at *9-11 (Sup. Ct. N.Y. Cnty. Oct. 10, 2024) (denying CESG and Con Edison's motions to dismiss NYLL unpaid wages

---

[10] In their briefing, the parties primarily rely on the *Carter* test.  The CESG Defendants' opening brief does not rely at all on the *Zheng* functional control test, and Con Edison's opening brief includes only a cursory discussion of the *Zheng* factors at the end of its joint employer argument.  (*See* Con Ed Br. at 17-18).  Plaintiffs' Opposition responds by disputing Con Edison's analysis of the *Zheng* factors (Pl. Br. at 36-41), but Plaintiffs also submit that "[b]y satisfying the formal control factors, Plaintiffs have carried their burden to allege a joint employment relationship.  As such, no further inquiry is necessary, and the Court need not reach the issue of functional control." (Pl. Br. at 36 (citing *Gayle v. Harry's Nurses Registry, Inc.*, No. 07 Civ. 4672 (CPS) (MDG), 2009 WL 605790, at *6 n.4 (E.D.N.Y. Mar. 9, 2009) ("Because I conclude that defendants exercised formal control over plaintiff, it is not necessary to analyze her work situation under the functional control test."), *aff'd*, 594 F. App'x 714 (2d Cir. 2014)).  The Court agrees that it is unnecessary to analyze the *Zheng* factors in deciding Defendants' motions.

claims brought on behalf of class of flaggers because "the complaint sufficiently alleges that defendants were joint employers").

### i. Power to Hire and Fire

The Court found in the R&R that "[t]here are no non-conclusory allegations in the FAC that support Plaintiffs' assertion that the CESG Defendants had control over hiring or firing workers." (R&R at 31). In their arguments on this factor, Plaintiffs relied either on "boilerplate allegations" in the FAC or paragraphs that "either make conclusory allegations as to all Defendants or make specific allegations as to Con Edison or CE Solutions, but not the CESG Defendants." (*Id.* at 32).

With respect to control over hiring, the SAC has beefed up substantially Plaintiffs' allegations concerning the CESG Defendants specifically. As noted above, the SAC specifically alleges that each Plaintiff (other than Gamboa[11]) was instructed by the CESG Defendants to report to CESG's Office where they were "interviewed" and "hired" by a CESG manager or employee. (Pl. Br. at 14; *see* SAC ¶¶ 350-51, 387-88, 440-41, 481-82, 539-40, 575-76, 614-15). The CESG Defendants' argument that the SAC's allegations with regard to hiring are "still too conclusory and non-specific"—which simply ignores the allegations cited above—must therefore be rejected.

---

[11] Gamboa alleges that she contacted Sablini, the owner of Argani, and was hired by him. (SAC ¶¶ 514-16).

The CESG Defendants also argue that, as noted in the R&R, a 2018 Referral Agreement between CESG and Argani (the "Argani Contract") "assigns CESG no role with respect to the hiring of employees." (CESG Br. at 8 (citing R&R at 35-36)). Even assuming that the Argani Contract—which is neither attached to nor incorporated by reference in the SAC—is properly before the Court on this motion, its silence on the subject of hiring no longer helps the CESG Defendants, in light of the SAC's allegations that, in fact, the CESG Defendants hired all but one of the eight Plaintiffs who went to work for Argani. (*See* R&R at 36 (rejecting CESG Defendants' argument that the Argani Contract "refutes any possible claim that Plaintiffs were employees of the CESG Defendants") (citation omitted)).

With regard to control over firing, Plaintiffs point to several allegations in the SAC describing incidents where the CESG Defendants purportedly threatened to, or did, discipline, suspend, or terminate Employees. (Pl. Br. at 17, 19). These include a text message from Plaintiff Rosario indicating that the CESG Defendants "are trying to fire all 10 flaggers including me" for allegedly stealing time (SAC ¶ 232 & Ex. L at 1); a text message from a CESG employee informing Plaintiff Allicott that if he did not upload photographs of himself in full gear, he "will not be able to get anymore work" (*id*. ¶ 233 & Ex. W at 7); allegations that the CESG Defendants, together with Con Edison and the Argani Defendants, suspended Lopez and Najarro for an incident at work (*id*. ¶¶ 392, 442); and an allegation that Napoleone-Colbert and other employees of the CESG Defendants pressured Employees to form their own businesses by informing them that if they refused, they might not be paid

36

for shifts worked or might be terminated (*id*. ¶ 239). The SAC also alleges generally that in the event an Employee violates policy, the CESG Defendants will either directly discipline the Employee or instruct the Subcontractor to do so, including by terminating the Employee's employment. (*Id*. ¶ 234).

The CESG Defendants argue that the SAC's allegations are insufficient because some of them "vaguely point to multiple parties who had suspension/termination powers" and "indicate that Plaintiffs do not know which defendants actually disciplined them." (CESG Br. at 8-9 (citing SAC ¶¶ 393-95 (describing Lopez's inquiry as to who suspended her and Napoleone-Colbert's conflicting responses); *see* CESG Rep. at 6). But allegations that other defendants also had a role in the termination or discipline of Employees does not insulate the CESG Defendants from a finding of joint employment. *See, e.g.*, *Short v. Churchill Ben. Corp.*, No. 14 Civ. 4561 (MKB), 2016 WL 8711349, at *19 (E.D.N.Y. Apr. 8, 2016) (noting that defendant's "shared authority" over hiring and firing decisions "supports [defendant's] status as a joint-employer").

Accordingly, the SAC alleges sufficient facts to support a finding in Plaintiffs' favor under the first *Carter* factor.

### ii. Conditions of Employment

The R&R concluded that Plaintiffs' allegations in the FAC did not satisfy the second *Carter* factor with respect to the CESG Defendants, but it did so because the vast majority of allegations relevant to this factor alleged that "CE Solutions" had the power to supervise and control Employees' work schedules and conditions of

employment.  (R&R at 38-39).  The relevant allegations in Plaintiffs' amended pleading now do include allegations as to the CESG Defendants specifically.

As Plaintiffs point out (Pl. Br. at 20-21), the SAC alleges a myriad of ways in which the CESG Defendants directed and supervised Plaintiffs' schedules and work, including, *inter alia*, calling Employees to assign them shifts and directing the Subcontractors to assign shifts (SAC ¶¶ 169-70); instructing Employees to call the Office or the CESG Defendants' hotline number to sign up for shifts (*id.* ¶¶ 172, 174); notifying Employees of the location of jobsites (*id.* ¶¶ 173, 177, 180); directing Employees to call the Office to confirm they can leave a jobsite or secure standby shifts, or to obtain permission to take breaks or call out sick (*id.* ¶¶ 175, 178, 187, 196-200); developing and maintaining the Smartphone App which, *inter alia*, tracks Employees' locations to determine if and when an Employee has arrived at a jobsite (*id.* ¶¶ 188, 190 & Ex. E at 13); assigning CESG Supervisors to perform regular rounds of jobsites to monitor Employees' work (*id.* ¶ 195 & Ex. E at 4, 6); requiring Employees to take photographs to show they are using the proper equipment (*id.* ¶ 220); and requiring Employees to call the Office if a shift extends beyond its end time and to confirm when a Con Edison crew has arrived at the jobsite (*id.*).

The CESG Defendants nonetheless argue that the SAC makes clear that "nearly all of [CESG Defendants'] alleged conduct concerning Plaintiffs' work schedules and conditions of employment were at [Con Edison's] behest."  (CESG Br. at 9 (citing SAC ¶¶ 151, 152, 168, 172, 173, 175, 202)).  But as Plaintiffs correctly respond, while they "do not dispute Con Edison controlled Plaintiffs' work schedule

and conditions of employment," this "'does not preclude a finding that [the CESG Defendants] exert[] sufficient control to qualify as a joint employer under the FLSA.'" (Pl. Br. at 20 (quoting *Barfield*, 537 F.3d at 148)). Whether or not the CESG Defendants exercised this control at the behest of Con Edison, the SAC's allegations suggest that the CESG Defendants jointly controlled many aspects of Plaintiffs schedules and employment conditions, which is sufficient at the pleading stage.

The CESG Defendants also argue that Plaintiffs' analysis fails to account for the nature of "the contractor/subcontractor relationship" and thus fails to allege "a substantial or sufficient level of control by the CESG Defendants." (CESG Rep. at 7). They cite *Hugee v. SJC Grp., Inc.*, No. 13 Civ. 423 (GBD), 2013 WL 4399226 (S.D.N.Y. Aug. 14, 2013), but that case is inapposite. In *Hugee*, the plaintiff, a security guard for a subcontractor of the defendant-contractor, claimed the contractor was a joint employer and attempted to satisfy the second *Carter* factor based on allegations that he was required to report in by telephone to the contractor upon arriving at a worksite. *Id*. at *5. The court found those allegations insufficient, noting that the plaintiff conceded he was "given day-to-day instruction about assignments or scheduling" from the subcontractor and "does not allege that he worked under the supervision of [the contractor] or any of its employees at any point in time." *Id*. Here, by contrast, Plaintiffs allege that they were given their day-to-day instructions about assignments from the CESG Defendants (SAC ¶¶ 142, 169-70), and further allege that they worked under the supervision of the

CESG Defendants in several respects, including, as noted, that the CESG

Defendants "assign its own supervisors to perform regular rounds of jobsites to,

*inter alia*, monitor Employees' work, ensure Employees were dressed appropriately

and using proper traffic safety equipment."  (*Id.* ¶ 195; emphasis added).

The Court thus finds the CESG Defendants' arguments to be unpersuasive.

Whether the "level of control" exercised by the CESG Defendants over Plaintiffs'

schedules and conditions of employment was "substantial or sufficient" enough to

satisfy the second *Carter* factor (CESG Rep. at 7) is a factual question that cannot

be decided as a matter of law at the pleading stage.  For now, Plaintiffs' allegations

are sufficient to satisfy the second *Carter* factor with respect to the CESG

Defendants.

### iii. Rate and Methods of Pay

In line with its analysis of the previous two factors, the R&R held that the

FAC's allegations concerning the CESG Defendants' control of rate and methods of

pay were too conclusory and non-specific to satisfy the third *Carter* factor as to the

CESG Defendants, as they again referred to an undifferentiated grouping of all

"Defendants."  (R&R at 39; *see id.* at 41 (finding FAC's allegations as to

"Defendants" provided "no indication at all that the CESG Defendants played a role

in setting or establishing such payment practices")).

The CESG Defendants argue that "[t]he R&R's holding that the FAC's

allegations were in 'entirely conclusory fashion' is equally applicable to the SAC."

(CESG Br. at 10 (citing R&R at 39)).  As with their objections to the SAC's

purported group pleading, the CESG Defendants contend that Plaintiffs have simply replaced references to "Defendants" in the FAC with references to combinations of large categories of Defendants in the SAC, such as "Con Edison, CESG Defendants and/or the Subcontractors." (CESG Br. at 10; *compare* FAC ¶¶ 218-21 *with* SAC ¶¶ 243-47). The Court disagrees with this reading of the SAC and rejects the CESG Defendants' argument.

The SAC adds several allegations, absent from the FAC, detailing the process whereby Employees' wages are determined and Employees are paid. The SAC alleges that "Con Edison and the CESG Defendants establish hourly rates based on whether an Employee is a Flagger or a Spotter," and those rates "are then communicated to and agreed upon with the Subcontractors." (SAC ¶ 244; *see id.* ¶ 246 (alleging that Con Edison, CESG Defendants, and the Subcontractors set hourly rates of $15 to $17 per hour for Flaggers and from $10 to $12 per hour for Spotters)). Con Edison, the CESG Defendants, and the Subcontractors then allegedly work together to confirm the number of hours Employees worked during a given pay period in order to process Employees' payroll and rectify any discrepancies. (*Id.* ¶¶ 248-50).

"Once Employees' true hours worked are accounted for, Con Edison then pays CESG Defendants an hourly rate for these hours, pursuant to the hourly unit prices set in the BPAs." (*Id.* ¶ 251). The BPA between Con Edison and CESG attached to the SAC reflects Con Edison's agreement to remit such payment to CESG and also includes a schedule reflecting the agreed-upon hourly rates to be paid to CESG for

flagging services (although the specific amounts are redacted).  (*Id*. Ex. A at 4-5, §

5(B)).  Then, "after receiving payment from Con Edison, CESG Defendants and the

Subcontractors paid Employees at a straight time rate for each hour that they

worked."  (*Id*. ¶ 253).  "Employees' wages are then issued through by"—*i.e.*, as the

Court understands this phrase, paid by—"the Subcontractors."  (*Id*.; *see also id*. ¶

255 (alleging that Employees are paid "through the Subcontractors")).

Thus, while the SAC includes certain conclusory allegations attributing to

Con Edison, the CESG Defendants, and the relevant Subcontractor the failure to

pay Plaintiffs their duly earned wages (*see, e.g.*, *id*. ¶¶ 356-78), it also provides

sufficient additional detail as to the CESG Defendants' alleged role in setting

Plaintiffs' rates of pay and the amounts they are paid for particular pay periods.

The fact that Plaintiffs were paid directly by the Subcontractors does not negate

Plaintiffs' allegations that the CESG Defendants also exerted control over Plaintiffs'

pay.

Accordingly, Plaintiffs' allegations are sufficient to satisfy the third *Carter*

factor with respect to the CESG Defendants.

### iv. Maintenance of Employment Records

With respect to the fourth factor, the R&R recognized that the FAC's

allegations that Employees were instructed to fill out timesheets marked with

CESG's name, address, and phone number and send the completed timesheets to an

email address owned and operated by the CESG Defendants offered "some support"

for Plaintiffs, "as they indicate the CESG Defendants 'maintained employment

records on the matter most relevant to' Plaintiffs' claims: 'the hours worked.'"  (R&R

at 42 (quoting *Barfield*, 537 F.3d at 144).  However, because the FAC did not

contain "any tangible allegation of any use of the timesheets made by the CESG

Defendants" (*id*. at 43 (citing *Hugee*, 2013 WL 4399226, at *7), and the FAC's other

allegations concerning the fourth factor described records maintained by

"Defendants" generally, and not the CESG Defendants specifically, the R&R

concluded that the FAC fell short in this regard as well.  (*Id*.).

Here, too, the SAC improves upon the allegations in the FAC.  First, as

Plaintiffs argue (Pl. Br. at 35), the SAC now alleges not only that Employees were

instructed to send the timesheets to the CESG Defendants (SAC ¶¶ 204-05, 217),

but also that the CESG Defendants (as well as Con Edison and the Subcontractors)

used the timesheets to confirm that Employees were physically present at jobsites,

ascertain the number of hours Employees worked, and address any discrepancies

regarding Employees' hours or wages.  (*Id*. ¶¶ 223, 248-50, 266-68).  Exhibits

attached to the SAC lend support for those allegations, including text messages in

which Napoleone-Colbert and Plaintiff Lopez communicate about a timesheet and

in which Gustavo instructs Plaintiff Rosario to "send that timesheet in asap" to the

Office.  (*Id*. Exs. E at 3 & F at 12-13).

Second, the SAC alleges that the CESG Defendants maintain other

employment records aside from the timesheets.  These records include the

documents that all but one of the Plaintiffs filled out or provided at the CESG Office

when they were first onboarded, such as their banking information, drivers'

licenses, social security cards, and IRS Forms 1099. (SAC ¶¶ 255, 260-62, 351, 387, 440, 481, 539, 575, 614; *see also id*. Ex. F at 2 (Najarro's banking information being provided to Napoleone-Colbert)). The records also include certificates demonstrating that Employees completed a mandatory online flagging training course, which employees of the CESG Defendants collected from some Plaintiffs during the onboarding process (*id*. ¶¶ 272, 351, 614 & Ex. F at 1-2); photographs of Plaintiffs at jobsites that Plaintiffs were required to send to the CESG Defendants (*id*. ¶¶ 263-65, 267 & Exs. D at 7-8, E at 7, O at 1-2, and W at 3) and COVID-19 vaccination cards (*id*. ¶ 273 & Ex. B at 9). (*See* Pl. Br. at 31-32).

Despite these allegations, the CESG Defendants insist the SAC engages in "word play" that fails to cure the FAC's deficiencies and "is still not specific enough as to the role of each defendant in maintaining employment records." (CESG Rep. at 8-9; *see* CESG Br. at 12). This argument is baseless. The SAC's allegations are sufficient to satisfy the fourth *Carter* factor with respect to the CESG Defendants.

### v. Assessment

Considered in their totality and viewed in the light most favorable to Plaintiffs, as they must be on this motion to dismiss, the SAC's allegations cure the deficiencies in the FAC and are more than sufficient to plausibly plead that the CESG Defendants were Plaintiffs' "employer" or "joint employer" under the FLSA and NYLL. *See Richardson*, 2024 WL 4467705, at *2 (citing plaintiffs' allegations that CESG "hired plaintiffs, assigned them to a subcontractor, gave plaintiffs their job assignments, and on occasion terminated employees" in finding that plaintiffs

stated a claim that CESG was a joint employer, and noting that "[i]t is not relevant on a motion to dismiss whether plaintiffs will ultimately be able to establish [their] allegations").

### b. Con Edison

Although Con Edison did not contend in its prior motion to dismiss that the FAC failed to adequately plead that it was an employer or joint employer, and does not contend that the SAC diluted Plaintiffs' allegations of joint employment against Con Edison, it now seeks dismissal of Counts One through Ten of the SAC on this ground.  (Con Ed Br. at 8-18).  As in other cases rejecting similar arguments by Con Edison at the motion to dismiss stage, the Court finds Con Edison's arguments to be unavailing.  *See Richardson*, 2024 WL 4467705, at \*2 (finding that complaint sufficiently alleged that Con Edison and CESG were joint employers and denying Con Edison's motion to dismiss NYLL claims); *Moses v. Griffin Indus., LLC*, 369 F. Supp. 3d 538, 544 (S.D.N.Y. 2019) (finding that complaint sufficiently alleged that Con Edison and a traffic control services company similar to CESG (Griffin) were joint employers and denying Con Edison's motion to dismiss FLSA and NYLL claims in action brought on behalf of putative class of flaggers).

### i. Power to Hire and Fire

As noted above and in Con Edison's brief, the SAC alleges that all eight named Plaintiffs were hired by the CESG Defendants or, in one instance, Argani. (Con Ed Br. at 9).  Con Edison argues that "[n]owhere does the SAC specifically allege that Con Edison hired Plaintiffs, or even directed that the CESG Defendants

or Subcontractors hire any specific plaintiff or putative class member" or "that Con Edison participated in any interviewing, hiring or onboarding or any Plaintiff, or that Con Edison instructed the CESG Defendants or Subcontractors on who to hire, or that Con Edison was even aware or involved in their hiring of Plaintiffs." (*Id.*; Con Ed Rep. at 4).

Plaintiffs' Opposition replies that, while Con Edison may not have been directly involved in the hiring process (*i.e.*, not physically present during the interview), the CESG Defendants interviewed and hired Plaintiffs "'to work for Con Edison'" and "'on behalf of Con Edison.'" (Pl. Br. at 15 (quoting SAC ¶¶ 225-26)). Plaintiffs also allege that "Con Edison directs CESG Defendants as to the number of Employees Con Edison requires at a given jobsite" (SAC ¶ 168), either posts or instructs CESG to post available shifts (*id.* ¶ 190), and can dictate where Employees work (*id.* ¶ 179). (Pl. Br. at 16). But the Court concurs with Con Edison that these allegations (the latter two of which are not even germane to the hiring process) do not sufficiently plead that Con Edison has the requisite power to hire, given the lack of allegations about their involvement in the hiring process. "Mere influence on hiring is not sufficient to find that [the first *Carter*] factor has been met." *Fernandez*, 407 F. Supp. 3d at 452 (explaining that plaintiffs did not satisfy the hiring element of the first *Carter* factor absent evidence that defendants directly reviewed or made final hiring decisions as to applicants).

Con Edison argues that the SAC is similarly lacking with respect to "Con Edison's supposed power to fire or discipline Plaintiffs" because Plaintiffs offer only

the conclusory allegation that "'Con Edison, CESG Defendants, and Subcontractors'" all had the power to fire and discipline Employees. (Con Ed Br. at 10 (quoting SAC ¶ 224)). Plaintiffs respond that the SAC alleges that Con Edison supervisors could report an Employee's infraction and "direct CESG Defendant regarding the appropriate discipline" (SAC ¶ 229; *see also id.* ¶ 231), and that the CESG Defendants disciplined or terminated Employees on behalf of Con Edison for policy violations (*id.* ¶ 234). (Pl. Br. at 18-19). Plaintiffs highlight Napoleone-Colbert's text messages to Plaintiff Rosario, after Rosario was suspended, stating that Con Edison "no longer wants [you] serving the company" and that "[o]nce [Con Edison] decides they no longer want a worker on any sites at that point there is nothing I can do." (*Id.* at 19; *see* SAC ¶ 394 & Ex. F at 4-6, 9). Indeed, the BPA specifically requires CESG to "remove any personnel from performing services under the [BPA] as may be requested by Con Edison." (SAC Ex. A at 15-16).

Here, the Court agrees with Plaintiffs. Con Edison argues that its ability to "complain to CESG about a flaggers' performance, and even request that certain flaggers not be reassigned to its projects, is not indicative of joint employment." (Con Ed Rep. at 5). It cites a line of cases, illustrated by *Godlewska v. HDA*, 916 F. Supp. 2d 246, 258 (E.D.N.Y. 2013), *aff'd*, 561 F. App'x 108 (2d Cir. 2014), holding that a client's ability to request that its vendor remove a worker from the client's projects is not tantamount to a power of termination. (Con Ed Rep. at 5). However, as Plaintiffs note, and as the R&R noted when the CESG Defendants made a similar argument, *Godlewski* and other cases in this line were decided on summary

47

judgment, not a motion to dismiss.  (Pl. Br. at 23 n.14; R&R at 34).  So far as appears from the SAC's allegations, Plaintiffs were hired specifically to work at Con Edison jobsites, and generally worked full-time and exclusively at Con Edison jobsites.  (SAC ¶¶ 274, 288, 291).  Plaintiffs are entitled to explore in discovery whether under the circumstances of this case Con Edison effectively had the power to require that Employees be terminated.

Accordingly, at the pleading stage, Plaintiffs have sufficiently alleged that Con Edison has the power to fire and discipline Employees, although they have not sufficiently alleged that Con Edison has the requisite power to hire.  *See Richardson*, 2024 WL 4467705, at *10-11 (relying on provision of BPA giving Con Edison the right to "remove any personal from performing services under the Contract" and allegations that Con Edison "sometimes terminated flaggers from employment" in denying Con Edison's motion to dismiss); *Moses*, 369 F. Supp. 3d at 544 (similarly relying on allegations that "employees were terminated by both [Con] Edison and Griffin" in denying Con Edison's motion to dismiss).

### ii. Conditions of Employment

Con Edison argues that the SAC alleges that "once Con Edison [has] informed CESG that flaggers were needed for a utility project, the duty of staffing those projects was handled entirely by the CESG Defendants and Subcontractors." (Con Ed Br. at 12-13 (citing SAC ¶¶ 168-78)).  Con Edison contends that these allegations fall short of the requisite "control" over Plaintiffs' schedules, as Plaintiffs do not allege that Con Edison determines which specific worker will work

which shift.  (Con Ed Br. at 13 (citing *Godlewska,* 916 F. Supp. 2d at 259 ("Simply determining when a certain job will be performed is not tantamount to determining which employee will perform that job at a particular time."))).

As Plaintiffs note (*see* Pl. Br. at 22-23), however, the SAC alleges more: it alleges that "Con Edison supervisors can also mandate that specific Employees work or not work a shift or at a jobsite based on a Con Edison supervisor's prior dealing with the Employee."  (SAC ¶ 235; *see also id.* ¶ 179).  Additionally, the SAC alleges that Con Edison has the power to determine which jobsite an Employee works at and that Plaintiffs Allicott and Rosario directly reported to the same Con Edison supervisor for each shift, who would direct them regarding what jobsite to go to, what time to show up, and when the shift ended.  (*Id.* ¶¶ 543-44, 579-80; *see id.* Ex. D (text messages exchanged between Rosario and "Nesbitt," a Con Edison supervisor, wherein Nesbitt directs Rosario to work at various jobsites)).  The SAC further alleges that Employees sometimes would arrive at Con Edison facilities to receive "standby shifts" assigned to them by a Con Edison employee.  (*Id.* ¶¶ 175-78).  Employees' shifts allegedly ended only after a Con Edison supervisor said it was over.  (*Id.* ¶ 185).

Although Con Edison argues that these allegations "conflict[]" with what it characterizes as the SAC's assertion that "it was the CESG Defendants who then scheduled and assigned its Subcontractors' staff to perform those jobs" (Con Ed Rep. at 6 (citing SAC ¶¶ 168-78)), the Court perceives no inconsistency.  The SAC's allegations do not suggest that the CESG Defendants *alone* had or exercised this

power.  Fairly read, the SAC alleges that both the CESG Defendants and Con Edison had the power to control Plaintiffs' schedules.  Indeed, as the CESG Defendants read the SAC, "nearly all of CESG's alleged conducted concerning Plaintiff's work schedules and conditions of employment were at *ConEd's* behest." (CESG Br. at 9; emphasis added).  Whether control over Plaintiffs' schedules was exercised by Con Edison (as the CESG Defendants contend) or the CESG Defendants (as Con Edison contends), or both, is a question of fact to be explored during discovery.

Con Edison argues further that the SAC fails to adequately allege Con Edison's supervision over Plaintiffs' work.  Con Edison contends that the SAC includes only conclusory allegations to this effect, *e.g.*, "Defendants also maintain direction, control, and supervision of the work performed by Employees" (SAC ¶ 193), but offers "few examples" evincing such control.  (Con Ed Br. at 13).  But this is not so.  The SAC alleges that Con Edison *and* the CESG Defendants each had their own "supervisors" physically present at any jobsite (SAC ¶¶ 194-195), "monitoring and directing Employees regarding myriad aspects of their work" (*id.* ¶ 201).  The SAC adds specific detail of this control by alleging, for instance, that the onsite Con Edison supervisor "tasks the Employee with assignments and directs the Employee's work, including, *inter alia*, where to stand to direct traffic, where to erect signage and/or barricades, and which streets or sidewalks to close."  (*Id.* ¶ 194).  The SAC alleges that the joint onsite supervision "speaks to the inextricably interconnected manner in which Defendants jointly control Employees."  (*Id.* ¶ 201).

50

*See Moses*, 369 F. Supp. 3d at 544 (relying on allegations that flaggers "would be assigned to [Con] Edison worksites under the control of [Con] Edison supervisors").

Lastly, Con Edison argues that the extent of its supervision of Plaintiffs was mandated by requirements of the Occupational Safety and Health Act ("OSHA") and New York State Department of Transportation, Work Zone Traffic Control Manual, https://webapps.dot.ny.gov/introduction-and-fundamental-principles (last visited Nov. 1, 2024), and as such, Plaintiffs' allegations of Con Edison's supervision do not speak to the requisite "control" under the second *Carter* factor. (Con Edison Br. at 13-15 (citing *Godlewska*, 916 F. Supp. 2d at 259 ("[H]aving strict standards and monitoring compliance with those standards does not constitute supervising and controlling employees' work conditions," especially "where the quality control's purpose is to ensure compliance with the law or protect clients' safety."))). However, as the foregoing suggests, Plaintiffs' allegations of Con Edison's monitoring and supervision of Plaintiffs clearly extend beyond ensuring compliance with the relevant mandated job safety requirements (*e.g.*, tasking Employees with assignments and directing their work (*see* SAC ¶ 194)).

"In assessing supervision in contracting and subcontracting arrangements, courts distinguish between 'circumstances where the putative joint employer maintains specific standards to which its contractors and the contractors' employees must adhere, and regularly monitors the contractor's employees to ensure that their performance satisfies the putative joint employer's expectations,' which alone does not establish control of work conditions, and 'circumstances where the putative joint

employer is responsible for the day-to-day management of the contractor's

employees.'" *Gil v. Pizzarotti, LLC*, No. 19 Civ. 03497 (MKV), 2021 WL 1178027, at

*10 (S.D.N.Y. Mar. 29, 2021) (quoting *Vasto v. Credico (USA) LLC*, No. 15 Civ. 9298

(PAE), 2017 WL 4877424, at *10 (S.D.N.Y. Oct. 27, 2017), *aff'd*, 767 F. App'x 54 (2d

Cir. 2019) (cleaned up)). Here, the SAC's allegations, viewed in the light most

favorable to Plaintiffs, reflect the latter more than the former. Accordingly,

Plaintiffs allegations are sufficient to satisfy the second *Carter* factor with respect to

Con Edison.

### iii. Rate and Methods of Pay

Con Edison points to similar purported "inconsistencies" in the SAC's

allegations with respect to Con Edison's power to control the rate and method of

payment. (Con Ed Br. at 11-12; Con Ed Rep. at 9-10). Con Edison argues that

Plaintiffs' relevant allegations are conclusory (Con Ed Br. at 11 (citing SAC ¶¶ 243,

246)), and inconsistent in that some paragraphs do not even reference Con Edison

as determining the rate and method of pay (*id.* (citing SAC ¶280 ("CESG

Defendants and the Subcontractors . . . determine Employees' rate and method of

payment and hours worked."))).

Con Edison's arguments again ignore relevant allegations in the SAC. As

described above, the SAC alleges that "Con Edison and the CESG Defendants

establish hourly rates" for Employees which are then "agreed upon with the

Subcontractors." (SAC ¶¶ 244, 246). Plaintiffs allege, and the BPA appears to

confirm, that Con Edison paid CESG on the basis of hourly rates for the hours

worked by Employees. (*Id.* ¶ 251 & Ex. A at 4-5 § 5(b)). This stream of money was then used by the Subcontractors to pay Employees on an hourly basis. (*Id.* ¶ 253).

While Con Edison did not pay the Employees directly, "'[t]he Second Circuit has . . . recognized that a company can *de facto* set employees' wages . . . , though they do not literally pay the workers, where those employees perform work exclusively in service of that company.'" *Velez v. New Haven Bus Serv., Inc.*, No. 3:13cv19 (JBA), 2015 WL 75361, at *6 (D. Conn. Jan. 6, 2015) (quoting *Lin v. Great Rose Fashion, Inc.*, No. 08 Civ. 4778 (NGG) (RLM), 2009 WL 1544749, at *15 (E.D.N.Y. June 3, 2009)); *see Barfield*, 537 F.3d at 144 (hospital could be said to have "exerted some control" over plaintiff-nurse's pay, even though nurse was directly paid by referral agencies, where hospital "paid the agencies an hourly rate for [the nurse's] hours," which "effectively set a cap on the hourly rate that the agencies would pay [her]"). Based on the SAC's allegations, Employees generally, and at least most of the Plaintiffs, worked full-time and exclusively for Con Edison. (*See id.* ¶¶ 274, 288; *see also, e.g., id.* ¶ 349 (alleging that Plaintiff Nashaily Ortiz "routinely worked five to seven days per week, for approximately 50 to 90 hours each week")). Plaintiffs thus have sufficiently alleged that Con Edison exercised control over their rates of pay.[12]

---

[12] Con Edison claims that "the record demonstrates" that the hourly rates in the BPA "were far higher than the rates Plaintiff[s] claim they were paid by the Subcontractors" and that "the record evidence" demonstrates that Con Edison "paid [CESG] at overtimes rates for Plaintiffs' overtime" despite Plaintiffs' claim they were not paid overtime. (Con Ed Br. at 11-12; *see* Con Ed Rep. at 9). For these assertions Con Edison relies on declarations and accompanying exhibits submitted by a Con Edison executive in connection with a previously filed motion by Plaintiffs for conditional certification. (Dkt. Nos. 170, 178). Needless to say, the Court cannot consider Con Edison's factual assertions in ruling on this motion to dismiss.

Similarly, Con Edison ignores allegations in the SAC that Con Edison worked together with the CESG Defendants and the Subcontractors in determining the number of hours Employees worked and, thus, the amount they would be paid. (SAC ¶¶ 213-14, 219, 248-50; *see id*. Ex. L at 1-2 (a Con Edison supervisor, "Roy," informing Rosario that he "asked [the Office] to fix" the number of hours Rosario worked, and that he has to report discrepancies between time sheet on the Smartphone App and actual time worked to CESG)).  These allegations also plausibly allege a degree of control by Con Edison over Plaintiffs' wages.

Accordingly, the third *Carter* factor also favors Plaintiffs' joint employment allegations against Con Edison.

### iv. Maintenance of Employment Records

As with the other *Carter* factors, Con Edison argues that the SAC is rife with inconsistencies regarding the maintenance of employment records.  (Con Edison Br. at 16-17).  Con Edison specifically points to a purported contradiction between the SAC's allegation that "Con Edison, CESG Defendants, and the Subcontractors maintain all [of the Plaintiffs'] employment, personnel, and business records" (SAC ¶ 259) in one paragraph with the SAC's allegation that it is "CESG Defendants and/or Subcontractors" who maintain the records in the next three paragraphs (*id.* ¶¶ 260-62).  (Con Ed Br. at 16).  Con Edison ignores, however, Plaintiffs' allegation that the CESG Defendants and/or Subcontractors maintain these records "on behalf of Con Edison."  (SAC ¶¶ 260-62).

54

Putting that aside, the SAC alleges other ways in which Con Edison maintained Employee records. (*See* Pl. Br. 33). The SAC alleges, for instance, that Con Edison itself, among other Defendants, maintained Employees' timesheets and used them to track Employees' hours. (SAC ¶ 266). The SAC alleges that Con Edison and the CESG Defendants jointly developed the Smartphone App (*id.* ¶ 188), and that Con Edison and CESG supervisors can log into the Smartphone App, *inter alia*, to review Employees' timesheets to "confirm the number of hours Employees worked in order to process Employees' payroll or to rectify a discrepancy regarding an Employee's hours worked or wages paid." (*Id.* ¶¶ 219, 249). Text messages from Con Edison employees attached to the SAC appear to confirm that they had access to the Smartphone App. (*Id.* Exs. D at 6 & Ex. L at 2 ("Roy" indicating that he reviews "the time sheets on the app")). Taken together, the SAC's allegations plausibly suggest that certain records are maintained by or on Con Edison's behalf and are are sufficient to satisfy the fourth *Carter* factor with respect to Con Edison.

### v. Assessment

Even if not all the *Carter* factors weigh in Plaintiffs' favor, such as Con Edison's control over the hiring of Plaintiffs, "[n]o one of the four factors standing alone is dispositive." *Herman*, 172 F.3d at 139-40 (affirming trial verdict in favor of plaintiff even though there was little or no evidence that defendant set rates of pay or maintained employment records). Viewing the SAC's allegations holistically and favorably to Plaintiffs, the Court concludes—like the courts in *Richardson* and *Moses*—that Plaintiffs have plausibly alleged that Con Edison was their joint

employer when they worked as flaggers or spotters at Con Edison jobsites. *See Richardson*, 2024 WL 4467705, at \*10-11; *Moses*, 369 F. Supp. 3d at 544.[13]

\*    \*    \*

"[T]he 'economic reality' test encompasses the totality of circumstances[.]" *Herman*, 172 F.3d at 139. Looking at the totality of the circumstances, and drawing all reasonable inferences in Plaintiffs' favor, the Court readily infers that the economic reality of the relationship between Plaintiffs and both the CESG Defendants and Con Edison—as pled in the SAC—plausibly supports the conclusion that these Defendants were joint employers of Plaintiffs. As such, the Court recommends denying the CESG Defendants' and Con Edison's motions to dismiss Plaintiffs' FLSA and NYLL claims in Counts One through Ten on this ground.

## C. It Is Premature to Address Plaintiffs' FIFA Claims

"In the alternative to their claims brought under the FLSA and NYLL" (SAC ¶¶ 780, 791), Plaintiffs assert claims under FIFA for failure to pay compensation (Count No. 11, *id.* ¶¶ 779-89) and late payment of compensation (Count No. 12, *id.* ¶¶ 790-99). Both the CESG Defendants and Con Edison move to dismiss Counts

---

[13] Following discovery, the court in *Moses* later granted partial summary judgment in favor of Con Edison on the joint employer issue. *Moses v. Consol. Edison Co. of N.Y. Inc.*, No. 18 Civ. 1200 (ALC), 2024 WL 1329800 (S.D.N.Y. Mar. 28, 2024). In applying the *Carter* test, Judge Carter found that while the first two factors weighed in the plaintiffs' favor, the third and fourth factors weighed in favor of Con Edison, and he concluded that, on balance, the evidentiary record established that Con Edison did not exert formal control over the plaintiffs. *Id.* at \*8. Subsequently, the plaintiffs and Con Edison entered into a settlement agreement providing for class-wide relief, which is pending court approval. (*Moses*, Dkt. Nos. 774-76). While there may be significant overlap in the relevant factual circumstances between this case and *Moses*, this case involves different Plaintiffs and different providers of flagging and spotting services for Con Edison jobsites. Having pleaded facts sufficient to survive a motion to dismiss, like the *Moses* plaintiffs, Plaintiffs are entitled to develop their own evidentiary record to be tested at summary judgment and/or at trial, as appropriate.

Eleven and Twelve, each arguing that Plaintiffs fail to allege that they, respectively, are a "hiring party," and so fail to allege a claim under FIFA. (*See* CESG Br. at 16; Con Ed Br. at 18-19).

As explained in the R&R, "'FIFA regulates the relationship between freelance workers and those who retain their services, the hiring party, in New York City.'" (R&R at 76 (quoting *Ward v. Cohen Media Publications LLC*, No. 22 Civ. 06431 (JLR), 2023 WL 5353342, at *17 (S.D.N.Y. Aug. 21, 2023) (alteration in original)). "FIFA defines a freelance worker as 'any natural person . . . that is hired or retained as an independent contractor by a hiring party to provide services in exchange for compensation.'" *Varn v. Orchestrade, Inc.*, No. 19 Civ. 2875 (MKB), 2022 WL 900855 at *6 (E.D.N.Y. Mar. 28, 2022) (quoting N.Y.C. Admin. Code § 20-927).

The statutory language of FIFA explicitly defines a "hiring party" as "any person who [or entity that] retains a freelance worker to provide any service" in exchange for compensation. N.Y.C. Admin. Code § 20-927. FIFA "does not mandate direct contracting between a freelance worker and the hiring party." *Chen v. Romona Keveza Collection LLC*, 208 A.D.3d 152, 159, 173 N.Y.S.3d 201, 207 (1st Dep't 2022) (citing N.Y.C. Admin. Code § 20-927).

The R&R held that, "[f]or similar reasons that lead the Court to conclude the FAC does not adequately allege that the CESG Defendants were Plaintiffs' 'employer,' . . . Plaintiffs do not sufficiently identify the CESG Defendants as a 'hiring party' under FIFA." (R&R at 78).[14]  The R&R also rejected several other

---

[14] The R&R did not consider the sufficiency of the FAC's FIFA claims with respect to Con Edison because—here again—Con Edison did not move to dismiss those claims.

arguments advanced by the CESG Defendants for dismissal of the FIFA claims, including that Plaintiffs failed to adequately allege, in the alternative, that they meet FIFA's definition of freelance workers.  (R&R at 78-80).

Echoing the R&R, both the CESG Defendants and Con Edison argue that Plaintiffs' FIFA claims fail for the same reason that they contend Plaintiffs' FLSA and NYLL claims fail, namely, that the SAC does not adequately allege employer or joint employer status on the part of the CESG Defendants and Con Edison.  (CESG Br. at 16-17; Con Ed Br. at 18-19).  However, as set forth above, the Court has rejected the CESG Defendants' and Con Edison's challenges to Plaintiffs' FLSA and NYLL claims and concluded that the SAC now adequately alleges that they were Plaintiffs' employer or joint employer.  Accordingly, the R&R's rationale for dismissal of Plaintiffs' FIFA claims is no longer operative.

Both Con Edison and the CESG Defendants assert additional grounds for dismissal of the FIFA claims.  Con Edison argues that Plaintiffs' FIFA claims should be dismissed because a "hiring party" under FIFA "is defined narrowly to include only the person or entity who actually" retains the freelance worker and "does not extend to other persons or entities that a worker claims may be her 'joint employers.'"  (Con Edison Br. at 19).  For this proposition Con Edison cites *Monzano-Moreno v. Libqual Fence Co.*, No. 18 Civ. 161, 2021 WL 730663, at *18 (E.D.N.Y. Feb. 5, 2021), *R&R adopted sub nom. Monzano-Moreno v. Fence*, 2021 WL 688295 (E.D.N.Y. Feb. 23, 2021).  Con Edison further argues that the FIFA claims should be dismissed because the SAC alleges that Plaintiffs were hired by the

CESG Defendants or the Subcontractors, not by Con Edison, and hence "the SAC concedes that Con Edison was not Plaintiffs' 'hiring party.'" (Con Ed Br. at 19-20).

For their part, the CESG Defendants argue—though not until their reply brief—that, based on the SAC's allegations, the CESG Defendants acted merely as an "intermediary," and caselaw suggests that intermediaries are not "hiring parties" under FIFA. (CESG Rep. at 11). The CESG Defendants cite two cases, *Buttar v. Elite Limousine Plus, Inc.*, No. 651088/2019, 2022 WL 912142 (Sup. Ct. N.Y. Cty. Mar. 29, 2022) and *Iams v. 10X Management LLC*, No. 656266/2019, 2020 WL 3000551 (Sup. Ct. N.Y. Cty. May 29, 2020), both of which they read to hold that the relevant "complaints failed to plead that the defendants were a 'hiring party' under FIFA because the defendants' role was that of an intermediary between the freelancer and the true hiring party." (CESG Rep. at 11).

While Plaintiffs claim the SAC sufficiently alleges that both Con Edison and the CESG Defendants are "hiring parties" within the meaning of FIFA, Plaintiffs first argue that the Court "need not address Plaintiffs' FIFA claims, as they are pleaded in the alternative." (Pl. Br. at 45 (citing *Pierre v. City of New York*, No. 20 Civ. 5116 (ALC), 2021 WL 3887912, at *9 (S.D.N.Y. Aug. 31, 2021)). In *Pierre*, as here, the plaintiff asserted FLSA and NYLL claims and, in the alternative, claims under FIFA. After rejecting the defendants' arguments for dismissal of the FLSA and NYLL claims on the ground that plaintiff failed to adequately plead that they were joint employers, the court decided not to reach defendants' arguments for dismissal of the FIFA claims, reasoning: "Plaintiff has asserted his FIFA claims in

the alternative, and as Vendor Defendants appear to recognize, this claim can only

be sustained if his FLSA and NYLL claims are dismissed.  Because these claims

have been upheld, it is not necessary to reach Plaintiff's FIFA claim at this stage."

*Pierre*, 2021 WL 3887912, at *9.

The Court finds for prudential reasons that this is the appropriate course in

this case as well.  There is a relative dearth of case law interpreting the term

"hiring party" as used in FIFA.  In particular, the parties have not cited, and the

court has not found, cases addressing whether, as Con Edison argues, concepts of

joint employment are inapplicable in defining the scope of a "hiring party" for FIFA

purposes.[15]  Moreover, because the CESG Defendants did not raise their

"intermediary" argument until their reply brief, Plaintiffs have not had an

opportunity to respond to it.  *See Solomon v. Spring Corp.*, No. 19 Civ. 5272 (MKV),

2022 WL 889897, at *4 n.2 (S.D.N.Y. Mar. 25, 2022) ("[O]rdinarily the Court does

not consider matters addressed for the first time in a reply brief.").  As a result, the

Court does not have adequate briefing from the parties on these unsettled and

potentially important issues of New York law.

Moreover, Plaintiffs contend that so long as their FLSA and NYLL claims are

proceeding to discovery, "it is unnecessary and premature to render decision on

---

[15] Con Edison's reliance on *Monzano-Moreno* for its argument is misplaced.  In that case, after finding that the moving defendants could *not* be liable as employers or joint employers under the FLSA and NYLL, the court ruled that, "for similar reasons," they would not be a hiring party for FIFA purposes.  *Monzano-Moreno*, 2021 WL 730663, at *18.  In other words, the court found—as this Court did in addressing the FAC in the R&R—that the inadequacy of plaintiffs' claims that defendants were employers or joint employers was fatal to plaintiffs' claims that defendants were a hiring party under FIFA.  (*See* R&R at 78 (citing *Monzano-Moreno* for this point)).  *Monzano-Moreno* did not address and cannot be read to support the converse proposition: that *adequate* allegations of joint employer status are insufficient to plead hiring party status under FIFA.

their alternative claims under FIFA at this early stage of the proceedings." (Pl. Br. 45). Neither Con Edison nor the CESG Defendants took issue with this contention in their reply briefs, or suggested that discovery would be materially streamlined if Plaintiffs' FIFA claims are dismissed while the FLSA and NYLL claims proceed. The Court perceives no reason why this would be the case.

Accordingly, as in *Pierre*, the Court concludes that because Plaintiffs' FLSA and NYLL claims have been upheld, and their FIFA claims are pled only in the alternative, "it is not necessary to reach [Plaintiffs'] FIFA claim[s] at this stage." *Pierre*, 2021 WL 3887912, at *9; *see also LaSalle Bank Nat'l Assoc. v. Citicorp Real Estate, Inc.*, No. 02 Civ. 7868 (HB), 2003 WL 21671812, at *5 (S.D.N.Y. July 16, 2003) (finding it "not necessary to reach" claim pled in the alternative where party's main claim was upheld as sufficient on motion to dismiss).

### D. Plaintiffs Have Cognizable Claims for Prevailing Wages

As in the FAC, Plaintiffs allege Defendants were required to pay them "prevailing wages" for the work they performed as flaggers and spotters (SAC ¶¶ 301-21), asserting causes of action for breach of contract (Count 13, *id*. ¶¶ 800-08) and unjust enrichment (Count 14, *id*. ¶¶ 809-18). Con Edison and the CESG Defendants move to dismiss these claims as well. (Con Ed. Br. at 21-22; CESG Br. at 15-16). Plaintiffs not only oppose Defendants' motion (Pl. Br. at 41-45), but also request leave to file the TAC in order to plead an additional theory in support of their prevailing wages claims based on the First Department's recent decision in the *Santana* case. (Pl. Supp. at 1 & n.1).

### 1.  Legal Background

The applicable law relating to claims by workers in New York for prevailing wages is set forth in detail in the R&R.  (R&R at 45-50).  The Court summarizes here the salient legal principles pertinent to the issues presented by these motions.

Both New York State and New York City law require employers to pay prevailing wages in certain circumstances.  Section 220 of the New York Labor Law requires all "laborers, workmen or mechanics" employed on "public works" projects to be paid the "prevailing rate of wages."  NYLL § 220(3)(a).  Section 19-142 of the New York City Administrative mandates that before it may obtain a permit from the DOT "to use or open a street," the permittee must "agree that . . . the prevailing wage . . . as established by [Section 220] [is to be] paid to [the workers] employed" on the project.  N.Y. City Admin. Code § 19-142.

Plaintiffs do not assert claims for prevailing wages directly under either Section 220 or Admin. Code 19-142.  Section 220 "applies only to employees on public works projects," *Concerned Home Care Providers, Inc. v. Cuomo*, 783 F.3d 77, 86 (2d Cir. 2015), and as determined in the R&R, the projects that Plaintiffs worked on do not qualify as "public works" projects.  (R&R at 64-65).  In addition, workers are unable to sue under Admin. Code § 19-142 "because it vests its enforcement exclusively with the New York City Comptroller."  *Ross v. No Parking Today, Inc.*, 80 Misc. 3d 499, 502, 192 N.Y.S.3d 872, 874 (Sup. Ct. N.Y. Cnty. 2023), *aff'd in part & rev'd in part*, 224 A.D.3d 559, 203 N.Y.S.3d 608 (1st Dep't 2024).

However, it is well-settled under New York law that where a public or private sector contract calls for the payment of prevailing wages, and prevailing wages were not paid, workers may sue for breach of contract under a third-party beneficiary theory. *See Cox v. NAP Const. Co.*, 891 N.E.2d 271, 275, 10 N.Y.3d 592, 601 (2008) ("under long-settled rules plaintiffs would be third-party beneficiaries" of promises made by contractors to New York City agency to pay plaintiffs certain wages); *Santana v. San Mateo Const. Corp.*, 234 A.D.3d 562, 224 N.Y.S.3d 246, 247 (1st Dep't 2025) ("[W]orkers entitled to prevailing wages under [Admin. Code 19-142] may enforce any agreements entered into pursuant thereto as third-party beneficiaries thereof."); *Lewis v. Hallen Constr. Co.*, 193 A.D.3d 511, 512, 141 N.Y.S.3d 857, 858 (1st Dep't 2021) (affirming lower court decision allowing plaintiffs to proceed on breach of contract theory, "[w]hether or not the construction projects at issue were public works projects," where prevailing wage requirements "were applicable pursuant to both [Admin. Code § 19-142] and a contractual provision").

As was true of the FAC (R&R at 53), Plaintiffs' breach of contract claim in the SAC proceeds on such a third-party beneficiary theory. (*See* SAC ¶¶ 319, 804; Pl. Br. at 41-43).

## 2. The FAC and R&R

During the prior round of briefing, Plaintiffs pointed to several purported sources of their third-party beneficiary rights, including (i) the Con Edison Standard Terms and Conditions for Service Contracts incorporated into the BPAs between Con Edison and CESG (the "Service Contracts"); (ii) the Argani Contract

between CESG and Argani; (iii) Con Edison's Standard Terms and Conditions for Construction Contracts; (iv) the DOT Permits issued to Con Edison for the work Plaintiffs performed in New York City; (v) the prevailing wage agreements required to be made under Admin. Code § 19-142 to receive the DOT Permits; and (vi) purportedly similar agreements required to be made to receive permits for the work Plaintiffs performed in Westchester County.  (R&R at 53-54).  The Court found that Plaintiffs had not properly pled a breach of contract claim under the first four, and the last, of these theories.  (*See* R&R at 54-65, 65-67, 67-69, 69-73, 74-75).

With respect to the Service Contracts and the Argani Contract, Plaintiffs relied on "Compliance with Laws" provisions in the agreements obligating the contractor to "comply with all federal, state and local laws" applicable to the work performed under the contract.  (R&R at 55).  Those agreements do not, however, contain language expressly requiring payment of prevailing wages or compliance with Admin. Code § 19-142, and Con Edison argued this was fatal to Plaintiffs' claim.  Based on recent authority in this Court and the New York state courts, the R&R expressed disagreement with Con Edison's position, stating that the Court was "inclined to agree with Plaintiffs that the Compliance with Laws provision creates enforceable third-party beneficiary rights to prevailing wages by encompassing Admin. Code § 19-142."  (R&R at 56).[16]

---

[16] In support, the Court cited *Lewis*, 141 N.Y.S.3d at 858, *Machuca v. Collins Bldg. Servs., Inc.*, 206 N.Y.S.3d 515 (Table), 2024 WL 1164633, at *2 (Sup. Ct. N.Y. Cnty. Mar. 13, 2024), and *Ballast v. Workforce7 Inc.*, No. 20 Civ. 3812 (ER), 2024 WL 307966, at *8 (S.D.N.Y. Jan. 26, 2024).  (R&R at 58).  After the R&R, the New York County Supreme Court, in *Richardson*, also flatly "reject[ed] [Con Edison and CESG's] argument that plaintiffs cannot recover prevailing wages because the BPAs do not contain provisions expressly requiring the payment of such wages," finding that the Compliance

64

Nevertheless, the Court ultimately rejected Plaintiffs' argument because of disclaimers in the Service Contracts and the Argani Contract. These disclaimers state that (with certain exceptions not helpful to Plaintiffs' theory) "[t]here are no other third-party beneficiaries" of the agreements. (R&R at 62). Based on case law finding that such disclaimers foreclose a worker's claim for prevailing wages under a third-party beneficiary theory, the Court found that these disclaimers barred Plaintiffs' breach of contract claim. (*Id*. at 62-63). Plaintiffs argued that the disclaimers were void as against public policy, relying on *Wroble v. Shaw Evtl. & Infrastructure Eng'g of N.Y., P.C.*, 166 A.D.3d 520, 521, 88 N.Y.S.3d 21, 23 (1st Dep't 2018), which invalidated a disclaimer in a "public works" contract because it infringed upon the public policy in NYLL Section 220. Plaintiffs claimed that the contracts pursuant to which they performed their work as flaggers and spotters were "public works" contracts within the meaning of Section 220. (R&R at 63). The Court, however, rejected that claim, and thus rejected Plaintiffs' argument that the disclaimers in the Service Contracts and the Argani Contract were void as against public policy. (*Id*. at 65). In so doing, the R&R cited the lower court's decision in *Santana* for the proposition that "the public policy that led the First Department to invalidate the third-party beneficiary disclaimer in *Wroble* is inapplicable here." (*Id*. at 65 (citing *Santana v. San Mateo Constr. Corp.*, No. 650029/2022, 2023 WL 4106949, at *3 (Sup. Ct. N.Y. Cnty. June 21, 2023)).

---

with Laws provisions of the Service Contracts "is sufficient to require the payment of statutorily-mandated wages." *Richardson*, 2024 WL 4467705, at *10.

However, the Court proceeded to sustain the legal sufficiency of Plaintiffs'
theory that Plaintiffs were third-party beneficiaries of agreements that Con Edison
was required under Admin. Code § 19-142 to enter into with the City.  (R&R at 71).
As the Court noted, Admin. Code § 19142 expressly requires the permittee "to
agree" that prevailing wages shall be paid and states: "No permit shall be issued
until such agreement shall have been entered into with the [DOT]."
(*Id*.).  Moreover, the DOT Permits for the New York City projects at issue similarly
state that the permittee "shall be required, before such permit may be issued, to
agree" that prevailing wages shall be paid, which, as the R&R noted, "clearly
impl[ies] the existence of an agreement separate from and antecedent to the permit
itself."  (*Id*.).  And in February 2024, the First Department had upheld a
substantially identical breach of contract claim for prevailing wages on this theory.
*See Ross v. No Parking Today*, 203 N.Y.S.3d at 609 (finding that plaintiffs, who
were flaggers at Con Edison jobsites, sufficiently alleged a breach of contract claim
as third-party beneficiaries of "agreements required to be made" between Con
Edison and the City pursuant to Admin. Code § 19-142).

The R&R held that, as in *Ross*, "Plaintiffs plausibly allege that, based on
Admin. Code § 19-142, Con Edison entered into agreements with the City requiring
payment of prevailing wages in order to obtain the DOT permits."  (R&R at 69).  In
support of this holding, the Court cited Paragraphs 146 and 263 of the FAC, which
alleged, upon information and belief, that work performed by Plaintiffs was
pursuant to agreements between Con Edison and the City that required payment of

66

prevailing wages. (*Id.* at 69-70). The Court also rejected Con Edison's argument that *Ross* was not controlling due to the different pleading standards in federal and state court, finding that the FAC's allegations satisfied the *Iqbal/Twombly* plausibility standard. (*Id.* at 70-71). The Court thus concluded that "Plaintiffs have adequately alleged a breach of contract claim against Con Edison and the CESG Defendants as third-party beneficiaries of agreements required to be made under Admin. Code § 19-142 to receive the DOT permits." (*Id.* at 73).[17] The Court also denied the motions to dismiss the FAC's unjust enrichment claim, which largely mirrored the allegations underlying the breach of contract claim. (*Id.* at 75).

### 3. Defendants' Motions to Dismiss the SAC's Prevailing Wage Claims

Con Edison moves to dismiss the prevailing wage claims on the ground that "in amending their complaint, Plaintiffs did not plead [the] potential theory of recovery" upheld in the R&R, *i.e.*, that Con Edison had entered into agreements with the City of which Plaintiffs are third-party beneficiaries. (Con Ed Br. at 20-22). The CESG Defendants move to dismiss the prevailing wage claims against them on the ground that Plaintiffs allege only that "Con Edison, not the CESG Defendants, entered into agreements with the City." (CESG Br. at 15-16). The Court considers each argument for dismissal in turn.

---

[17] Because Plaintiffs did not allege a basis to believe that the permits for jobsites in Westchester County required Con Edison to enter into similar agreements, the Court found that Plaintiffs had not plausibly alleged a contract claim for work in Westchester County. (*Id.* at 74-75).

### a. Con Edison's Argument for Dismissal

Con Edison's argument for dismissal of the SAC's prevailing wage claims

lacks merit.  The relevant factual allegations in Paragraphs 146 and 263 of the

FAC, upon which the R&R relied in finding Plaintiffs had adequately pled these

claims, are repeated in Paragraphs 144 and 314 of the SAC:

> **FAC ¶ 146**: "Upon information and belief, the work Employees
> perform, at Defendants' direction and under Defendants' control, is
> pursuant to contracts and/or permits between Con Edison and the City
> of New York, State of New York, and/or Westchester County."

> **SAC ¶ 144**: "Upon information and belief, the work Employees
> perform, at Con Edison's, CESG Defendants', and the Subcontractors'
> direction and under their control, is pursuant to contracts and/or
> permits between Con Edison and the City of New York and/or the
> State of New York."

> **FAC ¶ 263**: "Further, upon information and belief, the Permits and/or
> other agreements between Con Edison and New York State, New York
> City, and/or Westchester County require payment of prevailing wages,
> either specifically or through a general requirement to comply with all
> applicable laws."

> **SAC ¶ 314**: "Further, upon information and belief, the Permits and/or
> other agreements between Con Edison and New York State, New York
> City, and/or DOT require payment of prevailing wages, either
> specifically pursuant to NYC Admin. Code § 19-142 or through a
> general requirement to comply with all applicable laws."

As is readily apparent, although the SAC, in accordance with the R&R, drops the

FAC's allegations concerning agreements between Con Edison and Westchester

County, the SAC's allegations concerning the existence of agreements between Con

Edison and the City are in substance identical to those in the FAC.

Nonetheless, Con Edison argues that the SAC is defective because the word

"Contracts" as defined by the SAC and used in the relevant causes of action

themselves (Counts 13 and 14) does not encompass Con Edison's alleged agreements with the City.  (Con Ed Br. at 20-21; *see, e.g.*, SAC ¶¶ 801-02 (alleging that "CESG Defendants and/or New York State and/or New York City entered into the Contracts with Con Edison to provide flagging and spotting services" and that "pursuant to the Contracts, Defendants were required to pay Plaintiffs and the class the local prevailing wage rate")).  Much earlier in the SAC, Con Edison notes, "Contracts" is defined as the BPAs that CESG entered into with Con Edison.  (*Id.* at 21 (citing SAC ¶ 302)).  Con Edison argues that the term "Contracts" when used in Counts 13 and 14 means the same thing and hence excludes alleged agreements with the City.  (*Id.*).  According to Con Edison, it was incumbent upon Plaintiffs, when drafting the SAC, to make clear that the term "Contracts" includes the agreements between Con Edison and the City, and because Plaintiffs failed to do so, the SAC's breach of contract and unjust enrichment claims are "premised solely on theories the Court has already rejected."  (*Id.*).

Notably, as Plaintiffs point out (Pl. Br. at 42), Con Edison did not make this argument when moving to dismiss the FAC, even though the FAC likewise defined the term "Contracts" to refer solely to agreements between CE Solutions and Con Edison (*compare* FAC ¶ 250 *with* SAC ¶ 302) and likewise used the capitalized word "Contracts" in Counts 13 and 14 (*compare* FAC ¶¶ 730-33, 735, 739-42 *with* SAC ¶¶ 801-04, 806, 810-13).  Plaintiffs also correctly point out that the R&R did not direct Plaintiffs to revise the wording of Counts 13 and 14 in order for them to adequately allege a breach of contract claim as third-party beneficiaries of the agreements

between Con Edison and the City (Pl. Br. at 42); to the contrary, the R&R ruled that "Plaintiffs *have* adequately alleged a breach of contract claim" under this theory. (R&R at 73 (emphasis added)).

In any event, Plaintiffs *did* make a relevant revision in Counts 13 and 14 of the SAC.  Whereas Paragraphs 730 and 739 of the FAC alleged that "CE Solutions entered into the Contracts with Con Edison to provide flagging and spotting services," Paragraphs 801 and 810 of the SAC allege that "CESG Defendants and/or New York State and/or *New York City entered into the Contracts with Con Edison* to provide flagging and spotting services."  (Emphasis added).  Thus, the corresponding paragraphs of the SAC now expressly refer to contracts between Con Edison and New York City.  Con Edison would nonetheless read those paragraphs as referring *only* to "Contracts" between Con Edison and the CESG Defendants, because that is how "Contracts" was defined some 500 paragraphs earlier.  Such a reading is not only strained and hyper-technical, but nonsensical.  It would mean that when referring to "Contracts" that "New York City entered into . . . with Con Edison," Paragraphs 801 and 810 refer to the "Contracts" between the CESG Defendants and Con Edison—to which the City indisputably is not a party.

In essence, Con Edison asks the Court to dismiss Plaintiffs' claims because Plaintiffs upper-cased rather than lower-cased the word "Contracts" in the allegations under Counts 13 and 14.  The Court declines to penalize Plaintiffs in this manner.  On a motion to dismiss, "a complaint must be read most favorably to the plaintiffs," not the defendants; such a motion "is not designed to be a game of

'gotcha.'" *In re Refco Sec. Litig.*, 779 F. Supp. 2d 372, 377 (S.D.N.Y. 2011); *see also* Fed. R. Civ. P. 8(f) ("Pleadings must be construed so as to do justice.").

Con Edison offers no other argument in support of dismissal of these claims, and since the time of the R&R, the First Department has reaffirmed its holding in *Ross* that workers entitled to prevailing wages under Admin. Code § 19-142 may sue as third party beneficiaries "based on an alleged underlying agreement between [] Consolidated Edison [] and the City of New York pursuant to [Admin. Code] § 19-142." *Santana*, 225 N.Y.S.3d at 247. Accordingly, the Court finds that the SAC, like the FAC, adequately pleads claims against Con Edison for breach of contract and unjust enrichment based on the allegation that Con Edison entered into contracts with the City or the DOT requiring the payment of prevailing wages.[18]

### b.   CESG Defendants' Argument for Dismissal

The CESG Defendants' argument for dismissal of Plaintiffs' prevailing wage claims is more substantial. The CESG Defendants contend that Plaintiffs' claim to be third-party beneficiaries of agreements with the City "is not viable against the CESG Defendants" because the SAC "does not allege that the CESG Defendants

---

[18] Plaintiffs' Opposition offered to amend the SAC to rectify the wording issue seized upon by Con Edison. (Pl. Br. at 43). With their supplemental submission, Plaintiffs provided the proposed TAC that includes proposed amendments to this effect. (Pl. Supp. Ex. 1). While the Court would not otherwise require an amendment, since Plaintiffs are being given leave to file the TAC anyway (*see* Section D.4, *infra*), the Court grants Plaintiffs leave to include the amendments relating to the "Contracts" issue as well. Con Edison opposes these amendments, claiming they are "prejudicial," but their argument consists of the same claim, rejected above, that the SAC does not properly plead a prevailing wage claim against Con Edison to begin with. (Con Ed Supp. at 4-5). In any event, there is no conceivable prejudice to Con Edison from these amendments since this case still has not progressed into discovery.

were ever permittees who had agreements with the City mandating payment of prevailing wages as required by Admin. Code § 19-142." (CESG Br. at 15-16).

"It 'is black letter law that non-parties [to a contract] ordinarily cannot be held liable for a breach of contract.'" *Wiederman v. Spark Energy, Inc.*, No. 19 Civ. 4564 (PGG), 2020 WL 1862319, at *5 (S.D.N.Y. Apr. 14, 2020) (quoting *Rennaker Co. Consulting, Inc. v. TLM Grp.*, LLC, No. 16 Civ. 3787 (DAB), 2017 WL 2304302, at *2 (S.D.N.Y. May 18, 2017)) (alteration in original); *see Ixe Banco, S.A. v. MBNA Am. Bank, N.A.*, No. 07 Civ. 432 (LAP), 2008 WL 650403, at *12 (S.D.N.Y. Mar. 7, 2008) ("Non-parties cannot be liable for a breach of contract under New York law."). While there are "limited exceptions to this rule," *Wiederman*, 2020 WL 1862319, at *5, the SAC does not plead any facts suggesting any such exception applies here, nor does Plaintiffs' Opposition argue that any exception applies. Indeed, Plaintiffs' Opposition offers no substantive response to the CESG Defendants' argument that they cannot be held liable for breach of contract on the basis of Con Edison's agreements with the City.

Instead, Plaintiffs counter with a technical argument of their own. Plaintiffs correctly note that when the R&R found that Plaintiffs had sufficiently pled a breach of contract claim as third-party beneficiaries of alleged agreements between Con Edison and the City, it sustained Plaintiffs' claim as against both Con Edison and the CESG Defendants. (Pl. Br. at 43-44; *see* R&R at 73 n.35). As the R&R explained, that was because—even though Plaintiffs alleged that Con Edison, not the CESG Defendants, entered into those agreements—"the CESG Defendants do

not raise this as a basis to dismiss the claim as it applies to them" but "simply 'join in' Con Edison's arguments, which the Court has rejected." (*Id.*). Now, Plaintiffs argue, it is too late for the CESG Defendants to make this objection, as Fed. R. Civ. P. 12(g)(2) precludes them from doing so. (Pl. Br. at 44-45).

The Court disagrees. Rule 12(g)(2) provides: "Except as provided in Rule 12(h)(2) or (3), a party that makes a motion under this rule must not make another motion under this rule raising a defense or objection that was available to the party but omitted from its earlier motion." Fed. R. Civ. P. 12(g)(2). Rule 12(h)(2), in turn, provides that "[f]ailure to state a claim" may be raised in any pleading allowed under Rule 7(a), by motion under Rule 12(c), or at trial. Fed. R. Civ. P. 12(h)(2). Plaintiffs argue that under Rule 12(g)(2), "where 'a defense or objection . . . was available to the party' its omission from an earlier Rule 12(b) motion constitutes waiver." (Pl. Br. at 44 (citing *Falcon v. City Univ. of New York*, No. 15 Civ. 3421 (ADS) (ARL), 2016 WL 3920223, at *14 (E.D.N.Y. July 15, 2016)). Thus, according to Plaintiffs, because the CESG Defendants could have raised their argument in connection with the prior motion to dismiss, they are barred from raising it in a "successive motion[] to dismiss." (*Id*. at 43-45 (citing *Falcon*, 2016 WL 3920223, at *14, and *Ogunkoya v. Cnty. of Monroe*, No. 15 Civ. 6119 (KAM), 2020 WL 3791850, at *4 (E.D.N.Y. July 7, 2020)).

Courts in this District, however, have rejected Plaintiffs' rigid reading of Rule 12(g)(2). *See Ballast*, 2024 WL 307966, at *5 ("Courts in this District have . . . held that successive Rule 12(b)(6) motions are not procedurally improper."); *see also*

*Renois v. WVMF Fund., LLC*, No. 20 Civ. 9281 (LTS) (VF), 2025 WL 1744902, at *3-4 (S.D.N.Y. June 24, 2025) (following *Ballast* and considering arguments made in motion to dismiss amended complaint that could have been but were not raised in defendants' previous motion to dismiss). As Judge Ramos explained in *Ballast*, "'[a]lthough Rule 12 bars successive motions premised on the differing defenses listed in Fed. R. Civ. P. Rule 12(b)(2)-(5)[,]' it does not necessarily prevent additional 12(b)(6) motions containing 'differing arguments.'" 2024 WL 307966, at *5 (quoting *Indig v. Vill. of Pomona*, No. 18 Civ. 10204 (PMH), 2021 WL 3773653, at *3 (S.D.N.Y. Aug. 24, 2021)); *see also United States ex rel. Kolchinsky v. Moody's Corp.*, 238 F. Supp. 3d 550, 555 (S.D.N.Y. 2017) ("Rule 12 provides that while procedural defenses are waived if omitted from a pleading or pre-answer motion, a defendant cannot waive the more fundamental 12(b)(6) defense—that the plaintiff has no legal right to recovery in the first place." (citation omitted)). Thus, although Judge Ramos acknowledged the existence of contrary authority in cases such as *Falcon* and *Ogunkoya*—the same cases upon which Plaintiffs rely here—he declined to follow them because "the greater weight of case law in this District suggests that failure-to-state-a-claim arguments are not waivable and may be brought in a successive Rule 12 motion." *Ballast*, 2024 WL 307966, at *5.

Ultimately, the Court need not take a position on the extent to which Rule 12(g)(2) does or does not bar arguments raised in a successive Rule 12(b)(6) motions to dismiss. Undoubtedly there are cases where preclusion would be appropriate and would further the purpose of Rule 12(g)(2) to prevent dilatory motion practice. This

case is not one of them.  The CESG Defendants are not raising a completely new ground for dismissal; they previously moved against Plaintiffs' prevailing wage claims in the FAC.  Even if the particular argument they wish to present now were deemed procedurally barred by Rule 12(g)(2), they could re-raise the argument on a Rule 12(c) motion for judgment on the pleadings, as the text of Rule 12(h)(2)(A) makes clear.  *See Falcon*, 2016 WL 3920223, at *14 (acknowledging this possibility).  But "[b]arring Defendants from making the[ir] arguments in [a successive] 12(b)(6) motion and instead requiring that Defendants 're-raise[] identical arguments as a 12(c) motion after answering the SAC' would undermine, not promote, the purpose of Rule 12(g) by creating inefficient and dilatory motion practice."  *Renois*, 2025 WL 1744902, at *4 (quoting *Ballast*, 2024 WL 307966, at *5).  Thus, "addressing the merits now will spare the parties (and the Court) another round of likely repetitive briefing."  *Edmondson v. Raniere*, No. 20 Civ. 485 (EK) (CLP), 2025 WL 1755843, at *2 (E.D.N.Y. June 25, 2025) (reaching merits of argument while declining to take a position on the unsettled issue of whether Rule 12 permits successive motions for failure to state a claim).

On the merits, the CESG Defendants are correct: Plaintiffs may not assert a third-party beneficiary claim for breach of contract against an entity that is not a party to the contract that was allegedly breached.  As noted, Plaintiffs offer no substantive argument to the contrary—and in any event, they will be able to pursue a third-party beneficiary breach of contract claim against the CESG Defendants on the alternative theory discussed below.  Accordingly, the Court concludes that to the

75

extent Plaintiffs' prevailing wage claims against the CESG Defendants are based on the alleged agreements between Con Edison and the City, those claims should be dismissed.[19]

### 4. Plaintiffs' Motion to Amend Their Prevailing Wage Claims

In their supplemental submission dated March 4, 2025, Plaintiffs request that the Court reconsider the R&R's ruling that Plaintiffs had not pled a viable prevailing wage claim as third-party beneficiaries of the Service Contracts and the Argani Contract. (Pl. Supp. at 1). Plaintiffs do so on the basis of the First Department's January 2025 decision in *Santana v. San Mateo Constr. Corp.*, *supra*, which they contend makes clear that the disclaimers in the Service Contracts and the Argani Contract, upon which the R&R relied in rejecting Plaintiffs' theory, are void as against public policy. (*Id.* at 3-4). Should the Court reconsider its ruling, Plaintiffs propose filing a TAC adding allegations to support this theory of relief. (*Id.* at 1 n.1 & Ex. 1 (proposed TAC containing allegations in ¶¶ 302-03, 312-18, 802-10 and 815-21 concerning the Service Contracts and the Argani Contract)).

Both the CESG Defendants and Con Edison oppose this request, arguing that Plaintiffs have not satisfied the "strict" standard for reconsideration. (CESG Supp. at 2-3; Con Ed Supp. at 2). In addition, Con Edison argues that Plaintiffs' proposed amendment would be futile as to Con Edison because the relevant contracts do not obligate Con Edison to pay prevailing wages. (Con Ed Supp. at 3-4).

---

[19] In their Opposition, Plaintiffs request that, should the Court agree with the CESG Defendants on this point, Plaintiffs "should be allowed to file a Third Amended Complaint to rectify this issue." (Pl. Br. at 45). Plaintiffs do not, however, suggest *how* they could rectify this issue. The Court thus recommends denial of Plaintiffs' request for leave to amend in this respect.

### a. The First Department's Decision in *Santana*

The Court begins by considering the First Department's decision in *Santana*.
The plaintiff in *Santana*, a putative class action, was a flagger employed by another
of Con Edison's traffic control flagging service vendors, San Mateo Construction
Corp. ("San Mateo").  *Santana v. San Mateo Constr. Corp.*, No. 650029/2022, 2023
WL 4106949, at *1 (Sup. Ct. N.Y. Cnty. June 21, 2023).  Like the Service Contracts
here, Con Edison's agreements with San Mateo did "not contain any provisions
requiring the payment of prevailing wages," but did contain provisions requiring
San Mateo to "comply with all federal, state and local laws" as well as provisions
"disclaim[ing] any third-party beneficiary status to Plaintiff and San Mateo's other
workers."[20]  The plaintiff sought to enforce his alleged right to prevailing wages
through these agreements, arguing that the disclaimer was void as against public
policy.  The Supreme Court, New York County rejected plaintiff's public policy
argument because the contracts did not involve "public works when prevailing
wages are required by statute," enforced the disclaimer, and dismissed plaintiff's
claim.  *Id.* at *3.

On appeal, the First Department reversed this ruling.  *Santana*, 225
N.Y.S.3d at 248.  The First Department reasoned as follows:

> [San Mateo] agreed in the subject flagging contracts to comply with all
> applicable laws, which necessarily includes Administrative Code § 19-
> 142, and the putative plaintiff class members are third-party
> beneficiaries of that agreement. The contractual disclaimers of third-
> party beneficiary rights are void as against public policy (*see Wroble*,

---

[20] Memorandum of Law in Support of Defendant Consolidated Edison Company of New York, Inc.'s
Motion to Dismiss, *Santana v. San Mateo Constr. Corp.*, No. 650029/2022, 2022 WL 22925310 (Sup.
Ct. N.Y. Cnty. filed May 2, 2022).

> 166 A.D.3d at 521, 88 N.Y.S.3d 21 . . .).  It does not matter, for these
> purposes, whether public works projects were involved because the
> putative plaintiff class would have a statutory right to prevailing
> wages under Administrative Code § 19-142 even on private projects,
> the forfeiture of which would be against public policy.

*Id*. (citations omitted in part).

 *Santana* has two highly consequential implications for the R&R's analysis of

whether the Service Contracts and the Argani Contract supported the FAC's breach

of contract claim for prevailing wages.  First, *Santana* confirms that, contrary to

Con Edison's argument on the earlier motion to dismiss, the absence of an explicit

reference to prevailing wages in the Service Contracts and the Argani Contracts is

not fatal to Plaintiffs' claims.  The same was true of the San Mateo agreements in

*Santana* and the First Department held nonetheless that the general compliance-

with-laws provision "necessarily includes" Admin. Code § 19-142.  *Santana*, 225

N.Y.S.3d at 248.  Hence, the First Department has endorsed the view expressed

(albeit without finality) in the R&R that, at least at the motion to dismiss stage, the

contracts at issue here impose an obligation to pay prevailing wages.[21]

 Second, *Santana* shows that, contrary to the R&R's conclusion, the

disclaimers in the Service Contracts and the Argani Contract are indeed

unenforceable on public policy grounds—albeit not for the reason argued by

Plaintiffs in connection with the prior motion to dismiss.  Although Plaintiffs

---

[21] *Santana*'s conclusion in this regard cannot be viewed as *dicta*.  San Mateo specifically argued on
appeal that the plaintiff's claim should fail because the contracts in question did not specify that
prevailing wages must be paid to the flaggers.  Brief for Defendant-Respondent San Mateo
Construction Corp., *Santana v. San Mateo Constr. Corp.*, No. 2023-03571 (1st Dep't filed July 25,
2024).  Necessarily the First Department rejected that argument.

argued that the disclaimers were void on public policy grounds because the Service Contracts and the Argani Contract involved "public works" projects, *Santana* squarely holds that "[i]t does not matter . . . whether public works projects were involved" or not. *Id*. The disclaimers of third-party beneficiary rights are still "void as against public policy" because they violate the public policy set forth in Admin. Code § 19-142 that prevailing wages should be paid. *Id*. In substance, *Santana* extended the logic of the First Department's prior holding in *Wroble*, 88 N.Y.S.3d at 23—which invalidated a disclaimer related to a "public works" project as violative of the public policy in Section 220 of the Labor Law—to invalidate a disclaimer related to a private sector project as violative of the public policy in Admin. Code § 19-142.

It is plain that, had *Santana* been decided prior to the R&R, this Court would have reached a different conclusion as to the Plaintiffs' theory that they were third-party beneficiaries of the Service Contracts and the Argani Contract. Indeed, in rejecting that theory, the R&R explicitly relied on the lower court's decision in *Santana* that has now been reversed by the First Department. (*See* R&R at 65, 69). In light of the First Department's ruling, the Court would now be bound to accept Plaintiffs' theory of recovery. *See Scholl v. Compass Grp. USA, Inc.*, No. 19 Civ. 6685 (MKV), 2022 WL 2716950, at *2 (S.D.N.Y. July 13, 2022) ("This Court is 'bound' to 'apply the law as interpreted by New York's intermediate appellate court[,]' unless there is strong reason to believe the New York Court of Appeals, which has not ruled on the issue, would reach a different conclusion." (quoting *Pahuta v. Massey-Ferguson*, 170 F.3d 125, 134 (2d Cir. 1999))).

### b. Whether Reconsideration Is Warranted

It is well settled that "an intervening change in controlling law" may justify reconsideration of a prior ruling. *See, e.g.*, *Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir. 1992) ("The major grounds justifying reconsideration are an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." (cleaned up)); *Kirk v. Heppt*, No. 05 Civ. 9977, 2009 WL 2870167, at *13 (S.D.N.Y. Sept. 3, 2009) (recognizing that "reconsideration is authorized under certain circumstances, including 'an intervening change of controlling law'" (quoting *Virgin Atl. Airways*, 956 F.2d at 1255)). While the change in law "must do more than merely cast doubt on the previous court order," reconsideration will be warranted where the change in law "is beyond any question inconsistent with [the] earlier decision." *Poletti v. Pepsi-Cola Bottling Co. of N.Y., Inc.*, No. 21 Civ. 7603 (VSB), 2025 WL 41609, at *2 (S.D.N.Y. Jan. 7, 2025) (cleaned up).

Here, the First Department's decision in *Santana* constitutes an intervening change in controlling law. *Santana* was decided after Judge Rochon's June 24, 2024 Order adopting the R&R on Defendants' first motions to dismiss, so it is "intervening." It is the first decision to hold that a disclaimer of third-party beneficiary status in a contract requiring payment of prevailing pages may be void as against the public policy in Admin. Code § 19-142—reversing the lower court's contrary conclusion, which had been cited in the R&R—so it is a "change" in law,

and one plainly inconsistent with the R&R's prior conclusion.[22]  And it is "controlling," as the enforceability of the disclaimer is an issue of New York law and *Santana* is a decision by a New York intermediate appellate court that, as noted above, is ordinarily binding on this Court.  *See, e.g.*, *Kirk*, 2009 WL 2870167, at *13 (reconsidering prior ruling on motion to dismiss on issue of New York law "[t]o the extent the Court's previous articulation of the law was made prior to the First Department's decision" in question).

Defendants contend that reconsideration should be denied because Plaintiffs could have raised, but did not raise, the Admin. Code § 19-142 public policy argument in opposing Defendants' motions to dismiss the FAC.  (CESG Supp. at 3-4; Con Ed Supp. at 2).  It is true that, although Plaintiffs did raise *a* public policy objection to the enforceability of the disclaimers on the prior motions to dismiss, they did not raise *the* specific public policy argument subsequently embraced by the First Department in *Santana*.  (*See* Dkt. No. 280 at 1; Pl. Supp. at 3 n.3).  However, at that time, there was no case specifically supporting this subsequent public policy argument and the only case on point, the Supreme Court's decision in *Santana*, had rejected the argument.  Moreover, Defendants do not and could not claim any prejudice from Plaintiffs' previous failure to raise this argument.  This case is still at the pleadings stage and there has been no discovery as of yet.  Nor do Defendants

---

[22] The CESG Defendants argue that the holding in *Santana* is "not inconsistent" with the R&R's ruling that, because the contracts in question were not "public works" contracts, they were not void as against the public policy in Section 220.  (CESG Supp. at 3).  That is true, but of course misses the larger point: The R&R concluded that the disclaimers were enforceable (R&R at 65), and the First Department has now told us that they are not.

offer any persuasive reason why the Court should preclude Plaintiffs from pursing an avenue of recovery that New York law now gives them the right to pursue.[23]

The law of the case doctrine, which animates the strict standard for reconsideration, "is admittedly discretionary and does not limit a court's power to reconsider its own decisions prior to final judgment." *Virgin Atl. Airways*, 95 F.2d at 1255; *see also Alfadda v. Fenn*, 966 F. Supp. 1317, 1333 (S.D.N.Y. 1997) ("'The law of the case is a discretionary doctrine that need not be applied when no prejudice results from its omission.'" (quoting *First Nat'l Bank of Hollywood v. Am. Foam Rubber Corp.*, 530 F.2d 450, 453 n.3 (2d Cir. 1976))). The Court easily concludes in the circumstances here that the proper exercise of its discretion is to permit Plaintiffs to proceed with prevailing wage claims based on the Service Contracts and Argani Contract, notwithstanding the R&R's prior conclusion.

Accordingly, the undersigned finds, in view of the First Department's decision in *Santana*, that reconsideration should be granted, that Plaintiffs have a plausible claim for prevailing wages as third-party beneficiaries of the Service Contracts and Argani Contract despite the disclaimers in those agreements, and that Plaintiffs should be granted leave to file a TAC asserting this theory of recovery.

---

[23] The cases Defendants cite in support of their argument are inapposite. (*See* CESG Supp. at 3; Con Ed Supp. at 2). For example, in *Poletti*, the court found that an intervening U.S. Supreme Court decision "did not overrule any controlling law on which the Opinion was based; nor does it have any other impact on the holding of the opinion." *Poletti*, 2025 WL 41609, at *4. Similarly, in *United States v. Yudong Zhu*, 41 F. Supp. 3d 341 (S.D.N.Y. 2014), the court denied defendant's motion for reconsideration because he "failed to identify an intervening change in controlling law." *Id.* at 343. And in *Analytical Surveys v. Tonga Partners LP*, 684 F.3d 36 (2d Cir. 2012), the new decision invoked by the party seeking reconsideration "came down more than five months *before*" the district court's decision. *Id.* at 52 (emphasis in original).

### c. Con Edison's Futility Argument

The "Compliance with Laws" provisions of the Service Contracts between CESG and Con Edison are one-sided; they require the "[c]ontractor," which is CESG, to "comply with all [applicable] federal, state and local laws." (SAC Ex. A at 23, at § 26; *see* R&R at 13). The Service Contracts impose no corresponding obligation on Con Edison to comply with these laws. For this reason, Con Edison argues that "the *Santana* decision offers no basis for Plaintiffs to assert a claim *against Con Edison* based on the 'Compliance with Laws' provisions of its contracts with CE Solutions." (Con Ed Supp. at 4; emphasis in original; *see also* Dkt. No. 279 at 2).

Plaintiffs contend that Con Edison's argument is misguided because the SAC alleges a "joint employment theory of liability" against Con Edison and that under this theory Con Edison may be held "jointly liable for Plaintiffs' prevailing wage claims." (Pl. Supp. at 4). Con Edison responds by arguing that, while the joint employer doctrine may be used to assess joint liability under statutes such as the FLSA and NYLL, "New York's courts do not recognize a 'joint employer' theory of common law or contract liability." (Con Ed Supp. at 4). As such, Con Edison argues that it "cannot be held liable under an employment-related 'joint employer' theory based upon [CESG's] alleged breach of the 'Compliance with Laws' provision of its contracts with Con Edison." (*Id.*).

The cases Con Edison cites, however, are not so definitive. For example, Con Edison cites a footnote in *Murray v. Miner*, 74 F.3d 402 (2d Cir. 1996), stating only

83

that "[i]t is not clear whether the single employer doctrine applies to common law claims of employees" and that the court "need not address that issue" in light of its disposition of the case. *Id.* at 404 n.2.[24] Further, the *Murray* court cited *Owens v. Am. Nat'l Red Cross*, 673 F. Supp. 1156 (D. Conn. 1987), in which then-District Judge Cabranes *applied* the single employer test to determine whether a national organization, which was not a party to the employment contract at issue, could be held liable for an alleged breach of contract by its local chapter. *Id.* at 1159-61 (applying Connecticut law); *see also Jackam v. Hosp. Corp. of Am. Mideast, Ltd.*, 800 F.2d 1577, 1581 (11th Cir. 1986) (holding that parent corporation could be liable for subsidiary's breach of employment contract under a joint employer theory).

On the other hand, Plaintiffs cite no cases applying a joint employer theory in the context of a contract or common law claim. They cite only *Arculeo v. On-Site Sales & Mktg., LLC*, 425 F.3d 193, 198 (2d Cir. 2005), for the proposition that "[liability] may [be] imposed . . . on the theory that this other entity is the employee's joint employer." (Pl. Supp. at 4.) Plaintiffs' ellipsis, however, omits that the quote from *Arculeo* spoke only of "liability for *violations of employment law*," as the case addressed the question of "whether employees of different entities may be aggregated under either the single employer or the joint employer doctrines to satisfy *Title VII's fifteen-employee threshold*." *Arculeo*, 425 F.3d at 198 (emphasis

---

[24] Con Edison also cites district court decisions that, as described by Con Edison, "question[ed]" and "express[ed] doubt," based on *Murray*, as to whether an employee can invoke the joint employer doctrine to support a breach of contract or common law claim. (Con Ed Supp. at 4 (citing *Horizon Plastics, Inc. v. Constance*, No. 00 Civ. 6458 (RCC), 2002 WL 398668, at *3 n.4 (S.D.N.Y. Mar. 13, 2002), and *Carner v. MGS-576 5th Ave. Inc.*, 992 F. Supp. 340, 350-51 n.10 (S.D.N.Y. 1998)).

added).  Moreover, the Court's own research discloses New York decisions rejecting attempts by employees to impose contractual liability on non-parties based on a joint employer theory.  *See Pittman v. Yantiss*, No. 151274/2020, 2022 WL 2238886, at *24 (Sup. Ct. N.Y. Cnty. June 15, 2022) (dismissing employee's breach of contract claim, as she "has 'failed to present the court with any authority finding that a claim for breach of contract can be stated against a non-signatory, non-party to an employment contract under a joint employer theory'" (quoting *Naderi v. North Shore-Long Island Jewish Health System*, No. 158028/13, 2014 WL 840417, at *3 (Sup. Ct. N.Y. Cnty. Feb. 28, 2014))).

Because the issue has not been fully briefed in the parties' letter submissions, the Court is reluctant to render a definitive ruling at this time as to whether Con Edison can be held liable for prevailing wages on a breach of contract theory based on the Service Contracts and the Argani Contract.  Unlike the cases discussed above, while Con Edison is not the promisor with respect to the "Compliance with Laws" provision, Con Edison *is* a party to the Service Contracts.  Moreover, insofar as CESG's promise to comply with applicable laws extends to Admin. Code § 19-142, that promise assists Con Edison in complying with its own legal obligations, under Admin. Code § 19-142 and/or Con Edison's alleged agreements with the City, to pay prevailing wages.[25]  The Court cannot say at this juncture that under these

---

[25] The same is true of Argani's promise to comply with all applicable laws in the Argani Contract. (*See* Dkt. No. 106-3 at § 24).  In fact, in its Service Contracts with CESG, Con Edison required that the agreements CESG entered into with Subcontractors "shall provide for [CESG] the same rights against the subcontractor as Con Edison . . . ha[s] hereunder against [CESG] and shall expressly state that such provisions shall also be for the benefit of Con Edison[.]"  (SAC Ex. A at 16, § 16(B)).  In accordance with that requirement, Con Edison is expressly designated as "a third party

circumstances there is no viable legal basis, whether under the joint employer doctrine or otherwise, upon which Plaintiffs could seek to hold Con Edison liable for a breach of the promise in the Service Contracts or the Argani Contract to pay prevailing wages.

Accordingly, the Court recommends that Plaintiffs be given leave to file their proposed TAC to assert a theory of liability for prevailing wages under *Santana* as against both Con Edison and the CESG Defendants. Con Edison may, if it wishes, move to dismiss that theory of liability after the TAC is filed. However, any such motion practice will not delay this action from proceeding to an Initial Case Management Conference and into discovery.

### E. Plaintiffs Have Adequately Alleged Standing for Their NYLL §§ 195(1) and 195(3) Claims

Finally, the CESG Defendants move to dismiss Counts Six and Seven, Plaintiffs' claims for notice of pay rate and inaccurate wage statements under NYLL § 195(1) and NYLL § 195(3). (CESG Br. at 13-15).

"Under Labor Law § 195(1)(a), New York employers must provide an employee . . . [with] a written wage notice of the employer's business information and the employee's salary information, including the employee's rate and frequency of pay." *Davis v. Carlo's Bakery 42nd & 8th LLC*, 78 Misc. 3d 362, 365, 180 N.Y.S.3d 805, 807 (Sup. Ct. N.Y. Cnty. 2022) (citing 12 N.Y.C.R.R. § 146-2.2). In addition, under Labor Law § 195(3), New York employers must provide "a

---

beneficiary" in the Argani Contract. (Dkt. No. 106-3 at § 43). Thus, Con Edison appears to have the right to enforce the "Compliance with Laws" provision of the Argani Contract against Argani.

statement with each paycheck" that includes information about, *inter alia*, "'the dates of work covered by that payment'" and "'rate or rates of pay and basis thereof, whether paid by the hour'" or otherwise. *Id.* at 808 (quoting NYLL § 195(3)). Employees may recover up to $5,000 in statutory damages for violations of the wage notice requirements, *see* NYLL § 198(1-b), and up to $5,000 for violations of the wage statement requirements, *see* NYLL § 198(1-d). *Castillo v. Isakov*, No. 22 Civ. 6888 (LJL) (GS), 2024 WL 5323851, at *10 (S.D.N.Y. Dec. 27, 2024), *R&R adopted*, 2025 WL 89048 (S.D.N.Y. Jan. 14, 2025).

The Second Circuit held last year that, to establish standing to bring NYLL § 195 claims, "a plaintiff cannot rely on technical violations of the Labor Law but must allege actual injuries suffered as a result of the alleged . . . wage notice and wage statement violations." *Guthrie v. Rainbow Fencing Inc.*, 113 F.4th 300, 305 (2d Cir. 2024) (cleaned up). Plaintiffs must establish "*some* causal connection between the lack of accurate notices and [a] downstream harm." *Id.* at 308 (emphasis added). "[U]nless the plaintiff-employee can show that he or she would have undertaken . . . advocacy and plausibly would have avoided some actual harm or obtained some actual benefit if accurate notices had been provided, the plaintiff-employee has not established a concrete injury-in-fact sufficient to confer standing to seek statutory damages under § 195." *Id.*

Standing may be established by a plaintiff-employee under *Guthrie* when, for example, "inaccurate or noncompliant notices prevented the employee from obtaining full payment of wages in a timely fashion. But the plaintiff-employee

cannot 'assume[ ] [t]his conclusion without analysis' or rely on 'speculation and conjecture.'  Rather, the plaintiff-employee must support a plausible 'theory as to *how* he was injured by [the] defendants' failure to provide the required documents.'" *Id.* at 309 (alteration in original) (quoting *Quieju v. La Jugueria Inc.*, No. 23 Civ. 264 (BMC), 2023 WL 3073518, at *2 (E.D.N.Y. Apr. 25, 2023)).

Relying on *Guthrie*, the CESG Defendants argue that Plaintiffs lack standing to assert claims under NYLL § 195-1(a) and NYLL § 195-3.  (CESG Br. 13-15).  They argue that the SAC merely provides "vague" and "conclusory" allegations "based on nothing more than speculation" that Plaintiffs might have avoided harm had they been provided NYLL-compliant wage notices and wage statements.  (*Id.* at 14).  They further argue that if Plaintiffs' allegations are deemed sufficient, "[a]ny plaintiff alleging both a generic wage notice violation and wage statement violation could allege the same exact 'injury'."  (*Id.*).  Such "boilerplate" allegations, the CESG Defendants contend, fail to plead an injury-in-fact that satisfies the *Guthrie* standard.  (*Id.*).

The Court disagrees.  Plaintiffs have explicitly and plausibly pled a causal connection between the alleged violations of the NYLL's requirements and injuries they have suffered as a result.  Plaintiffs allege that the CESG Defendants "never provided Plaintiffs or any other Employees with Notices of Pay Rate" or with "accurate wage statements with each payment of wages."  (SAC ¶¶ 341-42).  Plaintiffs further allege that, as a result, Plaintiffs "have been prevented from, *inter alia*: (i) realizing their true hours worked; (ii) realizing that they were underpaid;

and (iii) taking appropriate action to obtain the payments due to them." (*Id.* ¶ 346; *see also id.* ¶¶ 375, 433, 472, 506, 532, 566, 605, 641, 745, 755 (relevant allegations as to each named Plaintiff)).

Post-*Guthrie*, courts in this Circuit have regularly found similar allegations sufficient to plead standing. *See, e.g.*, *Velasquez v. Anoop*, No. 24 Civ. 4795 (JLR), 2025 WL 2105894, at *4 (S.D.N.Y. July 28, 2025) ("'[I]n the wake of *Guthrie*, courts in this Circuit are in agreement that a plaintiff has standing if he or she plausibly alleges that, by failing to provide the required wage statements, the employer was able to hide its violations of wage and hour laws and thus prevent the employee from determining and seeking payment for the precise amount of his unpaid wages.'" (quoting *Cortez v. Brand Name 99 Cents & Up Corp.*, No. 24 Civ. 5262 (LJL), 2025 WL 1251297, at *6 (S.D.N.Y. Apr. 30, 2025)) (cleaned up)); *accord, e.g.*, *Schiller-Egles v. PromptCare Cos., Inc.*, No. 23 Civ. 6790 (KMK), 2025 WL 904331, at *10 (S.D.N.Y. Mar. 25, 2025); *Freeland v. Findlay's Tall Timbers Distrib. Ctr., LLC*, No. 22 Civ. 6415, 2024 WL 4652251, at *2 (W.D.N.Y. Nov. 1, 2024); *Castillo v. Hollis Delicatessen Corp.*, No. 22 Civ. 5476, 2024 WL 4107258, at *1 n.1 (E.D.N.Y. Sept. 6, 2024). Indeed, in a pre-*Guthrie* decision, this Court approved allegations of harm identical to those alleged by Plaintiffs here. *See Lipstein v. 20X Hospitality, LLC*, No. 22 Civ. 4812 (JLR), 2023 WL 6124048, at *9 (S.D.N.Y. Sept. 19, 2023) (Rochon, J.). Subsequently, in a post-*Guthrie* decision, the Court reaffirmed the sufficiency of such allegations at the motion to dismiss stage—where the court is "obliged to draw all reasonable inferences in favor of the plaintiff-employee"—while

cautioning that plaintiffs will need to proffer "specific facts" to prevail on summary judgment. *Martinenko v. 212 Steakhouse, Inc.*, No. 22 Civ. 518 (JLR), 2024 WL 4275286, at *10 (S.D.N.Y. Sept. 24, 2024) (Rochon, J.) (discussing *Lipstein*).[26]

Undoubtedly, such a causal connection can be alleged in many cases to satisfy the *Guthrie* injury-in-fact standard. But contrary to the CESG Defendants' suggestion (*see* CESG Br. at 14), that is not an argument for tightening the standard. Rather, it is a function of the fact that such injuries are the natural and common consequence of violations of the wage notice and statement requirements when employees are underpaid. The commonality of these pleadings across cases does not render them violative of the standards for establishing standing at the motion to dismiss stage. As such, the undersigned recommends that the CESG Defendants' motion to dismiss Counts Six and Seven be denied.

---

[26] The CESG Defendants' citation of *McLaughlin v. Onanafe Mgmt. Sols. LLC*, No. 22 Civ. 6792 (PKC) (MMH), 2024 WL 4184485, at *11 (E.D.N.Y. Sept. 14, 2024), *R&R adopted*, 2024 WL 4355485 (E.D.N.Y. Sept. 30, 2024) (*see* CESG Br. at 14), is unavailing. *McLaughlin* did not involve a motion to dismiss. Rather, the court in *McLaughlin* denied entry of a default judgment despite the plaintiff's allegations that he did not receive proper wage statements because he presented "no other evidence of any injury that resulted from [defendant's] failure to provide wage notices and accurate wage statements." *McLaughlin*, 2024 WL 4184485, at *11.

**CONCLUSION**

For the reasons stated above, the undersigned respectfully recommends that Con Edison's motion to dismiss be **DENIED**; that the CESG Defendants' motion to dismiss be **GRANTED** with respect to Plaintiffs' prevailing wage claims and otherwise be **DENIED**; and that Plaintiffs' motion for leave to file a TAC be **GRANTED**.

Dated:      August 8, 2025
            New York, New York

_____
GARY STEIN
United States Magistrate Judge

**NOTICE OF PROCEDURE FOR FILING OBJECTIONS
TO THIS REPORT AND RECOMMENDATION**

Pursuant to 28 U.S.C. Section 636(b)(1) and Fed. R. Civ. P. 72(b), the parties shall have fourteen days, inclusive of weekends and holidays, from the date of this Report and Recommendation to file written objections thereto. *See also* Fed. R. Civ. 6(a), (b), and (d). Any such objections shall be filed with the Clerk of Court. Any request for an extension of time to file objections must be directed to the Honorable Jennifer L. Rochon. A failure to file timely objections will preclude appellate review. *See Thomas v. Arn*, 474 U.S. 140 (1985); *Wagner v. Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C.*, 596 F.3d 84, 92 (2d Cir. 2010).